UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

SEOW LIN, Individually and On Behalf of All : 
Others Similarly Situated,

                 :      Civil Action No. 08 CV 00242 (CM)

               Plaintiff,

                 :      **ELECTRONICALLY FILED**

      -against-

                 :      **DECLARATION OF NEIL A. STEINER**

INTERACTIVE BROKERS GROUP, INC. and : 
THOMAS PETERFFY,

                 :

            Defendants.

------------------------------------ X

Neil A. Steiner declares under penalty of perjury:

1.     I am a member of the law firm Dechert LLP, counsel to defendants Interactive Brokers Group, Inc. ("IB") and Thomas Peterffy (collectively, "Defendants") in the above-captioned action, and am duly admitted to practice before this Court and the courts of the State of New York. I make this Declaration in support of Defendants' Motion to Dismiss the Amended Complaint.

2.     Annexed hereto as Exhibit A is a copy of the Amended Complaint.

3.     Annexed hereto as Exhibit B is a copy of IB's Registration Statement filed with the Securities and Exchange Commission on May 3, 2007.

4.     Annexed hereto as Exhibit C is a chart listing IB's stock price for period May 4, 2007 through April 24, 2008.

Dated: New York, New York
        April 25, 2008

                                    Neil A. Steiner

13170244

Jack G. Fruchter (JF-8435)
Lawrence D. Levit (LL-9507)
Ximena R. Skovron (XS-3397)
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, New York 10119
Telephone: (212) 279-5050
Facsimile: (212) 279-3655

**Lead Counsel for Lead Plaintiff**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ZEESHAN NAYAB, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>INTERACTIVE BROKERS GROUP, INC., and THOMAS PETERFFY,<br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 08 CV 00242 (CM)<br><br>**ECF Case**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Seow Lin ("Plaintiff") makes the following allegations, except as to allegations specifically pertaining to Plaintiff and her counsel, based upon the investigation undertaken by Plaintiff's counsel (which investigation included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about Interactive Brokers Group, Inc. ("Interactive Brokers" or the "Company"), press releases and other public statements issued by the Company, and media reports about the Company) and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.     This is a federal securities class action brought on behalf of a class consisting of all persons other than defendants and certain others, who purchased the common stock ("Common Stock") of Interactive Brokers pursuant to and/or traceable to the Company's initial public offering ("IPO" or "Offering") on or about May 4, 2007 through July 5, 2007, seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

**JURISDICTION AND VENUE**

2.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].

3.     This Court has jurisdiction of this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §1331.

4.     Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §1391(b).  The acts and conduct complained of herein occurred in substantial part in this District and the IPO was marketed in this District.

5.     In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NASDAQ Global Select Market.

**PARTIES**

6.     Lead Plaintiff Seow Lin purchased shares of Interactive Brokers Common Stock, as set forth in the certification attached hereto and incorporated herein by reference, pursuant to and traceable to the Company's IPO, and was damaged thereby.

7.    Defendant Interactive Brokers together with its subsidiaries, operates as an automated global electronic market maker and broker. It specializes in routing orders, as well as in executing and processing trades in securities, futures, and foreign exchange instruments as a member of approximately 60 electronic exchanges and trading venues worldwide. The Company provides direct access trade execution and clearing services to institutional and professional traders for various electronically traded products, including options, futures, stocks, ETF's, forex, and bonds. It offers continuous bid and offer quotations on approximately 324,000 securities and futures products listed on electronic exchanges. The Company is headquartered in Greenwich, Connecticut. Its stock is listed on the NASDAQ Global Select Market.

8.    Defendant Thomas Peterffy ("Peterffy" and together with Interactive Brokers, "Defendants") was, at all relevant times, the founder, Chief Executive Officer, Chairman of the Board and President of Interactive Brokers and in that capacity signed the Registration Statement, as that term is defined below.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

9.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of herself and all other persons who purchased the Common Stock of Interactive Brokers pursuant to and/or traceable to the Company's IPO (the "Class"). Excluded from the Class are Defendants herein, members of the immediate family of the individual defendant and any person, firm, trust, corporation, or other entity in which the Defendants have a controlling interest or which is related to or affiliated with the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

-3-

10.    The members of the Class are so numerous that joinder of all members is impracticable.  Interactive Brokers sold 40 million shares of Common Stock in the IPO.  The precise number of Class members is unknown to Plaintiff at this time but is believed to be in the thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of Interactive Brokers or its transfer agent or the underwriters to the IPO.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

11.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

12.    Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff's and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

13.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

-4-

14.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether the Prospectus and Registration Statement (defined below) issued by Interactive Brokers to the investing public in connection with the IPO negligently omitted and/or misrepresented material facts about Interactive Brokers and its business; and

(c)    The extent of injuries sustained by members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

15.    Defendant Interactive Brokers operates as an automated global electronic market maker and broker. It specializes in routing orders, as well as in executing and processing trades in securities, futures, and foreign exchange instruments as a member of approximately 60 electronic exchanges and trading venues worldwide. On or about May 3, 2007, Interactive Brokers filed with the Securities and Exchange Commission (the "SEC") a Form S-1/A Registration Statement (the "Registration Statement") for the IPO.

16.    On or about May 4, 2007, the Prospectus (the "Prospectus") with respect to the IPO, which forms part of the Registration Statement, was filed with the SEC, whereby 40 million shares of Interactive Brokers' Common Stock priced at $30.01 per share were sold to the public

and began trading. The IPO closed on or about May 9, 2007, raising more than $1.2 billion for the Company.

17.     The IPO was a Dutch Auction handled by WR Hambrecht & Co., LLC, HSBC Securities (USA) Inc., Fox-Pitt, Kelton Incorporated, Sandler O'Neill + Partners, L.P. and E*Trade Securities, LLC as placement agents (or underwriters). The Offering method differed from the traditional firm commitment underwritten public offerings. The Offering price and allocation of shares was to be determined primarily by an auction process conducted by the lead banks and other securities dealers who participated in the Offering. Additionally, the placement agents were not required to sell any specific number or dollar amount of shares of common stock but rather agreed to use their best efforts to obtain potential purchasers for the shares.

18.     The Registration Statement and Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

19.     The Registration Statement and Prospectus positively described the Company's "competitive strengths" stating in pertinent part as follows:

> *Proprietary technology.* We view ourselves primarily as a technology company. Since our inception in 1977, we have focused on developing proprietary software to automate broker-dealer functions. Our proprietary technology makes us a low cost provider of market making and brokerage services. It also enables us to make markets profitably in financial instruments (e.g., equity options, futures, index options and equities) worldwide with low spreads between bid and offer prices, while at the same time providing our customers with the ability to effect trades at execution and commission costs that are among the lowest in the industry.

20.     The Registration Statement and Prospectus further positively described Interactive Brokers' function as a "market maker" stating in pertinent part as follows:

*Real-time risk management.* We operate as a market maker, not an investor. Therefore, our ability to generate profits is generally a function of transaction volume on electronic exchanges rather than volatility or the direction of price movements. We seek to calculate quotes a few seconds ahead of the market and execute small trades at a tiny but favorable differential as a result. Our proprietary pricing model continuously evaluates and monitors the risks inherent in our portfolio, assimilates market data and reevaluates the outstanding quotes in our entire portfolio each second. In our electronic brokerage business, our entire credit management process is automated, including real-time margin calls and automatic liquidation. This automated system enables us to maximize profits while minimizing losses typically associated with manual risk management.

21.    Additionally, the Registration Statement and Prospectus touted the Company's proprietary technology as reevaluating the Company's portfolio every second, rebalancing the portfolio continually throughout the trading day and thus minimizing the risk to the Company's portfolio "at all times:"

We conduct our market making business through our Timber Hill subsidiaries. As one of the largest market makers on many of the world's leading exchanges, we provide liquidity by offering competitively tight bid/offer spreads over a broad base of approximately 353,000 tradable, exchange-listed products. As principal, we commit our own capital and derive revenues or incur losses from the difference between the price paid when securities are bought (or sold) and the price received when those securities are sold (or bought). Because we provide continuous bid and offer quotations and we are continuously both buying and selling quoted securities, we may have either a long or a short position in a particular product at a given point in time. Our entire portfolio is evaluated each second and continuously rebalanced throughout the trading day, thus minimizing the risk of our portfolio at all times. This real-time rebalancing of our portfolio, together with our real-time proprietary risk management system, enables us to curtail risk and to be profitable in both up-market and down-market scenarios.

22.    The statements referenced above in ¶¶ 19, 20, and 21 were materially false and misleading because they failed to disclose that the Company's proprietary technology had failed to prevent material losses totaling $25 million resulting from options market machinations in advance of corporate announcements during the period ending March 31, 2007, although such

machinations involved multiple transactions executed in different securities. The Company did not supplement or otherwise correct this omission of material fact from the Registration Statement.

23.     When the Company's earnings, including the shortfall caused by the options market activities, was announced by the Company in a May 29, 2007 press release, the Company's share price declined by 6%. Thus, as *The Street.com* observed:

> Interactive Brokers Group (IBKR - Cramer's Take - Stockpickr) was among the many trailing financial stocks, sliding 6% to $25.91 after the Connecticut firm said first-quarter income was only $12.4 million, or 31 cents a share (pro forma), compared with year-ago income of 34 cents a share.

24.     After the close of trading on July 5, 2007, Interactive Brokers filed a Form 8-K with the SEC reporting its preliminary financial results for the second quarter of 2007, the period ending June 30, 2007. Among other things, the Company reported that it had incurred another loss relating to options trading, this time a $37 million loss beginning on or about May 3, 2007 and continuing on the following few trading days through the close of the IPO on May 9, 2007, as a result of options trading machinations on the German electronic stock market (the "Altana Options").

25.     Following the Company's filing of its Form 8-K, the price of Interactive Brokers Common Stock dropped from a closing price of $27.11 per share on July 5, 2007 to a closing price of $24.97 per share on July 6, 2007 on extremely heavy trading volume. The stock price continued to decline and closed at $23.49 per share on July 10, 2007.

26.     The decline in the price of the Company's Common Stock occurred notwithstanding the fact that an entity affiliated with Chief Executive Officer and Company

founder Defendant Peterffy bought the claims from the Company for $37 million, hoping to

recover the losses after the investigation being conducted in Germany.  According to a

*Forbes.com* article on July 6, 2007, Peterffy's "reassurance wasn't enough to convince investors,

who dumped Interactive Brokers in after-hours trading . . ."

27.     The extent of the losses suffered by the Company as a consequence of the options

market machinations in advance of certain corporate announcements was only disclosed to be up

to a $25 million loss in a Form 10-Q filed on June 15, 2007:

> During the three months ended March 31, 2007, income before income tax in our
> market making segment decreased 21% compared with the three months ended
> March 31, 2006, reflecting lower trading gains.  The decrease in trading gains was
> driven in part by heavy options activity in advance of certain corporate
> announcements which had a negative impact on our profits.

28.     Subsequently, on July 6, 2007, articles in both *TheStreet.com* and *Forbes.com*

attributed the entire $25 million in losses suffered by the Company to those options market

activities.  For example, *Forbes.com* stated:

> In recent months, there have been some days when demand for certain call
> options  - - a bet that the underlying stock is about to rise in price - -
> overwhelmed supply, and Interactive Brokers had to meet the demand. That
> meant it was on the hook to lose if the stock shot up, which happened a few times
> during the first quarter, hence the $25 million shortfall.

29.     With respect to the losses resulting from trading in the Altana Options, those

losses were more completely described in a Form 10-Q for the period ended June 30, 2007,

which was filed with the SEC on August 13, 2007, as follows:

> On May 3, 2007, Altana AG, a stock in which we are a Registered Market
> Maker, declared a special cash dividend of EUR 33.00, which amounted to about
> 74% of the company's value. On Deutsche Boerse AG's XETRA trading system,

closing stock prices are determined by a day's end auction. At the closing auction, approximately 31 million Altana shares, which amounted to 44% of the true float, traded at an artificial price that was approximately 25% below the regular trading session's final price ex-dividend. We believe that this artificial price was set by buyers and sellers who unlawfully colluded to manipulate Altana's options prices.

The closing auction price of the Altana shares was used by the EUREX to calculate a new set of contract parameters for the outstanding options. Since Altana's closing stock price was artificial, its dependent option strike prices and contract multiplier were also artificial and not calculated to reflect values corresponding to the change in the value of the underlying stock. Accordingly, on May 4, 2007 and thereafter, our market making options positions were affected by the artificial closing price of May 3 and were mis-priced. As a result of this manipulation, we suffered a position loss over the ensuing trading days amounting to approximately $37 million. Other Altana market makers also suffered substantial losses as a result of this manipulation, and we have reported this manipulation to, and met with, the German Federal Financial Supervisory Authority, the BaFin, which has undertaken an official investigation of the matter.

30.     The statements referenced in ¶¶ 19, 20 and 21 were materially false and misleading because they failed to disclose that the Company's proprietary technology had failed to prevent material losses, which totaled $37 million, resulting from trading machinations in connection with the Altana Options beginning on or around May 3, 2007 and continuing on the following few trading days. The Company did not supplement or otherwise correct this omission of material fact from the Registration Statement.

31.     The Registration Statement and Prospectus described losses that might be incurred from the Company's market making activities as follows:

**We may incur material trading losses from our market making activities.**

A substantial portion of our revenues and operating profits is derived from our trading as principal in our role as a market maker and specialist. We may incur trading losses relating to these activities since each primarily involves the purchase or sale of securities for our own account. In any period, we may incur trading losses in a significant number of securities for a variety of reasons including:

-10-

- ■    price changes in securities;

- ■    lack of liquidity in securities in which we have positions; and

- ■    the required performance of our market making and specialist obligations.

These risks may limit or restrict our ability to either resell securities we purchased or to repurchase securities we sold. In addition, we may experience difficulty borrowing securities to make delivery to purchasers to whom we sold short, or lenders from whom we have borrowed. From time to time, we have large position concentrations in securities of a single issuer or issuers engaged in a specific industry or traded in a particular market. Such a concentration could result in higher trading losses than would occur if our positions and activities were less concentrated.

In our role as a market maker, we attempt to derive a profit from the difference between the prices at which we buy and sell, or sell and buy, securities. However, competitive forces often require us to match the quotes other market makers display and to hold varying amounts of securities in inventory. By having to maintain inventory positions, we are subjected to a high degree of risk. We cannot assure you that we will be able to manage such risk successfully or that we will not experience significant losses from such activities, which could have a material adverse effect on our business, financial condition and operating results.

32.    The Registration Statement and Prospectus described possible losses in connection with the Company's pricing model as follows:

**We may incur losses in our market making activities in the event of failures of our proprietary pricing model.**

The success of our market making business is substantially dependent on the accuracy of our proprietary pricing mathematical model, which continuously evaluates and monitors the risks inherent in our portfolio, assimilates market data and reevaluates our outstanding quotes each second. Our model is designed to automatically rebalance our positions throughout the trading day to manage risk exposures on our positions in options, futures and the underlying securities. In the event of a flaw in our pricing model and/or a failure in the related software, our pricing model may lead to unexpected and/or unprofitable trades, which may result in material trading losses.

33.    The statements referenced above in paragraphs ¶¶ 30 and 31 were materially false and misleading because although they mentioned losses the Company *might* incur, they failed to disclose that the Company already *had* suffered material trading losses totaling $25 million in the period ending March 31, 2007 as a result of options market machinations, and was incurring losses that totaled $37 million as a result of machinations in connection with trading of the Altana Options.

34.    Although the Company disclosed an adverse event concerning options trading activities in the Registration Statement, the Company failed to disclose the extent of these activities and the Company's inability to prevent material losses from such activities. Moreover, the Company failed to disclose material information concerning the extent of the impact of the options market activities on the Company's earnings, stating only that the Company was unable to provide details concerning such activities, that such activity typically occurs prior to corporate announcements, and that such activities had "adversely impacted" its operations:

> Unexpectedly heavy options trading activity in advance of certain corporate announcements adversely impacted our market making operations during the quarter ended March 31, 2007. While we are unable to detail the exact frequency of these announcements in a given period and their exact financial impact on our results of operations, in the quarter ended March 31, 2007, there were a greater number of surprise or unexpected announcements preceded by heavy options activity than in prior quarters. Heavy options activity typically occurs in advance of certain surprise or unexpected corporate announcements, especially where there is a leakage of information and when regularly scheduled annual or quarterly corporate announcements materially deviate from expectations.

35.    In fact, options market activity that resulted in $25 million in losses during the first quarter of 2007, the trading machinations in connection with the Altana Options and the financial impact on the Company of such activities was known or reasonably should have been

known to the Company at the time of the IPO through its proprietary technology, which continuously evaluated the Company's portfolio on a daily basis, and because earnings for the first quarter ended March 31, 2007 were known or reasonably should have been known to the Company at the time of the IPO. Just three weeks after the IPO, in a Form 8-K filed on May 29, 2007, the Company reported that its market making segment income had decreased by 20.6% as a consequence of the options market machinations that occurred prior to certain corporate announcements during the first quarter:

> Market making segment income before income tax decreased 20.9% in the quarter ended March 31, 2007 compared with the same period in 2006, reflecting lower trading gains driven in part by heavy options activity in advance of certain corporate announcements, which had a negative impact on profits.

36.    Under applicable SEC rules and regulations governing the preparation of the Registration Statement and Prospectus, the Registration Statement was required to disclose that the Company had suffered material losses in the amount of $25 million as a result of these options market machinations, that such losses contributed to a 20.9% decrease in the Company's market making income, that the Company was suffering additional material losses which amounted to $37 million as a result of trading machinations in connection with the Altana Options, and that the Company's safeguards in place to protect itself against such activities, which were impacting the Company's continuing operations, had proven inadequate. The Registration Statement failed to contain any such disclosures. The Company did not supplement or otherwise correct these omissions of material fact.

## COUNT I

### Violation of Section 11 of the Securities Act Against Defendant Interactive Brokers and Defendant Peterffy

37.    Plaintiff repeats and realleges each and every allegation contained above.

38.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class.

39.    The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

40.    Interactive Brokers is the registrant for the IPO.  Interactive Brokers is responsible for the contents and dissemination of the Registration Statement and Prospectus.

41.    As issuer of the shares, Interactive Brokers is strictly liable to Plaintiff and the Class for the misstatements and omissions.

42.    Defendant Interactive Brokers did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true and without omissions of any material facts and were not misleading.

43.    Defendant Peterffy signed the Registration Statement and served as an executive and/or director of Interactive Brokers at all times relevant to this action and is, therefore, liable for the materially false and misleading statements made in, and omissions from, the Registration Statement.  Defendant Peterffy did not make a reasonable investigation or possess reasonable grounds for the belief that each of the statements made in the Registration Statement and the Prospectus were true, did not omit any material facts and were not materially misleading.

-2-

44.    By reasons of the conduct herein alleged, Defendants violated Section 11 of the Securities Act.

45.    Plaintiff and the other members of the Class acquired Interactive Brokers shares pursuant to or traceable to the Registration Statement.

46.    Plaintiff and the Class have sustained damages and are entitled to recover those damages from Defendants.  The value of Interactive Brokers declined substantially subsequent to and due to Defendants' violations.

47.    At the times they purchased shares of Interactive Brokers Common Stock, Plaintiff and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to July 5, 2007.  Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff filed this Complaint.  Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this Complaint.

## COUNT II
## Violations of Section 12(a)(2) of the Securities Act Against Defendant Interactive Brokers

48.    Plaintiff repeats and realleges each and every allegation contained above.

49.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2).

50.    By means of the Registration Statement and Prospectus, and by using means and instruments of transportation and communication in interstate commerce and of the mails, Defendant Interactive Brokers through the Offering sold Interactive Brokers Common Stock to Plaintiff and other members of the Class.

51.    Defendant Interactive Brokers successfully solicited these purchases motivated, at least in part, by its own financial interest. Defendant Interactive Brokers reviewed and participated in drafting the Prospectus. Through ensuring the successful completion of the Offering, Defendant Interactive Brokers received more than $1.1 billion.

52.    The Registration Statement, at the time it became effective, contained material misrepresentations of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement.

53.    Defendant Interactive Brokers owed to the purchasers of Interactive Brokers Common Stock, including Plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. Defendant knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the IPO materials as set forth above.

54.    Plaintiff and the other members of the Class purchased or otherwise acquired Interactive Brokers Common Stock pursuant to the defective Registration Statement and Prospectus. Plaintiff and the members of the Class did not know, nor in the exercise of

-4-

reasonable diligence could have known, of the untruths and omissions contained in the Registration Statement and Prospectus.

55.     Plaintiff, individually and representatively, hereby offers to tender to the Company those securities which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.

56.     By reason of the conduct alleged herein, Defendant violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff and members of the Class who hold Interactive Brokers securities purchased in or traceable to the IPO have the right to rescind and recover the consideration paid for their Interactive Brokers securities and hereby elect to rescind and tender their Interactive Brokers securities to Defendant Interactive Brokers.  Plaintiff and Class members who have sold their Interactive Brokers securities are entitled to rescessionary damages.

## COUNT III
### Violation of Section 15 of the Securities Act Against Defendant Peterffy

57.     Plaintiff repeats and realleges each and every allegation made above as if fully set forth herein.

58.     This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against Defendant Peterffy.  It is brought within one year after discovery of the untrue statements and omissions and within three years from the time the securities were offered to the public.

59.     Defendant Peterffy had the power through his position as a senior executive and/or director of Interactive Brokers and his relationships with other directors and senior executives of the Company to, and did, exercise control over the Company with respect to its violations of the Securities Act alleged in Count I and Count II above.  Defendant Peterffy did not make a reasonable investigation or possess reasonable grounds for the belief that the statements made in the Registration Statement and/or Prospectus were true, did not omit any material facts and were not materially misleading.  As a result, Defendant Peterffy is liable as a control person for Defendant Interactive Brokers' primary violations of the Securities Act alleged in this Complaint and is liable to the same extent as Interactive Brokers, pursuant to Section 15 of the Securities Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for judgment as follows:

(a)     declaring this action to be a proper class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying the Plaintiff as the class representative and appointing her counsel as Class Counsel;

(b)     awarding Plaintiff and the other members of the Class compensatory damages against Defendants, jointly and severally, together with interest thereon;

(c)     awarding Plaintiff and the other members of the Class rescission on Count II to the extent they still held Interactive Brokers' Common Stock, or if they sold,

-6-

awarding rescissory damages in accordance with Section 12(a)(2) of the

Securities Act from Defendant Interactive Brokers;

(d)    awarding Plaintiff and the other members of the Class their costs and expenses of

this litigation, including reasonable attorneys' fees, accountants' fees and experts'

fees and other costs and disbursements; and

(e)    awarding Plaintiff and the other members of the Class such other and further

relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:    March 24, 2008         **ABRAHAM, FRUCHTER & TWERSKY, LLP**

Jack G. Fruchter (JF-8435)
Lawrence D. Levit (LL-9507)
Ximena R. Skovron (XS-3397)
One Penn Plaza, Suite 2805
New York, New York 10119
Telephone: (212) 279-5050
Facsimile: (212) 279-3655

**Lead Counsel for Lead Plaintiff**

## CERTIFICATION OF SEOW LIN
## IN SUPPORT OF CLASS ACTION COMPLAINT

Seow Lin ("plaintiff") declares, as to the claims asserted under the federal securities laws,

that:

1.    Plaintiff has reviewed the complaint prepared by counsel in the above-captioned case and

has authorized the filing of a similar complaint or to otherwise add my name as a lead

plaintiff in these proceedings.

2.    Plaintiff did not purchase the security that is the subject of the complaint at the direction

of plaintiff's counsel or in order to participate in any private action arising under the

federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including

providing testimony at deposition and trial, if necessary.

4.    During the proposed Class Period, plaintiff executed the following transactions in the

stock of Interactive Brokers Group, Inc.  See Attachment A.

5.    In the past three years, plaintiff has not served, nor sought to serve, as a representative

party on behalf of a class in an action filed under the federal securities laws.

6.    Plaintiff will not accept payment for serving as a representative party on behalf of a class

beyond plaintiff's pro rata share of any recovery, except such reasonable costs and

expenses (including lost wages) directly relating to the representation of the Class as

ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 30th

day of January, 2008

Seow Lin

ATTACHMENT A

| Date | Action | Amount | Price |
|------|--------|--------|-------|
| 05/09/2007 | Buy | 8,500 | 30.01 |
| 08/24/2007 | Sell | 1,000 | 24.7 |
| 08/24/2007 | Sell | 3,000 | 25.2 |

Jack G. Fruchter (JF-8435)
Lawrence D. Levit (LL-9507)
Ximena R. Skovron (XS-3397)
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, New York 10119
Telephone: (212) 279-5050
Facsimile: (212) 279-3655

**Lead Counsel for Lead Plaintiff**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ZEESHAN NAYAB, Individually and On Behalf of All Others Similarly Situated, ) ) ) | No. 08 CV 00242 (CM) |
| Plaintiff, ) ) ) | **ECF Case** |
| vs. ) ) | **CERTIFICATE OF SERVICE** |
| INTERACTIVE BROKERS GROUP, INC., and THOMAS PETERFFY, ) ) Defendants. ) ) | |

The undersigned certifies that the following statement is true under penalty of perjury:

I am a member of the Bars of the State of New York and the United States District Court for the Southern District of New York. I am an associate with the firm of Abraham, Fruchter & Twersky, LLP, attorneys for Lead Plaintiff in this action. I am over the age of 18 and not a party to this action. I hereby certify under penalty of perjury that on March 24, 2008 I caused the attached AMENDED CLASS ACTION COMPLAINT as well as the AMENDED SUMMONS to be served by postage pre-paid First Class US Mail on the following:

Andrew J. Levander, Esq.
Neil A. Steiner, Esq.
Dechert LLP
30 Rockefeller Plaza
New York, NY 10112-2200

*Attorneys for Defendant Interactive Brokers Group, Inc.*

Ximena R. Skovron

As filed with the Securities and Exchange Commission on May 3, 2007.

Registration No. 333-138955

# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

**AMENDMENT NO. 5
TO**

# FORM S-1

**REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933**

# INTERACTIVE BROKERS GROUP, INC.

(Exact name of registrant as specified in its charter)

| DELAWARE | 6211 | 30-0390693 |
|---|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(Primary Standard Industrial Classification Code Number)* | *(I.R.S. Employer Identification No.)* |

**ONE PICKWICK PLAZA
GREENWICH, CONNECTICUT 06830
(203) 618-5800**
(Address, including zip code, and telephone number, including
area code, of registrant's principal executive offices)

**THOMAS PETERFFY
CHAIRMAN, CHIEF EXECUTIVE OFFICER AND PRESIDENT
ONE PICKWICK PLAZA
GREENWICH, CONNECTICUT 06830
(203) 618-5800**
(Name, address including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| ADAM M. FOX, ESQ. | GREGORY A. FERNICOLA, ESQ. |
|---|---|
| DECHERT LLP | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP |
| 30 ROCKEFELLER PLAZA | FOUR TIMES SQUARE |
| NEW YORK, NEW YORK 10112 | NEW YORK, NEW YORK 10036 |
| (212) 698-3500 | (212) 735-3000 |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box.     ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.     ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.     ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.     ☐

---

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Proposed Maximum Aggregate Offering Price(1) | Amount of Registration Fee(1) |
|---|---|---|
| Class A Common Stock, $0.01 par value per share | $1,000,500,000(2) | $30,715.35(3) |

(1)     Estimated pursuant to Rule 457(o) under the Securities Act of 1933, as amended, solely for purposes of calculating the registration fee, which was previously paid in connection with the initial filing of this Registration Statement.

(2)     An additional indeterminate amount of securities are being registered hereby to be offered solely for market making purposes by an affiliate of the registrant. Pursuant to Rule 457(q) under the Securities Act, no additional filing fee is required.

(3)     Previously paid.

**The registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to such Section 8(a), may determine.**

**EXPLANATORY NOTE**

    This Registration Statement contains a prospectus relating to the initial public offering of shares of Class A common stock, par value $0.01 per share ("common stock"), of Interactive Brokers Group, Inc. (the "Company"). This Registration Statement also contains a prospectus relating to sales of common stock by W.R. Hambrecht + Co., LLC in connection with market making transactions. The complete prospectus relating to the initial public offering of common stock (the "IPO Prospectus") follows immediately after this Explanatory Note. Following the IPO Prospectus are certain pages of the prospectus relating solely to such market making transactions (together with the remainder of the prospectus as modified as indicated below, the "Market Making Prospectus"), including an alternate front and back cover page and alternate sections entitled "Use of Proceeds" and "Plan of Distribution." Each of such alternate pages has been marked "Alternate Page for Market Making Prospectus." The Market Making Prospectus will not include the information in the IPO Prospectus Summary under the heading "The Offering," or the sections of the IPO Prospectus entitled "Risk Factors—Risks Related to the Auction Process of This Offering," "Risk Factors—Other Risks Related to This Offering—You Will Experience Immediate and Substantial Dilution," "Dilution," "Use of Proceeds" and "Plan of Distribution." All other sections of the IPO Prospectus are to be used in the Market Making Prospectus. A complete version of each of the IPO Prospectus and the Market Making Prospectus will be filed with the Securities and Exchange Commission in accordance with Rule 424 under the Securities Act.

34,500,000 Shares of Class A Common Stock

**The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.**



Interactive Brokers Group, Inc.

This is our initial public offering of Class A common stock, which we refer to as common stock, and no public market currently exists for our shares. We are offering 34,500,000 shares of common stock. We expect that the public offering price will be between $27.00 and $31.00 per share.

| THE OFFERING | PER SHARE | TOTAL |
|---|---|---|
| Public Offering Price | $ | $ |
| Placement Agency Fee | $ | $ |
| Proceeds to Interactive Brokers Group, Inc. | $ | $ |

**OpenIPO® and Best Efforts Offering:** The method of distribution being used by the placement agents in this offering differs somewhat from that traditionally employed in firm commitment underwritten public offerings. In particular, the public offering price and allocation of shares will be determined primarily by an auction process conducted by the placement agents and other securities dealers participating in this offering. In addition, the placement agents are not required to sell any specific number or dollar amount of shares of common stock but have agreed to use their best efforts to procure potential purchasers for the shares of common stock offered pursuant to this prospectus. A more detailed description of the OpenIPO process and the best efforts offering is included in the "Plan of Distribution" section of this prospectus beginning on page 157.

The placement agents expect to deliver shares of common stock to purchasers on                    , 2007. Proposed NASDAQ Global Select Market Symbol: IBKR

**This offering involves substantial risk. You should purchase shares only if you can afford a complete loss of your investment. See "Risk Factors" beginning on page 19.**

**Neither the Securities Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

WR HAMBRECHT + CO                                                    HSBC ⟨X⟩

# FOX-PITT,KELTON

## SANDLER O'NEILL + PARTNERS, L.P.

## E✳TRADE Securities

A Participating Dealer:



The date of this prospectus is                    , 2007

# TABLE OF CONTENTS

| | |
|---|---|
| Prospectus Summary | 1 |
| Summary Historical and Pro Forma Consolidated Financial Data | 16 |
| Risk Factors | 19 |
| Forward Looking Statements | 36 |
| The Recapitalization Transactions and Our Organizational Structure | 37 |
| Use of Proceeds | 43 |
| Dividend Policy | 44 |
| Capitalization | 46 |
| Dilution | 48 |
| Unaudited Pro Forma Consolidated Financial Data | 50 |
| Selected Historical Consolidated Financial Data | 56 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 58 |
| Business | 87 |
| Management | 124 |
| Principal Stockholders | 135 |
| Transactions With Related Persons, Promoters and Certain Control Persons | 137 |
| Description of Capital Stock | 143 |
| Description of Indebtedness | 149 |
| Shares Eligible for Future Sale | 152 |
| Material United States Federal Tax Consequences to Non-United States Holders | 154 |
| Plan of Distribution | 157 |
| Legal Matters | 171 |
| Experts | 171 |
| Where You Can Find More Information | 171 |
| Index to Financial Statements | F-1 |

**You should rely only on the information contained in this document or to which we have referred you. We have not authorized anyone to provide you with information that is different. This document may only be used where it is legal to sell these securities. The information in this document may only be accurate as of the date of this document.**

i

# INFORMATION ABOUT THIS PROSPECTUS

This is the initial public offering of Class A common stock of Interactive Brokers Group, Inc., which will be the holding company for the public's ownership in IBG LLC, as defined below. Unless the context otherwise requires, the terms:

- "We," "us," "our" and similar terms, as well as references to "IBG" and the "Company," refer to Interactive Brokers Group, Inc., a newly formed Delaware corporation and, as applicable, our consolidated subsidiaries (including IBG LLC) after giving effect to the recapitalization transactions to be completed prior to the consummation of this offering as described in this summary under the heading "Recapitalization and Organizational Structure" and as described elsewhere in this prospectus in the section entitled "The Recapitalization Transactions and Our Organizational Structure."

- "IBG LLC" refers to IBG LLC (formerly known as Interactive Brokers Group LLC), a Connecticut limited liability company that is the current holding company for our businesses and in which IBG will acquire a controlling interest upon completion of this offering by becoming managing member.

- "Common stock" refers to the Class A common stock of Interactive Brokers Group, Inc.

Unless we state otherwise, the information in this prospectus gives effect to the recapitalization transactions described elsewhere in this prospectus in the section entitled "The Recapitalization Transactions and Our Organizational Structure." Some of the statements in this summary are forward-looking statements. For more information, see the section entitled "Forward-Looking Statements."

---

Industry and market data used throughout this prospectus were obtained through our research, surveys and studies conducted by third parties and industry and general publications. Data used throughout this prospectus regarding global equity options volume excludes volume of the Kospi 200 Index Option Contract, which is an index of 200 stocks on the Korea Exchange.

ii

# PROSPECTUS SUMMARY

*The following summary highlights information contained elsewhere in this prospectus and is qualified in its entirety by more detailed information and consolidated financial statements included elsewhere in this prospectus. Because it is a summary, it does not contain all of the information that you should consider before investing in our common stock. You should read this prospectus carefully, including the section entitled "Risk Factors" and the consolidated financial statements and the related notes to those statements included elsewhere in this prospectus.*

## Our Business

We are an automated global electronic market maker and broker specializing in routing orders and executing and processing trades in securities, futures and foreign exchange instruments as a member of more than 60 electronic exchanges and trading venues around the world. We are a holding company and, after completion of this offering, our primary assets will be our ownership of approximately 8.7% of the membership interests of IBG LLC, the current holding company for our businesses, and our controlling interest and related contractual rights as the sole managing member of IBG LLC. The remaining approximately 91.3% of IBG LLC membership interests after completion of this offering will be held by IBG Holdings LLC, a holding company that will be owned by the current members of IBG LLC, including our founder, chairman and chief executive officer, Thomas Peterffy, and his affiliates.

Since our inception in 1977, we have focused on developing proprietary software to automate broker-dealer functions. The advent of electronic exchanges in the last 16 years has provided us with the opportunity to integrate our software with an increasing number of exchanges and trading venues into one automatically functioning, computerized platform that requires minimal human intervention. Our high degree of automation enabled us to process on average 518,000 trades per day with an average of 505 employees in 2006. During 2005 and 2006, we generated pretax income in each period at an annual rate of more than $1 million per employee. Publicly available data regarding other companies in the securities and commodities industry indicate that this level of productivity is unparalleled for our industry. Automation has allowed us to become one of the lowest cost providers of broker-dealer services and to increase significantly the volume of trades we handle.

According to data compiled by the Futures Industry Association (FIA) based on data received from exchanges worldwide, in 2006, we accounted for approximately 15.9% of exchange-listed equity options volume traded worldwide and approximately 18.7% of exchange-listed equity options volume traded on those markets in which we actively trade. We were the number one liquidity provider on each of the three largest U.S. options exchanges (the Chicago Board Options Exchange, the International Securities Exchange and the Philadelphia Stock Exchange) during 2006, according to rankings provided by these exchanges. We serve sophisticated and active customers worldwide, including institutional investors, financial advisors, brokers and individuals. Our business includes two subsidiaries registered as broker-dealers under Section 15 of the Securities Exchange Act of 1934, namely Timber Hill LLC, our U.S. market making subsidiary, and Interactive Brokers LLC, our U.S. electronic brokerage subsidiary.

As a market maker, we provide continuous bid and offer quotations on approximately 357,000 securities and futures products listed on electronic exchanges around the world. Our quotes are driven by proprietary mathematical models that assimilate market data and reevaluate our outstanding quotes each second. Unlike firms that trade over-the-counter (OTC) derivative products, it is our business to create liquidity and transparency on electronic exchanges. Our profits have been principally a function of transaction volume on electronic exchanges rather than volatility or the direction of price movements.

1

As a direct market access broker, we serve the customers of both traditional brokers and prime brokers. We provide our customers with an advanced order management, trade execution and portfolio management platform at a very low cost. Our customers can simultaneously access different financial markets worldwide and trade across multiple asset classes (stocks, options, futures, foreign exchange (forex) and bonds) denominated in ten different currencies, on one screen, from a single account based in any major currency. Our large bank and broker-dealer customers may "white label" our trading interface (i.e., make our trading interface available to their customers without referencing our name), or can select from among our modular functionalities, such as order routing, trade reporting or clearing, on specific products or exchanges where they may not have up-to-date technology, in order to offer to their customers a complete global range of services and products. Our most successful module is the dynamic IB SmartRouting$^{SM}$ process, which manages orders among several stock and the six U.S. options exchanges by providing efficient executions for customers and enables brokers to meet their best execution regulatory requirements.

During 2006, our customers transacted an average of approximately 196,000 daily average revenue trades, which is a measurement of revenue-generating trades and referred to as DARTs.

Our proprietary technology is the key to our success. We built our business on the belief that a fully computerized market making system that could integrate pricing and risk exposure information quickly and continuously would enable us to make markets profitably in many different financial instruments simultaneously. We believe that integrating our system with electronic exchanges and market centers results in transparency, liquidity and efficiencies of scale. Together with the IB SmartRouting$^{SM}$ system and our low commissions, this reduces overall transaction costs to our customers and, in turn, increases our transaction volume and profits. Over the past 29 years, we have developed an integrated trading system and communications network and have positioned our company as an efficient conduit for the global flow of risk capital across asset and product classes on electronic exchanges around the world, permitting us to have one of the lowest cost structures in the industry. We believe that developing, maintaining and continuing to enhance our proprietary technology provides us and our customers with the competitive advantage of being able to adapt quickly to the changing environment of our industry and to take advantage of opportunities presented by new exchanges, products or regulatory changes before our competitors.

Our electronic market making and brokerage businesses are complementary. Both benefit from our combined scale and volume, as well as from our proprietary technology. Our brokerage customers benefit from the technology and market structure expertise developed in our market making business. The expense of developing and maintaining our unique technology, clearing, settlement, banking and regulatory structure required by any specific exchange or market center is shared by both of our businesses. This, in turn, enables us to provide lower transaction costs to our customers than our competitors, whether they use our services as market maker, broker or both. In addition, we believe we gain a competitive advantage by applying the software features we have developed for a specific product or market to newly-introduced products and markets over others who may have less automated facilities in one or both of our businesses or who operate only in a subset of the exchanges and market centers on which we operate.

For the year ended December 31, 2006, our total revenues were approximately $1.7 billion, as compared to approximately $1.1 billion for the year ended December 31, 2005. Our income before income taxes was approximately $761.6 million for the year ended December 31, 2006 and approximately $569.3 million for the year ended December 31, 2005. Our market making activities represented 77% of total revenues for the year ended December 31, 2006 and 79% of total revenues for the year ended December 31, 2005. The foregoing financial information may not be representative of our

2

results of operations as an independent public company or indicative of our results of operations for any future period.

## Our Competitive Strengths

- *Proprietary technology.* We view ourselves primarily as a technology company. Since our inception in 1977, we have focused on developing proprietary software to automate broker-dealer functions. We believe that our early and continuous investment in technology, as well as our overall technological capabilities, provide us with a significant advantage over our competition by enabling us to make markets profitably in financial instruments (e.g., equity options, futures, index options and equities) worldwide with low spreads between bid and offer prices, while at the same time providing our customers with the ability to effect trades at execution and commission costs that are among the lowest in the industry.

- *Experienced management team.* Our key employees have significant experience and expertise in the application of technology to the financial services industry and, as significant equity owners of IBG LLC, are heavily committed to our success. Our senior management team has an average of 17 years tenure with us.

- *Low cost structure.* Our focus on automation and expense management practices enables us to operate with a low cost structure. Our technology allows us to be one of the lowest cost providers of liquidity to the global, exchange-listed equity and derivatives markets and global execution and clearing services for professional traders and institutions.

- *Complementary lines of business.* We leverage the combined volume from our market making and brokerage operations and our proprietary technology in each of these operations to route orders effectively and to process trades on exchanges around the world, resulting in consistently best executions and one of the lowest unit costs in the industry. Our combined market making and brokerage systems offer access to exchanges and market centers that are typically not cost feasible for brokerage-only businesses.

- *Diversified revenue base.* We earn trading gains from our market making business as well as commissions and fee income from our electronic brokerage business. We generate revenues from millions of relatively small and diversified individual trades. In 2006, we executed approximately 130 million trades. These trades are broadly distributed among approximately 357,000 tradable, exchange-listed products on more than 60 exchanges and market centers in 23 countries.

- *Established business franchise.* We have been in operation for nearly three decades. In 2005, Institutional Investor ranked us the 16th largest U.S. securities firm, as measured by consolidated capital. We are members of more than 60 major exchanges and market centers around the world. Many of these memberships are franchises that are difficult to obtain. As of December 31, 2006, we held market maker licenses on 31 exchanges in 15 countries, and have preferential rights and obligations as designated specialists or market makers in approximately 1,100 classes of options in the United States.

- *Real-time risk management.* We operate as a market maker, not an investor. Therefore, our ability to generate profits is generally a function of transaction volume on electronic exchanges rather than volatility or the direction of price movements. We seek to calculate quotes a few seconds ahead of the market and execute small trades at a tiny but favorable

3

differential. As a result, Our proprietary pricing model continuously evaluates and monitors the risks inherent in our portfolio, assimilates market data and reevaluates the outstanding quotes in our entire portfolio each second. In our electronic brokerage business, our entire credit management process is automated, including real-time margin calls and automatic liquidation. This automated system enables us to maximize profits while minimizing losses typically associated with manual risk management.

- *Strong financial position.* We maintain a conservative capital structure with a large equity capital base, highly liquid assets and low financial leverage. As of December 31, 2006, we had equity capital of approximately $2.8 billion and our capital base grew organically at a CAGR of approximately 25% from December 2001 to December 2006. As of December 31, 2006, we held $32.1 billion in total assets, approximately 99% of which were highly liquid and readily convertible to cash, and our long-term debt-to-equity ratio was 11%.

## Our Strategies

- *Capitalize on industry growth trends.* We are well positioned in the financial markets as an automated global electronic market maker and broker. Electronic trading volume in equities, listed options, futures and forex has been growing rapidly. We expect this trend to continue due to the lower cost, the ability to execute quickly without errors, the anonymity associated with electronic trading and the increased knowledge of investors of the advantages of various forms of exchange-listed derivative products. Our market share in these products has also been growing. For example, our global market share in exchange-listed options has grown from 10.6% in 2004 to 13.8% in 2005 to 15.9% in 2006. We intend to continue to use automation to drive trading volume and increase our market share and revenues in these growing industries.

- *Drive increased trading volume through our low cost structure.* We intend to increase our trading volume by building on our leading position as a low cost provider of market making and brokerage services. Our scale, technology and operational efficiencies provide an advantage in delivering services at a low cost. Due to our high degree of automation, our net profit margins are generally higher than those of our competitors. We intend to maintain or increase our market share by decreasing bid/offer spreads in the market for our customers and to capture more order flow as we compete for market making and customer trades. We will continue to seek to refine our systems and processes to enhance our ability to deliver our services at a low cost.

- *Expand into new markets.* We intend to enter electronic markets where we are not currently operating as a market maker or broker, including markets in new geographic locations. We will also continue to expand our market making and brokerage services for new security types as they become available. We seek to enter new markets or product classes in which the execution of transactions can be automated using our technology. Our entry into new markets starts as a software development project. Once we have built the appropriate technology interface for that business and have satisfactorily integrated it with our automated platform, we then provide access to these new markets for our customers. We believe that our technology development skills enable us to enter new markets and add new products more rapidly and efficiently than can our competitors.

- *Market our customer offerings to new classes of customers.* We market ourselves to our customers based on our position as a low cost provider as well as our superior execution,

4

trading and account management tools. We intend to focus on obtaining new classes of customers such as broker-dealers, hedge funds and conventional money managers, whom we believe will find our "plug and play" systems much more efficient than maintaining their own systems. We intend to add new products, new analytical tools, new order types and new trading features that are in demand by our customers and potential customers. For example, new Securities and Exchange Commission (SEC) regulations that allow brokers to calculate customer margin requirements based on a portfolio risk-based model are expected to give us an opportunity to attract large trading accounts from hedge funds and other professional traders who currently use the services of prime brokers. We believe that these new portfolio margining rules will decrease the importance of providing leverage to hedge funds beyond those permitted by current U.S. rules (which we do not do) and will allow us to compete on the basis of price, where we are a low price provider of services. We will also continue our efforts to popularize OneChicago, an all-electronic securities futures exchange, and single stock futures (SSF) products as a vehicle to reduce financing costs for hedge funds, thus providing another growth opportunity.

## Our Challenges and Risks

Our business is subject to challenges and risks, including those summarized below and those more fully described in "Risk Factors" beginning on page 19. You should carefully consider the information contained in "Risk Factors" before you decide to invest in our common stock.

- ***Dependence on proprietary technology.*** Our success is highly dependent on our sophisticated proprietary technology that has taken many years to develop and has been available only to us. If our technology were to become available to our competitors, or if our competitors adopt or develop similar or more advanced technologies, our operating results may be adversely affected. Further, we may not be able to keep up with rapid changes in technology, evolving industry standards and changing trading systems, practices and techniques to remain competitive in our industry.

- ***Dependence on market conditions.*** Changes in the global financial markets, global economic conditions and political events affect levels of trading volumes in ways that we may not be able to predict. A slowdown and subsequent stagnation in trading volume in the global financial markets, or a systemic problem affecting any financial market, could have a material adverse effect on our revenues and profitability.

- ***Risks associated with computer system failures.*** The success of our business depends on the efficient and uninterrupted operations of our computer and communications hardware and software systems. Our service has occasionally experienced system interruptions in the past due to various reasons, some of which were beyond our control. We expect to experience occasional system interruptions from time to time in the future, which may have an adverse effect on our business.

- ***Industry regulation and litigation.*** Our industry is heavily regulated, and noncompliance with applicable laws or regulations could adversely affect our business due to resulting fines and censures, suspension or expulsion from a certain jurisdiction or market or the revocation of licenses. Further, our industry faces substantial litigation risks, and we may face legal liability and damage to our professional reputation if our services are not regarded as satisfactory.

5

- *Industry expansion or consolidation.* The introduction of new markets or products including quoting options in penny pricing, or new market structures or the elimination of existing markets by merger or otherwise may adversely affect our margins, profitability and business.

- *Fluctuations of revenues and profitability.* Our revenues and operating results have been subject to fluctuation based primarily on the willingness of competitors to trade more aggressively by decreasing their bid/offer spreads and thereby assuming more risk in order to acquire market share. Variations in trading levels caused by unpredictable market trends may cause our revenues and operating results to vary significantly from period to period, and period to period comparisons of our revenues and operating results may not be meaningful.

- *Control by a principal stockholder.* Upon completion of this offering, Thomas Peterffy, our founder, chairman and chief executive officer, will have approximately 91.3% of the voting power of our company and accordingly will be able to control the outcome of substantially all matters submitted to our stockholders for approval. This concentration in ownership may prevent transactions such as a change of control and a business combination that could otherwise be beneficial to those who purchase the shares in this offering or result in actions that such individuals may oppose.

- *Dependence on key employees.* Our key executives have substantial experience and have made significant contributions to our business, and our continued success is dependent upon the retention of our key management executives, as well as the services provided by our staff of trading system, technology and programming specialists and a number of other key managerial, marketing, planning, financial, technical and operations personnel. The loss of such key personnel could have a material adverse effect on our business.

## Recapitalization and Organizational Structure

*Overview*

We have historically conducted our business through a limited liability company structure. In order to have a Delaware corporation as the issuer for our initial public offering, immediately prior to and immediately following the consummation of this offering, IBG LLC and its members will consummate a series of transactions, which we collectively refer to as the "Recapitalization." We are a holding company and, after completion of this offering, our primary assets will be our ownership of approximately 8.7% of the membership interests of IBG LLC, the current holding company for our businesses, and our controlling interest and related contractual rights as the sole managing member of IBG LLC. The remaining approximately 91.3% of IBG LLC membership interests after completion of this offering will be held by IBG Holdings LLC, a holding company that will be owned by the current members of IBG LLC. All IBG LLC membership interests will be identical and have the same rights. Thus, after completion of this offering, there will be two holding companies owning interests in IBG LLC (namely, IBG and IBG Holdings LLC, owning approximately 8.7% and 91.3%, respectively, of the IBG LLC membership interests), thereby allowing both public stockholders (through IBG) and existing members (through IBG Holdings LLC) to have economic interests in our businesses.

IBG Holdings LLC will own all of our Class B common stock, which will have voting power of our company proportionate to the extent of IBG Holdings LLC's ownership of IBG LLC-initially approximately 91.3%. Through his ownership of the voting membership interests in IBG Holdings LLC, Thomas Peterffy will initially be able to exercise such voting power in his sole discretion.

6

Our only business following this offering will be to act as the sole managing member of IBG LLC, and, as such, we will operate and control all of the business and affairs of IBG LLC and will be able to consolidate IBG LLC's financial results into our financial statements. IBG Holdings LLC's ownership interests in IBG LLC will be accounted for as a minority interest in our consolidated financial results after this offering. Net profits, net losses and distributions of IBG LLC, including with respect to all management fees, incentive income and investment income earned by IBG LLC, will be allocated and made to its members pro rata in accordance with the respective percentages of their membership interests in IBG LLC. Accordingly, net profits and net losses of IBG LLC will initially be allocated, and distributions by IBG LLC will initially be made, approximately 8.7% to us and approximately 91.3% to IBG Holdings LLC. Subject to the availability of net cash flow at the IBG LLC level, IBG LLC shall distribute to us and to IBG Holdings LLC tax distributions using a tax rate no less than the actual combined federal, state and local income tax rates applicable to our allocable shares of taxable income and net capital gain. Assuming IBG LLC makes distributions to its members in any given year, the determination to pay dividends, if any, to our Class A stockholders will be made by our board of directors, and distributions to the IBG Holdings LLC members will be made in accordance with the IBG Holdings LLC Operating Agreement, a copy of which is filed as an exhibit to the registration statement of which this prospectus forms a part. Because our board of directors may or may not determine to pay dividends at the IBG level, our Class A stockholders may not necessarily receive dividend distributions relating to our pro rata share of the management fees, incentive income, investment income and other income earned by IBG LLC, even if IBG LLC makes such distributions to us.

7

The graphic below illustrates our anticipated ownership structure immediately following completion of this offering. The graphic below does not display the subsidiaries of IBG LLC. For more information, please read the section entitled "The Recapitalization Transactions and Our Organizational Structure" located elsewhere in this prospectus.



8

We intend to use the net proceeds from our sale of shares of common stock in this offering to purchase membership interests representing approximately 8.6% of the outstanding membership interests in IBG LLC from IBG Holdings LLC. The number of membership interests in IBG LLC to be purchased from IBG Holdings LLC and the purchase price for each membership interest corresponds to the number of shares of common stock to be sold in this offering and the offering price, less the placement agency fee. IBG Holdings LLC will, in turn, use such sale proceeds to redeem, on a pro rata basis, IBG Holdings LLC membership interests held by its members, who include 66 of our employees (including the executive officers set forth in the table below). See "Use of Proceeds." The following is a listing of our directors and executive officers expected to receive net proceeds from this offering, together with the percentage and dollar amount of net proceeds to be received from this offering and the amount of cash distributions received from IBG LLC in 2006 and 2007 to date.

| Name | Title | % of Net Proceeds to be Received | Dollar Amount of Net Proceeds Received From This Offering | 2006 Distributions | 2007 Distributions |
|------|-------|------|------|------|------|
| | | | (in millions) | | |
| Thomas Peterffy | Chairman of the Board of Directors, Chief Executive Officer and President | 84.5784% $ | 830.3 $ | 139.3 $ | 134.1 |
| Earl H. Nemser | Vice Chairman and Director | 1.1895% $ | 11.7 $ | 1.9 $ | 1.8 |
| Paul J. Brody | Chief Financial Officer, Treasurer, Secretary and Director | 1.2509% $ | 12.3 $ | 2.1 $ | 2.0 |
| Thomas A. Frank | Executive Vice President and Chief Information Officer | 3.1498% $ | 30.9 $ | 5.2 $ | 5.0 |
| Milan Galik | Senior Vice President, Software Development and Director | 1.3687% $ | 13.4 $ | 2.2 $ | 2.1 |
| Directors and executive officers as a group | | 91.5373% $ | 898.6 $ | 150.7 $ | 145.0 |

The aggregate consideration for the purchase of membership interests in IBG LLC from IBG Holdings LLC also includes an amount equal to 85% of the tax savings realized by us by reason of the increase in the tax basis of the assets of IBG LLC arising out of this transaction, as described under "—Exchange and Redemption of Membership Interests" below. Based on the assumptions set forth in calculating the deferred tax asset of $207.8 million arising from the acquisition of the membership interests in IBG LLC with the net proceeds of this offering, as set forth in footnote (1) to the "Notes to the Unaudited Pro Forma Consolidated Statement of Financial Condition" on page 54 of this prospectus, Messrs. Peterffy, Nemser, Brody, Frank, Galik and our directors and officers as a group could potentially receive aggregate payments of $159.0 million, $2.2 million, $1.2 million, $3.9 million, $1.3 million and $167.6 million, respectively, over 15 years based on these tax savings. Using these same assumptions, and assuming all remaining membership interests in IBG LLC are acquired by us over time, Messrs. Peterffy, Nemser, Brody, Frank, Galik and our directors and officers as a group could potentially receive additional aggregate payments of $1,684.4 million, $23.7 million, $12.5 million, $41.8 million, $13.6 million, and $1,776.0 million, respectively, over a period of 15 years from the dates of acquisition of the membership interests based on these tax savings.

No additional IBG LLC or IBG Holdings LLC membership interests will be granted to directors or executive officers in connection with this offering.

9

*Voting of Common Stock and Class B Common Stock*

Each share of our common stock will entitle its holder to one vote per share. Immediately after this offering, our Class B common stock will have approximately 91.3% of the voting power of our company, which percentage will decrease proportionately over time to the extent that IBG Holdings LLC owns a smaller percentage of IBG LLC. While our Class B common stock will be owned by IBG Holdings LLC, will initially be able to exercise control over all matters requiring the approval of our stockholders, including the election of our director and the approval of significant corporate transactions.

*Exchange and Redemption of Membership Interests*

In connection with the Recapitalization, the current members of IBG LLC will receive membership interests in IBG Holdings LLC. The membership interests in IBG Holdings LLC will not be directly exchangeable for shares of our common stock. Instead, the membership interests will become redeemable at various times over the next eight years following this offering at the option of the holder. The redemption price for the membership interests will depend on the manner in which the payment is made to IBG Holdings LLC.

The primary manner in which the redemption price will be paid is by selling shares of our common stock to the public and using the gross proceeds from such sales, less underwriting discounts or commissions, to acquire an identical number of IBG LLC membership interests from IBG Holdings LLC. We have reserved for issuance 365.5 million shares of common stock, which is the aggregate number of shares of common stock expected to be issuable over time through such sales, assuming no anti-dilution adjustments based on combinations or divisions of our common stock. We would then expect IBG Holdings LLC to use the proceeds it receives from such sales to redeem an identical number of IBG Holdings LLC membership interest from the requesting holders. The annual registration and sale of shares of our common stock to satisfy redemption requests is described in greater detail under "Transactions with Related Persons, Promoters and Certain Control Persons—Exchange Agreement" and in our exchange agreement, a copy of which is filed as an exhibit to the registration statement of which this prospectus forms a part. The sales of our common stock and the application of the proceeds to acquire IBG LLC membership interests are expected to have a negligible effect on the existing holders of our common stock, as the holders of our common stock would then own a larger portion of IBG LLC. Such transactions will have the effect of diluting your percentage ownership in us. However, because we will acquire an increased percentage ownership in IBG LLC over time as a result of such transactions, such transactions should not impact your effective percentage ownership of the economics of the underlying IBG LLC business.

In some cases, IBG LLC may redeem IBG LLC membership interests from IBG Holdings LLC using cash on hand. The primary circumstance under which IBG LLC would use cash on hand would be if IBG LLC had, at a given point in time, a relative surplus of cash on hand and our board of directors were to determine that using cash on hand to effect redemptions of IBG LLC membership interests would be an optimal use of such funds in relation to alternative uses. The redemption price per membership interest would be equal to the 30-day average closing price of our common stock. The use of IBG LLC's cash to acquire IBG LLC membership interests is expected to have a dilutive effect on the existing holders of our common stock, as the price paid per membership interest is likely to be higher than IBG LLC's tangible book value per membership interest. See "The Recapitalization Transactions and Our Organizational Structure—Exchange and Redemption of Membership Interests."

Certain of the IBG Holdings LLC membership interests are subject to forfeiture in the event that the holder terminates employment with IBG LLC or its subsidiaries, other than as a result of death, permanent disability, approved retirement or termination without cause.

10

As the result of our acquisition from IBG Holdings LLC of an IBG LLC membership interest using the proceeds of a sale of our common stock into the public markets, we will receive not only an additional interest in IBG LLC but also, for federal income tax purposes, an adjustment to the federal income tax basis of the assets of IBG LLC underlying such additional interest. We intend to enter into a tax receivable agreement with IBG Holdings LLC that will provide for the payment by us to IBG Holdings LLC of 85% of the cash savings, if any, in U.S. federal, state and local income tax or franchise tax that we actually realize as a result of these increases in tax basis and of certain other tax benefits related to entering into the tax receivable agreement, including tax benefits attributable to payments under the tax receivable agreement. We will retain the remaining 15% of the tax benefits actually realized. See "Transactions with Related Persons, Promoters and Certain Control Persons—Tax Receivable Agreement."

IBG Holdings LLC, with the consent of Thomas Peterffy and our board of directors, has the right to cause the holders of IBG Holdings LLC membership interests to have all or a portion of their interests redeemed at any time following the first anniversary of this offering. Such redemptions would be financed in the same manner as the scheduled redemptions described above.

## Recent Developments

We are currently in the process of finalizing our combined financial results for the quarter ended March 31, 2007, and therefore final results are not yet available. We have provided below our preliminary expectations as to certain operating results for the quarter ended March 31, 2007. These preliminary expectations are presented on a combined basis after giving pro forma effect to the Recapitalization, the consummation of our initial public offering of shares of common stock and the application of the net proceeds from such offering to purchase IBG LLC membership interests from IBG Holdings LLC. These preliminary expectations are based upon management estimates and are subject to quarterly review procedures and final recommendations and adjustments. Our operating results for the quarter ended March 31, 2007 have not been reviewed or audited by our independent registered public accounting firm. Our independent public accounting firm will be reviewing our financial statements for the quarter ended March 31, 2007, and such review could result in changes to the preliminary expectations indicated below. However, we do not anticipate that any such changes would consist of material or unusual adverse events, material or unusual increases in liabilities, contingent or otherwise, material decreases in revenues or cash flows from operations, material increases in borrowings or failures to comply with applicable debt covenants, or result in a material impact upon our results of operations.

We expect total net revenues to be between $318 million and $338 million for the quarter ended March 31, 2007, compared to total net revenues of $1.25 billion and $329 million for the year ended December 31, 2006 and the quarter ended March 31, 2006, respectively. We expect income before income tax to be between $181 million and $192 million for the quarter ended March 31, 2007, compared to income before income tax of $762 million and $215 million for the year ended December 31, 2006 and the quarter ended March 31, 2006, respectively. We expect pro forma basic and diluted earnings per share both to be between $0.29 and $0.31 for the quarter ended March 31, 2007, compared to pro forma basic and diluted earnings per share of $1.21 for the year ended December 31, 2006 and $0.34 for the quarter ended March 31, 2006. Unexpectedly heavy options activity in advance of certain corporate announcements adversely impacted our market making operations during the quarter ended March 31, 2007. While we are unable to detail the exact frequency of these announcements in a given period and their exact financial impact on our results of operations, in the quarter ended March 31, 2007, there were a greater number of surprise or unexpected announcements preceded by heavy options activity than in prior quarters. Heavy options activity typically occurs in advance of certain surprise or unexpected corporate announcements, especially where there is a leakage of information and when regularly scheduled annual or quarterly corporate announcements materially deviate from expectations. This impacts us as, when we trade with others who have different information than we do, we may accumulate unfavorable positions preceding large price

11

movements in companies. To the extent the frequency or magnitude of these events increase, we would expect our losses from such events to increase correspondingly. See "Risk Factors—Risks Related to Our Business—We are exposed to losses due to lack of perfect information."

Operating results for the quarter ended March 31, 2007 are not necessarily indicative of the results to be expected in future periods.

## Company Information

IBG was incorporated in November 2006 as a Delaware corporation. Our principal executive offices are located at One Pickwick Plaza, Greenwich, Connecticut 06830 and our telephone number at that location is (203) 618-5800. Our corporate website address is http://www.interactivebrokers.com. The information contained on this website should not be considered part of this prospectus.

12

## The Offering

| | |
|---|---|
| Common stock offered | 34,500,000 shares of Class A common stock |
| Common stock outstanding after this offering | 34,703,401 shares of Class A common stock<br>100 shares of Class B common stock |
| Voting | Each share of our common stock will entitle its holder to one vote per share. |
| | Immediately after this offering, our Class B common stock will have approximately 91.3% of the voting power of our company, which percentage will decrease proportionately to the extent that IBG Holdings LLC owns a smaller percentage of IBG LLC. |
| | While our Class B common stock will be owned by IBG Holdings LLC, Thomas Peterffy, through his ownership of the voting membership interests in IBG Holdings LLC, will be able to exercise control over all matters requiring the approval of our stockholders, including the election of our directors, and the approval of significant corporate transactions. See "The Recapitalization Transactions and Our Organizational Structure---Voting." |
| Use of proceeds | We estimate that we will receive net proceeds from the sale of shares of our common stock in this offering of $981.7 million, assuming the shares are offered at $29.00 per share, which is the midpoint of the range set forth on the cover page of this prospectus, after deducting the placement agency fee and commissions payable by us. We intend to use the net proceeds to purchase 34,500,000 membership interests in IBG LLC from IBG Holdings LLC at a purchase price per interest equal to the per share offering price in this offering, less the placement agency fee per share. See "Use of Proceeds." |
| Exchange and Redemption of Membership Interests | In connection with the Recapitalization, the current members of IBG LLC will receive membership interests in IBG Holdings LLC. These membership interests will become redeemable at various times over the next eight years following this offering at the option of the holder. See "The Recapitalization Transactions and Our Organizational Structure—Exchange and Redemption of Membership Interests." |
| Proposed NASDAQ Global Select Market symbol | IBKR |

13

| | |
|---|---|
| Dividends | As a holding company for our equity interest in IBG LLC, we will be dependent upon the ability of IBG LLC to generate earnings and cash flows and distribute them to us so that we may pay any dividends to our stockholders. To the extent that we have excess cash, any future determination relating to our dividend policy will be made at the discretion of our board of directors. See "Dividend Policy." |
| Risk Factors | Investment in our common stock involves substantial risks. You should read this prospectus carefully, including the section entitled "Risk Factors" and the financial statements and the related notes to those statements included in this prospectus before investing in our common stock. |
| OpenIPO Process | This offering will be made through the OpenIPO process, in which the allocation of shares and the public offering price are primarily based on an auction in which prospective purchasers are required to bid for the shares. The OpenIPO process allows all qualified investors, whether individuals or institutions, to bid for shares. All successful bidders in the auction will pay the same price per share. |

- Bidders may submit bids through the placement agents or participating dealers.

- Potential investors may bid any price for the shares, including a price above or below the projected price range on the cover of this prospectus.

- Once the auction closes, the placement agents will determine the highest price that will sell all of the shares offered. This is the clearing price and is the maximum price at which the shares will be sold. The clearing price, and therefore the actual offering price, could be higher or lower than the projected price range on the cover of this prospectus.

- We may choose to sell shares at the auction-set clearing price or we may choose to sell the shares at a lower offering price, taking into account additional factors.

- Bidders that submit valid bids at or above the offering price will receive, at a minimum, a pro-rated amount of shares for which they bid.

The OpenIPO process is described in full under "Plan of Distribution" beginning on page 157.

14

- assumes that our common stock will be sold at $29.00 per share, which is the mid-point of the range set forth on the cover of this prospectus;

- gives effect to the Recapitalization described more fully elsewhere in this prospectus in the section entitled "The Recapitalization Transactions and Our Organizational Structure;"

- assumes that we have made no purchases of IBG LLC membership interests; and

- assumes that none of the approximately 203,401 shares of common stock issuable on the date of this offering upon investment of accumulated earnings on IBG LLC's Return on Investment Dollar Units and pursuant to our employee incentive plan have been issued. See "Management—Return on Investment Dollar Units" and "—Employee Incentive Plan."

15

# SUMMARY HISTORICAL AND PRO FORMA CONSOLIDATED FINANCIAL DATA

The following table sets forth the historical summary consolidated statement of income data for IBG LLC for all periods presented. The table also presents certain pro forma consolidated financial data for IBG LLC.

The summary historical consolidated financial data as of and for the years ended December 31, 2002, 2003, 2004, 2005 and 2006 have been derived from IBG LLC's audited consolidated financial statements. The audited consolidated statements of financial condition as of December 31, 2005 and 2006 and the audited consolidated statements of income for the years ended December 31, 2004, 2005, 2006 are included elsewhere in this prospectus. The audited consolidated statements of financial condition as of December 31, 2002, 2003 and 2004 and the audited consolidated statements of income for the years ended December 31, 2002 and 2003 are not included in this prospectus. The historical consolidated financial position and results of operations are not necessarily indicative of the financial position or results of operations as of any future date or for any future period.

The historical statements of financial condition and certain other statements of financial condition data reflect members' capital as redeemable members' interests, which is required under certain accounting guidance for public company reporting. Such guidance did not apply historically to IBG LLC as a private company.

The historical financial statements do not reflect what our results of operations and financial position would have been had we been a stand-alone, public company for the periods presented. Specifically, our historical results of operations do not give effect to:

- The Recapitalization, which is described in more detail elsewhere in this prospectus in the sections entitled "The Recapitalization Transactions and our Organizational Structure" and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

- U.S. corporate federal income taxes, since for all periods presented IBG LLC has operated in the United States as a limited liability company that was treated as a partnership for U.S. federal income tax purposes. As a result, IBG LLC has not been subject to U.S. federal income taxes on its income. Taxes related to income earned by partnerships represent obligations of the individual partners. Outside the United States, IBG LLC historically has operated principally through subsidiaries and has been subject to local income taxes. Income taxes shown on IBG LLC's historical consolidated statements of income are attributable to taxes incurred by these non-U.S. subsidiaries.

- Minority interest expense reflecting IBG Holdings LLC's ownership of approximately 91.3% of the IBG LLC membership interests outstanding immediately after this offering.

The unaudited pro forma consolidated financial data set forth below as of and for the year ended December 31, 2006 are derived from IBG LLC's historical consolidated financial statements and the unaudited pro forma consolidated financial statements included elsewhere in this prospectus and give pro forma effect to (1) the Recapitalization and (2) the consummation of this offering and our application of the net proceeds from this offering to purchase membership interests in IBG LLC from IBG Holdings LLC as though such transactions had occurred on January 1, 2006. The unaudited pro forma financial data are presented for informational purposes only and should not be considered indicative of actual results of operations that would have been achieved had the Recapitalization and this offering been consummated on the dates indicated and do not purport to be indicative of balance sheet data or results of operations as of any future date or for any future period.

16

You should read the following summary historical and pro forma consolidated financial data in conjunction with the sections entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Selected Historical Consolidated Financial Data," "Unaudited Pro Forma Consolidated Financial Data" and IBG LLC's historical consolidated financial statements and related notes included elsewhere in this prospectus. See also the section entitled "The Recapitalization Transactions and our Organizational Structure" included elsewhere in this prospectus.

| Consolidated Statement of Income Data: | Historical Data of IBG LLC for the Year Ended December 31, | | | | | IBG 2006 Pro Forma Data |
|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 | |
| | (in millions except share and per share data) | | | | | |
| **Revenues:** | | | | | | |
| Trading gains | $ 472.2 | $ 488.4 | $ 423.2 | $ 640.4 | $ 805.1 | $ 805.1 |
| Commissions and execution fees | 64.0 | 93.0 | 112.0 | 132.1 | 174.4 | 174.4 |
| Interest revenues | 55.2 | 59.3 | 79.5 | 273.2 | 672.1 | 672.1 |
| Other income | 7.5 | 10.4 | 7.0 | 53.4 | 85.2 | 85.2 |
| Total revenues | 598.9 | 651.1 | 621.7 | 1,099.1 | 1,736.8 | 1,736.8 |
| Interest expense | 41.6 | 46.1 | 57.7 | 170.0 | 484.4 | 484.4 |
| Total net revenues | 557.3 | 605.0 | 564.0 | 929.1 | 1,252.4 | 1,252.4 |
| **Non-interest expenses:** | | | | | | |
| Execution and clearing | 96.5 | 127.3 | 152.5 | 215.0 | 313.3 | 313.3 |
| Employee compensation and benefits | 64.7 | 73.5 | 79.1 | 90.2 | 110.1 | 110.1 |
| Occupancy, depreciation and amortization | 12.6 | 13.7 | 16.4 | 20.4 | 22.7 | 22.7 |
| Communications | 7.8 | 7.5 | 9.0 | 10.4 | 12.6 | 12.6 |
| General and administrative | 29.1 | 18.2 | 17.0 | 23.8 | 32.1 | 32.3 |
| Total non-interest expenses | 210.7 | 240.2 | 274.0 | 359.8 | 490.8 | 491.0 |
| Income before income tax | 346.6 | 364.8 | 290.0 | 569.3 | 761.6 | 761.4 |
| Income tax expense | 21.3 | 19.9 | 19.6 | 33.8 | 27.4 | 48.8 |
| Less—Minority interest | — | — | — | — | — | (670.8) |
| Net income | $ 325.3 | $ 344.9 | $ 270.4 | $ 535.5 | $ 734.2 | $ 41.8 |
| Basic earnings per share | | | | | | $ 1.21 |
| Diluted earnings per share | | | | | | $ 1.21 |
| Weighted average common shares outstanding: | | | | | | |
| Basic | | | | | | 34,500,100 |
| Diluted | | | | | | 401,244,371 |

17

**Consolidated Statement of Financial Condition Data:**

| | Actual | | Pro Forma | |
|---|---|---|---|---|
| | (in millions) | | | |
| Cash, cash equivalents and short-term investments[1] | $ | 3,878.8 | $ | 3,878.8 |
| Total assets[2] | $ | 32,080.5 | $ | 32,288.3 |
| Total liabilities, excluding redeemable members' interests | $ | 29,278.6 | $ | 32,016.0 |
| Redeemable members' interests[3]/stockholders' equity | $ | 2,801.9 | $ | 272.3 |

(1) Cash, cash equivalents and short-term investments represent cash and cash equivalents, cash and securities segregated under federal and other regulations, U.S. and foreign government obligations and securities purchased under agreements to resell.

(2) At December 31, 2006, approximately $32.0 billion, or 99.7%, of total assets were considered to be liquid and consisted primarily of marketable securities.

(3) Redeemable members' interests represent member interests in IBG LLC that are entitled to share in the consolidated profits and losses of IBG LLC. IBG LLC is a private entity owned by the members holding such member interests. As a private company, such amounts were classified historically as members' capital. For presentation purposes, IBG LLC has applied guidance within Emerging Issues Task Force (EITF) Topic D-98, *Classification and Measurement of Redeemable Securities* (EITF D-98) which requires securities or equity interests of a company whose redemption is outside the control of the company to be classified outside of permanent capital in the statement of financial condition. The member interests in IBG LLC can be redeemed by the members at book value at their option. Because this redemption right is deemed to be outside the control of the company, IBG LLC has reclassified all members' capital outside of permanent capital to redeemable members' interests in the consolidated statement of financial condition. Such reclassification was made to comply with EITF D-98 and the requirements of Regulation S-X of the Securities Exchange Act of 1934, as amended (Exchange Act). Redeemable members' interests include accumulated other comprehensive income.

18

**RISK FACTORS**

*Investing in our common stock involves a substantial risk. You should consider carefully the following risks and other information in this prospectus, including our consolidated financial statements and related notes, before you decide to purchase our common stock. If any of the following risks actually materializes, our business, financial condition and operating results could be adversely affected. As a result, the trading price of our common stock could decline and you could lose part or all of your investment.*

### Risks Related to Our Company Structure

**Control by Thomas Peterffy of a majority of the combined voting power of our common stock may give rise to conflicts of interests and could discourage a change of control that other stockholders may favor, which could negatively affect our stock price, and adversely affect stockholders in other ways.**

Upon consummation of this offering, Thomas Peterffy, our founder, chairman and chief executive officer, and his affiliates will beneficially own approximately 85% of the economic interests and all of the voting interests in IBG Holdings LLC, which owns all of our Class B common stock, representing approximately 91.3% of the combined voting power of all classes of our voting stock. As a result, Mr. Peterffy will have the ability to elect all of the members of our board of directors and thereby to control our management and affairs, including determinations with respect to acquisitions, dispositions, material expansions or contractions of our business, entry into new lines of business, borrowings, issuances of common stock or other securities, and the declaration and payment of dividends on our common stock. In addition, Mr. Peterffy will be able to determine the outcome of all matters requiring stockholder approval and will be able to cause or prevent a change of control of our company or a change in the composition of our board of directors and could preclude any unsolicited acquisition of our company. The concentration of ownership could discourage potential takeover attempts that other stockholders may favor and could deprive stockholders of an opportunity to receive a premium for their common stock as part of a sale of our company and this may adversely affect the market price of our common stock.

Moreover, because of Mr. Peterffy's substantial ownership, we are eligible and intend initially to be treated as a "controlled company" for purposes of the NASDAQ Marketplace Rules. As a result, we will not be required by NASDAQ to have a majority of independent directors or to maintain compensation and nominating and corporate governance committees composed entirely of independent directors to continue to list the shares of our common stock on The NASDAQ Global Select Market. We expect that our compensation committee will be comprised of Messrs. Thomas Peterffy (who will be the chairman of the compensation committee), Earl H. Nemser (our vice chairman) and Philip D. DeFeo (who is expected to join our board of directors as an independent director in connection with the closing of this offering). Mr. Peterffy's membership on the compensation committee may give rise to conflicts of interests in that Mr. Peterffy will be able to influence all matters relating to executive compensation, including his own compensation.

**The historical financial information of IBG LLC contained in this prospectus may not be representative of our results as an independent public company.**

Because IBG LLC has operated as a limited liability company that is treated as a partnership for U.S. federal income tax purposes, it historically has paid little or no taxes on profits in the United States. As a result, IBG LLC's provision for income taxes has not reflected U.S. corporate federal income taxes. Accordingly, IBG LLC's historical results of operations and financial position are not necessarily indicative of the consolidated results of our operations and financial position after completion of the recapitalization transactions as described in the section entitled "The Recapitalization Transactions and Our Organizational Structure." For additional information about past financial performance and the basis of

19

presentation of IBG LLC's historical financial statements, see "Selected Historical Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Unaudited Pro Forma Consolidated Financial Data" and the IBG LLC historical financial statements and related notes included elsewhere in this prospectus.

**The pro forma financial information in this prospectus may not permit you to predict our costs of operations, and the estimates and assumptions used in preparing our pro forma financial information may be materially different from our actual experience as a public company.**

In preparing the pro forma financial information in this prospectus, we have made adjustments to the historical financial information of IBG LLC based upon currently available information and upon assumptions that our management believes are reasonable in order to reflect, on a pro forma basis, the impact of the Recapitalization. Some of these adjustments include, among other items, a deduction and charge to earnings of estimated income taxes based on an estimated tax rate. These and other estimates and assumptions used in the calculation of the pro forma financial information in this prospectus may be materially different from our actual experience as a public company. The pro forma financial information in this prospectus does not purport to represent what our results of operations would actually have been had we operated as a public company during the periods presented, nor do the pro forma data give effect to any events other than those discussed in the unaudited pro forma financial information and related notes. See "Unaudited Pro Forma Consolidated Financial Data."

**Upon consummation of this offering, we will be dependent on IBG LLC to distribute cash to us in amounts sufficient to pay our tax liabilities and other expenses.**

We will be a holding company and, immediately after the consummation of the Recapitalization, our primary assets will be our approximately 8.7% equity interest in IBG LLC and our controlling interest and related rights as the sole managing member of IBG LLC and, as such, we will operate and control all of the business and affairs of IBG LLC and will be able to consolidate IBG LLC's financial results into our financial statements. We will have no independent means of generating revenues. IBG LLC will be treated as a partnership for U.S. federal income tax purposes and, as such, will not itself be subject to U.S. federal income tax. Instead, its taxable income will be allocated on a pro rata basis to IBG Holdings LLC and us. Accordingly, we will incur income taxes on our proportionate share of any net taxable income of IBG LLC, and also will incur expenses related to our operations. We intend to cause IBG LLC to distribute cash to its members in amounts at least equal to that necessary to cover their tax liabilities, if any, with respect to the earnings of IBG LLC. To the extent we need funds to pay such taxes, or for any other purpose, and IBG LLC is unable to provide such funds, it could have a material adverse effect on our business, financial condition or results of operations.

**We will be required to pay IBG Holdings LLC for the benefit relating to any additional tax depreciation or amortization deductions we may claim as a result of the tax basis step-up our subsidiaries receive in connection with this offering and related transactions.**

In connection with this offering, we will purchase interests in IBG LLC from IBG Holdings LLC for cash. In addition, IBG LLC membership interests held by IBG Holdings LLC may be sold in the future to us and financed by our issuances of shares of our common stock. The initial purchase will, and the subsequent purchases may, result in increases in the tax basis of the tangible and intangible assets of IBG LLC and its subsidiaries that otherwise would not have been available. Such increase will be approximately equal to the amount by which our stock price at the time of the purchase exceeds the income tax basis of the assets of IBG LLC underlying the IBG LLC interests acquired by us. These increases in tax basis will result in increased deductions in computing our taxable income and resulting tax savings for us generally over the 15 year period commencing with the initial purchase. We have agreed to pay 85% of these tax savings, if any, to IBG Holdings LLC as they are realized as additional

20

consideration for the IBG LLC interests that we acquire. See "Transactions with Related Persons, Promoters and Certain Control Persons—Tax Receivable Agreement."

At the time of the closing of this offering, the increase in the tax basis attributable to our interest in IBG LLC, assuming an initial offering price of $29.00 per share of common stock (the midpoint of the range of initial public offering prices set forth on the cover of this prospectus) and our purchase of 8.6% of the outstanding interests of IBG LLC, is expected to be approximately $740.1 million. The tax savings that we would actually realize as a result of this increase in tax basis likely would be significantly less than this amount multiplied by our effective tax rate due to a number of factors, including the allocation of a portion of the increase in tax basis to foreign or non-depreciable fixed assets, the impact of the increase in the tax basis on our ability to use foreign tax credits and the rules relating to the amortization of intangible assets, for example. Based on current facts and assumptions, including that subsequent purchases of IBG LLC interests will occur in fully taxable transactions, the potential tax basis increase resulting from the purchase of the IBG LLC interests held by IBG Holdings LLC following the closing of the offering could be as much as $8.6 billion. The tax receivable agreement will require 85% of such tax savings, if any, to be paid to IBG Holdings LLC, with the balance to be retained by us. The actual increase in tax basis will depend, among other factors, upon the price of shares of our common stock at the time of the purchase and the extent to which such purchases are taxable and, as a result, could differ materially from this amount. Our ability to achieve benefits from any such increase, and the amount of the payments to be made under the tax receivable agreement, will depend upon a number of factors, as discussed above, including the timing and amount of our future income.

If either immediately before or immediately after any purchase or the related issuance of our stock, the IBG Holdings LLC members own or are deemed to own, in the aggregate, more than 20% of our outstanding stock, then all or part of any increase in the tax basis of goodwill may not be amortizable and, thus, our ability to realize the annual tax savings that otherwise would have resulted if such tax basis were amortizable may be significantly reduced. Although the IBG Holdings LLC members are prohibited under the exchange agreement from purchasing shares of Class A common stock, grants of our stock to employees and directors who are also members or related to members of IBG Holdings LLC and the application of certain tax attribution rules, such as among family members and partners in a partnership, could result in IBG Holdings LLC members being deemed for tax purposes to own shares of Class A common stock.

If the IRS successfully challenges the tax basis increase, under certain circumstances, we could be required to make payments to IBG Holdings LLC under the tax receivable agreement in excess of our cash tax savings.

**Our senior secured revolving credit facility and our senior notes impose certain restrictions. A failure to comply with these restrictions could lead to an event of default, resulting in an acceleration of indebtedness, which may affect our ability to finance future operations or capital needs, or to engage in other business activities.**

As of December 31, 2006, our total indebtedness (consisting of the aggregate amounts outstanding under senior notes, senior secured revolving credit facility and short-term borrowings) was approximately $1.6 billion. On May 19, 2006, IBG LLC entered into a $300.0 million three-year senior secured revolving credit facility with JPMorgan Chase Bank, N.A. as administrative agent, Harris N.A. as syndication agent, and Citibank, N.A. and HSBC Bank USA National Association as co-syndication agents. In addition, subject to restrictions in our senior secured revolving credit facility and our senior notes, we may incur additional first-priority secured borrowings under the senior secured revolving credit facility.

21

The operating and financial restrictions and covenants in our debt agreements, including the senior secured revolving credit facility and our senior notes, may adversely affect our ability to finance future operations or capital needs or to engage in other business activities. Our senior secured revolving credit facility requires us to maintain specified financial ratios and tests, including interest coverage and total leverage ratios and maximum capital expenditures, which may require that we take action to reduce debt or to act in a manner contrary to our business objectives. In addition, the senior secured revolving credit facility and the senior notes restrict our ability to, among other things:

- incur additional indebtedness;

- dispose of assets;

- guarantee debt obligations;

- repay indebtedness or amend debt instruments;

- pay dividends;

- create liens on assets;

- make investments;

- make acquisitions;

- engage in mergers or consolidations; or

- engage in certain transactions with subsidiaries and affiliates and otherwise restrict corporate activities.

A more detailed discussion of the restrictions contained in our senior secured revolving credit facility can be found on pages 149 and 150 of this prospectus. A failure to comply with the restrictions contained in the senior secured revolving credit facility could lead to an event of default, which could result in an acceleration of our indebtedness. Such an acceleration would constitute an event of default under our senior notes. A failure to comply with the restrictions in our senior notes could result in an event of default under our senior notes. Our future operating results may not be sufficient to enable compliance with the covenants in the senior secured revolving credit facility, our senior notes or other indebtedness or to remedy any such default. In addition, in the event of an acceleration, we may not have or be able to obtain sufficient funds to refinance our indebtedness or make any accelerated payments, including those under the senior notes. In addition, we may not be able to obtain new financing. Even if we were able to obtain new financing, we would not be able to guarantee that the new financing would be on commercially reasonable terms or terms that would be acceptable to us. If we default on our indebtedness, our business financial condition and results of operation could be materially and adversely affected.

## Risks Related to Our Business

**Our business may be harmed by global events beyond our control, including overall slowdowns in securities trading.**

Like other brokerage and financial services firms, our business and profitability are directly affected by elements that are beyond our control, such as economic and political conditions, broad trends in business and finance, changes in volume of securities and futures transactions, changes in the markets

22

in which such transactions occur and changes in how such transactions are processed. A weakness in equity markets, such as a slowdown causing reduction in trading volume in U.S. or foreign securities and derivatives, has historically resulted in reduced transaction revenues and would have a material adverse effect on our business, financial condition and results of operations.

**Because our revenues and profitability depend on trading volume, they are prone to significant fluctuations and are difficult to predict.**

Our revenues are dependent on the level of trading activity on securities and derivatives exchanges in the United States and abroad. In the past, our revenues and operating results have varied significantly from period to period due primarily to the willingness of competitors to trade more aggressively by decreasing their bid/offer spreads and thereby assuming more risk in order to acquire market share, to movements and trends in the underlying markets, and to fluctuations in trading levels. As a result, period to period comparisons of our revenues and operating results may not be meaningful, and future revenues and profitability may be subject to significant fluctuations or declines.

**Our reliance on our computer software could cause us great financial harm in the event of any disruption or corruption of our computer software. We may experience technology failures while developing our software.**

We rely on our computer software to receive and properly process internal and external data. Any disruption for any reason in the proper functioning or any corruption of our software or erroneous or corrupted data may cause us to make erroneous trades or suspend our services and could cause us great financial harm. In order to maintain our competitive advantage, our software is under continuous development. As we identify and enhance our software, there is risk that software failures may occur and result in service interruptions and have other unintended consequences.

**Our business could be harmed by a systemic market event.**

Some market participants could be overleveraged. In case of sudden, large price movements, such market participants may not be able to meet their obligations to brokers who, in turn, may not be able to meet their obligations to their counterparties. As a result, the financial system or a portion thereof could collapse, and the impact of such an event could be catastrophic to our business.

**We may incur material trading losses from our market making activities.**

A substantial portion of our revenues and operating profits is derived from our trading as principal in our role as a market maker and specialist. We may incur trading losses relating to these activities since each primarily involves the purchase or sale of securities for our own account. In any period, we may incur trading losses in a significant number of securities for a variety of reasons including:

- price changes in securities;

- lack of liquidity in securities in which we have positions; and

- the required performance of our market making and specialist obligations.

These risks may limit or restrict our ability to either resell securities we purchased or to repurchase securities we sold. In addition, we may experience difficulty borrowing securities to make delivery to purchasers to whom we sold short, or lenders from whom we have borrowed. From time to time, we have large position concentrations in securities of a single issuer or issuers engaged in a specific industry or traded in a particular market. Such a concentration could result in higher trading losses than would occur if our positions and activities were less concentrated.

23

In our role as a market maker, we attempt to derive a profit from the difference between the prices at which we buy and sell, or sell and buy, securities. However, competitive forces often require us to match the quotes other market makers display and to hold varying amounts of securities in inventory. By having to maintain inventory positions, we are subjected to a high degree of risk. We cannot assure you that we will be able to manage such risk successfully or that we will not experience significant losses from such activities, which could have a material adverse effect on our business, financial condition and operating results.

**Reduced spreads in securities pricing, levels of trading activity and trading through market makers and/or specialists could harm our business.**

Computer-generated buy/sell programs and other technological advances and regulatory changes in the marketplace may continue to tighten spreads on securities transactions. Tighter spreads and increased competition could make the execution of trades and market making activities less profitable. In addition, new and enhanced alternative trading systems such as ECNs have emerged as an alternative for individual and institutional investors, as well as broker-dealers, to avoid directing their trades through market makers, and could result in reduced revenues derived from our market making business.

**We may incur losses in our market making activities in the event of failures of our proprietary pricing model.**

The success of our market making business is substantially dependent on the accuracy of our proprietary pricing mathematical model, which continuously evaluates and monitors the risks inherent in our portfolio, assimilates market data and reevaluates our outstanding quotes each second. Our model is designed to automatically rebalance our positions throughout the trading day to manage risk exposures on our positions in options, futures and the underlying securities. In the event of a flaw in our pricing model and/or a failure in the related software, our pricing model may lead to unexpected and/or unprofitable trades, which may result in material trading losses.

**The valuation of the financial instruments we hold may result in large and occasionally anomalous swings in the value of our positions and in our earnings in any period.**

The market prices of our long and short positions are reflected on our books at closing prices which are typically the last trade price before the official close of the primary exchange on which each such security trades. Given that we manage a globally integrated portfolio, we may have large and substantially offsetting positions in securities that trade on different exchanges that close at different times of the trading day. As a result, there may be large and occasionally anomalous swings in the value of our positions daily and, accordingly, in our earnings in any period. This is especially true on the last business day of each calendar quarter.

**We are exposed to losses due to lack of perfect information.**

As market makers, we provide liquidity by buying from sellers and selling to buyers. Quite often, we trade with others who have different information than we do, and as a result, we may accumulate unfavorable positions preceding large price movements in companies. Should the frequency or magnitude of these events increase, our losses will likely increase correspondingly.

**Rules governing specialists and designated market makers may require us to make unprofitable trades or prevent us from making profitable trades.**

Specialists and designated market makers are granted certain rights and have certain obligations to "make a market" in a particular security. They agree to specific obligations to maintain a fair and orderly market. In acting as a specialist or designated market maker, we are subjected to a high degree of

24

risk by having to support an orderly market. In this role, we may at times be required to make trades that adversely affect our profitability. In addition, we may at times be unable to trade for our own account in circumstances in which it may be to our advantage to trade, and we may be obligated to act as a principal when buyers or sellers outnumber each other. In those instances, we may take a position counter to the market, buying or selling securities to support an orderly market. Additionally, the rules of the markets which govern our activities as a specialist or designated market maker are subject to change. If these rules are made more stringent, our trading revenues and profits as specialist or designated market maker could be adversely affected.

**Regulatory and legal uncertainties could harm our business.**

The securities and derivatives businesses are heavily regulated. Firms in financial service industries have been subject to an increasingly regulated environment over recent years, and penalties and fines sought by regulatory authorities have increased accordingly. This regulatory and enforcement environment has created uncertainty with respect to various types of transactions that historically had been entered into by financial service firms and that were generally believed to be permissible and appropriate. Our broker-dealer subsidiaries are subject to regulations in the United States and abroad covering all aspects of their business. Regulatory bodies include, in the United States, the SEC, the National Association of Securities Dealers (NASD), the Board of Governors of the Federal Reserve System, the Chicago Board Options Exchange (CBOE), the Commodity Futures Trading Commission (CFTC), National Futures Association (NFA) and the NYSE, in Switzerland, the Federal Banking Commission, in the United Kingdom, the Financial Services Authority (FSA), in Hong Kong, the Securities and Futures Commission (SFC), in Australia, the Australian Securities and Investment Commission (ASIC), and in Canada, the Investment Dealers Association of Canada (IDA) and various Canadian securities commissions. Our mode of operation and profitability may be directly affected by additional legislation; changes in rules promulgated by various domestic and foreign government agencies and self-regulatory organizations that oversee our business; and changes in the interpretation or enforcement of existing laws and rules. Noncompliance with applicable laws or regulations could result in sanctions being levied against us, including fines and censures, suspension or expulsion from a certain jurisdiction or market or the revocation or limitation of licenses. Noncompliance with applicable laws or regulations could adversely affect our reputation, prospects, revenues and earnings. In addition, changes in current laws or regulations or in governmental policies could adversely affect our operations, revenues and earnings.

Domestic and foreign stock exchanges, other self-regulatory organizations and state and foreign securities commissions can censure, fine, issue cease-and-desist orders, suspend or expel a broker-dealer or any of its officers or employees. Our ability to comply with all applicable laws and rules is largely dependent on our internal system to ensure compliance, as well as our ability to attract and retain qualified compliance personnel. We could be subject to disciplinary or other actions in the future due to claimed noncompliance, which could have a material adverse effect on our business, financial condition and results of operations. To continue to operate and to expand our services internationally, we may have to comply with the regulatory controls of each country in which we conduct, or intend to conduct business, the requirements of which may not be clearly defined. The varying compliance requirements of these different regulatory jurisdictions, which are often unclear, may limit our ability to continue existing international operations and further expand internationally.

**Our future efforts to sell shares or raise additional capital may be delayed or prohibited by regulations.**

As certain of our subsidiaries are members of the NASD, we are subject to certain regulations regarding changes in control of our ownership. NASD Rule 1017 generally provides that NASD approval must be obtained in connection with any transaction resulting in a change in control of a member firm. The NASD defines control as ownership of 25% or more of the firm's equity by a single entity or person and would include a change in control of a parent company. Interactive Brokers (U.K.) Limited is subject

25

to similar change in control regulations promulgated by the FSA in the United Kingdom. As a result of these regulations, our future efforts to sell shares or raise additional capital may be delayed or prohibited. We may be subject to similar restrictions in other jurisdictions in which we operate.

**We depend on our proprietary technology, and our future results may be impacted if we cannot maintain technological superiority in our industry.**

Our success in the past has largely been attributable to our sophisticated proprietary technology that has taken many years to develop. We have benefited from the fact that the type of proprietary technology equivalent to that which we employ has not been widely available to our competitors. If our technology becomes more widely available to our current or future competitors for any reason, our operating results may be adversely affected. Additionally, adoption or development of similar or more advanced technologies by our competitors may require that we devote substantial resources to the development of more advanced technology to remain competitive. The markets in which we compete are characterized by rapidly changing technology, evolving industry standards and changing trading systems, practices and techniques. Although we have been at the forefront of many of these developments in the past, we may not be able to keep up with these rapid changes in the future, develop new technology, realize a return on amounts invested in developing new technologies or remain competitive in the future.

**We are subject to potential losses as a result of our clearing and execution activities.**

As a clearing member firm providing financing services to certain of our brokerage customers, we are ultimately responsible for their financial performance in connection with various stock, options and futures transactions. Our clearing operations require a commitment of our capital and, despite safeguards implemented by our software, involve risks of losses due to the potential failure of our customers to perform their obligations under these transactions. If our customers default on their obligations, we remain financially liable for such obligations, and although these obligations are collateralized, we are subject to market risk in the liquidation of customer collateral to satisfy those obligations. There can be no assurance that our risk management procedures will be adequate. Any liability arising from clearing operations could have a material adverse effect on our business, financial condition and/or operating results.

As a clearing member firm of securities and commodities clearing houses in the United States and abroad, we are also exposed to clearing member credit risk. Securities and commodities clearing houses require member firms to deposit cash and/or government securities to a clearing fund. If a clearing member defaults in its obligations to the clearing house in an amount larger than its own margin and clearing fund deposits, the shortfall is absorbed pro rata from the deposits of the other clearing members. Many clearing houses of which we are members also have the authority to assess their members for additional funds if the clearing fund is depleted. A large clearing member default could result in a substantial cost to us if we are required to pay such assessments.

**The loss of our key employees would materially adversely affect our business.**

Our key executives have substantial experience and have made significant contributions to our business, and our continued success is dependent upon the retention of our key management executives, as well as the services provided by our staff of trading system, technology and programming specialists and a number of other key managerial, marketing, planning, financial, technical and operations personnel. The loss of such key personnel could have a material adverse effect on our business. Growth in our business is dependent, to a large degree, on our ability to retain and attract such employees.

26

**We are exposed to risks associated with our international operations.**

During 2005 and 2006, approximately 33% and 21%, respectively, of our net revenues were generated outside the United States. We are exposed to risks and uncertainties inherent in doing business in international markets, particularly in the heavily regulated brokerage industry. Such risks and uncertainties include political, economic and financial instability; unexpected changes in regulatory requirements, tariffs and other trade barriers; exchange rate fluctuations; applicable currency controls; and difficulties in staffing, including reliance on newly hired local experts, and managing foreign operations. These risks could cause a material adverse effect on our business, financial condition or results of operations.

**We do not have fully redundant systems. System failures could harm our business.**

If our systems fail to perform, we could experience unanticipated disruptions in operations, slower response times or decreased customer service and customer satisfaction. Our ability to facilitate transactions successfully and provide high quality customer service also depends on the efficient and uninterrupted operation of our computer and communications hardware and software systems. Our service has experienced periodic system interruptions, which we believe will continue to occur from time to time. Our systems and operations also are vulnerable to damage or interruption from human error, natural disasters, power loss, telecommunication failures, break-ins, sabotage, computer viruses, intentional acts of vandalism and similar events. While we currently maintain redundant servers to provide limited service during system disruptions, we do not have fully redundant systems, and our formal disaster recovery plan does not include restoration of all services. For example, we have backup facilities to our disaster recovery site that enable us, in the case of complete failure of our main North America data center, to recover and complete all pending transactions, provide customers with access to their accounts to deposit or withdraw money, transfer positions to other brokers and manage their risk by continuing trading through the use of marketable orders. These backup services are currently limited to U.S. markets. We do not currently have separate backup facilities dedicated to our non-U.S. operations. It is our intention to provide for and progressively deploy backup facilities for our global facilities over time. In addition, we do not carry business interruption insurance to compensate for losses that could occur to the extent not required. Any system failure that causes an interruption in our service or decreases the responsiveness of our service could impair our reputation, damage our brand name and materially adversely affect our business, financial condition and results of operations.

**Failure of third-party systems on which we rely could adversely affect our business.**

We rely on certain third-party computer systems or third-party service providers, including clearing systems, exchange systems, Internet service, communications facilities and other facilities. Any interruption in these third-party services, or deterioration in their performance, could be disruptive to our business. If our arrangement with any third party is terminated, we may not be able to find an alternative source of systems support on a timely basis or on commercially reasonable terms. This could have a material adverse effect on our business, financial condition and results of operations.

**We face competition in our market making activities.**

In our market making activities, we compete with other firms who act as market makers based on our ability to provide liquidity at competitive prices and to attract order flow. Market makers range from sole proprietors with very limited resources, of which there are still a few hundred left, to a few highly sophisticated groups which have substantially greater financial and other resources, including research and development personnel, than we do. These larger and better capitalized competitors may be better able to respond to changes in the market making industry, to compete for skilled professionals, to finance acquisitions, to fund internal growth and to compete for market share generally. We may not be able to compete effectively against these firms, particularly those with greater financial resources, and our failure to do so could materially and adversely affect our business, financial condition and results of

27

operations. As in the past, we may in the future face enhanced competition, resulting in narrowing bid/offer spreads in the marketplace that may adversely impact our financial performance. This is especially likely if others can acquire systems that enable them to predict markets or process trades more efficiently than we can.

**Our direct market access clearing and non-clearing brokerage operations face intense competition.**

With respect to our direct market access brokerage business, the market for electronic and interactive bidding, offering and trading services in connection with equities, options and futures is relatively new, rapidly evolving and intensely competitive. We expect competition to continue and intensify in the future. Our current and potential future competition principally comes from five categories of competitors:

- prime brokers who, in an effort to satisfy the demands of their customers for hands-on electronic trading facilities, universal access to markets, smart routing, better trading tools, lower commissions and financing rates, have embarked upon building such facilities and product enhancements;

- direct market access and online options and futures firms;

- direct market access and online equity brokers;

- software development firms and vendors who create global trading networks and analytical tools and make them available to brokers; and

- traditional brokers.

In addition, we compete with financial institutions, mutual fund sponsors and other organizations, many of which provide online, direct market access or other investing services. A number of brokers provide our technology and execution services to their customers, and these brokers will become our competitors if they develop their own technology. Some of our competitors in this area have greater name recognition, longer operating histories and significantly greater financial, technical, marketing and other resources than we have and offer a wider range of services and financial products than we do. Some of our competitors may also have an ability to charge lower commissions. We cannot assure you that we will be able to compete effectively or efficiently with current or future competitors. These increasing levels of competition in the online trading industry could significantly harm this aspect of our business.

**We are subject to risks relating to litigation and potential securities laws liability.**

We are exposed to substantial risks of liability under federal and state securities laws, other federal and state laws and court decisions, as well as rules and regulations promulgated by the SEC, the CFTC, the Federal Reserve, state securities regulators, the self-regulatory organizations (SROs) and foreign regulatory agencies. We are also subject to the risk of litigation and claims that may be without merit. We could incur significant legal expenses in defending ourselves against and resolving lawsuits or claims. An adverse resolution of any future lawsuits or claims against us could result in a negative perception of our company and cause the market price of our common stock to decline or otherwise have an adverse effect on our business, financial condition and/or operating results.

**Any future acquisitions may result in significant transaction expenses, integration and consolidation risks and risks associated with entering new markets, and we may be unable to profitably operate our consolidated company.**

Although our growth strategy has not focused historically on acquisitions, we may in the future engage in evaluations of potential acquisitions and new businesses. We may not have the financial resources necessary to consummate any acquisitions in the future or the ability to obtain the necessary

28

funds on satisfactory terms. Any future acquisitions may result in significant transaction expenses and risks associated with entering new markets in addition to integration and consolidation risks. Because acquisitions historically have not been a core part of our growth strategy, we have no material experience in successfully utilizing acquisitions. We may not have sufficient management, financial and other resources to integrate any such future acquisitions or to successfully operate new businesses and we may be unable to profitably operate our expanded company.

**Internet-related issues may reduce or slow the growth in the use of our services in the future.**

Critical issues concerning the commercial use of the Internet, such as ease of access, security, privacy, reliability, cost, and quality of service, remain unresolved and may adversely impact the growth of Internet use. If Internet usage continues to increase rapidly, the Internet infrastructure may not be able to support the demands placed on it by this growth, and its performance and reliability may decline. The recent growth in Internet traffic has caused frequent periods of decreased performance, outages and delays. Although our larger institutional customers use leased data lines to communicate with us, our ability to increase the speed with which we provide services to consumers and to increase the scope and quality of such services is limited by and dependent upon the speed and reliability of our customers' access to the Internet, which is beyond our control. If periods of decreased performance, outages or delays on the Internet occur frequently or other critical issues concerning the Internet are not resolved, overall Internet usage or usage of our web based products could increase more slowly or decline, which would cause our business, results of operations and financial condition to be materially and adversely affected.

**Our computer infrastructure may be vulnerable to security breaches. Any such problems could jeopardize confidential information transmitted over the Internet, cause interruptions in our operations or cause us to have liability to third persons.**

Our computer infrastructure is potentially vulnerable to physical or electronic computer break-ins, viruses and similar disruptive problems and security breaches. Any such problems or security breaches could cause us to have liability to one or more third parties including our customers, and disrupt our operations. A party able to circumvent our security measures could misappropriate proprietary information or customer information, jeopardize the confidential nature of information transmitted over the Internet or cause interruptions in our operations. Concerns over the security of Internet transactions and the privacy of users could also inhibit the growth of the Internet or the electronic brokerage industry in general, particularly as a means of conducting commercial transactions. To the extent that our activities involve the storage and transmission of proprietary information such as personal financial information, security breaches could expose us to a risk of financial loss, litigation and other liabilities. Our estimated annual losses from reimbursements to customers whose accounts have been negatively affected by unauthorized access have historically been less than $500,000, but instances of unauthorized access of customer accounts have been increasing recently on an industry-wide basis. Our current insurance program may protect us against some, but not all, of such losses. Any of these events, particularly if they (individually or in the aggregate) result in a loss of confidence in our company or electronic brokerage firms in general, could have a material adverse effect on our business, results of operations and financial condition.

**We may not be able to protect our intellectual property rights or may be prevented from using intellectual property necessary for our business.**

We rely primarily on trade secret, contract, copyright, patent and trademark laws to protect our proprietary technology. It is possible that third parties may copy or otherwise obtain and use our proprietary technology without authorization or otherwise infringe on our rights. We may also face claims of infringement that could interfere with our ability to use technology that is material to our business operations.

In the future, we may have to rely on litigation to enforce our intellectual property rights, protect our trade secrets, determine the validity and scope of the proprietary rights of others or defend against

29

claims of infringement or invalidity. Any such litigation, whether successful or unsuccessful, could result in substantial costs and the diversion of resources and the attention of management, any of which could negatively affect our business.

**Our future success will depend on our response to the demand for new services, products and technologies.**

The demand for market making services, particularly services that rely on electronic communications gateways, is characterized by:

- rapid technological change;

- changing customer demands;

- the need to enhance existing services and products or introduce new services and products; and

- evolving industry standards.

New services, products and technologies may render our existing services, products and technologies less competitive. Our future success will depend, in part, on our ability to respond to the demand for new services, products and technologies on a timely and cost-effective basis and adapt to technological advancements and changing standards to address the increasingly sophisticated requirements and varied needs of our customers and prospective customers. We cannot assure you that we will be successful in developing, introducing or marketing new services, products and technologies. In addition, we may experience difficulties that could delay or prevent the successful development, introduction or marketing of these services and products, and our new service and product enhancements may not achieve market acceptance. Any failure on our part to anticipate or respond adequately to technological advancements, customer requirements or changing industry standards, or any significant delays in the development, introduction or availability of new services, products or enhancements could have a material adverse effect on our business, financial condition and operating results.

**The expansion of our market making activities into forex-based products entails significant risk, and unforeseen events in such business could have an adverse effect on our business, financial condition and results of operation.**

We are in the process of entering into market making for forex-based products. This includes the trading of cash in foreign currencies with banks and exchange-listed futures, options on futures, options on cash deposits and currency-based ETFs. All of the risks that pertain to our market making activities in equity-based products also apply to our forex-based market making. In addition, we have very little experience in the forex markets and even though we are easing into this activity very slowly, any kind of unexpected event can occur that can result in great financial loss.

**We are subject to counterparty risk whereby defaults by parties with whom we do business can have an adverse effect on our business, financial condition and/or operating results.**

In our electronic brokerage business, our customer margin credit exposure is to a great extent mitigated by our policy of automatically evaluating each account throughout the trading day and closing out positions automatically for accounts that are found to be under-margined. While this methodology is effective in most situations, it may not be effective in situations in which no liquid market exists for the relevant securities or commodities or in which, for any reason, automatic liquidation for certain accounts has been disabled. If no liquid market exists or automatic liquidation has been disabled, we are subject to risks inherent in extending credit, especially during periods of rapidly declining markets. Any loss or expense incurred due to defaults by our customers in failing to repay margin loans or to maintain adequate collateral for these loans would cause harm to our business.

30

## Risks Related to the Auction Process for This Offering

**Potential investors should not expect to sell our shares for a profit shortly after our common stock begins trading.**

We will determine the initial public offering price for the shares sold in this offering through an auction conducted by the placement agents. We believe that the auction process will reveal a clearing price for the shares of our common stock offered in this offering. The clearing price is the highest price at which all of the shares offered may be sold to potential investors. Although the placement agents and we may elect to set the initial public offering price below the auction clearing price, the public offering price may be at or near the clearing price. If there is little to no demand for our shares at or above the initial public offering price once trading begins, the price of our shares would decline following the initial public offering. If your objective is to make a short-term profit by selling the shares you purchase in the offering shortly after trading begins, you should not submit a bid in the auction.

**Some bids made at or above the initial public offering price may not receive an allocation of shares.**

The placement agents may require that bidders confirm their bids before the auction for the initial public offering closes. If a bidder is requested to confirm a bid and fails to do so within a required time frame, that bid may be rejected and may not receive an allocation of shares even if the bid is at or above the initial public offering price. Further, if the auction process leads to a pro rata reduction in allocated shares and a rounding down of share allocations pursuant to the rules of the auction, a bidder may not receive any shares in the offering despite having bid at or above the initial public offering price. In addition, we, in consultation with the placement agents, may determine, in our sole discretion, that some bids that are at or above the initial public offering price are manipulative of or disruptive to the bidding process, not creditworthy, or otherwise not in our best interest, in which case such bids may be rejected or reduced. For example, in previous transactions for other issuers in which the auction process was used, WR Hambrecht + Co has rejected or reduced bids when WR Hambrecht + Co, in its sole discretion, deemed the bids not creditworthy or had reason to question the bidder's intent or means to fund its bid. In the absence of other information, the placement agents or a participating dealer may assess a bidder's creditworthiness based solely on the bidder's history with the placement agents or a participating dealer. WR Hambrecht + Co has also rejected or reduced bids that it deemed, in its sole discretion, to be potentially manipulative or disruptive or because the bidder had a history of alleged securities law violations. Other conditions for valid bids, including eligibility and account funding requirements of participating dealers, may vary. As a result of these varying requirements, a bidder may have its bid rejected by the placement agents or a participating dealer while another bidder's identical bid is accepted.

**Potential investors may receive a full allocation of the shares they bid for if their bids are successful and should not bid for more shares than they are prepared to purchase.**

If the initial public offering price is at or near the clearing price for the shares offered in this offering, the number of shares represented by successful bids will equal or nearly equal the number of shares offered by this prospectus. Successful bidders may therefore be allocated all or nearly all of the shares that they bid for in the auction. Therefore, we caution investors against submitting a bid that does not accurately represent the number of shares of our common stock that they are willing and prepared to purchase.

## Other Risks Related To The Offering

**The disparity in the voting rights among the classes of shares may exert downward pressure on the price of our common stock.**

Shares of our common stock and Class B common stock entitle the respective holders to identical rights, except that each share of our common stock will entitle its holder to one vote on all matters to be voted on by stockholders generally while each share of Class B common stock will entitle

31

its holder to a greater number of votes. Initially, the holders of Class B common stock, in the aggregate, will be entitled to approximately 365.5 million votes. The difference in voting rights could exert downward pressure on the price of our common stock to the extent that investors view, or any potential future purchaser of our company views, the superior voting rights of the Class B common stock to have value.

**Future sales of our common stock in the public market could lower our stock price, and any additional capital raised by us through the sale of equity or convertible securities may dilute your ownership in us.**

The members of IBG Holdings LLC have the right to cause the redemption of their IBG Holdings LLC membership interests over time in connection with offerings of shares of our common stock as further described in the section entitled "The Recapitalization Transactions and Our Organizational Structure." We intend to sell additional shares of common stock in subsequent public offerings on a regular basis, including annual offerings of our common stock to finance future purchases of IBG LLC membership interests which, in turn, will finance corresponding redemptions of IBG Holdings LLC membership interests. These annual offerings and related transactions are anticipated to occur on or about each of the first eight years following this offering and, depending on the timing of redemptions, possibly extend into the future in accordance with an exchange agreement among us, IBG LLC, IBG Holdings LLC and the historical members of IBG LLC described in greater detail under "Transactions with Related Persons, Promoters and Certain Control Persons—Exchange Agreement." We may also issue additional shares of common stock or convertible debt securities to finance future acquisitions or business combinations. After the consummation of this offering, we will have approximately 34.7 million outstanding shares of common stock. This number includes all the shares of our common stock we are selling in this offering, which may be resold immediately in the public market. Assuming no anti-dilution adjustments based on combinations or divisions of our common stock, the annual offerings referred to above could result in the issuance by us of up to an additional approximately 365.5 million shares of common stock. It is possible, however, that such shares could be issued in one or a few large transactions.

We cannot predict the size of future issuances of our common stock or the effect, if any, that future issuances and sales of shares of our common stock may have on the market price of our common stock. Sales of substantial amounts of our common stock (including shares issued in connection with an acquisition), or the perception that such sales could occur, may cause the market price of our common stock to decline.

**All net proceeds of this offering will go to the current members of IBG LLC, including all of our executive officers and employee directors, rather than be used for corporate business purposes.**

We intend to use all net proceeds of this offering to purchase IBG LLC membership interests from IBG Holdings LLC, which will, in turn, use such proceeds to redeem a portion of the IBG Holdings LLC membership interests to be held by the current members of IBG LLC. Such redemptions will result in all net proceeds of this offering going to the current members of IBG LLC on a pro rata basis. Of this amount, more than 91.5% will go to our employee directors and executive officers. We do not anticipate using any net proceeds for corporate business purposes. See "Use of Proceeds."

**Our internal controls over financial reporting may not be effective and our independent auditors may not be able to certify as to their effectiveness, which could have a significant and adverse effect on our business and reputation.**

We are evaluating our internal controls over financial reporting in order to allow management to report on, and our independent auditors to attest to, our internal controls over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002, as amended, and rules and regulations of the SEC thereunder, which we refer to as Section 404. We are in the process of documenting and testing our internal control procedures in order to satisfy the requirements of Section 404, which requires annual

32

management assessments of the effectiveness of our internal controls over financial reporting and a report by our independent registered public accountants addressing these assessments.

During the course of our initial evaluation of internal controls over financial reporting, we identified a material weakness, as such term is defined by Section 404, relating to the interpretation and application of generally accepted accounting principles. Specifically, subsequent to the filing of our Registration Statement on Form S-1 on November 27, 2006, our management determined that there was an error in the classification of certain securities loaned fee income, securities borrowed fee expense and foreign currency translation. These items have since been reclassified, as reflected in the consolidated financial statements included in this prospectus. These changes did not have any impact on our net income, our consolidated statements of financial condition or our cash and cash equivalents. The foregoing material weakness has been remediated.

As we continue our evaluation, we may identify additional material weaknesses that we may not be able to remediate in time to meet the deadline imposed by the Sarbanes-Oxley Act of 2002, as amended, for compliance with the requirements of Section 404. We will be required to comply with the requirements of Section 404 for our year ending December 31, 2008. In addition, if we fail to achieve and maintain the adequacy of our internal controls, as such standards are modified, supplemented or amended from time to time, we may not be able to ensure that we can conclude on an ongoing basis that we have effective internal controls over financial reporting in accordance with Section 404. We cannot be certain as to the timing of completion of our evaluation, testing and any remediation actions or the impact of the same on our operations. If we are not able to implement the requirements of Section 404 in a timely manner or with adequate compliance, our independent auditors may not be able to certify as to the effectiveness of our internal control over financial reporting and we may be subject to sanctions or investigation by regulatory authorities, such as the SEC. As a result, there could be a negative reaction in the financial markets due to a loss of confidence in the reliability of our financial statements. In addition, we may be required to incur costs in improving our internal control system and the hiring of additional personnel. Any such action could negatively affect our results of operations.

**You will experience immediate and substantial dilution.**

The price you pay for shares of our common stock sold in this offering is substantially higher than the per share value of our net assets, after giving effect to this offering. Assuming an initial public offering price for our common shares of $29.00 per share (the midpoint of the initial public offering price range indicated on the cover of this prospectus), you will incur immediate dilution in net tangible book value per share of $22.01. Dilution is the difference between the offering price per share and the net tangible book value per share of our common stock immediately after the offering. See "Dilution."

In addition, certain employees of IBG LLC currently hold Return on Investment Dollar Units (ROI Units) that entitle each holder thereof to accumulated earnings on the face value of the certificate representing his or her ROI Units. In connection with this offering, ROI Units may, at the employee's option, be cancelled and the accumulated earnings thereon invested in restricted shares of common stock in connection with this offering, which restricted shares would then vest over time assuming continued employment with IBG LLC and compliance with applicable covenants, thereby diluting the percentage ownership of IBG by unaffiliated public stockholders. Subsequent to this offering, non-cash compensation of employees will consist primarily of grants of restricted shares of our common stock. Such future grants of restricted shares would further dilute the percentage ownership of IBG LLC by unaffiliated public stockholders. See "Dilution," "Management—Return on Investment Dollar Units" and "Management—Employee Incentive Plan."

In addition, in the event IBG LLC uses cash on hand to acquire IBG LLC membership interests in the future, such use of cash is expected to have a dilutive effect on the existing holders of our common stock, as the price paid per membership interest is likely to be higher than IBG LLC's tangible book value

33

per membership interest. See "The Recapitalization Transactions and Our Organizational Structure—Exchange and Redemption of Membership Interests."

**Our common stock price may fluctuate after this offering. As a result, you may not be able to resell your shares at or above the price you paid for them.**

Prior to this offering, there has been no public market for our common stock. An active market may not develop following completion of this offering or, if developed, may not be maintained. The initial public offering price may not be indicative of the price at which our common stock will trade following completion of this offering. The market price of our common stock may be subject to sharp declines and volatility in market price. The market price of our common stock may also be influenced by many factors, some of which are beyond our control, including:

- the failure of securities analysts to cover our common stock after this offering or changes in financial estimates or recommendations by analysts;

- future announcements concerning us or our competitors, including the announcement of acquisitions;

- changes in government regulations or in the status of our regulatory approvals or licensure;

- public perceptions of risks associated with our services or operations; and

- general market conditions and other factors that may be unrelated to our operating performance or the operating performance of our competitors.

As a result, you may not be able to sell shares of our common stock at prices equal to or greater than the price you paid in this offering.

**There is no existing market for our common stock and we do not know if one will develop to provide you with adequate liquidity.**

There has not been a public market for our common stock. We cannot predict the extent to which investor interest in our company will lead to the development of an active trading market on The NASDAQ Global Select Market or otherwise or how liquid that market might become. If an active trading market does not develop, you may have difficulty selling any of our common stock that you buy.

**Certain provisions in our amended and restated certificate of incorporation may prevent efforts by our stockholders to change our direction or management.**

Provisions contained in our amended and restated certificate of incorporation could make it more difficult for a third party to acquire us, even if doing so might be beneficial to our stockholders. For example, our amended and restated certificate of incorporation authorizes our board of directors to determine the rights, preferences, privileges and restrictions of unissued series of preferred stock, without any vote or action by our stockholders. We could issue a series of preferred stock that could impede the completion of a merger, tender offer or other takeover attempt. These provisions may discourage potential acquisition proposals and may delay, deter or prevent a change of control of us, including through transactions, and, in particular, unsolicited transactions, that some or all of our stockholders might consider to be desirable. As a result, efforts by our stockholders to change our direction or management may be unsuccessful. See "Description of Capital Stock—Section 203 of the General Corporation Law of the State of Delaware."

**We may not pay dividends on our common stock at any time in the foreseeable future.**

As a holding company for our interest in IBG LLC, we will be dependent upon the ability of IBG LLC to generate earnings and cash flows and distribute them to us so that we may pay any dividends to our stockholders. To the extent (if any) that we have excess cash, any decision to declare and pay

34

dividends in the future will be made at the discretion of our board of directors and will depend on, among other things, our results of operations, financial conditions, cash requirement, contractual restrictions and other factors that our board of directors may deem relevant. We have made no determination as to whether to pay dividends on our common stock at any time in the foreseeable future.

**We will incur increased costs as a result of having publicly traded common stock.**

We will incur significant legal, accounting, reporting and other expenses as a result of having publicly traded common stock that we do not currently incur. We also anticipate that we will incur costs associated with recently adopted corporate governance requirements, including requirements under the Sarbanes-Oxley Act of 2002, as amended, as well as rules implemented by the SEC and The NASDAQ Global Select Market. We expect these rules and regulations to increase our legal and financial compliance costs and to make some activities more time-consuming and costly. We also expect these rules and regulations may make it more difficult and more expensive for us to obtain director and officer liability insurance (if we choose in the future to obtain such insurance) and we may be required to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage. As a result, we may experience more difficulty attracting and retaining qualified individuals to serve on our board of directors or as executive officers. We cannot predict or estimate the amount of additional costs we may incur as a result of these requirements or the timing of such costs. IBG LLC will pay all the expenses we may incur in connection with being a public company.

35

# FORWARD-LOOKING STATEMENTS

This prospectus contains forward-looking statements within the meaning of the federal securities laws. Statements that are not historical facts, including statements about our beliefs and expectations, are forward-looking statements. Forward-looking statements include statements preceded by, followed by or that include the words "may," "could," "would," "should," "believe," "expect," "anticipate," "plan," "estimate," "target," "project," "intend" and similar expressions. These statements include, among others, statements regarding our expected business outlook, anticipated financial and operating results, our business strategy and means to implement the strategy, our objectives, the amount and timing of capital expenditures, the likelihood of our success in expanding our business, financing plans, budgets, working capital needs and sources of liquidity.

Forward-looking statements are only predictions and are not guarantees of performance. These statements are based on our management's beliefs and assumptions, which in turn are based on currently available information. Important assumptions relating to the forward-looking statements include, among others, assumptions regarding demand for our products, the expansion of product offerings geographically or through new applications, the timing and cost of planned capital expenditures, competitive conditions and general economic conditions. These assumptions could prove inaccurate. Forward-looking statements also involve known and unknown risks and uncertainties, which could cause actual results that differ materially from those contained in any forward-looking statement. Many of these factors are beyond our ability to control or predict. Such factors include, but are not limited to, the following:

- general economic conditions in the markets where we operate;

- increased industry competition and downward pressures on bid/offer spreads and electronic brokerage commissions;

- risks inherent to the electronic market making and brokerage businesses;

- failure to protect or enforce our intellectual property rights in our proprietary technology;

- our ability to keep up with rapid technological change;

- system failures and disruptions;

- non-performance of third-party vendors;

- conflicts of interest and other risks due to our ownership and holding company structure;

- the loss of key executives and failure to recruit and retain qualified personnel;

- the risks associated with the expansion of our business;

- our possible inability to integrate any businesses we acquire;

- competitive pressures;

- compliance with laws and regulations, including those relating to the securities industry; and

- other factors discussed under "Risk Factors" or elsewhere in this prospectus.

Except as required by applicable law, including the securities laws of the United States and the rules and regulations of the SEC, we are under no obligation to publicly update or revise any forward-looking statements after we distribute this prospectus. Potential investors should not place undue reliance on our forward-looking statements. Before you invest in our common stock, you should be aware that the occurrence of the events described in the "Risk Factors" section and elsewhere in this prospectus could harm our business, prospects, operating results, and financial condition. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results or performance.

36

**THE RECAPITALIZATION TRANSACTIONS AND OUR ORGANIZATIONAL STRUCTURE**

**Overview**

We have historically conducted our business through a limited liability company structure. In order to have a Delaware corporation as the issuer for our initial public offering, immediately prior to and immediately following the consummation of this offering, IBG LLC and its members will consummate a series of transactions, which we collectively refer to as the "Recapitalization." We are a holding company and, after completion of this offering, our primary assets will be our ownership of approximately 8.7% of the membership interests of IBG LLC, the current holding company for our businesses, and our controlling interest and related contractual rights as the sole managing member of IBG LLC. The remaining approximately 91.3% of IBG LLC membership interests after completion of this offering will be held by IBG Holdings LLC, a holding company that will be owned by the current members of IBG LLC. All IBG LLC membership interests will be identical and have the same rights. Thus, after completion of this offering, there will be two holding companies owning interests in IBG LLC (namely, IBG and IBG Holdings LLC, owning approximately 8.7% and 91.3%, respectively, of the IBG LLC membership interests), thereby allowing both public stockholders (through IBG) and existing members (through IBG Holdings LLC) to have economic interest in our businesses.

IBG Holdings LLC will own all of our Class B common stock, which will have voting power of our company proportionate to the extent of IBG Holdings LLC's ownership of IBG LLC—initially approximately 91.3%. Through his ownership of the voting membership interests in IBG Holdings LLC, Thomas Peterffy will initially be able to exercise such voting power in his sole discretion.

Our only business following this offering will be to act as the sole managing member of IBG LLC, and, as such, we will operate and control all of the business and affairs of IBG LLC and will be able to consolidate IBG LLC's financial results into our financial statements. IBG Holdings LLC's ownership interests in IBG LLC will be accounted for as a minority interest in our consolidated financial results after this offering. Net profits, net losses and distributions of IBG LLC, including with respect to all management fees, incentive income and investment income earned by IBG LLC, will be allocated and made to its members pro rata in accordance with the respective percentages of their membership interests in IBG LLC. Accordingly, net profits and net losses of IBG LLC will initially be allocated, and distributions by IBG LLC will initially be made, approximately 8.7% to us and approximately 91.3% to IBG Holdings LLC. Subject to the availability of net cash flow at the IBG LLC level, IBG LLC shall distribute to us and to IBG Holdings LLC tax distributions using a tax rate no less than the actual combined federal, state and local income tax rates applicable to our allocable shares of taxable income and net capital gain. Assuming IBG LLC makes distributions to its members in any given year, the determination to pay dividends, if any, to our Class A stockholders will be made by our board of directors, and distributions to the IBG Holdings LLC members will be made in accordance with the IBG Holdings LLC Operating Agreement, a copy of which is filed as an exhibit to the registration statement of which this prospectus forms a part. Because our board of directors may or may not determine to pay dividends at the IBG level, our Class A stockholders may not necessarily receive dividend distributions relating to our pro rata share of the management fees, incentive income, investment income and other income earned by IBG LLC, even if IBG LLC makes such distributions to us.

**Recapitalization**

Our business is presently conducted by subsidiaries of IBG LLC, which currently is approximately 85% owned by Thomas Peterffy and his affiliates. In November 2006, we were incorporated as a Delaware corporation. We have not engaged in any business or other activities except in connection with its formation. The Recapitalization will result in the current members of IBG LLC becoming the sole members of IBG Holdings LLC, and will establish us as the sole managing member of IBG LLC. The completion of the Recapitalization is a condition to this offering.

37

As a result of the Recapitalization, immediately following this offering and the application of net proceeds from this offering:

- IBG will be the sole managing member of IBG LLC;

- we and IBG Holdings LLC will own approximately 8.7% and 91.3%, respectively, of the membership interests in IBG LLC;

- Thomas Peterffy and his affiliates will own approximately 85% of the membership interests in IBG Holdings LLC, and management and other employees of IBG LLC will own substantially all of the remaining membership interests;

- outstanding shares of our Class A common stock, all of which will have been sold pursuant to this offering, will represent more than 99.999% of our outstanding capital stock based on economic value (which, as used herein, refers to the right to share in dividend distributions and distributions upon liquidation, dissolution or winding up);

- outstanding shares of our Class B common stock, all of which will be owned by IBG Holdings LLC, will represent less than 0.001% of our outstanding capital stock based on economic value;

- outstanding shares of our Class B common stock will represent approximately 91.3% of the combined voting power of all shares of our capital stock, which percentage will decrease proportionately to the extent that IBG Holdings LLC owns a smaller percentage of IBG LLC; and

- Thomas Peterffy will own all of the voting membership interests, and Mr. Peterffy and his affiliates will own a majority of the overall membership interests, in IBG Holdings LLC and, accordingly, will beneficially own all of the outstanding shares of our Class B common stock. As a result, Mr. Peterffy will be able to exercise control over all matters requiring the approval of our stockholders.

If at any time in the future Thomas Peterffy and his affiliates own less than a majority of the membership interests in IBG Holdings LLC, then at such time all membership interests in IBG Holdings LLC will become voting membership interests. Accordingly, all members of IBG Holdings LLC, instead of Mr. Peterffy alone, would together direct the voting of our Class B common stock, and all such members would together exercise control over all matters requiring the approval of our stockholders.

38

The graphic below illustrates our anticipated ownership structure immediately following completion of this offering, including the subsidiaries of IBG LLC all of which are 100% owned, except for Timber Hill LLC, which is 99.99% owned by IBG LLC and 0.01% owned by Thomas Peterffy, our founder, chairman and chief executive officer, and Interactive Brokers LLC, which is 99.9% owned by IBG LLC and 0.1% owned by Mr. Peterffy.



39

We will be a holding company and, immediately after the consummation of the Recapitalization, our primary assets will be our approximately 8.7% equity interest in IBG LLC, and our controlling interest and related rights as the sole managing member of IBG LLC. Our only business following this offering will be to act as the sole managing member of IBG LLC, and, as such, we will operate and control all of the business and affairs of IBG LLC and will be able to consolidate IBG LLC's financial results into our financial statements. IBG Holdings LLC's ownership interests in IBG LLC will be accounted for as a minority interest in our consolidated financial results after this offering. Net profits, net losses and distributions of IBG LLC will be allocated and made to its members pro rata in accordance with the respective percentages of their equity interests in IBG LLC. Accordingly, net profits and net losses of IBG LLC will initially be allocated, and distributions by IBG LLC will initially be made, approximately 8.7% to us and approximately 91.3% to IBG Holdings LLC.

As the result of a federal income tax election made by IBG LLC applicable to our acquisition of IBG LLC interests, the income tax basis of the assets of IBG LLC underlying the interests we acquire will be adjusted based upon the amount that we have paid for our IBG LLC interests. This increase in tax basis will result in increased depreciation and other tax deductions that will be allocated solely for our benefit and will be taken into account in reporting our taxable income. We have entered into an agreement with IBG Holdings LLC to pay IBG Holdings LLC (for the benefit of the current members of IBG LLC) 85% of the tax savings that we actually realize as the result of this basis increase. We will retain the remaining 15% of such tax savings. See "Transactions with Related Persons, Promoters and Certain Control Persons—Tax Receivable Agreement."

As a member of IBG LLC, we will incur U.S. federal, state and local income taxes on our allocable share of any net taxable income of IBG LLC. As authorized by the amended and restated limited liability company agreement pursuant to which IBG LLC will be governed, we intend to cause IBG LLC to continue to distribute cash on a pro rata basis to its members at least to the extent necessary to provide funds to pay the members' tax liabilities, if any, with respect to the earnings of IBG LLC.

**Voting**

Each share of our common stock will entitle its holder to one vote per share. Immediately after this offering, our Class B common stock will have approximately 91.3% of the voting power of our company, which percentage will decrease proportionately over time to the extent that IBG Holdings LLC owns a smaller percentage of IBG LLC. Initially, Thomas Peterffy will own all of the voting membership interests in IBG Holdings LLC upon consummation of this offering. Accordingly, Mr. Peterffy will beneficially own all of the outstanding shares of our Class B common stock and will be able to exercise control over all matters requiring the approval of our stockholders, including the election of our directors and the approval of significant corporate transactions.

If at any time in the future Thomas Peterffy and his affiliates own less than a majority of the membership interests in IBG Holdings LLC, then at such time all membership interests in IBG Holdings LLC will become voting membership interests. Accordingly, all members of IBG Holdings LLC, instead of Mr. Peterffy alone, would together direct the voting of the shares of our Class B common stock, and all such members would together exercise control over all matters requiring the approval of our stockholders. However, even if Mr. Peterffy and his affiliates cease to own a majority of the membership interests in IBG Holdings LLC, Mr. Peterffy could, depending on his level of percentage ownership, continue to effectively control or significantly influence matters requiring the approval of our stockholders.

40

**Exchange and Redemption of Membership Interests**

In connection with the Recapitalization, the current members of IBG LLC will receive membership interests in IBG Holdings LLC. The membership interests in IBG Holdings LLC will not be directly exchangeable for shares of our common stock. Instead, the membership interests will become redeemable at various times over the next eight years following this offering at the option of the holder. The redemption price for the membership interests will depend on the manner in which the payment is made to IBG Holdings LLC.

On an annual basis, each holder of a membership interest may request that the liquefiable portion (determined in accordance with the schedule set forth below) of its interest be redeemed by IBG Holdings LLC. The primary manner in which the redemption price will be paid is by selling a similar number of shares of our common stock to the public and using the gross proceeds from such sales, less underwriting discounts or placement agency fees, to acquire IBG LLC membership interests from IBG Holdings LLC. We have reserved for issuance 365.5 million shares of common stock, which is the aggregate number of shares of common stock expected to be issuable over time through such sales, assuming no anti-dilution adjustments based on combinations or divisions of our common stock. We would then expect IBG Holdings LLC to use the net proceeds it receives from such sales to redeem an identical number of IBG Holdings LLC membership interests from the requesting holders. The annual registration and sale of shares of our common stock to satisfy redemption requests is described in greater detail under "Transactions with Related Persons, Promoters and Certain Control Persons—Exchange Agreement" and in our exchange agreement, a copy of which is set forth as an exhibit to the registration statement of which this prospectus forms a part. The sales of our common stock and the application of the net proceeds to acquire IBG LLC membership interests are expected to have a negligible effect on the existing holders of our common stock, as the holders of our common stock would then own a larger portion of IBG LLC. Such transactions will have the effect of diluting your percentage ownership in us. However, because we will acquire an increased percentage ownership in IBG LLC over time as a result of such transactions, such transactions will not impact your effective percentage ownership of the economics of the underlying IBG LLC business.

In some cases, IBG LLC may redeem IBG LLC membership interests from IBG Holdings LLC using cash on hand. The primary circumstance under which IBG LLC would use cash on hand would be if IBG LLC had, at a given point in time, a relative surplus of cash on hand and our board of directors were to determine that using cash on hand to effect redemptions of IBG LLC membership interests would be an optimal use of such funds in relation to alternative uses. The redemption price per membership interest would be equal to the 30-day average closing price of our common stock. The use of IBG LLC's cash to acquire IBG LLC membership interests is expected to have a dilutive effect on the existing holders of our common stock, as the price paid per membership interest is likely to be higher than IBG LLC's tangible book value per membership interest.

In connection with this offering, the holders of the membership interests have agreed to a schedule for redemptions which would allow the holders to liquefy their investment in IBG Holdings LLC, which is as follows (all dates are approximate and subject to the prior or concurrent registration of the corresponding shares of common stock and sale of such shares into the public markets in order to pay the redemption price of the membership interests, if this financing alternative is utilized):

- 8.6% of the membership interests on the date of this offering;

- an additional 12.5% of the membership interests on each of the first seven anniversaries of this offering; and

41

the remaining 30% of the membership interests on the eighth anniversary of this offering.

Certain of the IBG Holdings LLC membership interests are subject to forfeiture in the event that the holder terminates employment with IBG LLC or its subsidiaries, other than as a result of death, permanent disability, approved retirement or termination without cause.

As the result of our acquisition from IBG Holdings LLC of an IBG LLC membership interest using the proceeds of a sale of our common stock into the public markets, we will receive not only an additional interest in IBG LLC but also, for federal income tax purposes, an adjustment to the federal income tax basis of the assets of IBG LLC underlying such additional interest. We intend to enter into a tax receivable agreement with IBG Holdings LLC that will provide for the payment by us to IBG Holdings LLC of 85% of the cash savings, if any, in U.S. federal, state and local income tax or franchise tax that we actually realize as a result of these increases in tax basis and of certain other tax benefits related to entering into the tax receivable agreement, including tax benefits attributable to payments under the tax receivable agreement. While the actual amount and timing of any payments under this agreement will vary depending upon a number of factors, including the amount and timing of our income, we expect that, as a result of the size of the increases in the tax basis of the tangible and intangible assets of IBG LLC and its subsidiaries, the payments that we may make to IBG Holdings LLC could be substantial. If all IBG LLC membership interests had been acquired in a taxable transaction using the proceeds of a sale of our common stock into the public markets at the time of the closing of this offering, the increase in the tax basis attributable to our interest in IBG LLC would have been approximately $8.6 billion, including the increase in tax basis associated with our purchase of IBG LLC membership interests and the Recapitalization. Subject to the limitations discussed below, this increased tax basis is expected to result in tax benefits as a result of increased depreciation or amortization deductions. We will retain 15% of the tax benefits actually realized. As set forth in the tax receivable agreement, we will pay the remaining 85% of the realized tax benefits relating to any applicable tax year to IBG Holdings LLC within 13 calendar days of the delivery of a tax benefit calculation by us to IBG Holdings LLC, which delivery will take place within ten calendar days after the filing of our U.S. federal income tax return for the applicable tax year. IBG Holdings LLC shall distribute, pursuant to its operating agreement, any tax benefit payments received by it from us within 90 days following receipt thereof. A cash amount equal to the remainder of the tax benefits actually realized for a particular year will be paid to IBG Holdings LLC upon the realization of the tax benefits for such year. The actual amount of tax benefits that we realize (measured by a reduction in taxes otherwise payable by us) will depend upon multiple factors, including the tax rate applicable to us at the time. See "Transactions with Related Persons, Promoters and Certain Control Persons—Tax Receivable Agreement."

*Mandatory Redemption*

IBG Holdings LLC, with the consent of Thomas Peterffy and our board of directors, has the right to cause the holders of IBG Holdings LLC membership interests to have all or a portion of their interests redeemed at any time following the first anniversary of this offering. Such redemptions would be financed in the same manner as the scheduled redemptions described above.

42

## USE OF PROCEEDS

The net proceeds from the sale of the 34,500,000 shares of common stock offered by us will be approximately $981.7 million, after deducting the placement agency fee.

The primary purposes of this offering are to:

- diversify the ownership of IBG LLC's business;

- raise IBG LLC's profile for competitive reasons;

- create a public market for our common stock; and

- facilitate future access to public markets.

We intend to use the net proceeds of this offering to purchase membership interests in IBG LLC from IBG Holdings LLC representing approximately 8.6% of the outstanding membership interests in IBG LLC. The number of membership interests in IBG LLC to be purchased from IBG Holdings LLC and the purchase price for each membership interest corresponds to the number of shares of common stock to be sold in this offering and the offering price per share, less the placement agency fee per share. IBG Holdings LLC will, in turn, use such sale proceeds to redeem, on a pro rata basis, IBG Holdings LLC membership interests held by its members, who include 66 of our employees (including the directors and executive officers set forth in the second table below). The following table illustrates the expected application of the gross proceeds from this offering as described above. An additional $5.5 million in estimated offering expenses will be borne by IBG LLC.

|                                                            |    | (in millions) |
| ---------------------------------------------------------- | -- | ------------: |
| Gross proceeds from offering                               | $  |       1,000.5 |
| Placement agency fee                                       | $  |        (18.8) |
| Net proceeds                                               | $  |         981.7 |
| Acquisition of membership interests in IBG LLC from IBG Holdings LLC | $  |         981.7 |

The following is a listing of our directors and executive officers expected to receive net proceeds from this offering, together with the percentage and dollar amount net proceeds to be received from this offering:

| Name | Title | % of Net Proceeds to be Received | Amount |
| ---- | ----- | ---: | ---: |
|      |       |      | (in millions) |
| Thomas Peterffy | Chairman of the Board of Directors, Chief Executive Officer and President | 84.5784% $ | 830.3 |
| Earl H. Nemser | Vice Chairman and Director | 1.1895% $ | 11.7 |
| Paul J. Brody | Chief Financial Officer, Treasurer, Secretary and Director | 1.2509% $ | 12.3 |
| Thomas A. Frank | Executive Vice President and Chief Information Officer | 3.1498% $ | 30.9 |
| Milan Galik | Senior Vice President, Software Development and Director | 1.3687% $ | 13.4 |
| Directors and executive officers as a group | | 91.5373% $ | 898.6 |

No additional IBG LLC or IBG Holdings LLC membership interests will be granted to employees or executive officers in connection with this offering.

43

**DIVIDEND POLICY**

We have made no determination as to whether to pay any dividends on our common stock in the foreseeable future. Because we may not pay any dividends, you may need to sell your shares of common stock to realize your return on your investment, and you may not be able to sell your shares at or above the price you paid for them.

As a holding company for our interest in IBG LLC, our ability to pay dividends is subject to the ability of IBG LLC to provide cash to us through distributions of amounts in excess of our expenses of operations. In accordance with the amended and restated limited liability company agreement pursuant to which IBG LLC will be governed, we, as the managing member of IBG LLC, expect to cause IBG LLC to make distributions to its members, including us, to the extent necessary to enable such members to pay taxes incurred with respect to their allocable shares of taxable income of IBG LLC. Any distributions by IBG LLC in excess of such tax distributions, and the declaration and payment of any future dividends by us, will be at the discretion of our board of directors and will depend on IBG LLC's strategic plans, financial results and condition, contractual, legal, financial and regulatory restrictions on distributions (including the ability of IBG LLC to make distributions under the covenants in its senior secured revolving credit facility and senior notes as described below), capital requirements, business prospects and such other factors as our board of directors, in exercising our authority as managing member of IBG LLC, considers to be relevant to such determination.

IBG LLC's secured revolving credit facility restricts IBG LLC's ability to make dividend payments or similar distributions to the members of IBG LLC in any given fiscal year unless IBG LLC, prior to, as well as subsequent to, making such dividend payments or distributions, is in compliance with the financial covenants described under "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Principal Indebtedness—Senior Secured Revolving Credit Facility" on page 80.

IBG LLC's senior notes contain covenants that prohibit IBG LLC from making dividend payments or similar distributions to its members in any given fiscal year that exceed the greatest of:

- 50% of IBG LLC's consolidated income before income taxes for such fiscal year, as determined in accordance with generally accepted accounting principles;

- 50% of IBG LLC's consolidated income before income taxes for the prior fiscal year, as determined in accordance with generally accepted accounting principles;

- $50 million; and

- the sum of (a) amounts distributable in accordance with the limited liability company agreement of IBG LLC to members of IBG to cover their tax liabilities, if any, with respect to the earnings of IBG LLC and (b) amounts, not exceeding $50 million in any calendar year, that are distributable pursuant to the limited liability company agreement of IBG LLC upon the death, withdrawal, or termination of employment of a member.

IBG LLC is taxable as a partnership and we are taxable as a corporation for U.S. federal income tax purposes. Therefore, as a member and owner of an interest in IBG LLC, we are subject to tax on our allocable share of taxable income of IBG LLC, whether or not such income is distributed to us. Holders of our common stock will not be taxed directly on the earnings of IBG LLC. In general, any distributions of cash or other property that we pay to our stockholders will constitute dividends for U.S. federal income tax purposes. For more information regarding risk factors that could materially adversely affect our actual results of operations and our ability to pay any dividends, see "Risk Factors," including "Risk Factors—

44

We may not pay dividends on our common stock at any time in the foreseeable future." During 2005 and 2006, IBG LLC made aggregate cash distributions to its members in the amounts of $88.5 million and $164.5 million, respectively. As set forth in the table below, such distributions were made in five separate installments in each of 2005 and 2006. IBG LLC has historically used only its earnings to make these distributions.

Case 1:08-cv-00242-CM Document 20-3 Filed 04/25/2008 Page 52 of 52

|  | Distributions from IBG LLC | | | |
| --- | --- | --- | --- | --- |
|  | 2005 | | 2006 | |
|  | (In millions) | | | |
| Month |  |  |  |  |
| January | $ | 7.0 | $ | 18.0 |
| March/April | $ | 31.0 | $ | 68.0 |
| June | $ | 25.0 | $ | 33.0 |
| September | $ | 15.0 | $ | 33.0 |
| December | $ | 10.5 | $ | 12.5 |
| Total | $ | 88.5 | $ | 164.5 |

In January and April 2007, IBG LLC made cash distributions to its current members in the amounts of $24.5 million and $134 million, respectively. These distributions were intended to provide the members with funds to pay income taxes on their proportionate share of IBG LLC's income.

45

# CAPITALIZATION

The following table sets forth:

- the capitalization of IBG LLC on an actual basis as of December 31, 2006; and

- the capitalization of IBG LLC on a pro forma as adjusted basis, giving effect to (1) the Recapitalization as if it had occurred on December 31, 2006, (2) the sale of 34,500,000 shares of our common stock in this offering and (3) our receipt of the estimated $981.7 million in net proceeds from this offering, assuming the shares are offered at $29.00 per share, which is the midpoint of the range set forth on the cover page of this prospectus, after deducting the placement agency fee, and the application of those net proceeds to acquire membership interests in IBG LLC, as described under "Use of Proceeds."

You should read the unaudited financial information in this table together with the "Use of Proceeds," "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Description of Capital Stock" and our historical consolidated financial statements and our unaudited pro forma consolidated financial statements, along with the notes thereto, included elsewhere in this prospectus.

| | As of December 31, 2006 | |
| --- | --- | --- |
| | Actual | Pro Forma |
| | (in millions) | |
| Long-term debt: | | |
| Senior secured revolving credit facility[1] | $150.0 | $    150.0 |
| Senior notes | 150.6 | 150.6 |
| Total long-term debt | 300.6 | 300.6 |
| Minority interest | — | 2,555.7 |
| Redeemable members' interest[2] | 2,801.9 | — |
| Stockholders' equity[3] | | |
| Common stock—Class A, $0.01 par value: no shares authorized, issued or outstanding, actual; 1,000,000,000 shares authorized and 34,500,000 issued and outstanding pro forma as adjusted | — | 0.3 |
| Common stock—Class B, $0.01 par value: no shares authorized, issued or outstanding, actual; 100 shares issued and outstanding, pro forma as adjusted authorized | — | — |
| Paid-in capital[4] | — | 263.5 |
| Accumulated other comprehensive income | — | 8.5 |
| Total stockholders' equity | — | 272.3 |
| Total capitalization[4] | $3,102.5 | $    3,128.6 |

(1) On May 19, 2006, IBG LLC entered into a $300.0 million senior secured revolving credit facility, on which facility $150.0 million has been drawn and was outstanding as of December 31, 2006.

(2) Redeemable members' interests represent member interests in IBG LLC that are entitled to share in the consolidated profits and losses of IBG LLC. IBG LLC is a private entity owned by the members holding such member interests. As a private company, such amounts were classified historically as members' capital. For presentation purposes, IBG LLC has applied guidance within EITF D-98 which requires securities or equity interests of a company whose redemption is outside the control of the company to be classified outside of permanent capital in the statement of financial condition. The member interests in IBG LLC can be redeemed by the members at book value at their option. Because this redemption right is deemed to be outside the control of the company, IBG LLC has reclassified all members' capital outside of permanent capital to redeemable members' interests in the consolidated statement of financial condition. Such reclassification was made to comply with

46

EITF D-98 and the requirements of Regulation S-X of the Exchange Act. Redeemable members' interests include accumulated other comprehensive income of $98.6 million.

Case 1:08-cv-00242-CM    Document 20-4    Filed 04/25/2008    Page 2 of 46

(3)    Excludes (i) approximately 1,244,271 shares of our common stock that are to be issued over time resulting from investment of accumulated earnings on Return on Investment Dollar Units in connection with the Recapitalization, and (ii) approximately 789,700 shares of our common stock that are to be issued over time in connection with our equity incentive plan. See "The Recapitalization Transactions and Our Organizational Structure" and "Management—Return on Investment Dollar Units" and "—Employee Incentive Plan."

(4)    A $1.00 increase (decrease) in the assumed initial public offering price of $29.00 per share, which is the midpoint of the range set forth on the cover page of this prospectus, would increase (decrease) each of paid-in capital and total capitalization by $33.8 million, assuming the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same and after deducting the estimated placement agency fee payable by us.

47

# DILUTION

Purchasers of shares of common stock in this offering will experience immediate and substantial dilution to the extent of the difference between the pro forma net tangible book value of the common stock and the initial public offering price. Net tangible book value per share represents the amount of our total tangible assets less our total liabilities, divided by the number of shares of our common stock outstanding. Dilution in net tangible book value per share represents the difference between the amount per share that you pay in this offering and the net tangible book value per share immediately after this offering. Dilution results from the fact that the initial public offering price is substantially in excess of the net tangible book value per share effectively attributable to existing equityholders. Our net tangible book value at December 31, 2006 was approximately $2.802 billion. Our pro forma net tangible book value at December 31, 2006, after giving effect to the Recapitalization, was $2.802 billion, or $7.00 per share of our common stock, assuming we purchased all IBG LLC membership interests held by IBG Holdings LLC and issued 400,000,000 shares of common stock to public stockholders, as of the date of this offering.

After giving effect to the sale of 34,500,000 shares of our common stock in this offering at an assumed initial public offering price of $29.00 per share, the midpoint of the range set forth on the front cover of this prospectus, and after deducting the placement agency fee and estimated offering expenses, our pro forma net tangible book value would have been $2.796 billion, or $6.99 per share, assuming we purchased all IBG LLC membership interests held by IBG Holdings LLC and issued 400,000,000 shares of common stock to public stockholders, as of the date of this offering. This represents an immediate decrease in pro forma net tangible book value of $0.01 per share to existing stockholders and an immediate dilution of $22.01 per share to investors purchasing our common stock in this offering. The following table illustrates this per share dilution:

|  |  | Per Share |
|---|---|---|
| Initial public offering price per share |  | $ 29.00 |
| Pro forma net tangible book value per share at December 31, 2006 | $ 7.00 |  |
| Change in pro forma net tangible book value per share attributable to this offering | $ (0.01) |  |
| Pro forma net tangible book value per share after this offering |  | $ 6.99 |
| Dilution per share to new investors |  | $ 22.01 |

The following table summarizes on a pro forma basis as of December 31, 2006, after giving effect to this offering, the total number of shares of common stock purchased from us and the total consideration and the average price per share paid by existing equityholders and by investors participating in this offering, assuming we purchased all IBG LLC membership interests held by IBG Holdings LLC and issued a corresponding number of shares of our common stock to public stockholders, as of the date of this offering:

| | Shares Purchased | | Total Consideration | | Average Price Per Share |
|---|---|---|---|---|---|
| | Number | Percent | Amount | Percent | |
| Existing equityholders | 365,500,000 | 91.4% | $ — | —% | $ — |
| New investors | 34,500,000 | 8.6% | $ 1,000,500,000 | 100% | $ 29.00 |
| Total | 400,000,000 | 100% | $ 1,000,500,000 | 100% | |

The number of shares of our common stock outstanding after the offering as shown above is based on the number of shares outstanding as of December 31, 2006, and excludes (i) approximately 1,244,271 restricted shares of our common stock that are to be issued upon investment of accumulated earnings on ROI Units in connection with the Recapitalization, and (ii) up to 9,200,000 restricted shares

48

of our common stock that are issuable in the future pursuant to post offering equity incentive grants. See "The Recapitalization Transactions and Our Organizational Structure" and "Management—Return on Investment Dollar Units" and "—Employee Incentive Plan."

A $1.00 increase (decrease) in the assumed offering price of $29.00 per share, which is the midpoint of the range set forth on the cover page of this prospectus, would increase (decrease) total consideration paid by new investors by $33.8 million, assuming the number of shares offered by us, as set forth on the cover page of this prospectus and after deducting the estimated placement agency fee payable by us.

49

# UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL DATA

The following unaudited pro forma consolidated financial data for the year ended December 31, 2006 are derived from IBG LLC's historical consolidated financial statements included elsewhere in this prospectus. The unaudited pro forma financial statements should be read in conjunction with our consolidated financial statements and related notes included elsewhere in this prospectus, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the other financial information appearing elsewhere in this prospectus.

The unaudited pro forma consolidated statement of income for the year ended December 31, 2006, gives pro forma effect to (1) the Recapitalization and (2) the consummation of this offering and our application of the net proceeds from this offering to purchase membership interests in IBG LLC from IBG Holdings LLC as though such transactions had occurred on January 1, 2006, and the unaudited pro forma consolidated statement of financial condition as of December 31, 2006 gives pro forma effect to such transactions as though they had occurred on December 31, 2006.

As a result of the Recapitalization, we will become the sole managing member of IBG LLC and, as such, will continue to operate and control all of the business and affairs of IBG LLC and its subsidiaries and will be able to consolidate IBG LLC's financial results into our financial statements. We will reflect IBG Holdings LLC's ownership interest as a minority interest in our statement of financial condition and statement of income. Our historical results will be those of IBG LLC. As a result, our net income, after excluding IBG Holdings LLC's minority interest, will represent approximately 8.7% of IBG LLC's net income, and similarly, outstanding shares of our common stock will represent approximately 8.7% of the outstanding membership units of IBG LLC.

The unaudited pro forma consolidated financial statements reflect pro forma adjustments that are described in the accompanying notes and are based on available information and certain assumptions we believe are reasonable, but are subject to change. We have made, in our opinion, all adjustments that are necessary to present fairly the pro forma financial data. The unaudited pro forma financial data is presented for informational purposes only and should not be considered indicative of actual results of operations that would have been achieved had the Recapitalization and this offering been consummated on the dates indicated and do not purport to be indicative of balance sheet data or results of operations as of any future date or for any future period.

50

# Unaudited Pro Forma Consolidated Statement of Income

| | Year Ended December 31, 2006 | | |
|---|---|---|---|
| **Statement of Income Data:** | **Historical** | **Adjustments** | **Pro Forma**[1] |
| | (in millions, except per share data) | | |
| Revenues: | | | |
| Trading gains | $805.1 | $  — | $805.1 |
| Commissions and execution fees | 174.4 | — | 174.4 |
| Interest income | 672.1 | — | 672.1 |
| Other income | 85.2 | — | 85.2 |
| Total revenues | 1,736.8 | — | 1,736.8 |
| Interest expense | 484.4 | — | 484.4 |
| Total net revenues | 1,252.4 | — | 1,252.4 |
| Non-interest expenses: | | | |
| Execution and clearing | 313.3 | — | 313.3 |
| Employee compensation and benefits | 110.1 | — | 110.1 |
| Occupancy, depreciation and amortization | 22.7 | — | 22.7 |
| Communications | 12.6 | — | 12.6 |
| General and administrative[2] | 32.1 | 0.2 | 32.3 |
| Total non-interest expenses | 490.8 | 0.2 | 491.0 |
| Income before income tax | 761.6 | (0.2) | 761.4 |
| Income tax expense[3][4] | 27.4 | 21.4 | 48.8 |
| Less—Minority interest[5] | — | (670.8) | (670.8) |
| Net income | $734.2 | $ (692.4) | $41.8 |
| Earnings per share[6]: | | | |
| Basic | | | $1.21 |
| Diluted | | | $1.21 |
| Weighted average common shares outstanding: | | | |
| Basic | | | 34,500,100 |
| Diluted | | | 401,244,371 |

See accompanying notes to unaudited pro forma consolidated statement of income.

51

**Notes to the Unaudited Pro Forma Consolidated Statement of Income**

Represent adjustments to reflect the following:

(1)  Pro forma earnings per share calculations includes (i) the restricted shares of common stock that are to be issued upon investment of accumulated earnings on Return on Investment Dollar Units in connection with the Recapitalization, but excludes (ii) our shares of our common stock that are issuable in the future pursuant to post offering equity incentive plan. See "The Recapitalization Transactions and Our Organizational Structure" and "Management—Return on Investment Dollar Units" and "—Employee Incentive Plan."

(2)  Gives effect to Delaware franchise taxes that will be payable, estimated at $0.165 million annually.

(3)  The $21.4 million income tax expense adjustments for the year ended December 31, 2006 represent the sum of the current income tax expense adjustment for this period (referenced in this footnote 3) and the deferred income tax expense adjustment for this period (referenced in footnote 4 below). Additional current income tax expense on our 8.6% investment in IBG LLC would be $7.5 million for the year ended December 31, 2006. In addition to increased currently payable income taxes, we will incur increased deferred income tax expense (see footnote 4).

(4)  Additional deferred income tax expense of $13.9 million is the result of the straight-line amortization of the deferred tax asset of $207.8 million arising from the acquisition of the 8.6% member interest in IBG LLC (see footnote 3 above), and will be amortized over 15 years.

(5)  Gives effect to the 91.4% interest in IBG LLC that IBG Holdings LLC will have after the Recapitalization and this offering. The adjustments are equal to 91.4% of total net income for the year ended December 31, 2006.

(6)  Basic pro forma earnings per share are calculated based on the estimated 34.5 million shares of Class A common stock and 100 shares of Class B common stock being outstanding. Diluted earnings per share are calculated based on an assumed purchase by us of all remaining IBG LLC membership interests held by IBG Holdings LLC and the issuance by us of a corresponding number of shares of Class A common stock, resulting in a total of 400 million shares deemed outstanding as of the beginning of each period, as described in the caption entitled "The Recapitalization Transactions and Our Organizational Structure." There is no impact on earnings per share for such purchase and issuance because 100% of net income before minority interest would be available to common stockholders as IBG Holdings LLC would no longer hold a minority interest, and the full difference between the book and tax basis of IBG LLC's assets would also be available for reducing income tax expense. Therefore, the net income utilized to calculate diluted earnings per share would be $485.0 million.

In addition, diluted weighted average common shares outstanding includes 1.2 million restricted shares to be issued upon investment of accumulated earnings on Return on Investment Dollar Units in connection with the Recapitalization. Restricted shares to be issued in connection with the employee incentive plan have been excluded from diluted weighted average common shares outstanding because such shares are non-dilutive.

52

**Unaudited Pro Forma Consolidated Statement of Financial Condition**

**As of December 31, 2006**

| | Historical | Adjustments[1] | Pro Forma |
|---|---|---|---|
| | | (in millions, except per share data) | |
| **Assets** | | | |
| Cash and cash equivalents | $     669.3 | $ | $     669.3 |
| Cash and securities—segregated for regulatory purposes or deposited with clearing organizations | 3,111.8 | — | 3,111.8 |
| Securities borrowed | 10,479.2 | — | 10,479.2 |
| Securities purchased under agreements to resell | 97.7 | — | 97.7 |
| Trading assets, at market: | | | |
| Securities owned | 7,485.9 | | 7,485.9 |
| Securities owned and pledged as collateral | 8,331.9 | — | 8,331.9 |
| | 15,817.8 | — | 15,817.8 |
| Other receivables: | | | |
| Customers | 848.4 | — | 848.4 |
| Brokers, dealers and clearing organizations | 857.0 | — | 857.0 |
| Interest | 62.8 | — | 62.8 |
| | 1,768.2 | — | 1,768.2 |
| Other assets[1] | 136.5 | 207.8 | 344.3 |
| Total assets | $  32,080.5 | $     207.8 | $  32,288.3 |
| **Liabilities and Members' Capital** | | | |
| **Liabilities** | | | |
| Trading liabilities—securities sold but not yet purchased, at market | $  14,785.6 | $          — | $  14,785.6 |
| Securities loaned | 8,026.5 | — | 8,026.5 |
| Short-term borrowings | 1,296.9 | — | 1,296.9 |
| Other payables: | | | |
| Customers | 3,914.0 | — | 3,914.0 |
| Brokers, dealers and clearing organizations | 743.4 | — | 743.4 |
| Accounts payable, accrued expenses and other liabilities[2] | 161.8 | 181.7 | 343.5 |
| Interest | 49.8 | — | 49.8 |
| | 4,869.0 | 181.7 | 5,050.7 |
| Senior secured credit facility | 150.0 | — | 150.0 |
| Senior notes payable | 150.6 | — | 150.6 |
| Minority interest[3][4] | — | 2,555.7 | 2,555.7 |
| Redeemable members' interests: | | | |
| Accumulated other comprehensive income[5] | 98.6 | (98.6) | — |
| Redeemable members' interests | 2,703.3 | (2,703.3) | — |
| Total redeemable members' interests | 2,801.9 | (2,801.9) | — |
| | 32,080.5 | (64.5) | 32,016.0 |
| **Stockholders' equity** | | | |
| Accumulated other comprehensive income[4] | — | 8.5 | 8.5 |
| Common stock[6] | — | 0.3 | 0.3 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Additional paid-in capital [6] | | | | | | | 263.5 |
| Total stockholders' equity | | | | — | | 272.3 | 272.3 |
| Total liabilities and stockholders' equity | $ | 32,080.5 | $ | 207.8 | $ | | 32,288.3 |

See accompanying notes to unaudited pro forma consolidated statement of financial condition.

53

Notes to the Unaudited Pro Forma Consolidated Statement of Financial Condition

Represent adjustments to reflect the following:

(1)    Gives effect to a deferred tax asset of $207.8 million arising from the acquisition of the 8.6% member interest in IBG LLC (see footnote 2 below). The deferred tax asset is to be amortized over 15 years. $176.7 million (85%) of the tax savings realized by us will be paid to IBG Holdings LLC and is included in accounts payable, accrued expenses and other liabilities in our pro forma consolidated statement of financial condition, with the remaining $31.1 million recorded as a permanent increase to additional paid-in capital.

(2)    The $181.7 million adjustment to accounts payable, accrued expenses and other liabilities represents the $176.7 million of tax savings (referenced in footnote 1 above) minus existing minority interest of $0.5 million plus the $5.5 million of estimated offering expenses (referenced in footnote 6 below). Existing minority interest of $0.5 million at December 31, 2006 was reported in other liabilities in our historical financial statements and has been reclassified to minority interest in our pro forma consolidated statement of financial condition.

(3)    Minority interests are comprised of:

| | | |
|---|---|---|
| 91.4% of redeemable members' interests of $2,801.9 | $ | 2,560.2 |
| Add: existing minority interests | | 0.5 |
| Less: 91.4% of direct offering costs of $5.5 million to be reimbursed by IBG LLC (footnote 6) | | (5.0) |
| | $ | 2,555.7 |

(4)    Represents 8.6% of the $98.6 million in accumulated other comprehensive income included in redeemable members' interests in the historical financial statements.

(5)    Gives effect to the elimination of redeemable members' interest of IBG LLC.

Redeemable members' interests represent member interests in IBG LLC that are entitled to share in the consolidated profits and losses of IBG LLC. IBG LLC is a private entity owned by the members holding such member interests. As a private company, such amounts were classified historically as members' capital. For presentation purposes, IBG LLC has applied guidance within EITF D-98 which requires securities or equity interests of a company whose redemption is outside the control of the company to be classified outside of permanent capital in the statement of financial condition. The member interests in IBG LLC can be redeemed by the members at book value at their option. Because this redemption right is deemed to be outside the control of the company, IBG LLC has reclassified all members' capital outside of permanent capital to redeemable members' interests in the consolidated statement of financial condition. Such reclassification was made to comply with EITF D-98 and the requirements of Regulation S-X of the Exchange Act.

54

| | | |
|---|---|---:|
| 8.6% of redeemable members' interests of $2,703.3 million, which is net of accumulated other comprehensive income of $98.6 million (footnote 4) | $ | 233.2 |
| Add: additional paid in capital arising from recording of deferred tax asset (footnote 1) | | 31.1 |
| Less: | | |
| Par value of 34,500,000 shares of $0.01 per share Class A common stock | | (0.3) |
| 8.6% of direct offering costs of $5.5 million to be reimbursed by IBG LLC | | (0.5) |
| | $ | 263.5 |

The adjustment gives effect to our issuance of 34,500,000 shares of Class A common stock, par value $0.01 per share, in connection with the Recapitalization and this offering. All net proceeds of this offering, which would be approximately $981.7 million, assuming an initial offering price of $29.00 per share of common stock (the midpoint of the range set forth on the cover page of this prospectus), will be paid to existing members of IBG LLC and accordingly such net proceeds have been accounted for as a deemed dividend applied against additional paid in capital in our unaudited pro forma consolidated statement of financial position. An additional $5.5 million in estimated offering expenses (separate from the placement agency fee reflected in the table below) will be borne by IBG LLC. The following is a sensitivity analysis of the range of proceeds for different hypothetical issuance amounts of shares of our Class A common stock in this offering, assuming an initial offering price of $29.00 per share. A range of +/-15% has been utilized. Dollar amounts except for per share price are in millions:

| Number of shares issued | 29,325,000 | | 34,500,000 | | 39,675,000 | |
|---|---:|---|---:|---|---:|---|
| Class A common stock, $0.01 par value | $ | 0.3 | $ | 0.3 | $ | 0.4 |
| Additional paid in capital | | 850.1 | | 1,000.2 | | 1,150.2 |
| Gross proceeds | | 850.4 | | 1,000.5 | | 1,150.6 |
| Less: placement agency fee | | (15.9) | | (18.8) | | (21.6) |
| Net proceeds | | 834.5 | | 981.7 | | 1,129.0 |
| Less: paid to existing members | | (834.5) | | (981.7) | | (1,129.0) |
| Net effect of proceeds on additional paid in capital | $ | 0.0 | $ | 0.0 | $ | 0.0 |

55

# SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA

The following tables set forth selected historical consolidated financial and other data of IBG LLC as of the dates and for the periods indicated. The selected historical consolidated financial data as of and for the years ended December 31, 2002, 2003, 2004, 2005 and 2006 have been derived from IBG LLC's audited consolidated statements of financial condition as of December 31, 2005 and 2006 and the audited consolidated statements of income for the years ended December 31, 2004, 2005 and 2006 which are included elsewhere in this prospectus. The historical audited consolidated statements of financial condition as of December 31, 2002, 2003 and 2004 and the audited consolidated statements of income for the years ended December 31, 2002 and 2003 are not included in this prospectus.

For all periods presented, IBG LLC has operated in the United States as a limited liability company that was treated as a partnership for U.S. federal income tax purposes. As a result, IBG LLC has not been subject to U.S. federal income taxes on its income. Upon the consummation of this offering, we will be subject to U.S. federal and certain state and local income taxes applicable to a corporation.

You should read the following selected historical consolidated financial and other data in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Unaudited Pro Forma Consolidated Financial Data" and the IBG LLC historical consolidated financial statements and related notes included elsewhere in this prospectus.

|  | Year Ended December 31, | | | | |
|  | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
|  | (in millions) | | | | |
| **Consolidated Statement of Income Data:** | | | | | |
| **Revenues:** | | | | | |
| Trading gains | $ 472.2 | $ 488.4 | $ 423.2 | $ 640.4 | $ 805.1 |
| Commissions and execution fees | 64.0 | 93.0 | 112.0 | 132.1 | 174.4 |
| Interest revenues | 55.2 | 59.3 | 79.5 | 273.2 | 672.1 |
| Other income | 7.5 | 10.4 | 7.0 | 53.4 | 85.2 |
| Total revenues | 598.9 | 651.1 | 621.7 | 1,099.1 | 1,736.8 |
| Interest expense | 41.6 | 46.1 | 57.7 | 170.0 | 484.4 |
| Total net revenues | 557.3 | 605.0 | 564.0 | 929.1 | 1,252.4 |
| Non-interest expenses: | | | | | |
| Execution and clearing | 96.5 | 127.3 | 152.5 | 215.0 | 313.3 |
| Employee compensation and benefits | 64.7 | 73.5 | 79.1 | 90.2 | 110.1 |
| Occupancy, depreciation and amortization | 12.6 | 13.7 | 16.4 | 20.4 | 22.7 |
| Communications | 7.8 | 7.5 | 9.0 | 10.4 | 12.6 |
| General and administrative | 29.1 | 18.2 | 17.0 | 23.8 | 32.1 |
| Total non-interest expenses | 210.7 | 240.2 | 274.0 | 359.8 | 490.8 |
| Income before income tax | 346.6 | 364.8 | 290.0 | 569.3 | 761.6 |
| Income tax expense | 21.3 | 19.9 | 19.6 | 33.8 | 27.4 |
| Net income | $ 325.3 | $ 344.9 | $ 270.4 | $ 535.5 | $ 734.2 |

56

|  | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
|  | | | **(in millions)** | | |
| **Consolidated Statement of Financial Condition Data:** | | | | | |
| Cash, cash equivalents and short-term investments[1] | $    966.7 | $    1,390.8 | $    1,844.5 | $    2,741.9 | $    3,878.8 |
| Total assets[2] | 7,735.9 | 10,811.6 | 15,060.4 | 24,292.2 | 32,080.5 |
| Total liabilities, excluding redeemable members' interests | 6,476.6 | 9,255.1 | 13,261.9 | 22,118.0 | 29,278.6 |
| Redeemable members' interests[3] | 1,259.3 | 1,556.5 | 1,798.5 | 2,174.2 | 2,801.9 |

(1)    Cash, cash equivalents and short-term investments represent cash and cash equivalents, cash and securities segregated under federal and other regulations, short-term investments, U.S. and foreign government obligations and securities purchased under agreements to resell.

(2)    At December 31, 2006, approximately $32.0 billion, or 99.7%, of total assets were considered to be liquid and consisted primarily of marketable securities.

(3)    Redeemable members' interests represent member interests in IBG LLC that are entitled to share in the consolidated profits and losses of IBG LLC. IBG LLC is a private entity owned by the members holding such member interests. As a private company, such amounts were classified historically as members' capital. For presentation purposes, IBG LLC has applied guidance within EITF D-98 which requires securities or equity interests of a company whose redemption is outside the control of the company to be classified outside of permanent capital in the statement of financial condition. The member interests in IBG LLC can be redeemed by the members at book value at their option. Because this redemption right is deemed to be outside the control of the company, IBG LLC has reclassified all members' capital outside of permanent capital to redeemable members' interests in the consolidated statement of financial condition. Such reclassification was made to comply with EITF D-98 and the requirements of Regulation S-X of the Exchange Act. Redeemable members' interests include accumulated other comprehensive income.

57

# MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion should be read in conjunction with the "Selected Historical Consolidated Financial Data," and our consolidated financial statements and the related notes included elsewhere in this prospectus. The following discussion contains, in addition to historical information, forward-looking statements that include risks and uncertainties. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of certain factors, including those set forth under the heading "Risk Factors" and elsewhere in this prospectus.

## Overview

### Background

We are an automated global electronic market maker and broker specializing in routing orders and executing and processing trades in securities, futures and foreign exchange instruments as a member of more than 60 electronic exchanges and trading venues around the world. Since our inception in 1977, we have focused on developing proprietary software to automate broker-dealer functions. The advent of electronic exchanges in the last 16 years has provided us with the opportunity to integrate our software with an increasing number of exchanges and trading venues into one automatically functioning, computerized platform that requires minimal human intervention.

### Overview of Recapitalization Transactions and Our Organizational Structure

We have historically conducted our business through a limited liability company structure. In order to have a Delaware corporation as the issuer for our initial public offering, immediately prior to and immediately following the consummation of this offering, IBG LLC and its members will consummate a series of transactions described below, which we collectively refer to as the "Recapitalization." After completion of the Recapitalization, our primary assets will be our ownership of approximately 8.7% of the membership interests of IBG LLC, the current holding company for our businesses, and our controlling interest and related contractual rights as the sole managing member of IBG LLC. The remaining approximately 91.3% of IBG LLC membership interests after completion of this offering will be held by IBG Holdings LLC, a holding company that will be owned by the current members of IBG LLC. The IBG LLC membership interests held by IBG Holdings LLC will be subject to purchase by us over time in connection with offerings by us of shares of our common stock, as described elsewhere in this prospectus in the section entitled "The Recapitalization Transactions and Our Organizational Structure."

### Business Segments

The Company reports its results in two business segments, market making and electronic brokerage. These segments are analyzed separately as we derive our revenues from these two principal business activities as well as allocate resources and assess performance.

- *Market Making.* We conduct our market making business through our Timber Hill subsidiaries. As one of the largest market makers on many of the world's leading exchanges, we provide liquidity by offering competitively tight bid/offer spreads over a broad base of approximately 357,000 tradable, exchange-listed products. In particular, we are a market leader in exchange-traded equity options, equity-index options and futures. As principal, we commit our own capital and derive revenues or incur losses from the difference between the price paid when securities are bought (or sold) and the price received when those securities are sold (or bought). Because we provide continuous bid and offer quotations and we are continuously both buying and selling quoted securities, we may have either a long or a short position in a particular product at a given point in time. Historically, our profits have been

58

principally a function of transaction volume on electronic exchanges rather than volatility or the direction of price movements. Our strategy is to calculate quotes at which supply and demand for a particular security are likely to be in balance a few seconds ahead of the market and execute small trades at tiny but favorable differentials. Our quotes are based on our proprietary model rather than customer order flow, and we believe that this approach provides us with a competitive advantage. As a matter of practice, we will generally not take portfolio positions in either the broad market or the financial instruments of specific issuers in anticipation that prices will either rise or fall. Our entire portfolio is evaluated each second and continuously rebalanced throughout the trading day, thus minimizing the risk of our portfolio at all times. This real-time rebalancing of our portfolio, together with our real-time proprietary risk management system, enables us to curtail risk and to be profitable in both up-market and down-market scenarios.

- *Electronic Brokerage.* We conduct our electronic brokerage business through our Interactive Brokers (IB) subsidiaries. As an electronic broker, we execute, clear and settle trades globally for both institutional and individual customers. Capitalizing on the technology originally developed for our market making business, IB's systems provide our customers with the capability to monitor multiple markets around the world simultaneously and to execute trades electronically in these markets at a low cost in multiple products and currencies from a single trading account. Since launching this business in 1993, we have grown to approximately 80,000 institutional and individual brokerage customers. We offer our customers access to all classes of tradable, exchange-listed products and market centers, including stocks, bonds, options, futures and forex, traded on more than 50 exchanges and market centers and in 16 countries around the world seamlessly. We offer our customers state-of-the-art tools, which include a customizable trading platform, advanced analytical tools and sophisticated order types such as guaranteed combination trades. Our customers also benefit from advanced "smart-routing" of orders for optimal execution and among the lowest execution and commission costs in the industry.

The following two tables present net revenues and income before income taxes for each of our business segments for the periods indicated.

Net revenues of each of our business segments and our total net revenues are summarized below:

|  | Year Ended December 31, | | |
|  | 2004 | 2005 | 2006 |
| --- | --- | --- | --- |
|  | (in millions) | | |
| Market making | $ 428.5 | $ 738.5 | $ 954.7 |
| Electronic brokerage | 133.2 | 185.3 | 298.4 |
| Corporate[1] | 2.3 | 5.3 | (0.7) |
| Total | $ 564.0 | $ 929.1 | $ 1,252.4 |

(1) Corporate includes corporate related activities as well as inter-segment eliminations.

59

Income before income taxes of each of our business segments and our total income before income taxes are summarized below:

Case 1:08-cv-00242-CM    Document 20-4    Filed 04/25/2008    Page 16 of 46

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2004 | 2005 | 2006 |
|  | (in millions) | | |
| Market making | $ 241.1 | $ 505.2 | $ 662.8 |
| Electronic brokerage | 45.6 | 59.3 | 98.6 |
| Corporate[1] | 3.3 | 4.8 | 0.2 |
| Total | $ 290.0 | $ 569.3 | $ 761.6 |

(1)    Corporate includes corporate related activities as well as inter-segment eliminations.

You can read more about our segments under the sections entitled "Business—Market Making—Timber Hill" and "Business—Electronic Brokerage—Interactive Brokers," and in Note 17 of the IBG LLC audited consolidated financial statements included elsewhere in this prospectus.

### Revenue

#### Trading Gains

Our revenue base is comprised largely of trading gains generated in the normal course of market making. Trading revenues are, in general, proportional to the trading activity in the markets. Our revenue base is highly diversified and comprised of millions of relatively small individual trades of various financial products traded on electronic exchanges, primarily stocks, options and futures. Trading gains accounted for approximately 68%, 58% and 46% of our total revenues for the years ended December 31, 2004, 2005 and 2006, respectively. Trading gains also include translation gains and losses on cash and positions in foreign currency held primarily by our foreign market making subsidiaries as well as revenues from net dividends. Market making activities require us to hold a substantial inventory of equity securities. We derive significant revenues in the form of dividend income from these equity securities. This dividend income is largely offset by dividend expense incurred when we make significant payments in lieu of dividends on short positions in securities in our portfolio. Dividend income and expense arise from holding market making positions over dates on which dividends are paid to shareholders of record. When a stock pays a dividend, its market price is generally adjusted downward to reflect the value paid to the shareholders of record, which will not be received by those who purchase the stock after the dividend date. Hence, the apparent gains and losses due to these price changes must be taken together with the dividends paid and received, respectively, in order to accurately reflect the results of our market making operations.

Our trading gains are geographically diversified. In 2004, 2005 and 2006, we generated 29%, 40% and 25%, respectively, of our trading gains from operations conducted internationally. The increase in U.S. trading gains, as a proportion of total trading gains, during the year ended December 31, 2006, as compared to the prior year period, was primarily due to a 58% increase in U.S. trading gains, accompanied by level trading gains and foreign currency translation losses of our European market making subsidiary.

#### Commissions and Execution Fees

We earn commissions and execution fees from our cleared customers for whom we act as executing and clearing brokers and from our institutional customers for whom we act as an executing

broker only. During 2005, we introduced a new commission structure that allows customers to choose between an all-inclusive "bundled" rate or an "unbundled" rate that has lower commissions for high volume customers. For "unbundled" commissions, we charge regulatory and exchange fees, at our cost, separately from our commissions, adding transparency to our fee structure. Commissions and execution fees accounted for 18%, 12% and 10% of our total revenues for the years ended December 31, 2004, 2005 and 2006, respectively.

*Interest Income and Interest Expense*

We earn interest on customer funds segregated in safekeeping accounts; on customer borrowings on margin, secured by marketable securities these customers hold with us from our investment in government treasury securities; from borrowing securities in the general course of our market making and brokerage activities, and on bank balances. Interest income accounted for 13%, 25% and 39% of total revenues for the years ended December 31, 2004, 2005 and 2006, respectively. Interest income is partially offset by interest expense.

We pay interest on cash balances customers hold with us; for cash received from lending securities in the general course of our market making activities; and on our borrowings. Interest expense accounted for 9%, 16% and 28% of total revenues for the years ended December 31, 2004, 2005 and 2006, respectively.

In 2005, we began to automate and integrate our securities lending system with our trading system. As a result, we have been able to increase significantly our securities lending activity and our net interest income. Our net interest income accounted for approximately 4%, 11% and 15% of our total net revenues for the years ended December 31, 2004, 2005 and 2006, respectively.

*Other Income*

Other income consists primarily of payment for order flow income, mark-to-market gains on non-traded securities (primarily investments in exchanges) and market data fee income. Our other income accounted for approximately 1% of our total revenues for the year ended December 31, 2004, and 5% for each of the years ended December 31, 2005 and 2006.

**Costs and Expenses**

*Execution and Clearing Expenses*

Our largest single expense category is execution and clearing expenses, which includes the costs of executing and clearing our market making and electronic brokerage trades, as well as other direct expenses, including payment for order flow, regulatory fees and market data fees. Execution fees are paid primarily to electronic exchanges and market centers on which we trade. Clearing fees are paid to clearing houses and clearing agents. Payments for order flow are made as part of exchange-mandated programs and to otherwise attract order volume to our system. When we execute a customer order against another customer order, no payment for order flow is received. Market data fees are fees that we must pay to third parties to receive streaming quotes and related information.

*Employee Compensation and Benefits*

Employee compensation and benefits includes salaries, bonuses, group insurance, contributions to benefit programs and other related employee costs.

61

Occupancy expense consists primarily of rental payments on office leases and related occupancy costs, such as utilities. Depreciation and amortization expense results from the depreciation of fixed assets such as computing and communications hardware as well as amortization of leasehold improvements and capitalized in-house software development.

### Communications

Communications expense consists primarily of the cost of voice and data telecommunications lines supporting our business including connectivity to exchanges around the world.

### General and Administrative

Expenses in this category are primarily incurred for professional services, such as legal and audit work, and other operating expenses such as exchange membership lease expenses.

As a public company, we will be subject to the requirements of the Sarbanes-Oxley Act of 2002, which we expect will require us to incur significant expenditures in the near term to develop systems and hire and train personnel to comply with these requirements. In addition, as a public company, we expect to incur additional costs for external services such as legal, accounting and auditing.

### Income Tax Expense

Historically, our income tax expense consisted primarily of corporate subsidiary taxes, and our net income did not reflect cash distributions to IBG LLC's members to pay their taxes related to their proportionate shares of our net income. Those distributions reduced IBG LLC's members' capital. As a corporation, we will be required to pay U.S. federal, state and local income taxes on its taxable income. Our subsidiaries will continue to be subject to income tax in the respective jurisdictions in which they operate.

## Critical Accounting Policies

The consolidated financial statements are prepared in conformity with accounting principles generally accepted in the United States. In applying these principles, management is required to use certain assumptions and make estimates that could materially affect the reported amounts of assets, liabilities, revenues and expenses in the consolidated financial statements. We base our estimates and judgments on historical experience and other assumptions that we believe are reasonable under the circumstances. These assumptions, estimates and/or judgments, however, are often subjective and our actual results may change based on changing circumstances or changes in our analyses. If actual amounts are ultimately different from our estimates, the revisions are included in our results of operations for the period in which the actual amounts become known. These estimates are periodically reevaluated by management. We believe the following critical accounting policies could potentially produce materially different results if we were to change underlying assumptions, estimates and/or judgments. See Note 2 to the consolidated financial statements included elsewhere in this prospectus for a summary of our significant accounting policies.

### Valuation of Financial Instruments

Due to the nature of our operations, substantially all of our financial instrument assets, comprised of securities owned, securities purchased under agreements to resell, securities borrowed and receivables from brokers, dealers and clearing organizations are carried at fair value based on quoted market prices or are assets which are short-term in nature and are reflected at amounts approximating fair value. Similarly, all of our financial instrument liabilities that arise from securities sold but not yet

purchased, securities sold under agreements to repurchase, securities loaned and payables to brokers, dealers and clearing organizations are short-term in nature and are reported at quoted market prices or at amounts approximating fair value. In our case, our long and short positions are valued at either the last consolidated trade price or the last consolidated bid/offer mid-point (where applicable) at the close of regular trading hours, in the respective markets. Given that we manage a globally integrated market making portfolio, we have large and substantially offsetting positions on securities that trade on different exchanges that close at different times of the trading day. As a result, there may be large and anomalous swings in the value of our positions daily and, accordingly, in our earnings in any period. This is especially true on the last business day of each calendar quarter, although such swings tend to come back into equilibrium on the first business day of the succeeding calendar quarter.

### Member Interests

Selected employees are granted non-transferable fully vested member interests in IBG LLC. Such grants are accounted for pursuant to Accounting Principles Board (APB) Opinion No. 25, *Accounting for Stock Issued to Employees* and EITF Issue No. 00-23, *Issues Related to the Accounting for Stock Compensation under APB Opinion No. 25 and FASB Interpretation No. 44*. IBG LLC records a fixed dollar amount of expense for member interest grants at the date of grant based on management's estimate of fair value, which is book value (as defined in IBG LLC's Agreement as to Member Interest Purchase Rights). Member interests confer ownership rights in IBG LLC and entitle the holder to proportionate rights to future allocable profits and losses of IBG LLC. Member-employees may sell their interests back to IBG LLC at any time at book value. Member interest grants are initially accounted for as liabilities until six months elapses from the date of grant, at which time such liabilities are reclassified to members' capital as members' contributions.

### Contingencies

Our policy is to estimate and accrue for potential losses that may arise out of litigation, regulatory proceedings and tax audits to the extent that such losses are probable and can be estimated in accordance with Statement of Financial Accounting Standards (SFAS) No. 5, *Accounting for Contingencies*. Significant judgment is required in making these estimates and our final liabilities may ultimately be materially different. Our total liability accrued with respect to litigation and regulatory proceedings is determined on a case-by-case basis and represents an estimate of probable losses based on, among other factors, the progress of each case, our experience with and industry experience with similar cases and the opinions and views of internal and external legal counsel. Given the inherent difficulty of predicting the outcome of our litigation and regulatory matters, particularly in cases or proceedings in which substantial or indeterminate damages or fines are sought, or where cases or proceedings are in the early stages, we cannot estimate losses or ranges of losses for cases or proceedings where there is only a reasonable possibility that a loss may be incurred. For more information on our legal and regulatory matters, see "Business—Legal Proceedings and Regulatory Matters."

IBG LLC has been, and we likely will be, from time to time subject to litigation and other legal proceedings. As of December 31, 2006, certain subsidiaries of IBG LLC have been named parties to legal actions, which IBG LLC or such subsidiaries intend to defend vigorously. See "Business—Legal Proceedings and Regulatory Matters." Although the results of legal actions cannot be predicted with certainty, it is the opinion of management that the resolution of these actions is not expected to have a material adverse effect, if any, on IBG LLC's business or financial condition, but may have a material impact on the results of operations for a given period. As of December 31, 2006, reserves provided for potential losses related to litigation matters were not material. No such reserves were deemed necessary as of December 31, 2005.

63

**Minority Interest**

Upon consummation of the Recapitalization, we will become the sole managing member of IBG LLC and, as such, will continue to operate and control all of the business and affairs of IBG LLC and its subsidiaries and will be able to consolidate IBG LLC's financial results into our financial statements. In light of IBG Holdings LLC's expected approximately 91.3% ownership interest in IBG LLC, we will reflect its ownership as a minority interest in our statement of financial condition and statement of income. Our historical results will be those of IBG LLC, as our predecessor company. As a result, our net income, after excluding IBG Holdings LLC's minority interest, will represent approximately 8.7% of IBG LLC's net income immediately after the offering, and similarly, outstanding shares of our common stock will represent approximately 8.7% of the outstanding membership interests of IBG LLC immediately after the offering. For more information on the pro forma impact of the Recapitalization, see "Unaudited Pro Forma Consolidated Financial Data."

**Income Taxes**

Our business was historically operated through a limited liability company that was not subject to U.S. federal and certain state income taxes. Prior to the completion of this offering, as a result of the Recapitalization, our business will become subject to taxes applicable to "C" corporations. For more information on pro forma income taxes applicable to our business under "C" corporation status, see "The Recapitalization Transactions and Our Organizational Structure."

**Dilutive Effect of Issuance of New Shares of Common Stock**

When we issue new shares of common stock after this offering, including upon the issuance of common stock to finance purchases of IBG LLC membership interests from IBG Holdings LLC, our existing common stockholders will experience dilution at the IBG level, although we will own an increased percentage of the equity of IBG LLC upon giving effect to such common stock issuances.

Immediately following this offering, approximately 34.7 million shares of our common stock will be outstanding, representing more than 99.999% of our outstanding capital stock, and we will own membership interests in IBG LLC representing approximately 8.7% of the total equity interest in IBG LLC. In accordance with our amended and restated certificate of incorporation and the amended and restated limited liability company agreement pursuant to which IBG LLC will be governed, the net cash proceeds received by us from any future issuance of shares of common stock will either be used to purchase IBG LLC membership interests from IBG Holdings LLC or be transferred to IBG LLC in exchange for newly issued membership interests equal in number to such number of shares of common stock issued by us. The number of outstanding IBG LLC membership interests owned by us will, therefore, equal the number of outstanding shares of our common stock at all times. As a result, common stockholders will experience no material dilution with regard to their economic interest in IBG LLC as a result of the issuance of additional shares of our common stock.

**Certain Trends and Uncertainties**

We believe that our continuing operations may be favorably or unfavorably impacted by the following trends that may affect our financial condition and results of operations.

- Over the past several years, the effects of market structure changes, competition and market conditions have, during certain periods, exerted downward pressure on bid/offer spreads realized by market makers.

64

- Retail broker-dealer participation in the equity markets has fluctuated over the past few years due to investor sentiment, market conditions and a variety of other factors. Retail transaction volumes may not be sustainable and are not predictable.

- Broker-dealer clients continue to focus on statistics measuring the quality of equity executions (including speed of executions and price improvement). In an effort to improve the quality of their executions as well as increase efficiencies, market makers have increased the level of automation within their operations.

- Due to regulatory scrutiny over the past several years relating to equity sell-side research and the continued focus by investors on execution quality and overall transaction costs, more institutional clients allocate commissions to broker-dealers based on the quality of executions. In the past, institutional equity commissions were primarily allocated to broker-dealers in exchange for either research or soft dollar and commission recapture programs.

- There has been increased scrutiny of equity and option market makers, hedge funds and soft dollar practices by the regulatory and legislative authorities. New legislation or modifications to existing regulations and rules could occur in the future.

- There has been consolidation among market centers over the past year, and several regional exchanges have entered into joint ventures with broker-dealers to create their own alternative trading systems, such as ECNs, and compete within the OTC and listed trading venues.

- There has been a proliferation of alternative investment entities, which has had the effect of materially increasing competition for new investor assets.

See "Risk Factors" on page 19 for a discussion of other risks that may affect our financial condition and results of operations.

## Public Company Costs

Following this offering, we expect that we will incur additional expenses as a result of becoming a public company for, among other things, costs associated with self-insuring potential liabilities of our directors and officers, director fees, SEC reporting and compliance, transfer agent fees, professional fees and similar expenses. These additional expenses will reduce our net income. These costs will be borne by IBG LLC on behalf of IBG.

## Consolidated Results of Operations

The tables in the period comparisons below provide summaries of our revenues and expenses. The period-to-period comparisons below of financial results are not necessarily indicative of future results.

65

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2005 | 2006 |
| | (in millions) | | |

**Consolidated Statement of Income Data:**

| | 2004 | 2005 | 2006 |
| --- | --- | --- | --- |
| Revenues: | | | |
| Trading gains | $ 423.2 | $ 640.4 | $ 805.1 |
| Commissions and execution fees | 112.0 | 132.1 | 174.4 |
| Interest income | 79.5 | 273.2 | 672.1 |
| Other income | 7.0 | 53.4 | 85.2 |
| Total revenues | 621.7 | 1,099.1 | 1,736.8 |
| Interest expense | 57.7 | 170.0 | 484.4 |
| Total net revenues | 564.0 | 929.1 | 1,252.4 |
| Non-interest expenses: | | | |
| Execution and clearing | 152.5 | 215.0 | 313.3 |
| Employee compensation and benefits | 79.1 | 90.2 | 110.1 |
| Occupancy, depreciation and amortization | 16.4 | 20.4 | 22.7 |
| Communications | 9.0 | 10.4 | 12.6 |
| General and administrative | 17.0 | 23.8 | 32.1 |
| Total non-interest expenses | 274.0 | 359.8 | 490.8 |
| Income before income tax | 290.0 | 569.3 | 761.6 |
| Income tax expense | 19.6 | 33.8 | 27.4 |
| Net income | $ 270.4 | $ 535.5 | $ 734.2 |

The following table sets forth our consolidated results of operations as a percent of our total revenues for the indicated periods:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2005 | 2006 |

**Consolidated Statement of Income Data:**

| | 2004 | 2005 | 2006 |
| --- | --- | --- | --- |
| Revenues: | | | |
| Trading gains | 68.1% | 58.3% | 46.4% |
| Commissions and execution fees | 18.0% | 12.0% | 10.0% |
| Interest income | 12.8% | 24.9% | 38.7% |
| Other income | 1.1% | 4.8% | 4.9% |
| Total revenues | 100.0% | 100.0% | 100.0% |
| Interest expense | 9.3% | 15.5% | 27.9% |
| Total net revenues | 90.7% | 84.5% | 72.1% |
| Non-interest expenses: | | | |
| Execution and clearing | 24.5% | 19.5% | 18.0% |
| Employee compensation and benefits | 12.7% | 8.2% | 6.3% |
| Occupancy, depreciation and amortization | 2.6% | 1.9% | 1.3% |
| Communications | 1.4% | 0.9% | 0.8% |

| | 2.9% | 2.2% | 1.9% |
|---|---|---|---|
| Total non-interest expenses | 44.1% | 32.7% | 28.3% |
| | | | |
| Income before income tax | 46.6% | 51.8% | 43.8% |
| Income tax expense | 3.1% | 3.1% | 1.6% |
| | | | |
| Net income | 43.5% | 48.7% | 42.2% |

66

**Year Ended December 31, 2006 Compared to the Year Ended December 31, 2005**

*Net Revenues*

Total net revenues increased $323.3 million, or 35%, to $1,252.4 million for the year ended December 31, 2006 from $929.1 million for the year ended December 31, 2005. Trading volume is the most important driver of revenues and costs for both market making and electronic brokerage. To some extent, our trading volume is a function of the general level of activity in the securities and futures markets worldwide. This is especially true in products such as equity options where we hold a large market share. Based on data published by the Futures Industry Association (FIA), global equity options volume increased 35% in 2006 from 2005. For the year ended December 31, 2006, total trades executed by our subsidiaries increased by 34.0 million, or 35%, to 130.5 million trades from 96.5 million trades for the year ended December 31, 2005.

*Trading Gains.*    Trading gains increased $164.7 million, or 26%, to $805.1 million for the year ended December 31, 2006 from $640.4 million for the year ended December 31, 2005. The increase was primarily due to expansion in the number of securities products traded and increased trading volumes across the markets and exchanges on which our market making units traded. During the year ended December 31, 2006, our market making operations executed 66.1 million trades compared to 54.1 million trades during the year ended December 31, 2005, an increase of 22%. Included in trading gains are net dividends from market making activities and currency translation gains and losses. Our net dividends for the year ended December 31, 2006 were $(39.5) million compared to $42.9 million for the year ended December 31, 2005, a 192% decrease. For the year ended December 31, 2006, we incurred translation losses of $47.1 million on foreign currency balances held primarily by our European subsidiaries, as compared to translation gains of $43.9 million for the year ended December 31, 2005.

*Commissions and Execution Fees.*    Commissions and execution fees increased $42.3 million, or 32%, to $174.4 million for the year ended December 31, 2006 from $132.1 million for the year ended December 31, 2005. This increase was primarily due to higher customer trading volume on an expanded customer base, partially offset by a reduction in customer commission rates implemented in November 2005. Total DARTs for cleared and execution-only customers increased 47% to 196,000 during the year ended December 31, 2006, compared to 133,000 during the year ended December 31, 2005. DARTS for cleared customers, a subset that refers to those customers for whom we execute trades and also clear and carry positions, increased 41% to 157,000 during the year ended December 31, 2006 compared to 111,000 during the year ended December 31, 2005. The number of customer accounts grew by 27% to approximately 80,000 in the year ended December 31, 2006. Average commission per trade for cleared customers decreased by $.29, or 6%, to $4.25 for the year ended December 31, 2006 from $4.54 for the year ended December 31, 2005, due to lower commission rates we instituted in November 2005 in order to continue to provide cost-efficient executions to our customers. Based on 2006 volume, the reduction in commission rates would have resulted in a decrease in revenues of approximately $11.6 million; however, we experienced a 22.3% increase in DARTs for cleared customers in the quarter following the introduction of lower commission rates and a 41% increase in DARTs for cleared customers in the year ended December 31, 2006 from 2005. Our execution-only customers generated $7.5 million in execution fees in the year ended December 31, 2006. In addition to the execution fees we collect from certain execution-only customers, we receive payment for customer orders from U.S. options exchanges (see below under "—Other Income") and our U.S. market making unit is able to execute a portion of these customer orders when it is providing the best available price, i.e., the national best bid or offer (NBBO).

*Interest Income and Interest Expense.*    Net interest income (interest income less interest expense) increased $84.5 million, or 82%, to $187.7 million for the year ended December 31, 2006

67

from $103.2 million for the year ended December 31, 2005. Growth in net interest income was primarily attributable to higher interest rates, increases in net customer cash and margin balances and higher net interest from securities lending, resulting from the integration of our securities lending and trading systems, which commenced during 2005. As an example, the U.S. dollar average overnight LIBOR (the London Interbank Offered Rates, which serve as benchmark interest rates for most major currencies) for the year ended December 31, 2006 increased 52% to 5.0%, from 3.3% for the year ended December 31, 2005. Customer cash balances increased by 62%, to $3.9 billion, and customer fully secured margin borrowings increased 94%, to $846.7 million, at December 31, 2006 from $2.4 billion and $436.0 million, respectively, at December 31, 2005. During this period we also adopted new investment policy guidelines that enabled us to match more accurately the average maturities on investments of customer funds to the short-term rates paid to customers. As a result, net interest earned from customers' cash balances and fully secured margin balances increased $20.6 million, or 227%, to $29.7 million for the year ended December 31, 2006 from $9.1 million for the year ended December 31, 2005. Securities borrowed increased by 18%, to $10.5 billion, and securities loaned increased by 31%, to $8.0 billion, at December 31, 2006 from December 31, 2005. These increases reflect the growth in stock positions held by our market making units and the growth in short stock positions carried in customer accounts. Net interest earned from stock borrowing and lending activities increased $70.2 million, or 82%, to $155.3 million for the year ended December 31, 2006 from $85.1 million for the year ended December 31, 2005. During the same period, the growth in IBG LLC's capital to $2.8 billion at December 31, 2006 from $2.2 billion at December 31, 2005, combined with higher interest rates, also contributed to the increase in interest income.

*Other Income.*   Other income increased $31.8 million, or 60%, to $85.2 million for the year ended December 31, 2006 from $53.4 million for the year ended December 31, 2005. This increase was primarily attributable to an increase of $40.2 million, to $60.2 million in payment for order flow income, which was partially offset by a decrease of $9.2 million, to $6.5 million, in mark-to-market gains on non-trading securities, primarily investments in exchanges. The higher payment for order flow income was driven by increased trading volume by customers in U.S. options contracts and increased payment per contract from U.S. options exchanges that administered payment for order flow programs. The number of options contracts executed by our customers increased by 89% in the year ended December 31, 2006 as compared to the year ended December 31, 2005. Beginning in October 2005, the largest U.S. options exchanges by volume (the Chicago Board Options Exchange, the International Securities Exchange and the Philadelphia Stock Exchange) began to implement new, SEC-approved payment for order flow programs that pay $0.65 to $0.75 per qualified contract, generally into a pool that is available to pay the brokers providing the order flow. This has resulted in increased payment for order flow income at our U.S. electronic brokerage unit. This income was partially offset by payment for order flow expense to our customers, as described below under "—Non-Interest Expenses—Execution and Clearing." Net income from payment for order flow was $6.0 million for the year ended December 31, 2006, versus a net loss of $13.6 million for the year ended December 31, 2005. We believe that payment for order flow will decline with the introduction of penny pricing for options over the next year.

### Non-Interest Expenses

Non-interest expenses increased by $131.0 million, or 36%, to $490.8 million for the year ended December 31, 2006 from $359.8 million for the year ended December 31, 2005. As a percentage of total net revenues, non-interest expenses were 39% for each of the years ended December 31, 2006 and 2005.

*Execution and Clearing.*   Execution and clearing expenses increased $98.3 million, or 46%, to $313.3 million for the year ended December 31, 2006 from $215.0 million for the year ended December 31, 2005, primarily due to increased trading volume. These variable costs are our largest

expense category, representing 64% and 60% of total non-interest expenses for the year ended December 31, 2006 and 2005, respectively. Payments for order flow, a component of execution and clearing costs, increased $20.6 million, or 61%, to $54.2 million for the year ended December 31, 2006 from $33.6 million for the year ended December 31, 2005. The growth of payment for order flow expense in our electronic brokerage unit was primarily a result of our aggressive marketing of the IB SmartRouting[SM] system to new institutional customers, combined with incentive payments to these customers for options orders routed through IB. This expense was offset by payment for order flow revenue received from U.S. options exchanges, as described above under—Net Revenues—Other Income." As a percentage of total net revenues, execution and clearing expenses were 25% and 23% for the years ended December 31, 2006 and 2005, respectively.

*Employee Compensation and Benefits.*    Employee compensation and benefits expenses increased by $19.9 million, or 22%, to $110.1 million for the year ended December 31, 2006 from $90.2 million for the year ended December 31, 2005. This increase is primarily due to an 11% increase in the number of employees to 532 as of December 31, 2006 from 478 as of December 31, 2005, increased expenses for bonuses and ROI Units granted to employees due to higher IBG LLC earnings. As we continue to grow, our focus on automation has allowed us to maintain a relatively small staff of highly compensated professionals. As a percentage of total net revenues, employee compensation and benefits expenses were 9% and 10% for the years ended December 31, 2006 and 2005, respectively.

*Occupancy, Depreciation and Amortization.*    Occupancy, depreciation and amortization expenses increased $2.3 million, or 11%, to $22.7 million for the year ended December 31, 2006 from $20.4 million for the year ended December 31, 2005 primarily due to increased office rent expenses for additional office space. As a percentage of total net revenues, occupancy, depreciation and amortization expenses were 2% for each of the years ended December 31, 2006 and 2005.

*Communications.*    Communications expenses increased $2.2 million, or 21%, to $12.6 million for the year ended December 31, 2006 from $10.4 million for the year ended December 31, 2005. This increase was driven by additional telecommunications bandwidth required to support increased trading volume at electronic exchanges and the expansion in the number of markets in which IBG LLC operates. As a percentage of total net revenues, communications expenses were 1% for each of the years ended December 31, 2006 and 2005.

*General and Administrative.*    General and administrative expenses increased $8.3 million, or 35%, to $32.1 million for the year ended December 31, 2006 from $23.8 million for the year ended December 31, 2005, primarily attributable to increased legal and auditing professional fees and increased marketing and advertising costs. As a percentage of total net revenues, general and administrative expenses were 3% for each of the years ended December 31, 2006 and 2005.

*Income Tax Expense.*    As a limited liability company, historically, most of our income has not been subject to corporate tax but, instead, our members have been taxed on their proportionate share of the net income. Our income tax expense reflects taxes payable by certain of our non-U.S. companies. Income tax expense decreased $6.4 million, or 19%, to $27.4 million for the year ended December 31, 2006 from $33.8 million for the year ended December 31, 2005 primarily due to lower pre-tax earnings at one of our non-U.S. operating companies.

*Net Income.*    Net income increased $198.7 million, or 37%, to $734.2 million for the year ended December 31, 2006 from $535.5 million for the year ended December 31, 2005. Net income as a percentage of net revenues was 59% for the year ended December 31, 2006 compared to 58% for the year ended December 31, 2005.

69

Case 1:08-cv-00242-CM    Document 20-4    Filed 04/25/2008    Page 27 of 46

*Net Revenues*

Total net revenues increased $365.1 million, or 65%, to $929.1 million for the year ended December 31, 2005 from $564.0 million for the year ended December 31, 2004. Total trades executed by our subsidiaries increased by 23.1 million, or 31%, to 96.5 million trades for the year ended December 31, 2005 from 73.4 million trades for the year ended December 31, 2004. While we increased our market share, we also benefited from the general increase in trading volume globally. Based on data published by the FIA, global equity options volume increased 19% for the year ended December 31, 2005 over the prior year.

*Trading Gains.* Trading gains increased $217.2 million, or 51%, to $640.4 million for the year ended December 31, 2005 from $423.2 million for the year ended December 31, 2004. The increase was primarily attributable to increased trading activity and withdrawal of competitors from the business. Intense competition resulting from new market makers and other professionals entering the market and a corresponding compression of bid/offer spreads that marked 2004 subsided in 2005. During the year ended December 31, 2005, our market making operations executed 54.1 million trades compared to 41.5 million trades during the year ended December 31, 2004. Included in trading gains are net dividends from market making activities and currency translation gains and losses. Our net dividends for the year ended December 31, 2005 were $42.9 million, compared to $36.2 million for the year ended December 31, 2004, a 19% increase. During the year ended December 31, 2005, we had translation gains of $43.9 million on foreign currency balances held primarily by our European market making subsidiary, as compared to translation losses of $18.2 million during the year ended December 31, 2004.

*Commissions and Execution Fees.* Commissions and execution fees increased $20.1 million, or 18%, to $132.1 million for the year ended December 31, 2005 from $112.0 million for the year ended December 31, 2004. This increase was primarily due to higher customer trading volume on an expanded customer base. Total DARTs for cleared and execution-only customers increased 28% to 133,000 during the year ended December 31, 2005 from 104,000 during the year ended December 31, 2004. DARTs for cleared customers, a subset that refers to those customers for whom we execute trades and also clear and carry positions, increased 16% to 111,000 during the year ended December 31, 2005 from 95,000 during the year ended December 31, 2004. The number of customer accounts grew by 30% to approximately 63,000 in the year ended December 31, 2005.

*Interest Income and Interest Expense.* Net interest income increased $81.4 million, or 373%, to $103.2 million for the year ended December 31, 2005 from $21.8 million for the year ended December 31, 2004. Growth in net interest income was primarily attributable to higher net interest from securities lending, resulting from the integration of our securities lending and trading systems, which commenced during 2005, and higher interest rates. Approximately $75.7 million of the total increase was attributable to increased securities lending activities. Securities borrowed increased by 117%, to $8.9 billion and securities loaned increased by 85%, to $6.1 billion at December 31, 2005 from December 31, 2004. These increases reflect the growth in stock positions held by our market making units and the growth in short stock positions carried in customer accounts. As an example of the interest rate increases, LIBOR rates for the year ended December 31, 2005 increased 136% to 3.3%, from 1.4% for the year ended December 31, 2004. IBG LLC's capital grew from $1.8 billion to $2.2 billion during 2005, further contributing to increased interest income. Customer cash balances increased by 60%, to $2.4 billion, and customer fully secured margin borrowings increased 62%, to $436.0 million, at December 31, 2005 from $1.5 billion and $269.2 million, respectively, at December 31, 2004. However, net interest earned from customer cash balances and fully secured margin balances decreased

70

$1.6 million, or 15%, to $9.1 million for the year ended December 31, 2005 from $10.7 million for prior year. This was due in part to a flattening of the interest rate yield curve during the period and in part to higher interest rates offered to our brokerage customers.

*Other Income.*    Other income increased $46.4 million, or 666%, to $53.4 million for the year ended December 31, 2005 from $7.0 million for the year ended December 31, 2004. This increase was primarily due to a $22.4 million increase in mark-to-market gains on non-trading securities, primarily investments in exchanges, a $15.8 million increase in payment for order flow income and growth in market data income from customers, which was partially offset by market data expenses to exchanges. The higher payment for order flow income was driven by increased trading volume by customers in U.S. options contracts and increased payment per contract from U.S. options exchanges that administered payment for order flow programs. The number of options contracts executed by our customers increased by 212% in the year ended December 31, 2005 as compared to the year ended December 31, 2004. In October 2005, the largest U.S. options exchanges began to implement new, SEC-approved, payment for order flow programs that pay $0.65 to $0.75 per qualified contract, generally into a pool that is available to pay the brokers providing the order flow, which resulted in increased payment for order flow income at our U.S. electronic brokerage unit. This income was partially offset by payment for order flow expense to our customers, as described below under "—Non-Interest Expenses—Execution and Clearing." In our electronic brokerage unit net losses from payment for order flow were $6.3 million and $0.4 million for the years ended December 31, 2005 and 2004, respectively.

### Non-interest Expenses

Non-interest expenses increased by $85.8 million, or 31%, to $359.8 million for the year ended December 31, 2005 from $274.0 million for the year ended December 31, 2004. As a percentage of total net revenues, non-interest expenses were 39% and 49% for the years ended December 31, 2005 and 2004, respectively. Non-interest expenses decreased as a percentage of total net revenues primarily due to the 65% increase in net revenues from the prior year, more than offsetting the increases in expenses.

*Execution and Clearing.*    Execution and clearing expenses increased $62.5 million, or 41%, to $215.0 million for the year ended December 31, 2005 from $152.5 million for the year ended December 31, 2004, primarily due to increases in the number of securities products traded and increased trading volumes across the markets and exchanges in which IBG LLC and its customers traded. Payments for order flow increased $22.4 million, or 200%, to $33.6 million for the year ended December 31, 2005 as increasing trade volumes were directed to our U.S. electronic brokerage unit from other brokers. As a percentage of total net revenues, execution and clearing expenses were 23% and 27% for the years ended December 31, 2005 and 2004, respectively, and payments for order flow were 4% and 2%, respectively, for such periods. The decrease in execution and clearing expenses as a percentage of 2005 total net revenues was primarily due to the 65% increase in net revenues, which more than offset the increases in these expenses.

*Employee Compensation and Benefits.*    Employee compensation and benefits expenses increased by $11.1 million, or 14%, to $90.2 million for the year ended December 31, 2005 from $79.1 million for the year ended December 31, 2004. This increase was due to a 5% increase in employees to 478 as of December 31, 2005 from 455 as of December 31, 2004 and increased expenses for bonuses and ROI Units due to higher company earnings. As a percentage of total net revenues, employee compensation and benefits expenses were 10% and 14% for the years ended December 31, 2005 and 2004, respectively.

71

*Occupancy, Depreciation and Amortization.*   Occupancy, depreciation and amortization expenses increased $4.0 million, or 24%, to $20.4 million for the year ended December 31, 2005 from $16.4 million for the year ended December 31, 2004 primarily due to increased costs related to computer equipment and office rent. As a percentage of total net revenues, occupancy, depreciation and amortization expenses were 2% and 3% for each of the years ended December 31, 2005 and 2004, respectively.

*Communications.*   Communications expenses increased $1.4 million, or 16%, to $10.4 million for the year ended December 31, 2005 from $9.0 million for the year ended December 31, 2004, primarily due to an increase in data line costs. As a percentage of total net revenues, communications expenses were 1% and 2% for the years ended December 31, 2005 and 2004, respectively.

*General and Administrative.*   General and administrative expenses increased by $6.8 million, or 40%, to $23.8 million for the year ended December 31, 2005 from $17.0 million for the year ended December 31, 2004 primarily due to increased advertising expenses for the electronic brokerage business to generate greater awareness of the brand and its offerings. As a percentage of total net revenues, general and administrative expenses were 3% for each of the years ended December 31, 2005 and 2004.

*Income Tax Expense.*   As a limited liability company, historically, most of our income has not been subject to corporate tax but, instead, our members have been taxed on their proportionate share of the net income. Our income tax expense reflects taxes payable by certain of our non-U.S. companies. Income tax expense increased $14.2 million, or 73%, to $33.8 million for the year ended December 31, 2005 from $19.6 million for the year ended December 31, 2004 due to increased earnings derived from certain of our non-U.S. operating companies. Income tax expense increased from 3% to 4% of total net revenues for the year ended December 31, 2005 compared to the prior year.

*Net Income.*   Net income increased $265.1 million, or 98%, to $535.5 million for the year ended December 31, 2005 from $270.4 million for the year ended December 31, 2004. Net income as a percentage of total net revenues was 58% for the year ended December 31, 2005 compared to 48% for the year ended December 31, 2004.

**Business Segments**

The following sections discuss results of our operations by business segment, excluding a discussion of corporate income and expense. In the following tables, revenues and expenses directly associated with each segment are included in determining pretax earnings. Due to the integrated nature of the business segments, estimates and judgments have been made in allocating certain revenues and expense items. Transactions between segments generally results from one subsidiary facilitating the business of another subsidiary through the use of its existing trading memberships and clearing arrangements. In such cases, certain revenue and expense items are eliminated in order to accurately reflect the external business conducted in each segment. Rates on transactions between segments are designed to approximate full costs. In addition to execution and clearing expenses, which are the main cost driver for both the market making segment and the electronic brokerage segment, each segment's operating expenses include (i) employee compensation and benefits expenses that are incurred directly in support of the businesses, (ii) general and administrative expenses, which include directly incurred expenses for property leases, professional fees, travel and entertainment, communications and information services, equipment, and (iii) indirect support costs (including compensation and other related operating expenses) for administrative services provided by IBG LLC. Such administrative services include, but are not limited to, computer software development and support, accounting, tax, legal and facilities management.

72

The following table sets forth the results of our market making operations for the indicated periods:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2004** | **2005** | **2006** |
| | (in millions) | | |
| **Consolidated Statement of Income Data:** | | | |
| Revenues: | | | |
| Trading gains | $  421.1 | $  637.9 | $  807.7 |
| Interest income | 52.3 | 211.1 | 508.2 |
| Other income | 6.3 | 22.6 | 18.6 |
| Total revenues | 479.7 | 871.6 | 1,334.5 |
| Interest expense | 51.2 | 133.1 | 379.8 |
| Total net revenues | 428.5 | 738.5 | 954.7 |
| Non-interest expenses: | | | |
| Execution and clearing | 113.2 | 151.4 | 198.1 |
| Employee compensation and benefits | 40.6 | 41.4 | 47.3 |
| Occupancy, depreciation and amortization | 9.3 | 11.0 | 10.6 |
| Communications | 6.1 | 6.0 | 6.6 |
| General and administrative | 18.2 | 23.5 | 29.3 |
| Total non-interest expenses | 187.4 | 233.3 | 291.9 |
| Income before income tax | 241.1 | 505.2 | 662.8 |
| Income tax expense | 18.4 | 32.1 | 24.9 |
| Net income | $  222.7 | $  473.1 | $  637.9 |

**Year Ended December 31, 2006 Compared to Year Ended December 31, 2005**

*Net Revenues.*   Market making net revenues increased $216.2 million, or 29%, to $954.7 million for the year ended December 31, 2006 from $738.5 million for the year ended December 31, 2005. Trading gains increased $169.8 million, or 27%, from the year ended December 31, 2005, primarily attributable to increased transaction volume in the markets in which we participate and to improvements in our market making systems. During the year ended December 31, 2006, we executed 66.1 million trades compared to 54.1 million trades during the year ended December 31, 2005. Trading gains also include translation gains and losses, which are incurred primarily in our European market making operations where our trading assets and liabilities are denominated in multiple currencies. Translation gains and losses fluctuate with exchange rates and with changes in the composition of our trading assets and liabilities. During the year ended December 31, 2006, market making translation losses of $45.5 million were incurred as compared to translation gains of $42.1 million for the comparable prior period. Net interest income increased $50.4 million, or 65%, primarily attributable to increased securities lending activity resulting from the continuing integration of our securities lending system with our trading system and to higher interest rates.

*Non-interest Expenses.*   Market making non-interest expenses increased $58.6 million, or 25%, to $291.9 million for the year ended December 31, 2006 from $233.3 million for the year ended December 31, 2005. Of this increase, $46.7 million consisted of higher execution and clearing expenses, an increase of 31% over the year ended December 31, 2005, reflecting greater trading volume in the period. Employee compensation and benefits expenses increased $5.9 million, or 14%, over the year ended December 31, 2005 and other non-interest expenses were relatively stable. As a percentage of total net revenues for the market making segment, non-interest expenses were 31% and 32% for the years ended December 31, 2006 and 2005, respectively.

73

*Income Before Income Taxes.*    Market making income before income taxes increased $157.6 million, or 31%, to $662.8 million for the year ended December 31, 2006 from $505.2 million for the year ended December 31, 2005. As a percentage of total net revenues for the market making segment, income before income taxes were 69% and 68% for the years ended December 31, 2006 and December 31, 2005, respectively.

## Year Ended December 31, 2005 Compared to Year Ended December 31, 2004

*Net Revenues.*    Market making net revenues increased $310 million, or 72%, to 738.5 million for the year ended December 31, 2005 from $428.5 million for the year ended December 31, 2004. Trading gains increased $216.8 million, or 51%, over 2004, primarily attributable to increased trading activity and withdrawal of competitors from the business. Intense competition resulting from new market makers and other professionals entering the market and a corresponding compression of bid/offer spreads that marked 2004 subsided in 2005. During the year ended December 31, 2005, we executed 54.1 million trades compared to 41.5 million trades during the year ended December 31, 2004. Trading gains also include translation gains and losses, which are incurred primarily in our European market making operations where our trading assets and liabilities are denominated in multiple currencies. Translation gains and losses fluctuate with exchange rates and with changes in the composition of our trading assets and liabilities. For the year ended December 31, 2005, foreign currency translation gains were $42.1 million as compared to translation losses of $20.3 million for the year ended December 31, 2004. Net interest income increased $76.9 million, or 6991%, attributable to increased securities lending activity resulting from the integration of our securities lending system with our trading system and to higher interest rates.

*Non-interest Expenses.*    Market making non-interest expenses increased $45.9 million, or 24%, to $233.3 million for the year ended December 31, 2005 from $187.4 million for the year ended December 31, 2004. Of this increase, $38.2 million was due to higher execution and clearing expenses, an increase of 34% from 2004. The increase in execution and clearing expenses is consistent with the 30% increase in trading volumes. Other non-interest expenses had relatively minor increases. As a percentage of total net revenues for the market making segment, non-interest expenses were 32% and 44% for the years ended December 31, 2005 and 2004, respectively, a decrease that is attributable to the relatively greater increase in trading gains over these expenses.

*Income Before Income Taxes.* Market making income before income taxes increased $264.1 million, or 110%, to $505.2 million for the year ended December 31, 2005 from $241.1 million for the year ended December 31, 2004. As a percentage of total net revenues for the market making segment, income before income taxes were 68% and 56% for the years ended December 31, 2005 and 2004, respectively.

*Electronic Brokerage*

The following table sets forth the results of our electronic brokerage operations for the indicated periods:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2005 | 2006 |
| | (in millions) | | |
| **Consolidated Statement of Income Data:** | | | |
| Revenues: | | | |
| Commissions and execution fees | $ 112.0 | $ 132.2 | $ 174.5 |
| Interest income | 28.8 | 65.0 | 167.3 |
| Other income | 4.1 | 31.5 | 70.0 |
| Total revenues | 144.9 | 228.7 | 411.8 |
| Interest expense | 11.7 | 43.4 | 113.4 |
| Total net revenues | 133.2 | 185.3 | 298.4 |
| Non-interest expenses: | | | |
| Execution and clearing | 39.3 | 63.6 | 115.4 |
| Employee compensation and benefits | 18.1 | 22.1 | 28.8 |
| Occupancy, depreciation and amortization | 3.1 | 4.4 | 5.8 |
| Communications | 2.9 | 4.5 | 6.0 |
| General and administrative | 24.2 | 31.4 | 43.8 |
| Total non-interest expenses | 87.6 | 126.0 | 199.8 |
| Income before income tax | 45.6 | 59.3 | 98.6 |
| Income tax expense | 0.8 | 1.2 | 1.7 |
| Net income | $ 44.8 | $ 58.1 | $ 96.9 |

**Year Ended December 31, 2006 Compared to Year Ended December 31, 2005**

*Net Revenues.* Electronic brokerage net revenues increased $113.1 million, or 61%, to $298.4 million for the year ended December 31, 2006 from $185.3 million for the year ended December 31, 2005 primarily due to higher commissions and execution fees and net interest income, which increased $42.3 million, or 32%, and $32.3 million, or 150%, respectively. These increases reflect strong growth in the number of new customer accounts and significantly higher customer trading activity combined with commensurate increases in cash and margin debit balances. Total DARTs from cleared and execution-only customers increased 47% to 196,000 during the year ended December 31, 2006 compared to 133,000 during the year ended December 31, 2005. DARTs from cleared customers increased 41% to 157,000 during the year ended December 31, 2006 compared to 111,000 during the year ended December 31, 2005. Total customer account equity grew by 61% to $6.1 billion at December 31, 2006 from $3.8 billion at December 31, 2005. Commissions' growth due to volume was partially offset by the lower U.S. stock trade commissions that we introduced in November 2005, which resulted in a 10% decrease in average commissions. The primary component of other income was payment for order flow received through programs administered by U.S. options exchanges and it was largely offset by payment for order flow expense.

***Non-interest Expenses.***   Electronic brokerage non-interest expenses increased $73.8 million, or 59%, to $199.8 million for the year ended December 31, 2006 from $126.0 million for the year ended December 31, 2005. Of this increase, $51.8 million reflected an 81% increase in execution and clearing expenses from the year ended December 31, 2005. This increase was driven by higher customer trading volume and greater payment for order flow expense incurred in order to attract volume to our system. As a percentage of total net revenues for the electronic brokerage segment, non-interest expenses were 67% and 68% for the year ended December 31, 2006 and 2005, respectively. Electronic brokerage non-interest expenses decreased as a percentage of total net revenues primarily due to higher growth rates of commissions and execution fees and net interest income over expense levels required to support the increase in business activities.

***Income Before Income Taxes.***   Electronic brokerage income before income taxes increased $39.3 million, or 66%, to $98.6 million for the year ended December 31, 2006 from $59.3 million for the year ended December 31, 2005. As a percentage of total net revenues for the electronic brokerage segment, income before income taxes were 33% and 32% for the years ended December 31, 2006 and 2005, respectively.

## Year Ended December 31, 2005 Compared to Year Ended December 31, 2004

***Net Revenues.***   Electronic brokerage net revenues increased $52.1 million, or 39%, to $185.3 million for the year ended December 31, 2005 from $133.2 million for the year ended December 31, 2004. Commissions and execution fees increased $20.2 million, or 18%, over the prior year. The primary factor driving this increase was higher trading volume associated with new account openings that resulted from our improved system offerings and our marketing efforts. Total DARTs from cleared and execution-only customers increased 28% to 133,000 during the year ended December 31, 2005 compared to 104,000 during the year ended December 31, 2004. DARTs from cleared customers increased 17% to 111,000 during the year ended December 31, 2005 compared to 95,000 during the year ended December 31, 2004. In addition, other income increased due to higher payment for order flow received through programs administered by U.S. options exchanges, which is largely offset by payment for order flow expense.

***Non-interest Expenses.***   Electronic brokerage non-interest expenses increased $38.4 million, or 44%, for the year ended December 31, 2005 to $126.0 million from $87.6 million for the year ended December 31, 2004. Of this increase, execution and clearing expenses increased $24.3 million or 62% from 2004, which was directly attributable to higher customer trading volume. The remaining $14.1 million increase in other non-interest expenses was comprised of general increases in expense levels, most notably employee compensation and benefits, which increased $4.0 million or 22% as employees were added to support continued growth. As a percentage of total net revenues for the electronic brokerage segment, non-interest expenses were 68% and 66% for the years ended December 31, 2005 and 2004, respectively.

***Income Before Income Taxes.***   Electronic brokerage income before income taxes increased $13.7 million, or 30%, to $59.3 million for the year ended December 31, 2005 from $45.6 million for the year ended December 31, 2004. As a percentage of total net revenues for the electronic brokerage segment, income before income taxes were 32% and 34% for the years ended December 31, 2005 and 2004, respectively.

## Liquidity and Capital Resources

We maintain a highly liquid balance sheet. The majority of our assets consist of marketable securities inventories, which are marked to market daily, and collateralized receivables arising from customer-related and proprietary securities transactions. Collateralized receivables consist primarily of

securities borrowed, receivables from clearing houses for settlement of securities transactions and, to a lesser extent, customer margin loans and securities purchased under agreements to resell.

Total assets increased $7.8 billion to $32.1 billion at December 31, 2006 from $24.3 billion at December 31, 2005, primarily due to increases of $3.8 billion in trading assets and $1.6 billion in securities borrowed. These increases were driven by a controlled expansion of securities positions held by our market making subsidiaries to facilitate increased securities lending balances and corresponding net interest income. The $1.6 billion increase in cash and cash equivalents and cash and securities segregated for regulatory purposes or deposited with clearing organizations was partially offset by an $1.5 billion increase in payables to customers, resulting from strong growth in our electronic brokerage business. Funding was provided by a $2.4 billion increase in securities sold but not yet purchased and a $1.9 billion increase in securities loaned. At December 31, 2006, total assets were $32.1 billion of which approximately $32.0 billion, or 99.7%, were considered liquid and consisted predominantly of marketable securities.

Daily monitoring of liquidity needs and available collateral levels is undertaken to help ensure that an appropriate liquidity cushion in the form of unpledged collateral is maintained at all times. Our ability to quickly reduce funding needs by balance sheet contraction without adversely affecting our core businesses and to pledge additional collateral in support of secured borrowings is continuously evaluated to ascertain the adequacy of our capital base.

In order to provide additional liquidity and to further increase our regulatory capital reserves, we issue senior notes and we maintain a committed senior secured revolving credit facility from a syndicate of banks (see "—Principal Indebtedness" below). As of December 31, 2006, borrowings under these facilities totaled $300.6 million, which represented 10% of our total capitalization. Based on our current level of operations, we believe our cash flow from operations, available cash and available borrowings under our senior secured revolving credit facility will be adequate to meet our future liquidity needs for at least the next twelve months.

Historically, our consolidated equity has consisted primarily of accumulated retained earnings, which to date have been sufficient to fund our operations and growth. Consolidated equity increased from $927.6 million at December 31, 2001 to $2.8 billion at December 31, 2006, representing a CAGR of 25% over this five-year period.

*Regulatory Capital Requirements*

The regulatory capital computations at our market making broker-dealer subsidiaries are largely driven by "haircut" charges levied on market making securities and futures positions. Timber Hill LLC (TH LLC), our SEC-registered broker-dealer subsidiary that conducts our U.S. market making activities, is subject to the Uniform Net Capital Rule (Rule 15c3-1) (Net Capital Rule) under the Exchange Act, which requires the maintenance of minimum net capital. At December 31, 2006, TH LLC had net capital of $996.2 million, which was $982.7 million in excess of required net capital.

Interactive Brokers LLC, our SEC-registered broker-dealer subsidiary that conducts our U.S. brokerage activities, is also subject to the Net Capital Rule. At December 31, 2006, IB had net capital of $268.9 million, which was $245.6 million in excess of required net capital.

TH LLC and IB are also registered futures commissions merchants and are subject to, and at December 31, 2006 were in compliance with the CFTC's minimum financial requirements.

77

Our non-U.S. market making and brokerage subsidiaries are also subject to various foreign net capital and minimum financial requirements and were in full compliance with such regulatory capital requirements as of December 31, 2006. Our most significant international market making subsidiary, Timber Hill Europe AG (THE), is registered to do business in Switzerland as a securities dealer and is subject to the Swiss National Bank eligible equity requirement. At December 31, 2006, THE had eligible equity of $643.2 million, which was $437.6 million in excess of the minimum requirement.

Our most significant international brokerage subsidiary, Interactive Brokers (U.K.) Limited (IBUK), is subject to the U.K. FSA's financial resources requirement. At December 31, 2006, IBUK had financial resources, as defined, of $35.8 million, which was $33.0 million in excess of the minimum requirement.

## *Cash Flows*

The following table sets forth our cash flows from operating activities, investing activities for the periods indicated:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2004** | **2005** | **2006** |
| | **(in millions)** | | |
| Cash provided by (used in) operating activities | $(179.8) | $(110.5) | $(219.3) |
| Cash provided by (used in) investing activities | (18.4) | (9.7) | (50.4) |
| Cash provided by (used in) financing activities | 79.9 | 374.1 | 504.0 |
| Effect of exchange rate changes on cash and cash equivalents | 4.4 | (14.5) | 26.7 |
| Increase (decrease) in cash and cash equivalents | $(113.9) | $239.4 | $261.0 |

*Cash flow from operating activities.*   Our cash flows from operating activities are largely a reflection of the size and composition of trading positions held by our market making subsidiaries and of the changes in customer cash and margin debit balances in our electronic brokerage business. For example, larger long stock positions give rise to increases in securities loaned as we finance these holdings and larger short stock positions give rise to increases in securities borrowed to enable delivery of shares sold short. Through our automated pricing and risk management software, we are able to control the asset and liability mix of our positions by setting interest rates (for stocks) and discount rates (for options) accordingly, which, in turn, influence the amount of cash that we borrow and lend. In our electronic brokerage business, as brokerage customers deposit or borrow cash, our investments of these funds increase or decrease accordingly.

Net cash used in operating activities for the year ended December 31, 2006 was $219.3 million. The primary components of cash used in operating activities were an increase of $1.3 billion in cash and securities—segregated under federal and other obligations, reflecting growth in customer cash balances, and an increase of $1.4 billion in trading assets, net of trading liabilities, reflecting normal changes in the makeup of market making positions. Uses of cash were offset by sources of cash, which were made up primarily of an increase of $1.1 billion in payables to customers, net of receivables from customers, reflecting growth in customer cash balances; an increase of $409.4 million in other payables, net of other receivables, primarily to clearing organizations; and net income of $734.2 million. Net cash used in operating activities for the year ended December 31, 2005 was $110.5 million. The primary components of cash used in operating activities were an increase of $1.9 billion in securities borrowed, net of securities loaned, reflecting a relative increase in short stock positions held for market making; and an increase of $704.8 million in cash and securities—segregated under federal and other obligations, reflecting investment of new customer funds. These uses of cash were partially offset by an increase of $1.3 billion in trading liabilities, net of trading assets, which is the

78

driver for increased securities borrowing activity; an increase of $720.8 million in payables to customers, net of receivables from customers, reflecting growth in the electronic brokerage business; and net income of $535.5 million. Net cash used in operating activities for the year ended December 31, 2004 was $179.8 million. The primary components of cash used in operating activities were an increase of $823.0 million in trading assets, net of trading liabilities, reflecting normal changes in the makeup of market marking positions; and an increase of $362.1 million in cash and securities—segregated under federal and other obligations, reflecting large customer cash balances. These uses of cash were partially offset by an increase of $329.6 million in payables to customers, net of receivables from customers, and net income of $270.4 million.

*Cash flow from investing activities.*     Our investing activities are primarily comprised of capitalizable in-house software development; purchases and sales of memberships at exchanges where we trade; and, more recently, investments in exchanges where such investments will enable us to offer better execution alternatives to our current and prospective customers or create new opportunities for ourselves as market makers or where we can influence exchanges to provide competing products at better prices using sophisticated technology.

Net cash used for investing activities for the year ended December 31, 2006 was $50.4 million. Investments in One Chicago, LLC ($20.0 million), W.R. Hambrecht ($10.0 million), ISE Stock Exchange, LLC ($4.25 million) and CBOE Stock Exchange, LLC ($5.0 million) and additions to property and equipment of $12.3 million were the primary investing activities undertaken. Net cash used in investing activities for the year ended December 31, 2005 was $9.7 million, comprised of $12.8 million in additions to property and equipment, which is partially offset by proceeds of $3.1 million from sales of exchange investments and trading rights. Net cash used in investing activities for the year ended December 31, 2004 was $18.4 million, comprised of additions to property and equipment of $11.4 million, purchases of exchange seats and trading rights of $5.3 million and $1.7 million for investments made in exchanges.

*Cash flow from financing activities.*     Our cash flows from financing activities are comprised of short-term borrowings, long-term borrowings and capital transactions. Short-term borrowings from banks are part of our daily cash management in support of operating activities. Long-term borrowings provide us with flexible sources of excess liquidity and regulatory capital and they include a committed senior secured revolving credit facility from a syndicate of banks that was initiated in May 2006 and senior notes issued in private placements to certain qualified customers of IBG LLC. IBG LLC uses the proceeds from the credit facility and from sales of the senior notes to provide capital to IBG LLC's broker-dealer subsidiaries, primarily in the form of subordinated loans. Historically, our capital transactions have been comprised primarily of distributions paid to provide members with funds to meet their income tax obligations arising from their respective percentages of IBG LLC's income. New member interest contributions and redemptions of member interests have made up a smaller part of our capital transactions.

Net cash provided by financing activities for the year ended December 31, 2006 was $504.0 million, comprised of $512.5 million from the issuance of senior notes, offset by $526.5 million in senior note redemptions; a $525.9 million increase in short-term borrowings; $150.0 million in borrowings under our senior secured revolving credit facility, which facility was initiated in May 2006. Because the senior notes and the revolving credit facility are both sources of regulatory capital in our broker-dealer subsidiaries, we manage the amounts borrowed to maintain a comfortable excess of regulatory capital. During the year ended December 31, 2006 we targeted a reduction in the senior notes as the revolving credit facility became available. These increases were offset by $164.5 million in distributions paid to members to meet income tax obligations on IBG LLC's income and net member contributions of $6.7 million. Net cash provided by financing activities for the year ended December 31,

2005 was $374.1 million and included $549.0 million from the issuance of senior notes, partially offset by $493.2 million in senior notes redemptions, and increased short-term borrowings of $403.3 million. These increases were offset by $88.5 million in distributions paid to members during the year ended December 31, 2005 and net member contributions of $3.5 million. Net cash provided by financing activities for the year ended December 31, 2004 was $79.9 million, comprised primarily of $335.4 million from the issuance of senior notes, partially offset by $270.3 million in senior note redemptions, accompanied by a $87.9 million increase in short-term borrowings and net member contributions of $7.7 million. These increases were offset by $80.8 million in distributions paid to members.

### Principal Indebtedness

IBG LLC is the borrower under a $300.0 million senior secured revolving credit facility and is the issuer of senior notes of which $150.0 million and $150.6 million were outstanding, respectively, as of December 31, 2006.

#### Senior Secured Revolving Credit Facility

On May 19, 2006, IBG LLC entered into a $300.0 million three-year senior secured revolving credit facility with JPMorgan Chase Bank, N.A. as administrative agent, Harris N.A., as syndication agent, and Citibank, N.A. and HSBC Bank USA National Association, as co-syndication agents. IBG LLC is the sole borrower under this credit facility, which is required to be guaranteed by IBG LLC's domestic non-regulated subsidiaries (currently there are no such entities). The facility is secured by a first priority interest in all of the capital stock of each entity owned directly by IBG LLC (subject to customary limitations with respect to foreign subsidiaries). The facility may be used to finance working capital needs and general corporate purposes, including downstreaming funds to IBG LLC's regulated broker-dealer subsidiaries as regulatory capital. This allows IBG LLC to take advantage of market opportunities when they arise, while maintaining substantial excess regulatory capital. The financial covenants contained in this credit facility are as follows:

- minimum net worth of $1.5 billion, with quarterly increases equal to 25% of positive consolidated income;

- maximum total debt to capitalization ratio of 30%;

- minimum liquidity ratio of 1.0 to 1.0; and

- maximum total debt to net regulatory capital ratio of 35%.

#### Senior Notes

IBG LLC periodically issues senior notes in private placements to certain qualified customers of IBG LLC. IBG LLC uses the proceeds from sales of the senior notes to provide capital to IBG LLC's broker-dealer subsidiaries in the form of subordinated loans and for other general purposes. The outstanding senior notes either have a 7% or 8% interest rate and either a 15-month or an 18-month maturity, respectively. IBG LLC may, solely at its option, redeem the senior notes at any time on or after a specified date in the third month or the sixth month, respectively, after the date on which the senior notes are issued and sold, at a redemption price equal to 100% of the principal amount of the senior notes to be redeemed plus accrued interest.

IBG LLC had $164.7 million and $150.6 million of senior notes outstanding at December 31, 2005 and 2006, respectively. In 2006, IBG LLC redeemed $526.5 million of senior notes, which included $164.7 million of senior notes issued in 2005 and issued $512.5 million in new senior notes.

80

The senior notes are secured, along with the senior secured revolving credit facility, by a first priority interest in all of the capital stock of each entity owned directly by IBG LLC (subject to customary limitations with respect to foreign subsidiaries).

The senior notes contain covenants that may limit IBG LLC's ability to:

- incur, or permit its subsidiaries to incur, additional indebtedness;

- create, or permit its subsidiaries to create, liens on any capital stock or equity interests of its subsidiaries;

- declare and pay dividends or make other equity distributions; and

- consolidate, merge or sell all or substantially all of its assets.

### *Capital Expenditures*

Our capital expenditures are comprised of compensation costs of our software engineering staff for development of software for in-house use and expenditures for computer, networking and communications hardware. Both of these are reported in the property and equipment category. Capital expenditures for property and equipment were $12.3 million and $12.8 million for the years ended December 31, 2006 and 2005, respectively. We anticipate that our 2007 gross capital expenditures will approximate $20.0 million, including planned construction of a data center in Chicago, Illinois that will complement and back up our primary U.S. data center in Greenwich, Connecticut. We expect our future capital expenditures to rise as we continue our focus on technology infrastructure initiatives in order to further enhance our competitive position. We anticipate that we will fund capital expenditures with cash from operations and cash on hand. In response to changing economic conditions, we believe we have the flexibility to modify our capital expenditures by adjusting them (either upward or downward) to match our actual performance. If we pursue any strategic acquisitions, we may incur additional capital expenditures.

### Certain Information Concerning Off-Balance Sheet Arrangements

Our subsidiaries derive revenues from buying and selling a variety of financial instruments. Certain of these instruments, including equity options and futures products, give rise to off-balance-sheet risk. Risk arises from changes in the value of these contracts (market risk) and also from the potential inability of counterparties to perform under the terms of the contracts (credit risk). Our market making subsidiaries rely upon proprietary computer systems that reevaluate our prices each second in order to minimize market risk inherent in their portfolios at any moment. Credit risk is limited in that substantially all of the contracts entered into are settled directly at securities and commodities clearing houses or through member firms and banks with substantial financial and operational resources. Such clearing firms and banks are subject to the rules and regulations of the various contract markets in which they operate. Our subsidiaries' exposure is also limited in most locations by the segregation of assets, which protects our subsidiaries in the event of a bankruptcy or other disruption of business at the clearing firm or bank. Our subsidiaries also seek to control credit risk by following an established credit approval process prior to beginning business with a new counterparty.

Certain of our subsidiaries enter into securities purchased under agreements to resell transactions and securities sold under agreements to repurchase transactions (repos) in addition to securities borrowing and lending arrangements, all of which may result in credit exposure in the event the counterparty to a transaction is unable to fulfill its contractual obligations. In accordance with industry practice, repos are collateralized by securities with a market value in excess of the obligation under the contract. Similarly, securities borrowed and loaned agreements are collateralized by deposits and receipts of cash. Our subsidiaries attempt to minimize credit risk associated with these activities by monitoring

81

collateral values on a daily basis and requiring additional collateral to be deposited with or returned to our subsidiaries when deemed necessary.

Securities sold but not yet purchased represent obligations of our subsidiaries to deliver the specified securities at the contracted price and, thereby, may create a liability to repurchase them in the market at prevailing prices. Accordingly, these transactions result in off-balance-sheet risk as our subsidiaries' repurchase of such securities may exceed the amount reported in our consolidated statement of financial condition. Our continuous pricing and risk management systems are designed to minimize such risk on an overall portfolio basis.

### Contractual Obligations Summary

Our contractual obligations principally include obligations associated with our outstanding indebtedness and interest payments as of December 31, 2006.

| | | Payments Due by Year | | | |
|---|---|---|---|---|---|
| | Total | 2007-2008 | 2009-2010 | Thereafter | |
| | | (in millions) | | | |
| Senior notes | $ 150.6 | $ 150.6 | $ — | $ | — |
| Interest payments on senior notes[1] | 12.9 | 12.9 | — | | — |
| Senior secured credit facility | 150.0 | — | 150.0 | | — |
| Interest payments on senior secured credit facility[1] | 30.3 | 17.9 | 12.4 | | — |
| Operating leases | 44.6 | 13.1 | 11.7 | | 19.8 |
| Total contractual cash obligations | $ 388.4 | $ 194.5 | $ 174.1 | $ | 19.8 |

(1)    Future principal and interest payments are calculated based on the assumption that all debt is outstanding until maturity.

Additionally, as of December 31, 2006, we provide standby letters of credit to clearing houses totaling $8.4 million, which expire at various dates through March 2007.

### Seasonality

Our business is subject to seasonal fluctuations, reflecting varying numbers of market participants at times during the year and varying numbers of trading days from quarter to quarter, including declines in trading activity due to holidays. Typical seasonal trends may be superseded by market or world events, which can have a significant impact on prices and trading volume.

### Inflation

Although we cannot accurately anticipate the effect of inflation on our operations, we believe that inflation has not had for the three most recent years, and is not likely in the foreseeable future to have, a material impact on our results of operations.

### Strategic Investments and Acquisitions

We periodically engage in evaluations of potential strategic investments and acquisitions. In February and March 2007, IB Exchange Corp., one of our subsidiaries, completed the purchase of a total of $19.2 million of three year senior secured promissory notes issued by W.R. Hambrecht + Co., Inc., the parent of WR Hambrecht + Co, LLC, one of the placement agents for this offering. See "Transactions with Related Persons, Promoters and Certain Control Persons—Investment in W.R. Hambrecht + Co., Inc." In March 2006, IBG LLC invested $20.0 million in OneChicago LLC and $4.25 million in the newly-created ISE Stock Exchange, LLC. As of December 31, 2006, IBG LLC has invested $5.0 million in the newly-created CBOE Stock Exchange, LLC. OneChicago LLC operates an electronic futures trading

platform that currently trades SSF contracts. ISE Stock Exchange, LLC operates an electronic equities trading platform that was launched in September 2006. CBOE Stock Exchange, LLC plans to operate an electronic trading platform and as of December 31, 2006 was in a developmental stage. We intend to continue making acquisitions on an opportunistic basis generally only when the acquisition candidate will, in our opinion, enable us to acquire either technology or customers faster than we could develop them on our own. Currently, there are no definitive agreements with respect to any material acquisition.

**Recent Accounting Pronouncements**

In May 2005, the Financial Accounting Standards Board (FASB) issued SFAS No. 154, *Accounting Changes and Error Corrections*, which replaces APB Opinion No. 20 and SFAS No. 3, and changes the requirements for reporting of a change in accounting principle. SFAS No. 154 is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005, although early adoption is permitted for accounting changes and corrections of errors made in fiscal years beginning after the date that SFAS No. 154 was issued. Adoption of SFAS No. 154 in the first quarter of 2006 did not have a material effect on our consolidated financial statements.

In June 2005, the EITF reached a consensus on Issue 04-5, *Determining Whether a General Partner, or the General Partners as a Group, Controls a Limited Partnership or Similar Entity When the Limited Partners Have Certain Rights.* EITF Issue 04-5 presumes that a general partner (or managing member in the case of a limited liability company) controls a limited partnership, and should therefore consolidate a limited partnership, unless the limited partners have the substantive ability to remove the general partner without cause based on a simple majority vote or can otherwise dissolve the limited partnership, or unless the limited partners have substantive participating rights over decision making. The guidance in EITF Issue 04-5 was effective immediately for all new limited partnership agreements and any limited partnership agreements that are modified. The guidance is effective for existing partnership agreements for financial reporting periods beginning after December 15, 2005 and may be reported as either a cumulative effect of a change in accounting principle or via retroactive restatement. Adoption of EITF Issue 04-5 in the first quarter of 2006 did not have a material effect on our consolidated financial statements.

On December 16, 2004, the FASB issued SFAS No. 123 (revised 2004), *Share-Based Payment,* a revision of SFAS No. 123, *Accounting for Stock-Based Compensation* (SFAS No. 123R). In April 2005, the SEC delayed the effective date for SFAS No. 123R until the first fiscal year beginning after June 15, 2005. As a result of the SEC ruling, we were required to adopt the provisions of SFAS No. 123R in the first quarter of 2006. SFAS No. 123R clarifies and amends the guidance of SFAS No. 123 in several areas, including measuring fair value, classifying an award as equity or as a liability, attributing compensation cost to service periods and accounting for forfeitures of awards. We adopted SFAS No. 123R using the prospective method and accordingly the adoption did not have a material impact on our consolidated financial statements.

In February 2006, the FASB issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments an amendment of FASB Statements No. 133 and 140." SFAS No. 155 permits companies to elect, on a transaction-by-transaction basis, to apply a fair value measurement to hybrid financial instruments that contain an embedded derivative that would otherwise require bifurcation under SFAS No. 133. SFAS No. 155 is effective for financial statements issued for fiscal years beginning after September 15, 2006. Adoption of SFAS No. 155 is not expected to have a material effect on the Group's consolidated statements of financial condition, income or cash flows.

In June 2006, the FASB issued FASB Interpretation (FIN) No. 48, *Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109* (FIN No. 48), which is effective for fiscal years beginning after December 15, 2006. FIN No. 48 requires enterprises to assess and account for the effect of uncertainty of tax positions taken or to be taken on tax returns in their financial statements.

83

Adoption of FIN No. 48 is not expected to have a material effect on our consolidated financial statements.

In September 2006, the FASB issued SFAS No. 157, *Fair Value Measurements*. SFAS No. 157 defines fair value, establishes a framework for measuring fair value and requires enhanced disclosures about fair value measurements. SFAS No. 157 requires companies to disclose the fair value of its financial instruments according to a fair value hierarchy (i.e., levels 1, 2, and 3, as defined). Additionally, companies are required to provide enhanced disclosure regarding instruments in the level 3 category, including a reconciliation of the beginning and ending balances separately for each major category of assets and liabilities. SFAS No. 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007 and for interim periods within those fiscal years. Adoption of SFAS No. 157 is not expected to have a material effect on our results of operations or financial position.

In September 2006, the SEC issued Staff Accounting Bulletin No. 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements* (SAB No. 108). SAB No. 108 is effective for annual financial statements for fiscal years ending after November 15, 2006, and requires registrants to assess the effects of correcting prior years' misstatements on the current year's statement of income. The cumulative effect, if any, of initial application is to be reported as of the beginning of such fiscal year. Adoption of SAB No. 108 for 2006 did not have a material effect on our consolidated financial statements.

In February 2007, the FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities, Including an Amendment of FASB Statement No. 115." SFAS No. 159 permits entities to choose, at specified election dates, to measure many financial instruments and certain other items at fair value that are not currently required to be measured at fair value. SFAS No. 159 is effective for financial statements issued for an entity's first fiscal year beginning after November 15, 2007. Management is currently evaluating the impact that adoption of SFAS No. 159 may have on our consolidated financial statements.

**Quantitative and Qualitative Disclosures about Market Risk**

We are exposed to various market risks. Our exposures to market risks arise from assumptions built into our pricing models, equity price risk, foreign currency exchange rate fluctuations related to our international operations, changes in interest rates which impact our variable-rate debt obligations, and risks relating to the extension of margin credit to our customers.

*Pricing Model Exposure*

Our strategy as a market maker is to calculate quotes a few seconds ahead of the market and execute small trades at tiny but favorable differentials as a result. This is made possible by our proprietary pricing model, which continuously evaluates and monitors the risks inherent in our portfolio, assimilates market data and reevaluates the outstanding quotes in our entire portfolio each second. Certain aspects of the model rely on historical prices of securities. If the behavior of price movements of individual securities diverges substantially from what their historical behavior would predict, we might incur trading losses. We attempt to limit such risks by diversifying our portfolio across many different options, futures and underlying securities and avoiding concentrations of positions based on the same underlying security. Historically, our losses from these events have been immaterial in comparison to our annual trading profits.

*Foreign Currency Exposure*

As a result of our international market making activities and accumulated earnings in our foreign subsidiaries, our income and net worth is exposed to fluctuations in foreign exchange rates. Our European operations and some of our Asian operations are conducted by our Swiss subsidiary, THE. THE is

regulated by the Swiss Federal Banking commission as a securities dealer and its financial statements are presented in Swiss francs. Accordingly, THE is exposed to certain foreign exchange risks as described below:

Case 1:08-cv-00242-CM   Document 20-4   Filed 04/25/2008   Page 42 of 46

- THE buys and sells futures contracts and securities denominated in various currencies and carries bank balances and borrows and lends such currencies in its regular course of business. At the end of each accounting period THE's assets and liabilities are translated into Swiss francs for presentation in its financial statements. The resulting gains or losses are reported as translation gain or loss in THE's income statement. When we prepare our consolidated financial statements, THE's Swiss franc balances are translated into U.S. dollars for GAAP purposes. THE's translation gains or losses appear as such on IBG LLC's income statement, included in trading gains.

- THE's net worth is carried on THE's books in Swiss francs in accordance with Swiss accounting standards. At the end of each accounting period, THE's net worth is translated at the then prevailing exchange rate into U.S. dollars and the resulting gain or loss is reported in our statement of financial condition as "other comprehensive income," which is neither an income nor an expense item in our statement of income, in accordance with GAAP.

Historically, we have taken the approach of not hedging the above exposures, based on the notion that the cost of constantly hedging over the years would amount to more than the random impact of rate changes on our non-U.S. dollar balances. For instance, an increase in the value of the Swiss franc would be unfavorable to the earnings of THE but would be counterbalanced to some extent by the fact that the yearly translation gain or loss into U.S. dollars is likely to move in the opposite direction.

In late 2005, we began to expand our market making systems to incorporate cash forex and forex options in order to hedge our currency exposure at little or no cost. In September 2006, we began hedging our currency exposure throughout the day on a continuous basis. In connection with the development of our currency hedging strategy, we have determined to base our net worth in GLOBALs, where a GLOBAL is defined as consisting of $66^2/3$ U.S. cents and $33^1/3$ Euro cents. With the growth of our international operations, we foresee including other currencies in our definition of the GLOBAL. As our forex market making systems continue to develop, and as more exchanges trade more forex-based products electronically, we expect more trading volume to flow through this system and, accordingly, we expect to be able to manage the risks in forex in the same low cost manner as we currently manage the risks of our market making in equity-based products.

*Interest Rate Risk*

We had $150.0 million in variable-rate debt outstanding at December 31, 2006. These debt obligations are subject to fluctuations in interest rates at the end of each borrowing term, which impact the amount of interest we must pay. If variable interest rates were to increase by 1.0% per annum, the annual impact to our net income from debt obligations of this amount would be a reduction of $1.5 million. Under our senior secured revolving credit facility, we have the ability to choose borrowing tenors from overnight to twelve months, which permits us to minimize the risk of interest rate fluctuations.

We pay our electronic brokerage customers interest based on benchmark overnight interest rates in various currencies. We typically invest a portion of these funds in U.S. government treasury securities with maturities of up to three months. If interest rates were to increase rapidly and substantially, in increments that were not reflected in the yields on these treasury securities, our net interest income from customer deposits would decrease. An unexpected increase of 0.25% would reduce our net annual interest income by approximately $1.0 million.

We also face substantial interest rate risk due to positions carried in our market making business to the extent that long or short stock positions may have been established for future or forward dates on options or futures contracts and the value of such positions are impacted by interest rates. We hedge such risks by entering into interest rate futures contracts. To the extent that these futures positions do not perfectly hedge this interest rate risk, our trading gains may be adversely affected. The amount of such risk cannot be quantified.

*Dividend Risk*

We face dividend risk in our market making business as we derive significant revenues in the form of dividend income from our substantial inventory of equity securities, and must make significant payments in lieu of dividends on short positions in securities in our portfolio. Projected future dividends are an important component of pricing equity options and other derivatives, and incorrect projections may lead to trading losses. The amount of these risks cannot be quantified.

*Margin Credit*

We extend margin credit to our customers, which is subject to various regulatory requirements. Margin credit is collateralized by cash and securities in the customers' accounts. The risks associated with margin credit increase during periods of fast market movements or in cases where collateral is concentrated and market movements occur. During such times, customers who utilize margin credit and who have collateralized their obligations with securities may find that the securities have a rapidly depreciating value and may not be sufficient to cover their obligations in the event of a liquidation. We are also exposed to credit risk when our customers execute transactions, such as short sales of options and equities that can expose them to risk beyond their invested capital.

We expect this kind of exposure to increase with growth in our overall business. Because we indemnify and hold harmless our clearing firms from certain liabilities or claims, the use of margin credit and short sales may expose us to significant off-balance-sheet risk in the event that collateral requirements are not sufficient to fully cover losses that customers may incur and those customers fail to satisfy their obligations. As of December 31, 2006, we had $846.7 million in margin credit extended to our customers. The amount of risk to which we are exposed from the margin credit we extend to our customers and from short sale transactions by our customers is unlimited and not quantifiable as the risk is dependent upon analysis of a potential significant and undeterminable rise or fall in stock prices. Our account level margin credit requirements meet or exceed those required by Regulation T of the Board of Governors of the Federal Reserve. As a matter of practice, we enforce real-time margin compliance monitoring and liquidate customers' positions if their equity falls below required margin requirements.

We have a comprehensive policy implemented in accordance with SRO standards to assess and monitor the suitability of investors to engage in various trading activities. To mitigate our risk, we also continuously monitor customer accounts to detect excessive concentration, large orders or positions, patterns of day trading and other activities that indicate increased risk to us.

Our credit exposure is to a great extent mitigated by our policy of automatically evaluating each account throughout the trading day and closing out positions automatically for accounts that are found to be under-margined. While this methodology is effective in most situations, it may not be effective in situations where no liquid market exists for the relevant securities or commodities or where, for any reason, automatic liquidation for certain accounts has been disabled.

86

**BUSINESS**

## Overview

We are an automated global electronic market maker and broker specializing in routing orders and executing and processing trades in securities, futures and foreign exchange instruments as a member of more than 60 electronic exchanges and trading venues around the world.

Since our inception in 1977, we have focused on developing proprietary software to automate broker-dealer functions. The advent of electronic exchanges in the last 16 years has provided us with the opportunity to integrate our software with an increasing number of exchanges and trading venues into one automatically functioning, computerized platform that requires minimal human intervention. Our high degree of automation enabled us to process on average 518,000 trades per day with an average of 505 employees in 2006. During 2005 and 2006, we generated pretax income in each period at a rate of more than $1 million per employee. Publicly available data regarding other companies in the securities and commodities industry indicate that this level of productivity is unparalleled for our industry. Automation has allowed us to become one of the lowest cost providers of broker-dealer services and to increase significantly the volume of trades we handle.

According to data compiled by the Futures Industry Association (FIA) based on data received from exchanges worldwide, in 2006, we accounted for approximately 15.9% of exchange-listed equity options volume traded worldwide and approximately 18.7% of exchange-listed equity options volume traded on those markets in which we actively trade. We were the number one liquidity provider on each of the three largest U.S. options exchanges (the Chicago Board Options Exchange, the International Securities Exchange and the Philadelphia Stock Exchange) during 2006, according to rankings provided by these exchanges. We serve sophisticated and active customers worldwide, including institutional investors, financial advisors, brokers and individuals.

As a market maker, we provide continuous bid and offer quotations on approximately 357,000 securities and futures products listed on electronic exchanges around the world. Our quotes are driven by proprietary mathematical models that assimilate market data and reevaluate our outstanding quotes each second. Unlike firms that trade over-the-counter (OTC) derivative products, it is our business to create liquidity and transparency on electronic exchanges. Our profits have been principally a function of transaction volume on electronic exchanges rather than volatility or the direction of price movements.

As a direct market access broker, we serve the customers of both traditional brokers and prime brokers. We provide our customers with an advanced order management, trade execution and portfolio management platform at a very low cost. Our customers can simultaneously access different financial markets worldwide and trade across multiple asset classes (stocks, options, futures, foreign exchange (forex) and bonds) denominated in ten different currencies, on one screen, from a single account based in any major currency. Our large bank and broker-dealer customers may "white label" our trading interface (i.e., make our trading interface available to their customers without referencing our name), or can select from among our modular functionalities, such as order routing, trade reporting or clearing, on specific products or exchanges where they may not have up-to-date technology, in order to offer to their customers a complete global range of services and products. Our most successful module is the dynamic IB SmartRouting[SM] process, which manages orders among several stock and the six U.S. options exchanges by providing efficient executions for customers and enables brokers to meet their best execution regulatory requirements.

During 2006, our customers transacted an average of approximately 196,000 daily average revenue trades, which is a measurement of revenue-generating trades and referred to as DARTs.

87

Our proprietary technology is the key to our success. We built our business on the belief that a fully computerized market making system that could integrate pricing and risk exposure information quickly and continuously would enable us to make markets profitably in many different financial instruments simultaneously. We believe that integrating our system with electronic exchanges and market centers results in transparency, liquidity and efficiencies of scale. Together with the IB SmartRouting$^{SM}$ system and our low commissions, this reduces overall transaction costs to our customers and, in turn, increases our transaction volume and profits. Over the past 29 years, we have developed an integrated trading system and communications network and have positioned our company as an efficient conduit for the global flow of risk capital across asset and product classes on electronic exchanges around the world, permitting us to have one of the lowest cost structures in the industry. We believe that developing, maintaining and continuing to enhance our proprietary technology provides us and our customers with the competitive advantage of being able to adapt quickly to the changing environment of our industry and to take advantage of opportunities presented by new exchanges, products or regulatory changes before our competitors.

Our electronic market making and brokerage businesses are complementary. Both benefit from our combined scale and volume, as well as from our proprietary technology. Our brokerage customers benefit from the technology and market structure expertise developed in our market making business. The expense of developing and maintaining our unique technology, clearing, settlement, banking and regulatory structure required by any specific exchange or market center is shared by both of our businesses. This, in turn, enables us to provide lower transaction costs to our customers than our competitors, whether they use our services as market maker, broker or both. In addition, we believe we gain a competitive advantage by applying the software features we have developed for a specific product or market to newly-introduced products and markets over others who may have less automated facilities in one or both of our businesses or who operate only in a subset of the exchanges and market centers on which we operate.

## Our History

Our founder, chairman and chief executive officer, Thomas Peterffy, began the business in 1977 as an individual market maker on the American Stock Exchange. This enterprise was succeeded by our market making business, Timber Hill, which was formed in 1982, and our brokerage business, Interactive Brokers, which was formed in 1993. Throughout our history, we have continued to create and refine innovative technology to provide liquidity on better terms for our customers and to remain a leader in electronic market making for electronically-traded products as illustrated by the following highlights:

- In 1983, Timber Hill created the first handheld computers used for trading. The ability to track positions and continually re-price options on one stock quickly gave Timber Hill market makers an advantage over their counterparts on the AMEX, who continued to use fair value pricing sheets that were updated only once or twice a day.

- In 1984, Timber Hill created an integrated, computerized pricing and risk management system that allowed the firm to centrally price and manage risk on a portfolio of equity derivatives traded in multiple locations around the United States. Timber Hill implemented this system using touch-screen computers at the exchange floors.

- In 1990, Timber Hill joined the first fully electronic options exchange, the Deutsche Terminbörse (DTB). By directly connecting its market making system to the DTB's matching engine, price and trade reporting facilities, Timber Hill demonstrated the viability of a fully automated market making system.

88

- In 1993, Timber Hill's market makers began using commercially available handheld computers on U.S. exchange floors, communicating by radio with the firm's central pricing systems.

- In 1995, Interactive Brokers created a customer workstation, through which professional customers gained access to exchanges around the world, and executed its first public customer trade.

- In 1999, Interactive Brokers provided a "smart routing" linkage for multiple listed equity options and began to clear online trades for customers trading stocks and equity derivatives through our system.

- In 2000, Timber Hill became a primary market maker on the International Securities Exchange (ISE), the first fully electronic U.S. options exchange. By connecting our system to the ISE, just as we have done with many European and Asian exchanges, we maintained continuous quotes for products listed on the ISE, making electronic option trading a viable alternative to open outcry option trading in the United States.

- In 2002, Interactive Brokers, the Bourse de Montreal and the Boston Stock Exchange together formed the Boston Options Exchange (BOX). Interactive Brokers also launched the IB Universal Account[SM], which allowed trading of stocks, options and futures across multiple currencies from a single account.

- In 2004, Interactive Brokers created account structures for the financial advisors and introducing broker-dealers, thereby allowing professionals to service their customers on the IB platform.

- In 2005, Interactive Brokers began offering forex trading by building two internal exchanges that aggregated electronic bids and offers from major money center banks on one platform, enabling our customers and our market making system to execute efficient forex trades, and introduced the IB Daily Options Commentary and options scanner statistics, furnishing professional traders with important derivatives market indicators.

- In 2006, Interactive Brokers implemented a fully automated platform for trading of U.S. equity and index options in penny increments. We also made an equity investment in, and began contributing our technology to, OneChicago, LLC, the all-electronic security futures exchange offering single stock futures, and we began to prepare our software for portfolio margining.

**Trading Volume Growth**

The following table sets forth IBG LLC's growth in customer trades and market making trades since 2003:

| Period | Customer Trades | % Growth Over Same Period Last Year | Market Making Trades | % Growth Over Same Period Last Year | Total Trades | % Growth Over Same Period Last Year | Average Trades per U.S. Trading Day |
|---|---|---|---|---|---|---|---|
| | | | (In thousands, except percentages) | | | | |
| 2003 | 25,115 | | 32,772 | | 57,887 | | 230 |
| 2004 | 31,808 | 27% | 41,506 | 27% | 73,314 | 27% | 290 |
| 2005 | 42,180 | 33% | 54,044 | 30% | 96,224 | 31% | 382 |
| 2006 | 64,066 | 52% | 66,043 | 22% | 130,108 | 35% | 518 |

89

On most business days, trillions of dollars in securities, commodities, currencies and derivative instruments are traded around the world. These products range from standardized financial instruments, such as common equity securities and futures contracts typically traded on exchanges, to more complex, less standardized instruments, such as over-the-counter derivatives, that are typically traded between institutional dealers. Buyers and sellers of exchange-traded financial instruments benefit from:

- the price transparency, anonymity and enhanced liquidity, in the form of continuous bids and offers, provided by liquidity facilitators, such as market makers and specialists, who participate in those markets; and

- the financial stability of the securities and commodities clearing houses associated with these exchanges.

The financial markets in which we function as an automated market maker and broker are large and are experiencing substantial growth. We are focused on developing technology and applying it as a financial intermediary to increase liquidity and transparency in the financial markets in which we operate. The graphs below illustrate the growth of global financial markets over the past six years by product class.





(1)     Data for global equity option volume excludes volume of the Kospi 200 Index Option Contract, which is an index of 200 stocks on the Korea Stock Exchange.

http://sec.gov/Archives/edgar/data/1381197/000104746907003598/a2175861zs-1a.htm     4/25/2008





(1)    Data for global equity volume was based on annual volume of shares traded on the ten largest exchanges worldwide ranked by total value of shares traded. The ten exchanges are: BME Spanish Exchanges, Börsa Italiana SPA, The Deutsche Börse AG, The Euronext Exchanges, Korea Exchange, London Stock Exchange, The NASDAQ Stock Exchange, NYSE Group, SWX Swiss Exchange and Tokyo Stock Exchange.

### Markets in Which We Participate

We participate primarily in the following financial markets:

- *Derivatives*:   Financial instruments that derive their value based on the value of an underlying asset, such as a stock, a commodity, an interest rate, an index or a currency. Common types of derivatives include options and futures.

- *Equity options*:   Contracts giving the holder the right to buy or sell an underlying stock or equity index, at a specified price, by a specific date.

- *Futures and options on futures*:   Contracts to buy or sell a particular commodity or financial instrument at a specified price, on a specified date in the future and options thereon.

- *Exchange Traded Funds (ETFs) and options on ETFs*:   Shares that may be redeemed for a defined basket of securities and that trade on exchanges throughout the day at prices determined by the market and options therein.

- *Foreign exchange*:   Exchange of various currencies, which facilitate currency conversion and fluid markets.

- *Equities*:   Securities representing equity ownership interests in publicly traded companies.

Derivatives are increasingly being used by financial institutions, hedge funds and large corporations to manage risk or take advantage of the anticipated direction of a market, by allowing holders to manage exposure to gains or declines in the price of underlying assets without having to buy or sell such underlying assets.

Furthermore, the number of different derivative instruments is growing, as exchanges and other financial institutions develop new and innovative derivative instruments to meet industry demands for sophisticated risk management and complex financial arbitrage. Novel derivative instruments often have distinct terms and little or no trading history with which to estimate a price. Markets for new derivative instruments therefore require market intelligence, the services of highly-skilled and well-informed market makers and reliable market data and pricing tools.

Within the derivatives markets, our focus is on exchange-listed equity options and futures, each of which is described in greater detail below.

Equity Options

Equity options are traded on approximately 35 exchanges around the world. In the United States, equity options are currently traded on the American Stock Exchange, the Chicago Board Options Exchange, the International Securities Exchange, NYSE Arca, the Boston Options Exchange and the Philadelphia Stock Exchange. U.S. annual equity option volume increased from 781 million contracts traded in 2001 to 2.0 billion contracts traded in 2006 according to the FIA, representing a CAGR of 21.0%. Similarly, global annual equity options trading volume has increased from 1.5 billion contracts in 2001 to 3.4 billion contracts in 2006, according to the FIA, representing a CAGR of 18.0%.

We believe growth in the options market has increased dramatically over the last three decades largely due to the:

- emergence of electronic trading and resulting access to real-time market data and cost effective executions;

- substantial diminution in the cost of trading as a result of lower commissions and best execution and routing;

- widespread use of multiple listings for each option contract;

- proliferation of the type of options contracts including index options on equity indices;

- growing use of sophisticated hedging techniques and the increased acceptance of derivatives as an asset class to enable hedging; and

- greater understanding on the part of institutions and individual investors of the uses and benefits of options.

Futures and Options on Futures

Futures and options on futures are traded on approximately 60 exchanges around the world. In the United States, the four largest futures exchanges are the Chicago Mercantile Exchange, the Chicago Board of Trade, the New York Mercantile Exchange and the New York Board of Trade. Over the past six years, the U.S. and global futures and options on futures markets have grown substantially. Total U.S. volume for futures and options on futures increased from 797 million contracts in 2001 to 2.5 billion

contracts traded annually in 2006, according to the FIA, representing a CAGR of 26.1%. Total global volume for futures and options on futures increased from 2.0 billion contracts in 2001 to 6.0 billion contracts traded annually in 2006, according to the FIA, representing a CAGR of 23.9%.

We believe the growth in the futures and options on futures market is primarily due to:

- greater access to the futures and options on futures markets through technological innovation and the relaxation of regulatory barriers, resulting in a more liquid market;

- substantial diminution in the cost of trading as a result of lower commissions and best execution and routing;

- increasing awareness of the importance of risk management;

- access to real-time market data and cost effective trading; and

- growing awareness of the opportunities to obtain or hedge market exposure through the use of futures and options on futures contracts at a lower cost than the cost of obtaining or hedging comparable market exposure by purchasing or selling the underlying financial instrument or commodity.

*Exchange-Traded Funds*

Like mutual funds, ETFs are comprised of various stocks and bonds. Unlike mutual funds, however, ETFs attempt to imitate a stock market index, rather than actively add or remove stocks. ETFs can be traded during the day, they can be sold short and purchased on margin. As a result, ETFs offer investors the diversification advantages of a mutual fund, while also possessing certain advantages of traditional stocks. Examples of ETFs include Standard & Poor's SPDRs, Barclays iShares and Dow Jones Diamonds.

The creation and trading of ETFs have grown dramatically in recent years. According to statistics tracked by Bloomberg L.P., average daily trading volume of ETFs listed on U.S. exchanges increased from 101 million shares in 2001 to 398 million shares in 2006 representing a CAGR of 31.6%. Over the same period, the number of ETFs listed on U.S. exchanges increased 235% from 113 to 379. Similarly, average daily trading volume of ETFs listed globally increased from 116 million shares in 2001 to 576 million shares in 2006, representing a CAGR of 37.7%. Over the same period, the number of ETFs listed globally increased 364% from 187 to 868.

We believe the recent growth in ETFs is largely attributable to:

- low bid/offer spreads compared to bid/offer spreads on the equivalent basket of securities;

- the ability to trade ETFs during the trading day, unlike traditional mutual funds, which only trade at the end of the trading day;

- the ability to acquire an interest in a diversified portfolio of equities through the acquisition of one exchange-traded security; and

- relatively low expense ratios as compared to average mutual fund fees.

*Foreign Exchange (Forex)*

The forex market enables individuals, businesses, banks and governments to buy and sell the currencies of different countries. There is no single, unified forex market, largely due to the over-the-

93

counter nature of currency markets; however, there are a number of interconnected marketplaces. Economic globalization has increased the emphasis on greater geographic diversification of investments resulting in increased cross-border commercial activities. This has led to increasing levels of cross-border trading and capital movements, which, in turn, has led to growth in the number of foreign exchange transactions.

The forex market is one of the largest markets in the world, in terms of cash value traded, and has a wide variety of participants including, banks, central banks, currency speculators, corporations, governments and other financial institutions. As measured by the Bank for International Settlements 2004 Triennial Central Bank Survey (covering foreign exchange and derivatives market activity in 2004), total average daily foreign exchange turnover (the average daily amount of outright forwards, currency swaps and options) increased from $853 billion in April 2001 to approximately $1.3 trillion in April 2004, a CAGR of 14.8%.

*Equities*

Equity securities are traded on approximately 125 exchanges around the world, of which the ten largest exchanges, as measured by the value of shares traded, accounted for 86% of the total value of equities traded globally in 2006. The exchange-traded equity markets have grown during the past several years, as evidenced by the increase in trading volume and overall value of shares traded on major exchanges. For example, The World Federation of Exchanges (WFE) reports that the total annual volume of shares traded on the ten largest exchanges grew from 2.4 trillion shares in 2001 to 3.2 trillion shares in 2006, representing a CAGR of 6.3%. The WFE also reports that the total value of shares traded on these ten exchanges grew from $28.8 trillion in 2002, when the WFE standardized its methodology for calculating trading value, to $59.9 trillion in 2006, representing a CAGR of 20.1%.

We believe the growth in the equities securities markets has been largely attributable to:

- advances in trading and communications technology;

- decimalization and emergence of electronic communications networks (ECNs) and other trading networks as competition to traditional equities exchanges and the resulting decrease in execution costs;

- proliferation of overseas markets and exchanges; and

- general global economic expansion and growth.

We believe that we are well-positioned to benefit from these anticipated industry growth trends. In the past decade, the electronic market making and brokerage businesses have become synonymous with applying technology to secure the best price in electronic exchange transactions. Given the increasing globalization and automation of the financial markets, we believe that our investment in technology for nearly three decades and our overall technological capabilities provide us with a significant advantage over our competition. Our proprietary technology gives us the ability to innovate quickly and to automate key aspects of our business and makes us a low cost provider of electronic market making and brokerage services. As demonstrated by our primary role in the creation of fully automated electronic markets on the DTB in 1990 and on the ISE in 2000, we have been in the forefront of expansion into new financial products and exchanges and markets centers, and we believe we are able to adapt to, and in some cases initiate the adoption of, trading standards in rapidly changing technological environment. For instance, we initiated the trading of U.S. equity and index options in penny increments in 2006 through our fully automated platform. Our combined electronic market making and brokerage systems offer access to exchanges and market centers that are typically not cost feasible for brokerage-only business. We leverage the combined volume from our electronic market making and brokerage operations

94

and proprietary technology to route orders effectively and to process trades resulting in consistently best executions and one of the lowest unit costs in the industry.

*Market Making*

Traditionally, market makers provide a critical function in securities markets by providing liquidity, in the form of continuous bids and offers, in various types of financial instruments and facilitating rapid purchases and sales of such instruments with minimal price disturbance. Market makers use their own capital and derive revenues from the small difference between the price paid when securities are bought and price received when securities are sold, frequently within a few minutes. Market makers invest in computer software systems to compete with each other to buy and sell the securities in which they make markets. It is the market makers' responsibility to make bids and offers and maintain a fair and orderly market.

Market makers compete for customer order flow by displaying bid and offer quotations for a guaranteed number of shares, and adjust their bid and offer prices in response to the forces of supply and demand for each security. Market makers typically act as principal and derive most of their revenues from the difference, or spread, between the price paid when a security is bought and the price received when that security is sold or the price paid when bought back if a security is sold short. Buyers and sellers of equity securities, options, futures and foreign currencies benefit from the price transparency, anonymity and enhanced liquidity provided by liquidity facilitators, such as market makers.

With the arrival of electronic exchanges and direct market access brokers, the market making business has changed markedly. Direct market access brokers, such as IB, charge very low commissions and offer the ability to their customers to interact with pending bids and offers on electronic exchanges. As a result, traditional market makers have lost much of their historical time and place advantage over their professional trader customer base. Many professional traders now successfully compete with market makers by efficiently interacting with bids and offers or providing their own. This competition narrows bid/offer spreads, which in turn reduces transaction costs and increases transaction volume.

In this new electronic paradigm, market makers must transact many more trades at much lower markups and process them at very low cost in order to remain viable. This requires sophisticated electronic market making systems that are able to update quotes, consummate trades, keep positions and control risk on a large number of securities simultaneously. Making markets and carrying positions in a greater number of securities increase the need for capital and have forced many smaller market making firms to sell their business to better capitalized firms. With large-scale consolidation, market making for exchange-listed securities has become concentrated in a handful of large market making firms with proprietary market making systems, augmented by smaller firms who use systems provided by various vendors. These systems interact with the exchanges' systems, which are each driven by unique software developed independently by or for each exchange, and work according to different rules unique to each particular exchange. The larger firms typically maintain simultaneous quotes for tens or even hundreds of thousands of different securities, consummate transactions and update quotes in fractions of a second.

The increasing availability of sophisticated best execution order routing systems increases price (bid and offer) competition among market makers as these systems seek to execute each order at the best aggregate price. Technology and economies of scale are ever more important considerations in the market making business. With an increasing number of smaller trades distributed among a greater number of different instruments, risk control has become a more statistical, computationally intensive task, suitable for large computer systems.

The introduction of new financial products over time (such as the recent rapid growth in the utilization of ETFs) and the proliferation of new exchanges and market centers in the United States and

95

throughout the world, many of which are electronic, have contributed, and are likely to continue to contribute, to the growth of the market making industry in general and, in particular, the need for automated services that provide continuous bids and offers across many products in a rapidly changing price environment.

*Electronic Brokerage*

Brokerage firms offer execution and clearing in equity securities, options, fixed income, mutual funds and other securities to individuals, institutions and active or professional traders. Traditional online brokerage firms cater to self-directed retail investors by providing access to websites through which orders can be placed. Prime brokers act as settlement agent, provide custody for assets, provide financing for leverage, and prepare daily account statements for their clients, who generally are money managers, hedge funds, market makers, arbitrageurs, specialists and other professional investors. Direct-access trading systems allow an investor to see bid and offer quotes disseminated by market centers and to direct orders to a specific destination to interact with a specific bid or offer using software and high-speed computer linkages to such places as NASDAQ, various ECNs and options and futures exchanges.

The retail electronic brokerage industry has experienced moderate growth in the past several years, as evidenced by both the increase in the number of customer accounts and the trades executed by those customers. In the United States, the number of retail online brokerage accounts has increased from 13.2 million in 2001 to 16.9 million in 2006, according to the publicly available filings of major U.S. online brokers, representing a CAGR of 5.2%.

In addition to the growth in the underlying markets, additional factors that are expected to continue to contribute to the overall growth of the industry include:

- the appeal of online trading to hedge funds, financial advisors and individual customers based on lower commissions, convenience and hands-on control coupled with improved overall quality of trade execution;

- increased customer acceptance of and confidence in electronic trading as a reliable, secure and cost-effective medium for financial transactions;

- the availability of financial information online, including research, real-time quotes, charts, news and company information; and

- the growth in the availability of high-speed Internet access by customers.

The speed, efficiency and visibility provided by the Internet are expected to continue to drive an overall expansion of the electronic brokerage industry. In addition, the proliferation of such tools as analytical software packages and third-party securities research is expected to support the continued growth of the electronic brokerage industry as investors become increasingly comfortable with making their own investment decisions and executing upon those ideas via the Internet.

Certain of the primary factors associated with the projected growth of the market making industry, the ever-growing number of institutions and individuals who trade electronically, the continued increase in the number and types of electronically-traded products and the market centers in which those products are traded, are expected to continue to drive growth in the electronic brokerage industry. The rise in the number of securities globally, along with an increasing level of interconnectivity between exchanges, should support the growth of the electronic brokerage industry as investors seek to use the Internet to participate in these new investment opportunities.

96

**Our Competitive Strengths**

*Proprietary technology.* We view ourselves primarily as a technology company. Since our inception in 1977, we have focused on developing proprietary software to automate broker-dealer functions. Our proprietary technology makes us a low cost provider of market making and brokerage services. We believe that our early and continuous investment in technology, as well as our overall technological capabilities, provide us with a significant advantage over our competition by enabling us to make markets profitably in financial instruments (e.g., equity options, futures, index options and equities) worldwide with low spreads between bid and offer prices, while at the same time providing our customers with the ability to effect trades at execution and commission costs that are among the lowest in the industry. Through our automated trading system and telecommunications network, we can continuously calculate and disseminate, in real-time, a bid and offer around the "most probable price" for each tradable product in which our Timber Hill subsidiaries make markets. The same underlying systems and network enable our electronic brokerage platform to provide our customers with customized capabilities to monitor multiple markets around the world instantly and simultaneously and to execute trades electronically in these markets. Our proprietary technology also gives us the ability to innovate quickly and to automate key aspects of our business, including order routing for best execution, real-time risk and credit management, clearing, customer service, regulatory compliance and back-office functions. Other entrants in the automated market making business generally have arisen only within the past ten years, whereas we have been developing our market making technology for nearly three decades. Accordingly, we believe that our head start in developing this technology gives us a distinct advantage in time, experience and the amount of software and functionality we have been able to develop over that time. In the last decade, the electronic market making and brokerage businesses have become synonymous with applying technology to secure the best prices in electronic exchange transactions. We have been building our platform in anticipation of this paradigm shift.

*Experienced management team.* Our key employees have significant experience and expertise in the application of technology to the financial services industry and, as significant equity owners of IBG LLC, are heavily committed to our success. IBG LLC's five largest member-owners are computer programmers, three of whom oversee software development on a full-time basis. Nearly half of IBG LLC's members are software developers. Our senior management team has an average of 17 years tenure with us.

*Low cost structure.* Our focus on automation and expense management practices enables us to operate with a low cost structure. Our technology allows us to be one of the lowest cost providers of liquidity to the global, exchange-listed equity and derivatives markets and global execution and clearing services for professional traders and institutions. As a low cost provider with leading technology, we have achieved significant organic growth in our market making and electronic brokerage businesses. Our low cost structure enables us to achieve significant operating leverage on our scalable technology platform.

*Complementary lines of business.* We capitalize on the synergies between our market making and brokerage lines of business. Our global market making presence and high volume enable our brokerage business to service customers competitively and provide sophisticated investors and institutional traders with direct access to numerous electronically-traded products. We leverage the combined volume from our market making and brokerage operations and our proprietary technology in each of these operations to route orders effectively and to process trades on exchanges around the world, resulting in consistently best executions and one of the lowest unit costs in the industry. Our combined market making and brokerage systems offer access to exchanges and market centers that are typically not cost feasible for brokerage-only businesses.

97

Case 1:08-cv-00242-CM    Document 20-3    Filed 04/23/2008    Page 9 of 4

*Diversified revenue base.* We earn trading gains from our market making business as well as commissions and fee income from our electronic brokerage business. We generate revenues from millions of relatively small and diversified individual trades. These trades are broadly distributed geographically and among different products. In 2006, we executed approximately 130 million trades. These trades are broadly distributed among approximately 357,000 tradable, exchange-listed products on more than 60 exchanges and market centers in 23 countries. In the past three years, 25% to 40% of trading revenues were generated from international markets. The steady expansion of brokerage earnings has also contributed to the diversification of our revenues. In 2006, brokerage operations contributed approximately 24% to our net revenues.

*Established business franchise.* We have been in operation for nearly three decades. In 2005, Institutional Investor ranked us the 16th largest U.S. securities firm, as measured by consolidated capital. We are members of more than 60 major exchanges and market centers around the world. Many of these memberships are franchises that are difficult to obtain. As of December 31, 2006, we held market maker licenses in 15 countries and 31 exchanges, and have preferential rights and obligations as designated specialists or market makers in approximately 1,100 classes of options in the United States. We operate on the world's largest and most important electronic securities and commodities exchanges, and we accounted for 15.9% of the exchange-listed equity options volume traded worldwide and approximately 18.7% of exchange-listed equity options volume traded on those markets on which we actively trade, in 2006, according to data compiled by the FIA based on data received from exchanges worldwide. We believe that our proprietary technology, extensive market penetration, advanced trading and communications systems and substantial capital and human resources together constitute a significant business franchise.

*Real-time risk management.* We operate as a market maker, not an investor. Therefore, our ability to generate profits is generally a function of transaction volume on electronic exchanges rather than volatility or the direction of price movements. We seek to calculate quotes at which supply and demand for a particular security are likely to be in balance a few seconds ahead of the market and execute small trades at tiny but favorable differentials. Our proprietary pricing model continuously evaluates and monitors the risks inherent in our portfolio, assimilates market data and reevaluates the outstanding quotes in our portfolio each second. Our model automatically rebalances our positions throughout the trading day to manage risk exposures on our positions in options, futures and the underlying securities, and will price the increased risk that a position may add to the overall portfolio into the bid and offer prices we post. Continuously, and in real-time, we believe our system maintains an overall position that minimizes the risks from up or down market movements, and at a reasonable cost. The effectiveness of our risk management is monitored closely by our management team. Our assets and liabilities are marked-to-market daily for financial reporting purposes and re-valued continuously throughout the trading day for risk management and asset/liability management purposes. In our brokerage business, we calculate margin requirements for each of our customers on a real-time basis across all product classes and across all currencies. Recognizing that IB's customers are experienced investors, we expect our customers to manage their positions proactively and we provide tools to facilitate our customers' position management. However, if a customer's equity falls below what is required to support that customer's margin requirement, IB will automatically continuously liquidate positions on a real-time basis to bring the customer's account into margin compliance. This is done to protect IB, as well as the customer, from excessive losses and further contributes to our low-cost structure, by avoiding the costs associated with bad debt. Our entire credit management process is automated, and IB does not maintain a margin department, which many traditional brokerage firms employ. Over the past three years, we have experienced losses from bad customer accounts of approximately $1.1 million, or less than 0.07% of total customer borrowings during that time period. In summary, our anticipated portfolio risk management system for market making and our real-time credit management system for customer accounts enable us to maximize profits while minimizing losses typically associated with manual risk management.

http://sec.gov/Archives/edgar/data/1381197/000104746907003598/a2175861zs-1a.htm

*Strong financial position.*    We maintain a conservative capital structure with a large equity capital base, highly liquid assets and low financial leverage. As of December 31, 2006, we had equity capital of approximately $2.8 billion and our capital base grew organically at a CAGR of approximately 25% from December 2001 to December 2006. As of December 31, 2006, we held $32.1 billion in total assets, approximately 99% of which were highly liquid and readily convertible to cash, and our long-term debt-to-equity ratio was 11%. In May 2006, we enhanced our financing flexibility by arranging a $300.0 million secured, three-year senior secured revolving credit facility that can also be used as regulatory capital in our broker-dealer subsidiaries. Over the years, we have demonstrated consistent profitability in a variety of market conditions. Our consolidated net income from 2002 to 2006 has ranged from $270.4 million to $734.2 million. Except for two years in the early 1990s when we incurred minor losses, we have been profitable every year since our inception in 1982, when Timber Hill was formed.

## Our Strategies

We plan to continue to grow our business and strengthen our market leadership position by executing the following strategies:

*Capitalize on industry growth trends.*    We are well positioned in the financial markets as an automated global electronic market maker and broker. Electronic trading volume in equities, listed options, futures and forex has been growing rapidly. We expect this trend to continue due to the lower cost, the ability to execute quickly without errors, the anonymity associated with electronic trading and the increased knowledge of investors of the advantages of various forms of exchange-listed derivative products. Our market share in these products has also been growing. For example, our global market share in exchange-listed options has grown from 10.6% in 2004 to 13.8% in 2005 to 15.9% in 2006. On markets where we actively trade, our market share has grown from 12.3% in 2004 to 16.3% in 2005 to 18.7% in 2006. On U.S. options exchanges, our market share has grown from 12.6% in 2004 to 18.7% in 2005 to 21.4% in 2006. We intend to continue to use automation to drive trading volume and increase our market share and revenues in these growing industries. We also intend to make selective, strategic investments where such investments will enable us to offer better execution alternatives to our current and prospective customers or create new opportunities for ourselves as market makers or where we can influence exchanges to provide competing products at better prices using sophisticated technology.

*Drive increased trading volume through our low cost structure.*    We intend to increase our trading volume by building on our leading position as a low cost provider of market making and brokerage services. Our scale, technology and operational efficiencies provide an advantage in delivering services at a low cost. Due to our high degree of automation, our net profit margins are generally higher than those of our competitors. We intend to maintain or increase our market share by decreasing bid/offer spreads in the market for our customers and to capture more order flow as we compete for market making and customer trades. Similarly, we seek to market ourselves to our current customers and potential new classes of customers such as broker-dealers, hedge funds and conventional money managers based on our position as a low cost provider of the best execution brokerage services to further drive order flow. We will continue to seek to refine our systems and processes to enhance our ability to deliver our services at a low cost.

*Expand into new markets.*    We intend to enter electronic markets where we are not currently operating as a market maker or broker, including markets in new geographic locations. We will also continue to expand our market making and brokerage services for new security types as they become available. Our technology will be a key enabler in achieving this goal. We generally do not engage in any business that we cannot automate prior to entering into the business. We seek to enter new markets or

99

product classes in which the execution of transactions can be automated using our technology. Many of these markets are in nascent stages from an automation and information perspective with the ability to utilize sophisticated technology. This gives us the opportunity to play a key role in providing liquidity to new markets and products early in their life cycle and, in doing so, to handle a large market share. Our entry into new markets starts as a software development project. Once we have built the appropriate technology interface for that business and have satisfactorily integrated it with our automated platform, we then provide access to these new markets for our customers. We can then drive trading volumes and attract new customers from the geographic areas where these new markets are located, in order that they can integrate their local investments with a global portfolio. We believe that our technology development skills enable us to enter new markets and add new products more rapidly and efficiently than can our competitors.

*Market our customer offerings to new classes of customers.*    We market ourselves to our customers based on our position as a low cost provider as well as our superior execution, trading and account management tools. We intend to focus on obtaining new classes of customers, such as broker-dealers, hedge funds and conventional money managers, whom we believe will find our "plug and play" systems much more efficient than maintaining their own systems. We intend to add new products, new analytical tools, new order types and new trading features that are in demand by our customers and potential customers. For example, new SEC regulations that allow brokers to calculate customer margin requirements based on a portfolio risk-based model are expected to give us an opportunity to attract large trading accounts from hedge funds and other professional traders who currently use the services of prime brokers. We believe that these new portfolio margining rules will decrease the importance of providing leverage to hedge funds beyond those permitted by current U.S. rules (which we do not do) and will allow us to compete on the basis of price, where we are a low price provider of services. We will also continue our efforts to popularize OneChicago, an all-electronic securities futures exchange, and SSF products as a vehicle to reduce financing costs for hedge funds, thus providing another growth opportunity.

**Market Making—Timber Hill**

We conduct our market making business through our Timber Hill subsidiaries. As one of the largest market makers on many of the world's leading electronic exchanges, we provide liquidity by offering competitively tight bid/offer spreads over a broad base of approximately 357,000 tradable, exchange-listed products, including equity derivative products, equity index derivative products, equity securities and futures. As principal, we commit our own capital and derive revenues or incur losses from the difference between the price paid when securities are bought and the price received when those securities are sold. Because we provide continuous bid and offer quotations and we are continuously both buying and selling quoted securities, we may have either a long or a short position in a particular product at a given point in time. Historically, our profits have been principally a function of transaction volume on electronic exchanges rather than volatility or the direction of price movements. Our strategy is to calculate quotes at which supply and demand for a particular security are likely to be in balance a few seconds ahead of the market and execute small trades at tiny but favorable differentials. Our quotes are based on our proprietary model rather than customer order flow, and we believe that this approach provides us with a competitive advantage.

As a matter of practice, we will generally not take portfolio positions in either the broad market or the financial instruments of specific issuers in anticipation that prices will either rise or fall. Our entire portfolio is evaluated each second and continuously rebalanced throughout the trading day, thus minimizing the risk of our portfolio at all times. This real-time rebalancing of our portfolio, together with our real-time proprietary risk management system, enables us to curtail risk and to be profitable in both up-market and down-market scenarios.

100

We are a market leader in exchange-traded equity options and equity-index options and futures. Together with our electronic brokerage customers, in 2006 we accounted for approximately 15.9% of exchange-listed equity options traded worldwide and approximately 18.7% of exchange-listed equity options volume traded on those markets in which we actively trade, according to data compiled by the FIA based on data received from exchanges worldwide. Our ability to make markets in such a large number of exchanges and market centers simultaneously around the world is one of our core strengths and has contributed to the large volumes in our market making business. We engage in market making operations in North America, Europe and in the Asia/Pacific region as described below.

*North American Market Making Activities.*     Our U.S. market making activities are conducted through TH LLC, an SEC-registered securities broker-dealer that conducts market making in equity derivative products, equity index derivative products and equity securities. Since its inception in 1982, TH LLC has grown to become one of the largest of the listed options market makers in the United States. As of December 31, 2006, TH LLC held specialist, primary market maker, designated primary market maker or lead market maker designations in options on approximately 1,100 underlying securities listed in the United States. TH LLC is a member at the American Stock Exchange, Boston Options Exchange, Chicago Board Options Exchange, Chicago Mercantile Exchange, Chicago Board of Trade, International Securities Exchange, OneChicago and Philadelphia Stock Exchange. We also conduct market making activities in Canada through our Canadian subsidiary, Timber Hill Canada Company.

*International Market Making Activities.*     Our international market making subsidiaries conduct operations in 20 countries, comprising the major securities markets in these regions.

We began our market making operations in Europe in 1990. In Germany and Switzerland, we have been among the largest equity options market makers in terms of volume on Eurex, the world's largest futures and options exchange, which is jointly operated by Deutsche Börse AG and SWX Swiss Exchange. We have also been active in trading German stocks and warrants as a member of the XETRA, the German electronic stock trading system, and the Frankfurt and Stuttgart stock exchanges; and in Swiss stocks and warrants as a member of the Swiss Exchange (SWX) and Virt-x, a cross-border trading platform for pan-European companies. Our other European operations are conducted on the London Stock Exchange (LSE); the Irish Stock Exchange; the Copenhagen Stock Exchange; the Helsinki Stock Exchange; the Euronext exchanges in Amsterdam, Paris, Brussels, Lisbon and London; EDX, formerly OM, the Swedish and Norwegian options market; the Swedish Stock Exchange (SFB); the MEFF and Bolsa de Valencia in Spain; the IDEM and Borsa Italiana in Milan; and the ÖTOB in Vienna.

Since 1995, we have conducted market making operations in Hong Kong. Our Hong Kong subsidiary, Timber Hill Securities Hong Kong Ltd (THSHK), is a member of the Hong Kong Futures Exchange and the Stock Exchange of Hong Kong. Since 1997, we have conducted operations in Australia. Our Australian subsidiary, Timber Hill Australia Pty Ltd, is a member of the Australian Stock Exchange, and routes orders for its trading on the Sydney Futures Exchange through its affiliate, Interactive Brokers LLC. We commenced trading in Japan during the first half of 2002 and in Korea and Singapore during 2004.

In 2006 and 2005, our net revenues from our market making business were approximately $954.7 million and $738.5 million, respectively, which represented approximately 76% and 79% of our total net revenues, respectively, during such periods.

**Electronic Brokerage—Interactive Brokers**

We conduct our electronic brokerage business through our Interactive Brokers (IB) subsidiaries. As an electronic broker, we execute, clear and settle trades globally for both institutional and individual

101

customers. Capitalizing on the technology originally developed for our market making business, IB's systems provide our customers with the capability to monitor multiple markets around the world simultaneously and to execute trades electronically in these markets at a low cost in multiple products and currencies from a single trading account.

Since launching this business in 1993, we have grown to approximately 80,000 institutional and individual brokerage customers. We provide our customers with what we believe to be one of the most effective and efficient electronic brokerage platforms in the industry. The following are key highlights of our electronic brokerage business:

- *Low Costs.*  We provide our customers with among the lowest transaction costs in two ways. First, our customers benefit from our advanced routing of orders designed to achieve the best available price. Second, we offer among the lowest execution, commission and financing costs in the industry.

- *IB Universal Account$^{SM}$.*  From a single point of entry in one IB Universal Account$^{SM}$, our customers are able to trade products denominated in ten different currencies, across multiple classes of tradable, exchange-listed products, including stocks, bonds, options, futures and forex, traded on more than 50 exchanges and market centers and in 16 countries around the world seamlessly, a listing of which can be found at "Business—Exchanges and Market Centers" below.

- *IB SmartRouting$^{SM}$.*  Our customers benefit from our advanced routing. IB SmartRouting$^{SM}$ retains control of the customer's order, continuously searches for the best available price and, unlike most other routers, dynamically routes and re-routes all or parts of a customer's order to achieve optimal execution and among the lowest execution and commission costs in the industry, as described under "Business—Transaction Processing" below.

- *Flexible and Customizable System.*  Our platform is designed to provide an efficient customer experience, beginning with a highly automated account opening process and ending with a fast trade execution, with real-time position monitoring. Our sophisticated interface provides interactive real-time views of account balances, positions, profits or losses, buying power and "what if" scenarios to enable our customers to more easily make informed investment decisions and trade efficiently. Our system is configured to remember the user's preferences and is specifically designed for multi-screen systems. When away from their main workstations, customers are able to access their accounts through our IB WebTrader$^{SM}$ or MobileTrader interfaces.

- *Interactive Analytics$^{SM}$ and IB Options Analytics$^{SM}$.*  We offer our customers state-of-the-art tools, which include a customizable trading platform, advanced analytic tools and sophisticated order types such as guaranteed combination trades. IB also provides real-time option analytics, an arbitrage meter (a tool that illustrates the extent of the premium (or discount) of the lead month futures price above (or below) its fair future value with respect to the index price) and various combinations of charts and other analytical tools.

- *White Labeling.*  Our large bank and broker-dealer customers may "white label" our trading interface (i.e., make our trading interface available to their customers without referencing our name), or can select from among our modular functionalities, such as order routing, trade reporting or clearing, on specific products or exchanges where they may not have up-to-date technology, in order to offer to their customers a complete global range of services and products.

Case 1:08-cv-00242-PCM    Document 20-3    Filed 04/25/2008    Page 14 of 47

IB provides its customers with high speed trade execution at low commission rates, in large part because it utilizes the backbone technology developed for Timber Hill's market making operations. As a result of our advanced electronic brokerage platform, IB attracts sophisticated and active investors. IB's individual customers generate more DARTs than do typical online customer accounts in the industry. As illustrated in the following graph, from December 2002 to December 2006, the dollar amount of IB customer equity accounts grew at a CAGR of 75%, and the number of IB customer and cleared accounts grew at a CAGR of 37%.



For the years ended December 31, 2005 and 2006, our net revenues from our electronic brokerage business were approximately $185.3 million and $298.3 million, respectively, which represented approximately 20% and 24% of our total net revenues, respectively, during such periods.

## Why IB is Unique

We believe that IB is unique in the electronic brokerage industry, as it is clearly distinguishable from traditional online brokers, prime brokers and software providers although it provides many of the same services. For that reason, we believe comparisons with companies in these business categories are not true reflections of our performance.

*Although we offer all the services of online brokers, we are not in the category of typical online brokers:*

While we offer the services that typical online brokers offer, we also offer capabilities and price points that few online brokers match. We expect our customers to have had trading experience and to understand how financial markets work in detail. Our platform incorporates robust features and is not designed for use by non-professionals. To illustrate our positioning, we offer the following publicly

103

---

http://sec.gov/Archives/edgar/data/1381197/000104746907003598/a2175861zs-1a.htm        4/25/2008

available numerical comparisons with a large online broker, Schwab, and a smaller one specializing in derivatives, optionsXpress.

| | As of and for the Year Ended December 31, 2006 | | |
| --- | --- | --- | --- |
| | IB | Schwab | optionsXpress |
| Cleared accounts (*in thousands*) | 80 | 6,737 | 205 |
| Cleared DARTs (*in thousands*) | 157 | 267 | 27 |
| Average annual trades per account | 493 | 10 | 37 |
| Average commission per cleared trade (*including exchange and regulatory fees*) | $ 4.25 | $ 13.38 | $ 18.13 |
| Interest | | | |
| Paid on deposits of more than *$100,000* | 5.05% | 4.69% | 4.09% |
| Charged on margin loans (*$100,000 to $1,000,000*) | 6.30% | 9.06% | 7.25% |

*While we offer many of the services of prime brokers, IB is not in the category of typical prime brokers:*

While we have an increasing number of hedge fund customers, there are three important aspects of prime brokerage services we do not offer at this time:

- we do not offer introductions to potential investors;

- we do not execute or carry positions in OTC derivatives; and

- we do not provide special leverage to our customers—that is, we do not extend margin loans beyond what is prescribed by regulatory bodies.

We expect the importance of this last service to diminish with the introduction of new portfolio margining rules. Portfolio margining, as supported by the exchanges and clearing organizations, would set margin requirements as a function of the largest statistically possible portfolio loss within a wide range of probabilities. See "Business—Regulation—Portfolio Margining" below. We understand regulatory approval of these new rules to be imminent.

Unlike typical online brokers, prime brokers do not publish their commission or financing rates or other information on their business and therefore we cannot make a direct numerical comparison as with the online brokers. Prime broker charges are typically negotiated and there are no standard rates.

*While we offer most features and facilities offered by software providers, we are not a software provider:*

Although we offer most features and facilities that third-party software providers in our business offer, we do not sell, lease or rent our software. We find that operating and maintaining our software, under our control, requires fewer people and can be done much more efficiently. Furthermore, as our market making operation is the largest user of our platform, we are always aware of any problems or opportunities for improvement. We develop all of our software ourselves, which has shielded us from the problems experienced by market participants who rely on third-party software when attempting to update their software.

104

Our platform is interfaced with most of the world's exchanges, clearing organizations and data providers, as a result of additions of products or features or changes in rules or market structure or technology, frequently require changes in our software. Given our position as a primary market maker for many of these exchanges, we must update our software in conformity with exchange modifications and, therefore, we are often the first to incorporate the latest advances in exchange technology. We believe that this is a competitive advantage as our customers are often, for some time, the only ones who can take advantage of the new products and features.

## Technology

We are a technology-focused company. We built our business on the belief that a computerized trading system that could process pricing and integrated risk exposure information quickly would enable us to make markets profitably in many different listed financial instruments simultaneously. Since our inception in 1977, we have focused on developing proprietary software to automate broker-dealer functions. During that time, we have been a pioneer in developing and applying technology as a financial intermediary to increase liquidity and transparency in the capital markets in which we operate. Over the past 29 years, we have developed an automatically functioning, computerized platform that requires minimal human supervision. Our trading system contains unique architectural aspects that, together with our massive trading volume in markets worldwide, impose a significant barrier to entry for firms wishing to compete in our specific businesses and permit us to compete favorably against our competitors.

The quotes that we provide as market makers are driven by proprietary mathematical models that assimilate market data and reevaluate our outstanding quotes each second. Because our technology infrastructure enables us to process rapidly large volumes of pricing and risk exposure information, we are able to make markets profitably in securities with relatively low spreads between bid and offer prices. As market makers, we must ensure that our interfaces connect effectively and efficiently with each exchange and market center where we make markets and that they are in complete conformity with all the applicable rules of each local venue. Utilizing up-to-date computer and telecommunications systems, we transmit continually updated pricing information directly to exchange computer devices and receive trade and quote information for immediate processing by our systems. As a result, we are able to maintain more effective control over our exposure to price and volatility movements on a real-time basis than many of our competitors. This is important, not only because our system must process, clear and settle several hundred thousand market maker trades per day with a minimal number of errors, but also because the system monitors and manages the risk on the entire portfolio, which generally consists of several million open contracts distributed among more than 100,000 different products. Using our system, which we believe affords an optimal interplay of decentralized trading activity and centralized risk management, we quote markets in approximately 357,000 securities and futures products traded around the world.

In our electronic brokerage business, our proprietary technology infrastructure enables us to provide our customers with the ability to effect trades at among the lowest execution and commission costs in the industry. Additionally, our customers benefit from real-time systems optimization for our market making business. Customer trades are both automatically captured and reported in real time in our system. Our customers trade on more than 50 exchanges and market centers in 16 countries around the world. All of these exchanges are partially or fully electronic, meaning that a customer can buy or sell a product traded on that exchange via an electronic link from his or her computer terminal through our system to the exchange. We offer our products and services through a global communications network that is designed to provide secure, reliable and timely access to the most current market information. We provide our customers with a variety of means to connect to our brokerage systems, including dedicated point-to-point data lines, virtual private networks and the Internet.

105

Specifically, our customers receive worldwide direct-access connectivity through our Trader Workstation (our real-time Java-based trading platform), our proprietary Application Program Interface (API), and/or industry standard Financial Information Exchange (FIX) connectivity. Customers who want a professional quality trading application with a sophisticated user interface utilize our Trader Workstation. Customers interested in developing program trading applications in MS-Excel, Java, Visual Basic or C++ utilize our API. Large institutions with FIX infrastructure prefer to use our FIX solution for seamless integration of their existing order gathering and reporting applications.

While many brokerages, including online brokerages, rely on manual procedures to execute many day-to-day functions, IB employs proprietary technology to automate, or otherwise facilitate, many of the following functions:

- account opening process;

- order routing and best execution;

- seamless trading across all types of securities and currencies around the world from one account;

- order types and analytical tools offered to customers;

- delivery of customer information, such as confirmations, customizable real-time account statements and audit trails;

- customer service; and

- risk management through automated real-time credit management of all new orders and margin monitoring.

## Research and Development

One of our core strengths is our expertise in the rapid development and deployment of automated technology for the financial markets. Our core software technology is developed internally, and we do not generally rely on outside vendors for software development or maintenance. To achieve optimal performance from our systems, we are continuously rewriting and upgrading our software. Use of the best available technology not only improves our performance but also helps us attract and retain talented developers. Our software development costs are low because the employees who oversee the development of the software are the same employees who design the application and evaluate its performance. This also enables us to add features and further refine our software rapidly.

Our internally-developed, fully integrated trading and risk management systems are unique and transact across all product classes on more than 60 markets and 13 currencies around the world. These systems have the flexibility to assimilate new exchanges and new product classes without compromising transaction speed or fault tolerance. Fault tolerance, or the ability to maintain system performance despite exchange malfunctions or hardware failures, is crucial to successful market making and ensuring best executions for brokerage customers. Our systems are designed to detect exchange malfunctions and quickly take corrective actions by re-routing pending orders.

Our company is technology-focused, and our management team is hands-on and technology-savvy. Most members of the management team write detailed program specifications for new applications. The development queue is prioritized and highly disciplined. Progress on programming

106

initiatives is generally tracked on a weekly basis by a steering committee consisting of senior executives. This enables us to prioritize key initiatives and achieve rapid results. All new business starts as a software development project. We generally do not engage in any business that we cannot automate and incorporate into our platform prior to entering into the business.

The rapid software development and deployment cycle is achieved by our ability to leverage a highly integrated, object oriented development environment. The software code is modular, with each object providing a specific function and being reusable in multiple applications. New software releases are tracked and tested with proprietary automated testing tools. We are not hindered by disparate and often limiting legacy systems assembled through acquisitions. Virtually all of our software has been developed and maintained with a unified purpose.

For 29 years, we have built and continuously refined our automated and integrated, real-time systems for world-wide trading, risk management, clearing and cash management, among others. We have also assembled a proprietary connectivity network between us and exchanges around the world. Efficiency and speed in performing prescribed functions are always crucial requirements for our systems. As a result, our trading systems are able to assimilate market data, recalculate and distribute streaming quotes for tradable products in all product classes each second.

## Transaction Processing

Our transaction processing is automated over the full life cycle of a trade. Our market making software generates and disseminates to exchanges and market centers continuous bid and offer quotes on approximately 357,000 tradable, exchange-listed products. Our fully automated smart router system searches for the best possible combination of prices available at the time a customer order is placed and immediately seeks to execute that order electronically or send it where the order has the highest possibility of execution at the best price.

At the moment a trade is executed, our systems capture and deliver this information back to the source, either the market making system or via the brokerage system to the customer, in most cases within a fraction of a second. Simultaneously, the trade record is written into our clearing system, where it flows through a chain of control accounts that allow us to reconcile trades, positions and money until the final settlement occurs. Our integrated software tracks other important activities, such as dividends, corporate actions, options exercises, securities lending, margining, risk management and funds receipt and disbursement.

## *IB SmartRouting$^{SM}$*

IB SmartRouting$^{SM}$ searches for the best destination price in view of the displayed prices, sizes and accumulated statistical information about the behavior of market centers at the time an order is placed and IB SmartRouting$^{SM}$ immediately seeks to execute that order electronically. Unlike other smart routers, IB SmartRouting$^{SM}$ never relinquishes control of the order, and constantly searches for the best price. It continuously evaluates fast-changing market conditions and dynamically re-routes all or parts of the order seeking to achieve optimal execution. IB SmartRouting$^{SM}$ represents each leg of a spread order independently and enters each leg at the best possible venue. IB SmartRouting Autorecovery$^{SM}$ re-routes a customer's U.S. options order in the case of an exchange malfunction, with IB undertaking the risk of double executions. In addition, IB SmartRouting$^{SM}$ checks each new order to see if it could be executed against any of its pending orders. As the system gains more users, this feature becomes more important for customers in a world of multiple exchanges and penny price orders because it increases the possibility of best executions for our customers ahead of customers of other brokers.

107

**Clearing and Margining**

Our activities in the United States are almost entirely self-cleared. We are a full clearing member of The Options Clearing Corporation (OCC), the Chicago Mercantile Exchange Clearing House (CMECH), The Clearing Corporation and The Depository Trust and Clearing Corporation.

Due to our large positions in broad-based index products, we benefit from the cross-margin system maintained by these clearing houses. For example, if we hold a position in an OCC-cleared product and have an offsetting position in a CMECH-cleared product, the cross-margin computation takes both positions into account, thereby reducing the overall margin requirement. The reduced margin benefit proves especially useful during times of market stress, such as on days with large price movements when intra-day margin calls may be reduced or eliminated by the cross-margin calculation. We are planning to make similar benefits available to customers under an SEC-approved risk-based portfolio margin program.

In addition, we are self-cleared in the United Kingdom, Canada, Germany, Belgium, Ireland, France, Hong Kong, the Netherlands, Norway, Sweden and Switzerland.

## Exchanges and Market Centers

The table below summarizes the exchanges and market centers on which our operating subsidiaries conduct business as well as certain affiliations of these subsidiaries.

| **Timber Hill LLC** | **Interactive Brokers LLC** |
| --- | --- |
| American Stock Exchange | American Stock Exchange |
| Bolsa Mexicana de Valores | BondDesk |
| Boston Options Exchange | Boston Options Exchange |
| CBOE Futures Exchange | Boston Stock Exchange |
| Chicago Board of Trade | CBOE Futures Exchange |
| Chicago Board Options Exchange | Chicago Board Options Exchange |
| Chicago Mercantile Exchange | Chicago Stock Exchange |
| International Securities Exchange | International Securities Exchange |
| Mercado Mexicano de Derivados | ISE Stock Exchange |
| NASDAQ Stock Market | National Stock Exchange |
| New York Board of Trade | New York Stock Exchange |
| NYSE Arca | NYSE Arca |
| OneChicago | OneChicago |
| Philadelphia Stock Exchange | Philadelphia Stock Exchange |
| U.S. Futures Exchange (formerly, Eurex US) | Sydney Futures Exchange |
| Member, National Association | U.S. Futures Exchange (formerly, Eurex US) |
|   of Securities Dealers | Member, National Association |
| Member, National Futures Association |   of Securities Dealers |
| | Member, National Futures Association |

108

Interactive Brokers LLC also subscribes to the following ECNs: ArcaEdge, Bloomberg Tradebook and Direct Edge.

Case 1:08-cv-00242-CM    Document 20-5    Filed 04/25/2008    Page 20 of 47

**Timber Hill Europe AG**
Austrian Futures & Options Exchange (ÖTOB)
Bolsa de Valencia
Borsa Italiana (Borsa Valori di Milano)
Copenhagen Stock Exchange
EDX London
Eurex Deutschland
Eurex Schweiz
Euronext Amsterdam
Euronext Brussels
Euronext Paris
Euronext.Liffe
Euronext Lisbon
Frankfurt Stock Exchange
Helsinki Stock Exchange
Intercontinental Exchange
Korea Exchange
London Stock Exchange
MEFF
Osaka Stock Exchange
Oslo Bors
Singapore Exchange
Stockholm Stock Exchange
Stuttgart Stock Exchange
Swiss Exchange
Tokyo Stock Exchange
Vienna Stock Exchange
Virt-X
XETRA (Deutsche Borse Group)

**Timber Hill Securities Hong Kong Limited**
Hong Kong Futures Exchange (HKFE)
Stock Exchange of Hong Kong

**Timber Hill Australia Pty LTD**
Australian Stock Exchange

**Timber Hill Canada Company**
Montreal Exchange
Toronto Stock Exchange

**Interactive Brokers (U.K.) Limited**
Borsa Italiana (IDEM Derivatives Market)
Irish Stock Exchange
London Stock Exchange

**Interactive Brokers Canada Inc.**
Toronto Stock Exchange
TSX Venture

**Risk Management Activities**

The core of our risk management philosophy is the utilization of our fully-integrated computer systems to perform critical, risk-management activities on a real-time basis. In our market making business, our real-time integrated risk management system seeks to ensure that overall IBG positions are continuously hedged at all times, curtailing risk. In our electronic brokerage business, integrated risk management seeks to ensure that each customer's positions are continuously credit checked and brought into compliance if equity falls short of margin requirements, curtailing bad debt losses.

*Market Making*

We employ certain hedging and risk management techniques to protect us from a severe market dislocation. Our risk management policies are developed and implemented by our chairman and our steering committee, which is comprised of senior executives of our various companies. Our strategy is to calculate quotes a few seconds ahead of the market and execute small trades at a tiny but favorable differential as a result. This is made possible by our proprietary pricing model, which evaluates and monitors the risks inherent in our portfolio, assimilates market data and reevaluates the outstanding quotes in our portfolio each second. Our model automatically rebalances our positions throughout each trading day to manage risk exposures both on our options and futures positions and the underlying

109

securities, and will price the increased risk that a position would add to the overall portfolio into the bid and offer prices we post. Under risk management policies implemented and monitored primarily through our computer systems, reports to management, including risk profiles, profit and loss analysis and trading performance, are prepared on a real-time basis as well as daily and periodical bases. Although our market making is completely automated, the trading process and our risk are monitored by a team of individuals who, in real-time, observe multiple dimensional representations of various risk parameters of our consolidated positions. Our assets and liabilities are marked-to-market daily for financial reporting purposes and re-valued continuously throughout the trading day for risk management and asset/liability management purposes. No more than 0.5% of firm capital is at risk of loss at any one time.

As illustrated in the table below, since 1990 we have rapidly expanded the number of financial instruments in which we make markets and our market presence. This diversification acts as a passive form of portfolio risk management.

|  | 1990 | 1998 | 2006 |
| --- | --- | --- | --- |
| Equity option classes | 32 | 510 | 2,651 |
| Equity securities | 38 | 1,122 | 7,189 |
| Equity index products | 11 | 86 | 299 |
| Equity futures | — | — | 880 |
| Other financial futures | — | — | — |
| Exchanges and market centers | 8 | 31 | 65 |

We trade primarily the options on stocks (and individual stocks) where the underlying equity market capitalization is greater than $1 billion. Throughout the trading day we produce online, real-time profit and loss, risk evaluation, activity and other management reports. Our software assembles from external sources a balance sheet and income statements for our accounting department to reconcile the trading system results.

The adaptability of our portfolio risk management system and trading methods have allowed us to expand not only the number of financial instruments traded but also across markets. For additional information on how our risk management activities may affect our business, financial condition or results of operations, please see "Risk Factors—Risks Related to Our Business."

*Electronic Brokerage*

IB calculates margin requirements for each of its customers on a real-time basis across all product classes (stocks, options, futures, bonds and forex) and across all currencies. Recognizing that IB's customers are experienced investors, we expect our customers to manage their positions proactively and we provide tools to facilitate our customers' position management. However, if a customer's equity falls below what is required to support that customer's margin, IB will automatically liquidate positions on a real-time basis to bring the customer's account into margin compliance. This is done to protect IB, as well as the customer, from excessive losses and further contributes to our low-cost structure. The entire credit management process is completely automated, and IB does not employ a margin department.

As a safeguard, all liquidations are displayed on custom-built liquidation monitoring screens that are part of the tool set our technical staff uses to monitor performance of our systems at all times the markets around the world are open. In the event our systems absorb erroneous market data from exchanges, which prompts liquidations, risk specialists on our technical staff have the capability to halt liquidations that meet specific criteria. The liquidation halt function is highly restricted.

IB's customer interface includes color-coding on the account screen and pop-up warning messages to notify customers that they are approaching their margin limits. This feature allows customers to take action, such as entering margin-reducing trades, to avoid having IB liquidate their positions. These tools and real-time margining allow IB's customers to understand their trading risk at any moment of the day and help IB maintain low commissions, by not having to price in the cost of credit losses.

*Operational Controls*

We have automated the full cycle of controls surrounding the market making and brokerage business. Key automated controls include the following:

- Our technical operations section continuously monitors our network and the proper functioning of each of our nodes (exchanges, ISPs, leased customer lines and our own data centers) around the world.

- Our real-time credit manager software provides pre- and post-execution controls by

- testing every customer order to ensure that the customer's account holds enough equity to support the execution of the order, rejecting the order if equity is insufficient or directing the order to an execution destination without delay if equity is sufficient; and

- continuously updating a customer account's equity and margin requirements and, if the account's equity falls below its minimum margin requirements, automatically issuing liquidating orders in a smart sequence designed to minimize the impact on account equity.

- Our market making system continuously evaluates approximately 357,000 securities and futures products in which we provide bid and offer quotes and changes its bids and offers in such a way as to maintain an overall hedge and a low-risk profile. The speed of communicating with exchanges and market centers is maximized through continuous software and network engineering innovation, thereby allowing the firm to achieve real-time controls over market exposure.

- Our clearing system captures trades in real-time and performs automated reconciliation of trades and positions, corporate action processing, customer account transfer, options exercise, securities lending and inventory management, allowing the firm to effectively manage operational risk.

- Our accounting system operates with automated data feeds from clearing and banking systems, allowing the firm to produce financial statements for all parts of our business every day by noon on the day following trade date.

- Software developed to interface with the accounting and market making systems performs daily profit and loss reconciliations, which provide tight financial controls over market making functions.

111

We established our electronic brokerage subsidiary, IB, in 1993 to enhance the use of our global network of trading interfaces, exchange and clearinghouse memberships and regulatory registrations assembled over the prior 16 years to serve our market making business. We realized that electronic access to market centers worldwide through our network could easily be utilized by the very same floor traders and trading desk professionals who, in the coming years, would be displaced by the conversion of exchanges from open outcry to electronic systems.

We currently service approximately 80,000 cleared customer accounts. Our customers reside in approximately 140 countries around the world. IB currently executes trades for at least two of the largest commercial banks, at least two of the largest bulge bracket investment banks and at least two of the largest online brokers.

The target IB customer is one that requires the latest in trading technology, derivatives expertise, and worldwide access and expects low overall transaction costs. IB's customers are mainly comprised of "self-service" individuals, former floor traders, trading desk professionals, electronic retail brokers, financial advisors who are comfortable with technology, banks that require global access and hedge funds.

Our customers fall into three groups based on services provided: cleared customers, trade execution customers and wholesale customers. With the advent of portfolio margining, we believe we will be able to persuade more of our trade execution hedge fund customers to utilize our cleared business solution, which will benefit the hedge funds in terms of cost savings. Many prime brokers offer increased leverage over Regulation T credit limitations and NYSE margin requirements through offshore entities and joint back office arrangements. Through portfolio margining, IB will now be able to offer similar leverage with lower margin requirements that reflect the reduced risk of a hedged portfolio.

- *Cleared Customers*:   We provide trade execution and clearing services to our cleared customers who are generally attracted to our low commissions, low financing rates, high interest paid and best price execution. From small market making groups and individual market makers, our cleared customer base has expanded over the years to include institutional and individual traders and investors, financial advisors and introducing brokers.

- *Trade Execution Customers*:   We offer trade execution for customers who choose to clear with another prime broker or a custodian bank; these customers are able to take advantage of our low commissions for trade execution as well as our best price execution.

- *Wholesale Customers*:   Our wholesale customers, which include some of the largest banks and retail electronic brokers, are generally self-clearing. These customers count on us for our superior options and option/stock combination trade routing and execution and our ability to assist them in satisfying their regulatory requirements to provide best execution to their customers.

Our non-cleared customers include the large online brokers and increasing numbers of the proprietary and customer trading units of U.S., Canadian and European commercial banks. These customers are attracted by the IB SmartRouting[SM] technology as well as our direct access to stock, options, futures, forex and bond markets worldwide.

112

As described in greater detail above under "Business—Technology," our customers receive worldwide direct-access connectivity in one of three ways: the Trader Workstation (our real-time Java-based trading platform), our proprietary API, and/or industry standard FIX connectivity.

## Customer Service

IB's customer service operations are designed around an integrated technical solution that shifts the inquiry/response process as close to the client as possible. The emphasis on self-help/self-describe methods allows us to provide information and solutions without dependency on a large, personnel-intensive infrastructure. IB currently employs approximately 71 customer service providers.

### Website Self-Help

The foundation of our self-help model is a comprehensive website with substantial detail about all aspects of the trading/investing experience. While many brokerage websites provide primarily marketing and inquiry routing functions, we consider transparent, facile access to information to be the critical differentiating factor to allow sophisticated investors to both select IB as their broker and to thereafter optimize their trading strategies.

We maintain on our website an extensive library of tutorials and usage guides to help new clients familiarize themselves with the features and functions of the trading interfaces. Our fee models are standardized and fully disclosed, allowing prospective clients to understand easily our pricing, and obviating the need for inquiries to, and negotiations with, sales personnel. We publish details of product availability, contract parameters, interest methods, margin methods, delivery rules and other information.

### Customer Education

We have developed an online "University of IB" which provides the framework for discussion of advanced topics using web-based seminar (webinar) technology. Clients are able to watch, listen, and ask questions online as experts discuss some of the industry's most useful and timely issues. For highly technical topics such as developing programming interfaces to IB's proprietary application program interface, the webinar solution offers us the ability to communicate efficiently with groups of high value clients with special requirements.

### Customer Service

For customers requiring more personalized assistance, we maintain regional call centers in North America, Europe and Asia offering 24-hour support via live chat, web-based ticket interfaces, and telephone. All communication channels are tied into a proprietarily developed central client information management system which, in addition to traditional customer relationship management functionality, also provides automated inquiry routing to specialist teams, notification to appropriate customer service and management personnel, and quality control facilities, as well as data windows into the real-time brokerage system.

IB's customer service technology permits scalable, efficient rapid response service for professional clients. Customer Service personnel can interact directly with brokerage system functionalities such as trade/order management, risk overview, and regulatory capital compliance, allowing us to efficiently leverage our personnel resources by providing one-touch inquiry or resolution. Approximately 80% of all inquiries are answered and resolved on the first point of contact.

We also apply the self-help model into inquiry processing. Where possible, inquiries are handled automatically, using straight-through processing response engines to collect required data and process specific requests. Inquiry status and resolution is visible to clients over a secure web interface, where they are able refine their questions as needed and configure update/notification methods to include email and text message notifications.

113

Telephone technologies incorporate the current state-of-the-art voice over Internet protocol and call routing standards. Integration of Internet telephony directly into the trading interface is one of several initiatives under way to improve our service.

*Quality Control*

We operate an aggressive internal quality control program which offers clients the opportunity to evaluate every service interaction. The system automatically notifies managers within seconds of detecting potentially significant issues. The quality assurance management team responds to these issues immediately, in some cases contacting clients directly via telephone within minutes.

## Sales and Marketing

IB has traditionally relied on its superiority in technology and trading costs to sell its broker services. Our marketing and sales strategy is based on education, as we believe that once sophisticated traders and investors fully understand the benefits of superior technology and lower trading costs, they will choose IB as their broker. In recent years, we have increased our sales education efforts with the following:

- A sales team dedicated to selling our IB SmartRouting$^{SM}$ technology to large retail brokers.

- The introduction of our IB Options Intelligence Report which provides built-in options markets indicators to the public, and can be received on a real-time basis by becoming an IB customer. The Options Intelligence Report is now being posted to third-party websites such as the CBOE and Yahoo.

- A television and print advertising campaign which emphasizes our strengths and competitive advantages in the options markets, including trading options in penny increments.

- A webinar program which provides training on a multitude of technology and product related information. More than 20 webinars are offered by IB and other trading industry partners each month.

- The establishment of a direct mail and direct email database of prospective customers to which we send market education materials on a periodic basis.

- More aggressive use of Internet banners and search providers.

- Dedicated sales teams in North America, Europe, Asia and Australia.

- Introduction of the annual IB Collegiate Trading Olympiad, which allows college students to compete for prizes and jobs by developing program trading applications for the IB trading platform.

- A features poll which allows our customers to nominate new technology ideas and to vote on the nominations.

- Enhanced interaction with the media to emphasize the superiority of IB's technology.

- A "reference book" website that aims to provide rich offering of trade reference material directly to our customers. This includes users guides, flash tutorials, technical guidelines, a contract database, margin rules, and other detailed information.

All customer acquisitions are tracked and analyzed based on profitability on a regular basis so that adjustments can quickly be made to our marketing efforts.

114

Finally, with the advent of portfolio margining, IB sees an opportunity to further target the hedge fund market. To take advantage of this opportunity we will continue to enhance our worldwide cross product offerings, our options tools and hedge fund administration.

## Competition

### Market making

Market makers range from sole proprietors with very limited resources, of which there are still a few hundred left, to a few highly sophisticated groups which have substantially greater financial and other resources, including programmers and other research and development personnel, than we do. Along with the ongoing conversion of exchanges from floor-based, open outcry arenas to electronic matching systems, Timber Hill's competitors have changed from many individuals or groups of traders to large, integrated broker-dealers. Today, Timber Hill's major competitors are large broker-dealers, such as Goldman Sachs, Citigroup, UBS, Morgan Stanley and Merrill Lynch, and niche players such as Citadel, LaBranche, Group One Trading, Wolverine Trading and Peak6. Most of our competitors in market making are much larger than we are and have more captive order flow, although this is less true with respect to our narrow focus on options, futures and ETFs listed on electronic exchanges. In order to compete successfully, we believe that we must have more sophisticated, versatile and robust software than our competitors. This is our primary focus, as contrasted with many of our competitors. With respect to these competitors, Timber Hill maintains the advantage of having had much longer experience with the development and usage of its proprietary electronic brokerage and market making systems. Market conditions that are difficult for other market participants often present Timber Hill with the opportunities inherent in diminished competition. Our advantage is our expertise and decades of single-minded focus on developing our technology. This enables us to have a unique platform specializing strictly in electronic market making and brokerage.

### Electronic brokerage

The market for electronic brokerage services is rapidly evolving and highly competitive. IB believes that it neither fits within the definition of a traditional broker nor a prime broker. IB's primary competitors include offerings targeted to professional traders by large retail online brokers (such as E*TRADE's Power E*TRADE Pro business and Charles Schwab & Co., Inc.'s CyberTrader business) and the prime brokerage and electronic brokerage arms of major investment banks and brokers (such as Goldman Sachs' RediPlus business and Morgan Stanley's Passport business). We also encounter competition to a lesser extent from full commission brokerage firms including Merrill Lynch, Smith Barney (a division of Citigroup), as well as other financial institutions, some of which provide online brokerage services. The electronic brokerage businesses of many of our competitors are relatively insignificant in the totality of their firms' business. IB provides access to a global range of products from a single IB Universal Account$^{SM}$ and professional level executions and pricing, which positions it in competition with niche direct-access providers and prime brokers. In addition, IB provides sophisticated order types and analytical tools that give a competitive edge to its customers.

## Strategic Investments

From time to time, we seek to make targeted investments in related businesses where we can contribute our technological expertise and extensive knowledge of financial markets structure, in the United States and abroad. Investments in the Boston Options Exchange (BOX), the newly-created ISE Stock Exchange and CBOE Stock Exchange and the OneChicago futures exchange are examples.

In 2002, we became a founding member of the newly-created fully electronic BOX, which was the first options exchange to introduce a price improvement mechanism, which allows customers to receive better prices than National Best Bid and Offer by having market makers compete for the order via an auction, and by offering better prices denominated in pennies. Since introduction of price improvement

by BOX, other leading U.S. options exchanges adopted similar mechanisms which have not attracted as much volume so far.

In 2006, we made an equity investment in OneChicago, LLC, an all-electronic security futures exchange. OneChicago is a leading provider of SSFs, a low-cost alternative to trading stock. SSFs are futures whose underlying assets are an individual stock or a narrow-based index. Because SSFs are margined like futures, they require a fraction of the funds needed to purchase stocks and allow investors to avoid paying for margin loans. In addition, SSFs provide hedge funds and other traders and investors, large and small, with the means to drastically reduce financing costs associated with their stock positions. As a futures broker, we can offer SSFs whereas traditional online brokers that are not also futures brokers cannot offer SSFs. Prime brokers may offer SSFs but not as seamlessly as we can. We believe that the ability to offer SSFs to our customers gives us an additional competitive advantage.

In 2006, we made an investment in the newly-created, fully-electronic ISE Stock Exchange, which began to offer in September 2006 a continuous, instantaneous, fully automated and anonymous matching platform for trading stock. In 2006, we also made an investment in CBOE Stock Exchange, which commenced its operations in March 2007.

In February and March 2007, IB Exchange Corp., one of our subsidiaries, completed the purchase of a total of $19.2 million of three year senior secured promissory notes issued by W.R. Hambrecht + Co., Inc., the parent of WR Hambrecht + Co, LLC, one of the placement agents for this offering. See "Transactions with Related Persons, Promoters and Certain Control Persons—Investment in W.R. Hambrecht + Co., Inc."

## Regulation

Our securities and derivatives businesses are extensively regulated by U.S. federal and state regulators, foreign regulatory agencies, and numerous exchanges and self-regulatory organizations of which our subsidiaries are members. In the current era of heightened regulation of financial institutions, we expect to incur increasing compliance costs, along with the industry as a whole.

*Overview*

As registered U.S. broker-dealers, IB and TH LLC are subject to the rules and regulations of the Exchange Act, and as members of various exchanges, we are also subject to such exchanges' rules and requirements. Additionally, as registered futures commission merchants, IB and TH LLC are subject to the Commodity Exchange Act and rules promulgated by the CFTC and the various commodity exchanges of which they are members. Finally, we are subject to the requirements of various self-regulatory organizations such as the NASD and the National Futures Association (NFA). Our foreign affiliates are similarly regulated under the laws and institutional framework of the countries in which they operate.

U.S. broker-dealers and futures commission merchants are subject to laws, rules and regulations that cover all aspects of the securities and derivatives business, including:

- sales methods;

- trade practices;

- use and safekeeping of customers' funds and securities;

- capital structure;

- record-keeping;

- financing of customers' purchases; and

116

In addition, the businesses that we may conduct are limited by our agreements with the NASD and our oversight by the NYSE. Both of these organizations scrutinize their members' entry into new businesses. This process is time-consuming and may not be successful. Likewise, participation in new business lines, including trading of new products or participation on new exchanges or in new countries often requires governmental and/or exchange approvals, which may take significant time and resources. As a result, we may be prevented from entering new businesses that may be profitable in a timely manner, or at all.

As certain of our subsidiaries are members of the NASD, we are subject to certain regulations regarding changes in control of our ownership. NASD Rule 1017 generally provides that NASD approval must be obtained in connection with any transaction resulting in a change in control of a member firm. The NASD defines control as ownership of 25% or more of the firm's equity by a single entity or person and would include a change in control of a parent company. As a result of these regulations, our future efforts to sell shares or raise additional capital may be delayed or prohibited by the NASD.

*Net Capital Rule*

The SEC, NASD, CFTC and various other regulatory agencies within the United States have stringent rules and regulations with respect to the maintenance of specific levels of net capital by regulated entities. Generally, a broker-dealer's capital is net worth plus qualified subordinated debt less deductions for certain types of assets. The Net Capital Rule requires that at least a minimum part of a broker-dealer's assets be maintained in a relatively liquid form.

If these net capital rules are changed or expanded, or if there is an unusually large charge against our net capital, our operations that require the intensive use of capital would be limited. A large operating loss or charge against our net capital could adversely affect our ability to expand or even maintain these current levels of business, which could have a material adverse effect on our business and financial condition.

The SEC, NASD and NYSE impose rules that require notification when net capital falls below certain predefined criteria. These rules also dictate the ratio of debt-to-equity in the regulatory capital composition of a broker-dealer, and constrain the ability of a broker-dealer to expand its business under certain circumstances. If a firm fails to maintain the required net capital, it may be subject to suspension or revocation of registration by the applicable regulatory agency, and suspension or expulsion by these regulators could ultimately lead to the firm's liquidation. Additionally, the Net Capital Rule and certain NASD rules impose requirements that may have the effect of prohibiting a broker-dealer from distributing or withdrawing capital and requiring prior notice to the SEC and the NASD for certain capital withdrawals.

*Supervision and Compliance*

Our Compliance Department supports and seeks to ensure proper operations of our market making and electronic brokerage businesses. The philosophy of the Compliance Department, as of our company as a whole, is to build automated systems to try to eliminate manual steps and errors in the compliance process and then to augment these systems with human staff who apply their judgment where needed. We have built automated systems to handle wide-ranging compliance issues such as trade and audit trail reporting, financial operations reporting, enforcement of short sale rules, enforcement of margin rules and pattern day trading restrictions, review of employee correspondence, archival of required records, execution quality and order routing reports, approval and documentation of new customer accounts, and anti-money laundering and anti-fraud surveillance. In light of our automated operations and our automated compliance systems, we have a smaller and more efficient Compliance Department than many traditional securities firms. Nonetheless, we have increased the staffing in our Compliance

117

Department over the past several years to meet the increased regulatory burdens faced by all industry participants.

IB and Timber Hill each have a Chief Compliance Officer who reports to its General Counsel and its internal audit and compliance committee. These Chief Compliance Officers, plus certain other senior staff members, are NASD-registered principals with supervisory responsibility over the various aspects of our business. Staff members in the Compliance Department or in other departments of the firm are also registered with NASD, NFA, NYSE or other regulatory organizations.

*Regulation NMS*

On various dates throughout 2007, the U.S. securities industry is scheduled to implement a number of new rules contained in Regulation NMS (Reg NMS), which was approved by the SEC in June 2005 and makes a number of changes to the U.S. national market structure for equities. Among other things, Reg NMS governs how market centers provide access to their quotations, changes the way market data fees are paid and distributed, and prevents quoting in sub-penny increments. The most controversial aspect of Reg NMS is the "Trade-Through Rule," which generally prevents a market center from trading a stock at a price worse than an electronically accessible quote for the same stock displayed on a competing market center.

It is difficult to predict exactly how Reg NMS will affect IB's businesses, although IB and Timber Hill are well-positioned to benefit to the extent that Reg NMS increases transparency and automation in the U.S. equity markets. IBG LLC participated in various panel discussions and filed comment letters during the SEC's formulation and evaluation of Reg NMS, and IB was an early proponent and supporter of the Reg NMS initiative. Some exchanges and market centers, especially the NYSE, have already increased their efforts to automate more stock executions rather than rely on human brokers and specialists to match trades. Our brokerage and proprietary trading businesses are benefiting and should continue to benefit from this trend toward automatic executions, which increase the speed and transparency of trading and reduce the ability of human traders to commit fraud by "backing away" or changing their quotes after we send them an order, or by front-running orders.

With respect to the specific functionality of IB's brokerage platform, increased availability of automatic execution on stock exchanges will tend to make IB's automated platform more useful and valuable. On the other hand, the new Reg NMS Trade-Through Rule could pose a competitive threat to the IB SmartRouting[SM] system for stocks, because exchanges likely will build improved linkages to send orders to each other when an exchange is not itself offering the best posted price. An order smart routed by IB will always trade sooner than one that is linked by one exchange to another.

While increased competition from exchanges to provide "smart" order routing services is likely, IB is expected to have many advantages over any exchange systems, including the facts that:

- IB has nearly a decade's lead in developing smart routing technology and network infrastructure;

- IB's system is connected to a broad array of exchanges, ECNs and market makers;

- the IB SmartRouting[SM] system has the ability to split orders and route them to different markets and then re-route each piece as market conditions change;

- that multiple products in addition to stocks are available on the IB platform; and

- IB offers clearing, financing, custodial and many other services to its customers that exchanges are not in a position to provide.

118

Portfolio margining allows customers to take advantage of reduced margin requirements based on the risk of their combined equities and derivatives positions instead of traditional static margin requirements that are based on percent of value for each security that the customers hold. This risk-based margining is expected to allow for a more realistic representation of risk in a customer's portfolio, giving the benefit of lower margin requirements to hedged portfolios. As a result, IB will be more competitive with the largest U.S. prime clearing broker-dealers who use their balance sheets to provide financing to customers. IB caters to sophisticated customers who utilize hedging to reduce risk in their portfolios and benefit from risk-based margin approach.

Portfolio margining is only available for market-based index products but its expansion to stocks, options and futures has been approved by the SEC. SEC portfolio margining rules requires each participating firm to file an application with their designated SRO and receive approval for implementation of the portfolio margining program and related parameters, including margin determination and risk management. In January 2007, IB filed an application with the NYSE to offer portfolio margining to IB customers, tentatively beginning in April 2007.

*Patriot Act and Increased Anti-Money Laundering (AML) and "Know-Your- Customer" Obligations*

Registered broker-dealers traditionally have been subject to a variety of rules that require that they "know their customers" and monitor their customers' transactions for suspicious financial activities. With the passage of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the Patriot Act), broker-dealers are now subject to even more stringent requirements. Likewise, the SEC, CFTC, foreign regulators, and the various exchanges and SROs of which IB companies are members have passed numerous new AML and customer due diligence rules. There are significant criminal and civil penalties that can be imposed for violations of the Patriot Act, and significant fines and regulatory penalties can be imposed for violations of other governmental and SRO AML rules.

As required by the Patriot Act and other new rules, we have established comprehensive anti-money laundering and customer identification procedures, designated an AML compliance officer, trained our employees and conducted independent audits of our program. Our anti-money laundering screening is conducted using a mix of automated and manual review and has been structured to comply with recent regulations. We collect required information through our new account process and then screen accounts with databases for the purposes of identity verification and for review of negative information and appearance on the Office of Foreign Assets and Control, Specially Designated Nationals and Blocked Persons lists. Additionally, we have developed methods for risk control and continue to add upon specialized processes, queries and automated reports designed to identify money laundering, fraud and other suspicious activities.

As part of their routine examination schedules, both the NYSE and the SEC conducted examinations of IB during 2005, which included reviews of IB's customer identification and surveillance procedures. Both the SEC and the NYSE examination reports contained findings requiring that IB strengthen its procedures or make amendments to its policies and practices to further enhance its AML efforts. IB has made significant enhancements in response to these findings and is continuing to augment its efforts to verify the identities of its customers and monitor their transactions (including adding new databases containing the names of suspicious persons against which we check new customers, adding new surveillance reports and hiring additional surveillance personnel).

*Business Continuity Planning*

Federal regulators and industry self-regulatory organizations have passed a series of rules in the past several years requiring regulated firms to maintain business continuity plans that describe what

119

actions firms would take in the event of a disaster (such as a fire, natural disaster or terrorist incident) that might significantly disrupt operations. IB has developed business continuity plans that describe steps that the firm and its employees would take in the event of various scenarios. The firm has built a backup site for certain of its operations at its Chicago facilities that would be utilized in the event of a significant outage at the firm's Greenwich headquarters. In addition, the firm has strengthened the infrastructure at its Greenwich headquarters and has built redundancy of certain systems so that certain operations can be handled from multiple offices.

*Foreign Regulation*

Our international subsidiaries are subject to extensive regulation in the various jurisdictions where they have operations. The most significant of our international subsidiaries are THE, registered to do business in Switzerland as a securities dealer, THSHK, registered to do business in Hong Kong as a securities dealer, THA, registered to do business in Australia as a securities dealer and futures broker, IBUK, registered to do business in the U.K. as a broker, IBC and THC, registered to do business in Canada as an investment dealer and securities dealer, respectively.

As with those U.S. subsidiaries subject to NASD rules, the ability of our regulated U.K. subsidiary, IBUK, to pay dividends or make capital distributions may be impaired due to applicable capital requirements. IBUK is subject to "consolidated" regulation, in addition to being subject to regulation on a legal entity basis. Consolidated regulation impacts the regulated entity and its parent holding companies in the United Kingdom, including the regulated entity's ability to pay dividends or distribute capital.

IBUK is also subject to regulations regarding changes in control similar to those described above under "—Overview." Under FSA rules, regulated entities must obtain prior approval for any transaction resulting in a change in control of a regulated entity. Under applicable FSA rules, control is broadly defined as a 10% interest in the regulated entity or its parent or otherwise exercising significant influence over the management of the regulated entity. As a result of these regulations, our future efforts to sell shares or raise additional capital may be delayed or prohibited by the FSA.

In Hong Kong, the SFC regulates our subsidiary, THSHK, as a securities dealer. The compliance requirements of the SFC include, among other things, net capital requirements and stockholders' equity requirements. The SFC regulates the activities of the officers, directors, employees and other persons affiliated with THSHK and requires the registration of such persons.

In Canada, both THC and IBC are subject to the IDA risk adjusted capital requirement. In Switzerland, THE is subject to the Swiss National Bank eligible equity requirement. In Australia, THA is subject to the Australian Stock Exchange liquid capital requirement.

For additional information on how regulatory considerations may affect our business prospects, please see "Risk Factors" on page 19.

**Payment for Order Flow**

Five of the six U.S. options exchanges have recently expanded their SEC-approved programs to make payments to broker-dealers in return for receiving customer orders. The BOX does not facilitate payment for order flow. These programs were instituted to help exchanges attract order flow and replaced informal historical arrangements that accomplished the same on a much smaller scale. The IB SmartRouting[SM] software searches for the best bids and offers on multiple-listed options, which often results in orders being sent and executed on exchanges that pay for order flow. As a result, IB collects payments for order flow from exchanges and records them in "Other Income." Since this revenue is incidental to our business and difficult to predict accurately, we record it on a "best knowledge" basis, as data is made available by exchanges, instead of on a pure accrual method. Conversely, as a market

120

maker on the U.S. options exchanges and a participant in these exchange-mandated payment programs, Timber Hill records an expense for order flow payments it is required to make. Our automatic order routing software ensures that best execution is achieved and payment for order flow does not affect the routing of orders in a manner detrimental to our customers.

## Employees and Culture

We take pride in our technology-focused company culture and embrace it as one of our fundamental strengths. We remain committed to improving our technology, and we try to minimize corporate hierarchy to facilitate efficient communication among employees. We have assembled what we believe is a highly talented group of employees. As we grow, we expect to continue to provide significant rewards for our employees who provide significant value to us and the world's financial markets.

As of December 31, 2006, we had 532 employees, all of whom were employed on a full-time basis. None of our employees are covered by collective bargaining agreements. We believe that our relations with our employees are good.

## Properties

Our headquarters are located in Greenwich, Connecticut. We lease approximately 70,000 square feet for our headquarters, which lease expires in the year 2014. We also lease facilities in 8 other locations throughout parts of the world where we conduct our operations, which are located in Chicago, expiring in 2016; Zug, Switzerland, expiring in 2008; Hong Kong, expiring in 2009; London, expiring in 2015; Sydney, Australia, expiring in 2009; Montreal, Canada, expiring in 2009; Budapest, Hungary, expiring in 2007; and Washington D.C., currently month to month. The lease with respect to the Washington D.C. location is expected to be renewed on a long-term basis. Unless otherwise indicted, all properties are used by both our market making and electronic brokerage segments. We believe our present facilities, together with our current options to extend lease terms, are adequate for our current needs.

The following table sets forth certain information with respect to our leased facilities:

| Location | Space | Principal Usage |
|---|---|---|
| Greenwich, CT | 70,027 sq. feet | Headquarters and data center |
| Chicago, IL | 49,229 sq. feet | Office space and data center |
| Washington, D.C. | 416 sq. feet | Office space |
| Montreal, Canada | 4,668 sq. feet | Office space |
| London, United Kingdom | 2,283 sq. feet | Office space and data center |
| Zug, Switzerland | 19,590 sq. feet | Office space and data center |
| Sydney, Australia | 1,313 sq. feet | Office space |
| Hong Kong | 5,820 sq. feet | Office space and data center |
| Budapest, Hungary | 970 sq. feet | Office space |

## Intellectual Property

We rely on a combination of patent, trademark, copyright, trade secret, and fair business practice laws in the United States and other jurisdictions, as well as confidentiality procedures and contractual provisions to protect our proprietary technology, intellectual property rights and our brand. We also enter into confidentiality and invention assignment agreements with our employees and consultants, and confidentiality agreements with other third parties, and we rigorously control access to proprietary technology.

In addition to using marks protected by common law usage (including IB, IB Trader Workstation, IB Options Analytics, IB SmartRouting, IB SmartRouting Autorecovery and Interactive Analytics), we also

121

use the following service marks and patents that have been registered or applied for with the U.S. Patent and Trademark Office:

| Intellectual Property | Registration Type | Place of Registration | Registration No. | Registration Expiration Date |
|---|---|---|---|---|
| Pit Trader | Service Mark | U.S. Patent & Trademark Office | 2078131 | July 8, 2017 |
| InteractiveBrokers.com | Service Mark | U.S. Patent & Trademark Office | 2390621 | September 26, 2010 |
| IB Universal Account | Service Mark | U.S. Patent & Trademark Office | 2724295 | June 13, 2013 |
| IB Web Trader | Service Mark | U.S. Patent & Trademark Office | 3045411 | January 17, 2016 |
| The IB Options Intelligence Report | Service Mark | U.S. Patent & Trademark Office | Application No. 78965055 | Pending |
| Interactive Analytics | Service Mark | U.S. Patent & Trademark Office | Application No. 78965402 | Pending |
| Intelligent Design That Even Darwin Could Appreciate | Service Mark | U.S. Patent & Trademark Office | Application No. 78738,093 | Pending |
| Universal Direct Access Trading | Service Mark | U.S. Patent & Trademark Office | 3038567 | January 3, 2016 |
| System for Managing Multiple Types of Accounts Having Different Regulatory Requirements | Patent | U.S. Patent & Trademark Office | Application No. 10/465,827 | Pending |
| System and Method for Trading Financial Instruments Using Multiple Accounts | Patent | U.S. Patent & Trademark Office | Application No. 11/104,671 | Pending |
| Foreign Exchange Trading Platform | Patent | U.S. Patent & Trademark Office | Application No. 11/451,731 | Pending |
| Intermarket Smart-Routing for Combination Spread Order Trading | Patent | U.S. Patent & Trademark Office | Application No. 11/507,807 | Pending |
| Direct Access Bond Trading Platform | Patent | U.S. Patent & Trademark Office | Application No. 60/752,741 | Pending |

## Legal Proceedings and Regulatory Matters

The securities industry is highly regulated and many aspects of our business involve substantial risk of liability. In recent years, there has been an increasing incidence of litigation involving the securities brokerage industry, including class action suits that generally seek substantial damages, including in some cases punitive damages. Compliance and trading problems that are reported to federal, state and provincial securities regulators, securities exchanges or other self-regulatory organizations by dissatisfied customers are investigated by such regulatory bodies, and, if pursued by such regulatory body or such customers, may rise to the level of arbitration or disciplinary action. We are also subject to periodic regulatory audits and inspections.

Like other securities brokerage firms, we have been named as a defendant in lawsuits and from time to time we have been threatened with, or named as a defendant in, arbitrations and administrative proceedings. The following contains information regarding potentially material pending litigation and

122

pending regulatory inquiries. We may in the future become involved in additional litigation or regulatory proceedings in the ordinary course of our business, including litigation or regulatory proceedings that could be material to our business.

*Potentially Material Pending Litigation*

Kevin Steele Matter—National Futures Association Complaint Against Interactive Brokers; Commodity Futures Trading Commission Inquiry; and Related Threatened Civil Litigation

On May 25, 2005, the CFTC filed a civil action, in the United States District Court for the Northern District of Illinois Eastern Division, against Kevin Steele, a former customer of IB, for fraud and for failure to register as a commodity pool operator. IB is not a party to this action. The CFTC alleged that Mr. Steele had solicited approximately $7.5 million in funds from more than 200 investors and was operating an unregistered commodity investment pool in an ordinary, individual investment account held in Steele's name at IB. The CFTC alleged in its complaint against Mr. Steele that Mr. Steele had misrepresented the nature of his account with IB when he opened the account and had made repeated misrepresentations to IB personnel regarding the nature of the account. The IB account held in Mr. Steele's name suffered substantial losses. The CFTC and Mr. Steele's customers are conducting an inquiry into IB's handling of Mr. Steele's IB account.

On June 2, 2006, the Business Conduct Committee of the NFA, IB's designated self-regulatory organization for futures trading, filed a complaint against IB (06-BCC-010) for violation of NFA By-Law 1101 and related rules. NFA By-Law 1101 prevents an NFA member from doing business with non-members of NFA who are required to be registered with the CFTC. The NFA asserted in its complaint that IB knew or should have known that Mr. Steele was required to be registered with the CFTC and had failed to register. The NFA complaint also includes several unrelated alleged books and records violations arising from a routine NFA audit of IB in 2004. IB filed its answer to the NFA complaint denying its allegations on August 11, 2006. No hearing date in the case had been set.

*Pending Regulatory Inquiries*

IB's businesses are heavily regulated by state, federal and foreign regulatory agencies as well as numerous exchanges and self-regulatory organizations. IB's various companies are regulated under state securities laws, U.S. and foreign securities, commodities and financial services laws and under the rules of more than 25 exchanges and SROs. In the current era of dramatically heightened regulatory scrutiny of financial institutions, IB has incurred sharply increased compliance costs, along with the industry as a whole. Increased regulation also creates increased barriers to entry, however, and IB has built human and automated infrastructure to handle increased regulatory scrutiny, which provides IB an advantage over potential newcomers to the business.

IB receives hundreds of regulatory inquiries each year in addition to being subject to frequent regulatory examinations. The great majority of these inquiries do not lead to fines or any further action against IB. Most often, regulators do not inform IB as to when and if an inquiry has been concluded. IB companies are currently the subject of regulatory inquiries regarding topics such as order audit trail reporting, trade reporting, short sales, market making obligations, anti-money laundering, business continuity planning and other topics of recent regulatory interest. There are no formal regulatory enforcement actions pending against IB's regulated entities, except as specifically disclosed herein and IB is unaware of any specific regulatory matter that, itself, or together with similar regulatory matters, would have a material impact on IB's financial condition. Nonetheless, in the current climate, IB expects to pay significant regulatory fines on various topics on an ongoing basis, as other regulated financial services businesses do. The amount of any fines, and when and if they will be incurred, is impossible to predict given the nature of the regulatory process.

**MANAGEMENT**

**Directors and Executive Officers**

The following table sets forth the names, ages and positions of our current directors and executive officers, as well as Philip D. DeFeo, who is expected to join our board of directors in connection with the closing of this offering.

| Name | Age | Position |
| --- | --- | --- |
| Thomas Peterffy | 62 | Chairman of the Board of Directors, Chief Executive Officer and President |
| Earl H. Nemser | 60 | Vice Chairman and Director |
| Paul J. Brody | 47 | Chief Financial Officer, Treasurer, Secretary and Director |
| Thomas A. Frank | 52 | Executive Vice President and Chief Information Officer |
| Milan Galik | 40 | Senior Vice President, Software Development and Director |
| Philip D. DeFeo | 61 | Director |

*Thomas Peterffy.*    Mr. Peterffy emigrated from Hungary to the United States in 1965. After working for 10 years as a computer programmer, he became a member of the American Stock Exchange in 1977. As an individual floor trader, he founded the firm which became our company. As chief executive officer and president, Mr. Peterffy is active in our day-to-day management.

*Earl H. Nemser.*    Mr. Nemser has been our vice chairman since 1988 and also serves as director and/or officer for various subsidiaries of IBG LLC. Mr. Nemser has served as Special Counsel to the law firm Dechert LLP since January 2005. Prior to such time Mr. Nemser served as Partner at the law firms of Swidler Berlin Shereff Friedman, LLP from 1995 to December 2004 and Cadwalader, Wickersham & Taft LLP prior to 1995. Please see "Transactions with Related Persons, Promoters and Certain Control Persons—Legal Representation." Mr. Nemser received a Bachelor of Arts degree in economics from New York University in 1967 and a Juris Doctor, *magna cum laude,* from Boston University School of Law in 1970.

*Paul J. Brody.*    Mr. Brody joined us in 1987 and has served as chief financial officer since December 2003. Mr. Brody serves as director and/or officer for various subsidiaries of IBG LLC. Mr. Brody also serves as a director of the Options Clearing Corporation, of which Timber Hill LLC and IB are members. Mr. Brody received a Bachelor of Arts degree in economics from Cornell University in 1982.

*Thomas A. Frank.*    Dr. Frank joined us in 1985 and has served since July 1999 as executive vice president and chief information officer of Interactive Brokers LLC. In addition, Dr. Frank has served as vice president of Timber Hill LLC since December 1990. Dr. Frank received a Ph.D. in physics from the Massachusetts Institute of Technology in 1985.

*Milan Galik.*    Mr. Galik joined us in 1990 as a software developer and has served since October 2003 as senior vice president, software development of IBG LLC. In addition, Mr. Galik has served as

124

vice president of Timber Hill LLC since April 1998. Mr. Galik received a Master of Science degree in electrical engineering from the Technical University of Budapest in 1990.

   *Philip D. DeFeo.*    Mr. DeFeo's appointment to our board of directors is to become effective in connection with the completion of this offering, at which time it is anticipated that Mr. DeFeo will become chairman of the audit committee of our board of directors. Mr. DeFeo is currently managing partner of Lithos Capital Partners LLC and is on the board of directors of Computershare Limited, Visa U.S.A., Allied World Assurance Holdings, Ltd., Forward Asset Management, ReFlow Asset Management and Van Eck ETF Trust. From 1999 to 2005, Mr. DeFeo was the chairman and chief executive officer of the Pacific Exchange, which merged with Archipelago in 2005, creating the Archipelago Exchange, currently owned by the NYSE Group. Mr. DeFeo received a Bachelor of Arts degree in economics from Iona College in 1968.

## Our Board of Directors

   Immediately following the consummation of this offering, our board of directors will consist of five directors, one of whom will be an independent director. Thomas Peterffy will serve as chairman of our board of directors. We expect to appoint two other independent directors within one year after this offering, in compliance with NASDAQ Global Select Market rules.

### Committees of Our Board of Directors

   Prior to or immediately following the consummation of this offering, our board of directors will establish an audit committee, a compensation committee and a nominating and corporate governance committee. The composition, duties and responsibilities of these committees are set forth below. In the future, our board of directors may establish other committees, as it deems appropriate, to assist it with its responsibilities. As a controlled company, we will not be required by The NASDAQ Global Select Market to have a compensation committee or a nominating and corporate governance committee composed entirely of independent directors.

#### *Audit Committee*

   Our board of directors will designate an audit committee, at least one member of which we expect to be an "audit committee financial expert" as defined in the SEC rules. The audit committee will be comprised of independent directors, subject to the following phase-in periods available to companies listing on The NASDAQ Global Select Market in connection with an initial public offering: (1) one independent member at the time of listing (Philip D. DeFeo); (2) a majority of independent members within 90 days of listing; and (3) all independent members within one year of listing. Each member of the audit committee will be financially literate at the time such member is appointed. The composition of the audit committee will satisfy the independence and other requirements of The NASDAQ Global Select Market and the SEC.

   The audit committee will be responsible for, among other things:

   •   directly appointing, retaining, evaluating, compensating and terminating our independent registered public accounting firm;

   •   discussing with our independent registered public accounting firm auditors their independence from management;

   •   reviewing with our independent registered public accounting firm auditors the scope and results of their audit;

125

• pre-approving all audit and permissible non-audit services to be performed by our independent registered public accounting firm;

• overseeing the financial reporting process and discussing with management and our independent registered public accounting firm the interim and annual financial statements that we file with the SEC; and

• reviewing and monitoring our accounting principles, policies and financial and accounting controls.

### Compensation Committee

The primary responsibility of the compensation committee will be to develop and oversee the implementation of our philosophy with respect to the compensation of our officers. We expect that the compensation committee will be comprised of Thomas Peterffy (Chairman), Earl H. Nemser and Philip D. DeFeo.

The compensation committee will be responsible for, among other things:

• reviewing and recommending director compensation policies to the board of directors;

• making recommendations, at least annually, to the board of directors regarding our policies relating to the amounts and terms of all compensation of our executive officers; and

• administering and discharging the authority of the board of directors with respect to our equity plans.

### Nominating and Corporate Governance Committee

Our board of directors will designate a nominating and corporate governance committee. Thomas Peterffy will be the only member of the nominating and corporate governance committee.

The nominating and corporate governance committee will be responsible for, among other things:

• selecting potential candidates to be nominated for election to the board of directors;

• recommending potential candidates for election to the board of directors;

• reviewing corporate governance matters; and

• making recommendations to the board of directors concerning the structure and membership of board committees.

## IBG LLC Steering Committee

The management of IBG LLC and its subsidiaries is governed by a committee of our executive officers and certain other members of senior management, which we refer to as the steering committee. The steering committee handles day-to-day and strategic management issues. After the Recapitalization, the steering committee will report to the chief executive officer of IBG LLC.

126

**Executive Compensation**

**Compensation Discussion and Analysis**

*Compensation Philosophy and Objectives*

We adhere to the philosophy that compensation of our executive officers should first and foremost be directly and materially linked to each executive officer's individual performance and our overall performance. The objectives of our executive compensation program are (1) to enhance our long-term value, (2) to assist us in attracting and retaining high quality talent, (3) to reward past performance and motivate future performance and (4) to align executive officers' long-term interests with those of our shareholders.

*Role of Executive Officers in Compensation Decisions*

Historically, employee performance has been reviewed and compensation changes have been recommended to IBG LLC's chairman and chief executive officer (Thomas Peterffy) by members of the IBG LLC steering committee. The chairman and chief executive officer has ultimately determined compensation for all employees and will continue to remain significantly involved in all aspects of executive compensation, including his own executive compensation, as chairman of a newly formed compensation committee. Prior to this offering, we have not operated with a compensation committee. As soon as practicable after consummation of this offering, the compensation committee of our board of directors will be responsible for overseeing the implementation of our philosophy and objectives with respect to the compensation of our executive officers and directors and administering all aspects of our compensation and benefit plans and programs. We expect that the compensation committee will be comprised of Thomas Peterffy (Chairman), Earl H. Nemser and Philip D. DeFeo. As a controlled company, we will not be required by The NASDAQ Global Select Market to have a compensation committee composed entirely of independent directors. See "Risk Factors—Risks Related to Our Company Structure."

*Setting Executive Compensation*

Historically, we have kept base salaries at a relatively modest level in comparison to salaries paid to senior executives at many other companies in our industry and have not sought to "benchmark" salaries to those of our competitors. We have not utilized the services of a compensation consultant to date. We will leave decisions as to these matters from and after the consummation of this offering to our compensation committee.

We compensate our executive officers through three primary sources: base pay, annual cash bonuses and equity incentives. Using this approach, the base salary portion of the compensation of our executive officers is fixed; however, a substantial additional portion of total compensation is variable. This practice ensures that our executive compensation packages include a combination of base pay and incentives that are appropriate and competitive in the relevant marketplace, as well as related to the individual's performance and our performance. Our executive officers have an average of 21 years tenure with us.

Our compensation program is designed to reward performance by tying a substantial portion of each executive officer's total potential compensation to individual performance and our performance. We have historically evaluated individual and company performance in a qualitative fashion; we have not historically utilized specific financial or operating performance goals or targets in setting executive compensation. Through its practice of granting equity awards, the compensation program also promotes and rewards an executive officer's tenure and longevity with us, as well as the executive officer's role in our financial performance.

127

We do not utilize a set formula for allocating compensation among the elements of total compensation. The subjective decisions regarding the amount and mix of elements which comprise the compensation historically awarded to the executive officers were principally based upon an assessment of each executive's leadership, performance and contribution to the achievement of our financial goals, as well as subjective judgments about each executive officer individually, rather than on rigid guidelines or formulas. Key factors include the executive officer's performance; the nature, scope and level of the executive officer's responsibilities; and the executive officer's contribution to our overall financial results. The compensation of the executive officers who have the greatest ability to influence our performance, however, is predominately performance-based, which is consistent with the overall compensation philosophy as described above. The decisions concerning specific base compensation elements and the total compensation paid or awarded to our executive officers in fiscal year 2006 were made within this framework. Specific individual and/or company performance goals or targets were not used. In fiscal year 2006, the aggregated base salaries of our named executive officers constituted approximately 24.5% of their total aggregated compensation, bonuses constituted approximately 38.5%, and equity grants (as described below) constituted the remaining 37.0%. No IBG LLC equity awards were granted for fiscal 2006 in anticipation of this offering; however we intend to grant approximately $3,750,000 worth of restricted shares of common stock to our named executive officers in connection with this offering as part of their fiscal 2006 compensation. Pursuant to the terms of our employee incentive plan, 10% or $375,000 worth, of the shares are expected to be vested at or around the time of this offering. The individual allocations of compensation vary considerably from year to year.

## Elements of Compensation

Although our senior executive officers and other key employees holding ownership interests in IBG LLC have benefited from the increased value of their ownership interests, they have historically received salary and performance-based bonuses and we expect to continue compensating them in this form. We believe that in order to attract and retain highly effective people we must maintain a flexible compensation structure, including base salary, cash bonuses and equity-based compensation awards as described below. As stated above, we do not utilize a specific formula for allocating compensation among the various elements of total compensation. The relative amounts of bonus and equity-based compensation (which is included under "All Other Compensation" in the Summary Compensation Table below) awarded to our named executive officers in respect of the year ended December 31, 2006 were determined in the discretion of our chairman and chief executive officer.

*Base Salary.*   Base pay is structured to ensure that our executive officers are fairly and equitably compensated. Base pay is used to appropriately recognize and reward the experience and skills that employees bring to us and provides motivation for career development and enhancement. Base pay is designed to ensure that all employees continue to receive a basic level of compensation that reflects any acquired skills that are competently demonstrated and are consistently used at work.

Base pay for our executive officers is initially established based on the scope of their responsibilities and the applicable competitive market compensation paid by other companies for similar positions and is reviewed annually after employment. A single base salary level is established each year, applicable to all senior executive officers except our chairman and chief executive officer. Because executive officers are partially and, sometimes, substantially compensated through the appreciation in their equity ownership, the base salary is kept at a relatively modest level in comparison to salaries generally believed to be paid to senior executives at many other firms in our industry. An executive officer's base pay is not dependent upon our achievement of performance goals.

*Bonuses.*   We maintain an executive cash bonus program to reward superior individual and financial performance for the year. Each year, an executive cash bonus pool is established, from which we pay annual cash bonuses to our executive officers upon the direction of our chairman and chief

128

executive officer. Executive bonuses are based on individual performance and on the financial performance of the company, measured in a qualitative fashion. Specific individual and/or company performance goals or tagets have historically not been used. Cash bonuses awarded to our executive officers in December 2006 for fiscal year 2006 performance ranged from approximately 0% to 855% of the executive officer's 2006 base salary, amounting to an aggregate payout of $3.9 million, of which amount, our chairman and chief executive officer did not take a bonus. The annual bonuses paid to our other executive officers for fiscal year 2006 performance are shown below in the Summary Compensation Table.

*Long-Term Incentives.*    We utilize long-term equity incentive awards to promote the success of each executive officer, motivate outstanding performance and encourage and reward employment longevity. Senior executive officers and other key employees have historically been granted equity ownership interests in IBG LLC and will continue to hold such interests after the consummation of this offering through their ownership in IBG Holdings LLC. Other employees have been participants in our Return on Investment Dollar Units ("ROI Units") plan, in which their accumulated earnings are tied to the return on investment earned by IBG LLC (see "Return on Investment Dollar Units"). In anticipation of the offering, these employees have elected to either invest their accumulated earnings in shares of our common stock, subject to the terms of the employee incentive plan (see "Employee Incentive Plan"), or to retain their ROI Units. We believe that this alignment of interests has been a key contributor to our single-minded focus and our successes and that continued ownership will allow us to maintain this focus and achieve future success.

We believe that compensation paid to executive officers should be closely aligned with our performance on a continuing and long-term basis and, thereby, with the interests of our shareholders. Therefore, as discussed below under "Employee Incentive Plan," following the consummation of this offering, in lieu of granting equity interests in IBG LLC, we will adopt a new incentive compensation plan that will provide for the granting of common stock to be issued over time and subject to continued employment. It is not currently anticipated that we will grant, as part of executive compensation, stock appreciation rights or other forms of non-cash compensation except pursuant to the employee incentive plan described below.

Pursuant to policies set by the compensation committee, salary increases, bonuses and stock grants shall be awarded annually, following an evaluation of the individual's and the company's performance for the year.

### Compensation for Executive Officers During 2006

As noted above, historically Mr. Peterffy has ultimately determined compensation for all employees. Mr. Peterffy has traditionally set his own compensation as salary capped at 0.2% of IBG LLC's net income. Historically, Mr. Peterffy has taken no bonus or long-term incentives as he believes that his 85% ownership of IBG LLC has provided sufficient incentive to align his interests with those of IBG LLC. During 2006, Mr. Peterffy was paid a salary of $1,200,000 by IBG LLC and no bonus in accordance with these practices. Following this offering, our chairman and chief executive officer, Mr. Peterffy, will receive no compensation other than salary from IBG LLC, capped at 0.2% of IBG LLC's net income. We believe that the ownership by Mr. Peterffy and affiliates, through ownership in IBG Holdings LLC, of a significant amount of the equity in IBG LLC will align his interests with those of our Class A common stockholders.

Mr. Nemser's compensation has historically included significantly lower overall compensation than the other executive officers, befitting the fact that Mr. Nemser works less than full-time with us, but his compensation has been mainly in salary and a small long-term incentive grant. Mr. Peterffy has made this determination based on the assessments described above under "Setting Executive Compensation."

129

During 2006, Mr. Nemser was paid a salary of $455,000 by IBG LLC and no bonus in accordance with these practices. Concurrently with this offering, Mr. Nemser will receive an award under our employee incentive plan but at a lower amount than the other executive officers based on his anticipated future contribution to our success.

Messrs. Brody, Frank and Galik have historically been compensated in accordance with the policies discussed above under "Setting Executive Compensation" with a mixture of salary, bonus and long-term incentives. Mr. Peterffy has made these determinations based on the assessments described above under "Setting Executive Compensation." Their 2006 base salary was set at $275,000, and each received an individual performance-based bonus. Their 2007 base salary has been increased to $300,000. Concurrently with this offering, each will receive an award under our employee incentive plan based on each executive officer's anticipated future contribution to our success. While the policies were the same, Mr. Peterffy determined that Mr. Galik's leadership, performance and contribution to the building of our company in 2006 merited a significantly larger bonus and a significantly larger award under our employee incentive plan than the other executive officers.

All salaries and bonuses will be paid by IBG LLC or one of its operating subsidiaries. No employee of IBG LLC will be paid any separate or additional amount for their services as employees of IBG.

In addition to the foregoing, each of the executive officers, as a result of their ownership of membership interests in IBG LLC, received distributions from IBG LLC for the purpose of funding their income taxes due on their proportionate share of IBG LLC taxable income.

### Targeted Executive Share Ownership

Ownership by our executive officers of equity in IBG Holdings LLC serves to align their interests with those of our shareholders and demonstrates to the investing public and all of our other employees, senior management's commitment to IBG. As a private company, we have not historically had a targeted executive stockholdings policy. In the future, the compensation committee may establish a targeted executive stockholdings policy for each senior executive, as well as other executives and managers in leadership roles, specifying individual equity ownership goals which are to be achieved within a specified time frame.

### 401(k) Plan

We offer substantially all employees of our U.S. based subsidiaries who have met minimum service requirements the opportunity to participate in defined contribution retirement plans qualifying under the provisions of Section 401(k) of the Internal Revenue Code. The general purpose of these plans is to provide employees with an incentive to make regular savings in order to provide additional financial security during retirement. The plan provides for IBG LLC to match 50% of the employees' pretax contribution, up to a maximum of 10% of eligible earnings. The employee is vested in the matching contribution incrementally over six years.

### Severance Arrangements

None of our senior executive officers have employment agreements and none are subject to severance arrangements. Following consummation of this offering and after giving effect to the Recapitalization, a portion of our named executive officers' equity ownership in us will be in the form of IBG Holdings LLC membership interests. The IBG Holdings LLC operating agreement provides that if at any time a member's employment with us is terminated for any reason (other than such employee's death or as determined by the managing member of IBG Holdings LLC, such employee's disability, retirement or termination without cause), any non-vested IBG Holdings LLC membership interests held by

130

such employee on the date of termination that remain subject to restriction shall be forfeited to IBG Holdings LLC. Similarly, with regard to grants of restricted stock in connection with and following consummation of this offering, shares of restricted stock for which restrictions are still applicable shall be immediately forfeited upon the termination of employment for any reason.

*Perquisites*

    Our senior executive officers receive only the fringe benefits normally provided to all other employees, such as health, dental, life, hospitalization, surgical, major medical and disability insurance, participation in our 401(k) plan, paid time off, and other similar company-wide benefits which may be in effect from time to time for all other employees. Other than the standard employee benefits, we do not provide additional perquisites, personal direct or indirect benefits, or use any separate set of standards in determining the benefits for our executive officers. We believe that our base pay and total compensation package are reasonable and competitive in the industry, and we have demonstrated that we are able to hire and retain talented executives without offering additional perquisites.

    It is our philosophy that each executive officer may determine, within the limits of his or her own compensation, whether or not to personally purchase non-reimbursable luxury travel, private flights, housing, security systems, car service, club memberships, financial planning services, or other such goods and services, including those which are sometimes provided as executive perquisites by other companies, but not offered by us. This is consistent with our general operating principles.

    As described in "Transactions with Related Persons, Promoters and Certain Control Persons—Promissory Notes Issued by TP Holdings to IBG LLC," we have historically made loans to certain of our executive officers and directors. There are no such loans outstanding as of the date of this offering, and the practice of making loans to executive officers and directors has been discontinued.

*Accounting for Stock-Based Compensation*

    SFAS No. 123R, *Share-Based Payments*, which superseded SFAS 123, requires companies to expense the fair value of employee stock options and other forms of stock-based compensation. We adopted SFAS No. 123R in the first quarter of 2006 and have been expensing equity based compensation since that time. We have never issued stock options to our employees.

131

The following tables summarize, for the periods indicated, the principal components of compensation for our chief executive officer, our chief financial officer and our three other executive officers (collectively, the named executive officers) for the year ended December 31, 2006:

## Summary Compensation Table

| Name and Principal Position | Year | Salary | Bonus | All Other Compensation(1)(2) | Total |
|---|---|---|---|---|---|
| Thomas Peterffy<br>Chairman, Chief Executive Officer and President | 2006 | $ 1,200,000 | $ 0 | $ 0 | $ 1,200,000 |
| Earl H. Nemser<br>Vice Chairman and Director | 2006 | $ 455,000 | $ 0 | $ 200,000 | $ 655,000 |
| Paul J. Brody<br>Chief Financial Officer, Treasurer, Secretary and Director | 2006 | $ 275,000 | $ 700,000 | $ 700,000 | $ 1,675,000 |
| Thomas A. Frank<br>Executive Vice President and Chief Information Officer | 2006 | $ 275,000 | $ 850,000 | $ 500,000 | $ 1,625,000 |
| Milan Galik<br>Senior Vice President, Software Development and Director | 2006 | $ 275,000 | $ 2,350,000 | $ 2,350,000 | $ 4,975,000 |

(1)    IBG LLC has operated in the form of a limited liability company. The amounts in this summary compensation table do not include distributions received by each named executive officer from IBG LLC relating to invested capital in IBG LLC, as these amounts do not constitute executive compensation. In 2006 and 2007, Messrs. Peterffy, Nemser, Brody, Frank and Galik received approximately $158,235,000, $1,979,000, $2,339,000, $5,890,000 and $2,560,000, respectively, in distributions in respect of the year ended December 31, 2006.

(2)    Historically, IBG LLC has compensated executive officers and certain other employees in part with grants of non-transferable member interests in IBG LLC, which confer ownership rights in IBG LLC and entitle the holders to their proportionate share of the consolidated profits and losses of IBG LLC based on their holding percentages. During 2006, no grants of member interests were made to executive officers. Instead, in anticipation of this offering, IBG LLC communicated its intentions to grant restricted shares of common stock pursuant to the terms of our employee incentive plan (see "Employee Incentive Plan"). The amounts shown as All Other Compensation in this summary compensation table represent the value of these intended grants to the respective named executive officers, and assume a per share value of $29.00, which is the midpoint of the range set forth on the cover page of this prospectus.

## Executive Employment Agreements

Historically, we have not entered into employment agreements with our executive officers, and we do not plan on entering into employment agreements at this time. The non-disclosure, non-competition and non-solicitation agreements currently in effect between our subsidiaries and our officers and other employees will remain in effect after this offering.

**Employee Incentive Plan**

Prior to the consummation of this offering, we, IBG LLC and IBG Holdings LLC intend to adopt an employee incentive plan up to 9.2 million shares of our common stock may be granted and issued under the employee incentive plan. The purpose of the employee incentive plan will be to promote our long-term financial success by attracting, retaining and rewarding eligible participants.

The employee incentive plan will be administered by our compensation committee. The compensation committee will have discretionary authority to determine which employees will be eligible to participate in the employee incentive plan. The compensation committee will establish the terms and conditions of the awards under the employee incentive plan, including the number of awards offered to each employee and all other terms and conditions applicable to such awards in individual grant agreements. Awards are expected to be made through grants of common stock. The employee incentive plan will provide that awards will be subject to issuance over time and may be forfeited upon an employee's termination of employment or violation of certain applicable covenants prior to issuance, unless determined otherwise by the compensation committee.

The employee incentive plan will provide that, upon a change in control, the compensation committee may, at its discretion, fully vest any granted but unissued shares of common stock awarded under the employee incentive plan, or provide that any such granted but unissued shares of common stock will be honored or assumed, or new rights substituted therefor by the new employer on a substantially similar basis and on terms and conditions substantially comparable to those of the employee incentive plan.

We expect to grant awards, at the time of this offering and on or about January 1 of each year following this offering, to specific employees as part of an overall plan of equity compensation. The shares of common stock to be granted at the time of this offering will be issued in accordance with the following schedule:

- 10% on the date of this offering; and

- an additional 15% on each of the first six anniversaries of the date of this offering, assuming continued employment with us and compliance with non-competition and other applicable covenants.

We expect to grant awards covering approximately 789,700 shares of common stock on the date of this offering, of which 10% will be issuable upon consummation of this offering.

Under applicable tax law, we will be required to withhold an amount based on the value of the shares upon their issuance, and remit the withheld amount to the IRS and other taxing authorities. To effect that withholding, we may redeem a portion of the shares with an aggregate fair market value equal to the amount of taxes we are required to withhold and remit. For instance, if 1,000 shares would become issuable and we were required to withhold an amount equal to 40% of the value, we would redeem 400 shares and the employee would reclaim 600 shares. The source of funds for the amount to be remitted to the IRS shares will be a redemption by IBG LLC of a corresponding number of our interests in IBG LLC.

**Return on Investment Dollar Units**

Certain employees of IBG LLC (none of whom are our named executive officers) currently hold Return on Investment Dollar Units (ROI Units) that entitle each holder thereof to accumulated earnings on the face value of the certificate representing his or her ROI Units. Subsequent to this offering, no additional ROI Units will be granted, as non-cash compensation of employees will consist primarily of grants of shares of common stock, as described above under "—Employee Incentive Plan." In connection

133

with this offering, ROI Units may, at the employee's option, be redeemed for cash as currently provided for under the current ROI Unit plan, or the accumulated earnings attributable to the ROI Units as of December 31, 2006 may be invested in shares of common stock. For ROI Unit holders electing to invest the accumulated earnings on their ROI Units into shares of common stock in connection with this offering, the shares will be issued in accordance with the following schedule, subject to the conditions below:

- 10% on the date of this offering (or on the first anniversary of this offering, in the case of U.S. ROI Unit holders who made the above-referenced elections after December 31, 2006); and

- an additional 15% on each of the first six anniversaries of the date of this offering (or on each of the next six anniversaries of the date of this offering, in the case of U.S. ROI Unit holders who made the above-referenced elections after December 31, 2006), assuming continued employment with us and compliance with applicable covenants.

Under applicable tax law, we will be required to withhold an amount based on the value of the shares upon their vesting, and remit the withheld amount to the IRS and other taxing authorities. To effect the withholding, we may redeem a portion of the shares with an aggregate fair market value equal to the amount of taxes we are required to withhold and remit. For instance, if 1,000 shares would become issuable and we were required to withhold an amount equal to 40% of the value, we would redeem 400 shares and the employee would receive 600 shares. The source of funds for amount to be remitted to the IRS will be the redemption by IBG LLC of a corresponding number of our interests in IBG LLC.

Based on the accumulated earnings attributable to the ROI Units outstanding as of December 31, 2006, approximately 1.24 million shares of common stock may be issued to the current holders of the ROI Units, of which 10% will be issuable upon consummation of this offering. None of such shares will be issued to any of our named executive officers.

## Compensation of Directors

Our policy is not to pay director compensation to directors who are also our employees. All of our directors are entitled to receive reimbursement of their out-of-pocket expenses in connection with their travel to and attendance at meetings of the board of directors or committees thereof. We anticipate that each non-employee director will initially be compensated with an annual retainer of $100,000 and a grant of restricted stock (valued at $75,000 based on the fair market price of our Class A common stock on the date of grant), subject to straight-line vesting over a five year period. The grant of restricted stock would be issued on the later to occur of the director's start date and December 31, 2007. We also anticipate that non-employee chairmen of committees of our board of directors will be compensated with an additional annual retainer of $25,000 per committee. We reserve the right to change the manner and amount of compensation to our non-employee directors at any time.

## Compensation Committee Interlocks and Insider Participation

None of our executive officers have served as a member of the board of directors or compensation committee of any unrelated entity that has one or more executive officers serving on our board of directors or compensation committee.

134

# PRINCIPAL STOCKHOLDERS

Immediately prior to the consummation of this offering, IBG Holdings LLC will own all outstanding shares of our Class B common stock. Immediately after the consummation of this offering and the Recapitalization, IBG Holdings LLC will hold, through its ownership of all of the outstanding shares of our Class B common stock, approximately 91.3% of the combined voting power of the outstanding shares of our common stock. While our Class B common stock will be owned by IBG Holdings LLC, Thomas Peterffy, through his ownership of the voting membership interests in IBG Holdings LLC, will initially be able to exercise control over all matters requiring the approval of our stockholders, including the election of our directors and the approval of significant corporate transactions.

The following table sets forth certain information as of May 3, 2007, with respect to the beneficial ownership of our common stock, prior to and after giving effect to this offering, by:

- each beneficial owner of more than five percent of our common stock;

- our chief executive officer and our four other named executive officers;

- each of our directors; and

- all of our directors and executive officers as a group.

The amounts and percentages of common stock beneficially owned are reported on the basis of regulations of the SEC governing the determination of beneficial ownership of securities. Under the rules of the SEC, a person is deemed to be a beneficial owner of a security if that person has or shares voting power, which includes the power to vote or to direct the voting of such security, or investment power, which includes the power to dispose of or to direct the disposition of such security. Unless otherwise indicated below, each beneficial owner named in the table below has sole voting and sole investment power with respect to all shares beneficially owned. Because the IBG Holdings LLC membership interests are not directly exchangeable into shares of our common stock, none of our executive officers and directors may be deemed to own shares of our common stock except as set forth below. Thomas Peterffy may be deemed to own all of our shares of Class B common stock.

| Name | IBG LLC Interests Owned Prior to the Offering | IBG LLC Interests Owned After the Offering | | Class A Common Stock Owned After the Offering | | Class B Common Stock Owned After the Offering | |
|---|---|---|---|---|---|---|---|
| | % | Number | % | Number | % | Number | % |
| IBG Holdings LLC[1] | 0% | 365,500,000 | 91.3% | 0 | 0% | 100 | 100% |
| Thomas Peterffy[2] | 84.5784% | 365,500,000 | 91.3% | 0 | 0% | 100 | 100% |
| Earl H. Nemser[3][4] | 1.1895% | 0 | 0% | 690 | *% | 0 | 0% |
| Paul J. Brody[4] | 1.2509% | 0 | 0% | 2,414 | *% | 0 | 0% |
| Thomas A. Frank[4] | 3.1498% | 0 | 0% | 1,724 | *% | 0 | 0% |
| Milan Galik[4] | 1.3687% | 0 | 0% | 8,103 | *% | 0 | 0% |
| Philip D. Defeo | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| All directors and executive officers as a group | 91.5373% | 365,500,000 | 91.3% | 12,931 | *% | 100 | 100% |

(1)    IBG Holdings LLC, as the sole holder of the 100 outstanding shares of our Class B common stock, is entitled to the number of votes equal to the number of IBG LLC membership interests held by it at any given time. Immediately after this offering, our Class B common stock will have approximately 91.3% of the voting power of our company, which percentage will decrease proportionately to the

extent that IBG Holdings LLC owns a smaller percentage of IBG LLC. Except as otherwise provided by law or our amended and restated certificate of incorporation, our shares of Class A common stock and Class B common stock vote together as a single class. See "Description of Capital Stock—Common Stock—Class B Common Stock—Voting Rights."

(2)   Includes interests owned by The TP Holdings Limited Partnership ("TP Holdings"), an entity for which Mr. Peterffy serves as majority general partner. Initially, Thomas Peterffy, through his ownership of the voting membership interests in IBG Holdings LLC, will beneficially own all of the outstanding shares of our Class B common stock.

(3)   Includes interests owned by EN Holdings LLC, an entity for which he serves as managing member, and excludes interests (other than a direct general partner interest of 0.05%) owned by TP Holdings, an entity for which Mr. Nemser serves as minority general partner. Mr. Nemser disclaims ownership of all interests owned by TP Holdings, except for his direct general partner interest.

(4)   During 2006, no grants of IBG LLC member interests were made to executive officers. Instead, in anticipation of this offering, IBG LLC communicated its intentions to grant restricted shares of common stock pursuant to the terms of our employee incentive plan (see "Management—Employee Incentive Plan"). In the table above, the holders of Messrs. Nemser, Brody, Frank and Galik of Class A common stock after the offering represent solely the 10% portion of these intended grants issued on the date of this offering and assume the offering price of shares of common stock in this offering is $29.00 per share, which is the midpoint of the range set forth on the cover page of this prospectus. It is intended that Messrs. Nemser, Brody, Frank and Galik will be issued in the future an aggregate of 6,206, 21,724, 15,517 and 72,931 shares of common stock, respectively, such amounts representing the remaining 90% portions of the above-referenced intended grants. Such shares will be issued in equal amounts on each of the first six anniversaries of the date of this offering.

136

**TRANSACTIONS WITH RELATED PERSONS, PROMOTERS AND CERTAIN CONTROL PERSONS**

### Recapitalization Transactions

Our business is presently conducted by subsidiaries of IBG LLC, which currently is approximately 85% owned by Thomas Peterffy and his affiliates. In November 2006, we were incorporated as a Delaware corporation. We have not engaged in any business or other activities except in connection with its formation. The Recapitalization will result in the current members of IBG LLC becoming the sole members of IBG Holdings LLC, and will establish us as the sole managing member of IBG LLC. The completion of the Recapitalization is a condition to this offering.

As a result of the Recapitalization, immediately following this offering and the application of net proceeds from this offering as described herein:

- IBG will be the sole managing member of IBG LLC;

- we and IBG Holdings LLC will own approximately 8.7% and 91.3%, respectively, of the membership interests in IBG LLC;

- Thomas Peterffy and his affiliates will own approximately 85% of the membership interests in IBG Holdings LLC, and management and other employees of IBG LLC will own substantially all of the remaining membership interests;

- outstanding shares of our Class A common stock, all of which will have been sold pursuant to this offering, will represent more than 99.999% of our outstanding capital stock based on economic value (which, as used herein, refers to the right to share in dividend distributions and distributions upon liquidation, dissolution or winding up);

- outstanding shares of our Class B common stock, all of which will be owned by IBG Holdings LLC, will represent less than 0.001% of our outstanding capital stock based on economic value;

- outstanding shares of our Class B common stock will represent approximately 91.3% of the combined voting power of all shares of our capital stock, which percentage will decrease proportionately to the extent that IBG Holdings LLC owns a smaller percentage of IBG LLC; and

- Thomas Peterffy will own all of the voting membership interests, and Mr. Peterffy and his affiliates will own a majority of the overall membership interests, in IBG Holdings LLC and, accordingly, will beneficially own all of the outstanding shares of our Class B common stock. As a result, Mr. Peterffy will be able to exercise control over all matters requiring the approval of our stockholders.

If at any time in the future Thomas Peterffy and his affiliates own less than a majority of the membership interests in IBG Holdings LLC, then at such time all membership interests in IBG Holdings LLC will become voting membership interests. Accordingly, all members of IBG Holdings LLC, instead of Mr. Peterffy alone, would together direct the voting of our Class B common stock, and all such members would together exercise control over all matters requiring the approval of our stockholders.

Please see the section entitled "The Recapitalization Transactions and Our Organizational Structure" above.

137

**Voting**

Each share of our common stock will entitle its holder to one vote per share. Immediately after this offering, our Class B common stock will have approximately 91.3% of the voting power of our company, which percentage will decrease proportionately over time to the extent that IBG Holdings LLC owns a smaller percentage of IBG LLC. Initially, Thomas Peterffy will own all of the voting membership interests in IBG Holdings LLC upon consummation of this offering. Accordingly, Mr. Peterffy will beneficially own all of the outstanding shares of our Class B common stock. As a result, Mr. Peterffy will be able to exercise control over all matters requiring the approval of our stockholders, including the election of our directors and the approval of significant corporate transactions.

If at any time in the future Thomas Peterffy and his affiliates own less than a majority of the membership interests in IBG Holdings LLC, then at such time all membership interests in IBG Holdings LLC will become voting membership interests. Accordingly, all members of IBG Holdings LLC, instead of Mr. Peterffy alone, would together direct the voting of the shares of our Class B common stock, and all such members would together exercise control over all matters requiring the approval of our stockholders. However, even if Mr. Peterffy and his affiliates cease to own a majority of the membership interest in IBG Holdings LLC, Mr. Peterffy could, depending on his level of percentage ownership, continue to effectively control or significantly influence matters requiring approval of shareholders.

## Exchange Agreement

Immediately prior to this offering, we will enter into an exchange agreement with IBG Holdings LLC, IBG LLC and the historical members of IBG LLC. Pursuant to this agreement, the historical members of IBG LLC will contribute their IBG LLC membership interests to IBG Holdings LLC and receive IBG Holdings LLC membership interests in return. IBG Holdings will then sell certain of its newly acquired IBG LLC membership interests to us upon consummation of this offering. The membership interests in IBG Holdings LLC will not be directly exchangeable for shares of our common stock. Instead, the membership interests will become redeemable at various times over the next eight years following this offering at the option of the holder. The redemption price for the membership interest will depend on the manner in which the payment is made to IBG Holdings LLC.

On an annual basis, each holder of a membership interest may request that the liquefiable portion of its interest be redeemed by IBG Holdings LLC. The primary manner in which the redemption price will be paid is by selling shares of our common stock to the public and using the gross proceeds from such sales, less underwriting discounts or placement agency fees, to acquire IBG LLC membership interests from IBG Holdings LLC. We would then expect IBG Holdings LLC to use the net proceeds it receives from such sales to redeem an identical number of IBG Holdings LLC membership interests from the requesting holders. The annual registration and sale of shares of our common stock to satisfy redemption requests is described in greater detail in our exchange agreement, a copy of which is set forth as an exhibit to the registration statement of which this prospectus forms a part. The sales of our common stock and the application of the net proceeds to acquire IBG LLC membership interests are expected to have a negligible effect on the existing holders of our common stock, as the holders of our common stock would then own a larger portion of IBG LLC. Such transactions will have the effect of diluting your percentage ownership in us. However, because we will acquire an increased percentage ownership in IBG LLC over time as a result of such transactions, such transactions will not impact your effective percentage ownership of the economics of the underlying IBG LLC business.

In some cases, IBG LLC may redeem IBG LLC membership interests from IBG Holdings LLC using cash on hand. The redemption price per membership interest would be equal to the 30-day average closing price of our common stock. The use of IBG LLC's cash to acquire IBG LLC membership interests is expected to have a dilutive effect on the existing holders of our common stock, as the price

138

paid per membership interest is likely to be higher than IBG LLC's tangible book value per membership interest.

IBG Holdings LLC, with the consent of Thomas Peterffy and our board of directors, has the right to cause the holders of IBG Holdings LLC membership interests to have all or a portion of their interests redeemed at any time following the first anniversary of this offering. Such redemptions would be financed in the same manner as the scheduled redemptions described above.

Please see the section entitled "The Recapitalization Transactions and Our Organizational Structure" beginning on page 37 for further information.

**Tax Receivable Agreement**

As described in "The Recapitalization Transactions and Our Organizational Structure," prior to and in connection with this offering, we will purchase interests in IBG LLC from IBG Holdings LLC for cash. In addition, as described in "The Recapitalization Transactions and Our Organizational Structure—Exchange and Redemption of Membership Interests," IBG LLC membership interests held by IBG Holdings LLC may be purchased by us in the future in connection with offerings by us of shares of our common stock. Our initial purchase of the IBG LLC interests will, and the subsequent purchases may, result in increases in the tax basis of the tangible and intangible assets of IBG LLC attributable to our interest in IBG LLC that otherwise would not have been available, although the IRS may challenge all or part of that tax basis increase or our ability to amortize all or part of that increased tax basis, and a court could sustain such a challenge by the IRS. These increases in tax basis, if sustained, may reduce the amount of taxable income that we are required to recognize as the result of our ownership of interests in IBG LLC in the future.

We intend to enter into a tax receivable agreement with IBG Holdings LLC that will provide for the payment by us to IBG Holdings LLC of 85% of the amount of cash savings, if any, in U.S. federal, state and local income tax or franchise tax that we actually realize as a result of these increases in tax basis and of certain other tax benefits related to our entering into the tax receivable agreement, including tax benefits attributable to payments under the tax receivable agreement. We will retain 15% of the projected tax benefits.

If either immediately before or immediately after any purchase or the related issuance of our stock, the IBG Holdings LLC members own or are deemed to own, in the aggregate, more than 20% of our outstanding stock, then all or part of any increase in the tax basis of goodwill may not be amortizable and, thus, our ability to realize the annual tax savings that otherwise would have resulted if such tax basis were amortizable may be significantly reduced. Although the IBG Holdings LLC members are prohibited under the exchange agreement from purchasing shares of Class A common stock, grants of our stock to employees and directors who are also members or related to members of IBG Holdings LLC and the application of certain tax attribution rules, such as among family members and partners in a partnership, could result in IBG Holdings LLC members being deemed for tax purposes to own shares of Class A common stock.

In order to mitigate the risk to us of an IRS challenge to the tax basis increase, IBG Holdings LLC and its members will indemnify us for any additional taxes we owe if the IRS or other taxing authorities successfully challenge the basis increase. In addition, if the IRS or other taxing authorities successfully challenge the tax basis increase, any subsequent payments we are required to make under the tax receivable agreement will be reduced accordingly.

For purposes of the tax receivable agreement, cash savings in income and franchise tax will be computed by comparing our actual income and franchise tax liability to the amount of such taxes that we would have been required to pay had there been no increase in the tax basis of the tangible and intangible assets of IBG LLC attributable to our acquisition of our interest in IBG LLC, and had we not entered into the tax receivable agreement. The term of the tax receivable agreement will commence upon consummation of this offering and will, unless we exercise our right to terminate the tax receivable agreement for an amount based on an agreed value of payments remaining to be made under the agreement, terminate upon the earlier of (i) the end of the taxable year that includes the 50th anniversary of our initial acquisition of interests in IBG LLC, or (ii) the end of the taxable year that includes the 16th anniversary of the date upon which all rights of sale and exchange granted under the exchange agreement have terminated.

While the actual amount and timing of any payments under the tax receivable agreement will vary depending upon a number of factors, including the timing of purchases, the extent to which such purchases are taxable and the amount and timing of our income, we expect that, as a result of the size of the increases in the tax basis of the tangible and intangible assets of IBG LLC and its subsidiaries, the payments that we may make to IBG Holdings LLC could be substantial. At the time of the closing of this offering, the increase in the tax basis attributable to our interest in IBG LLC, assuming an initial offering price of $29.00 per share of common stock (the midpoint of the range of initial public offering prices set forth on the cover of this prospectus) and our purchase of 8.6% of the outstanding interests of IBG LLC, is expected to be approximately $207.8 million. The tax savings that we would actually realize as a result of this increase in tax basis likely would be significantly less than this amount multiplied by our effective tax rate due to a number of factors, including the allocation of the increase in tax basis to foreign or non-depreciable fixed assets, the impact of the increase in the tax basis on our ability to use foreign tax credits and the rules relating to the amortization of intangible assets, for example. Based on facts and assumptions applicable at the time of the offering, including that all subsequent purchases of IBG LLC interests will occur in fully taxable transactions, the potential tax basis increase resulting from the purchase of the IBG LLC interests held by IBG Holdings LLC following the closing of the offering could be as much as $8.6 billion. The actual increase in tax basis will depend, among other factors, upon the price of shares of our common stock at the time of the purchase and the extent to which such exchanges are taxable and, as a result, could differ materially from this amount. Our ability to achieve benefits from any such increase, and the payments to be made under the tax receivable agreement, will depend upon a number of factors, as discussed above, including the timing and amount of our future income.

**Promissory Notes Issued by TP Holdings to IBG LLC**

Historically, IBG LLC has made income distributions to its members in order to cover such members' personal income tax liabilities. In the event that such income distributions are insufficient for payment of the members' personal income tax liabilities, upon request by such members, IBG LLC has in the past from time to time made advances or loans to such members pursuant to its policies and procedures regarding advances or loans to its members or employees. In accordance with Section 402 of the Sarbanes-Oxley Act of 2002, as codified in Section 13(k) of the Exchange Act, in connection with this offering, we have adopted a policy that forbids IBG, either directly or indirectly, from extending credit in the form of a personal loan to any of our directors or executive officers.

The following reflects IBG LLC's former policies and procedures with respect to advances or loans to its members or employees. Such policy conferred upon Thomas Peterffy, IBG LLC's founder, chairman and chief executive officer, discretion to approve advances or loans to its members or employees upon notice to its chief financial officer or vice chairman regardless of the type of transaction involved. Such policy was not written; however, all such advances or loans were evidenced by promissory notes payable

140

upon demand and properly entered into IBG LLC's accounting system. All such advances or loans to date were made in accordance with such policy and procedure, and were made to TP Holdings, a member of IBG LLC. The majority general partner of TP Holdings is Mr. Peterffy, the sole voting member and sole managing member of IBG Holdings LLC, and the minority general partner is Earl Nemser, IBG LLC's vice chairman. TP Holdings issued notes to IBG LLC during 2004 and 2005 in amounts ranging from $25,000 to $4,500,000 at interest rates ranging from 1.46% to 4.34%, with $4,500,000 being the largest aggregate amount of indebtedness outstanding at any time during such period. All notes were repaid in the calendar year of issuance. No TP Holdings notes were issued in 2006 and 2007, and there are currently no TP Holdings notes outstanding.

## Legal Representation

Earl H. Nemser, our vice chairman and one of our directors, is also Special Counsel to the law firm of Dechert LLP, which has rendered legal services to IBG LLC and us, as applicable, during 2005 and 2006. Prior to joining Dechert LLP, Mr. Nemser served as Special Counsel to Swidler Berlin Shereff Friedman LLP from 1995 to December 2004, which had rendered legal services to IBG LLC during 2003 and 2004. Mr. Nemser beneficially owns 1.1893% of IBG LLC, which, assuming an initial offering price of $29.00 per share of common stock (the midpoint of the range of initial public offering prices set forth on the cover of this prospectus), would be worth $138.0 million at the time of this offering. See "Use of Proceeds."

## Purchase of Senior Notes

Earl H. Nemser, our vice chairman and one of our directors, from time to time purchases senior notes issued by IBG LLC that are described in greater detail under "Description of Indebtedness—Senior Notes" and "Item 15. Recent Sales of Unregistered Securities" contained in Part II of the registration statement of which this prospectus forms a part. The largest aggregate principal amount of senior notes held by Mr. Nemser since January 1, 2004 was $2,340,000. As of April 30, 2007, Mr. Nemser held $1,350,000 in aggregate principal amount of senior notes. Since January 1, 2004, the total amounts of senior notes principal and interest paid to Mr. Nemser were $21,640,000 and $437,459, respectively. As the senior notes have either a 15-month or 18-month maturity, Mr. Nemser has, during each of the last three fiscal years, both purchased additional senior notes and has had certain of his senior notes redeemed. All senior notes issued prior to June 19, 2006 had an interest rate of 8%, and all senior notes issued on and after such date had a 7% interest rate.

## Investment in W.R. Hambrecht + Co., Inc.

On December 21, 2006, IB Exchange Corp., one of our subsidiaries, purchased approximately $10.0 million in aggregate principal amount of short-term senior secured promissory notes (which we refer to as the "WRH Bridge Notes") issued by W.R. Hambrecht + Co., Inc., the parent of WR Hambrecht + Co, LLC, one of the placement agents for this offering. The WRH Bridge Notes were due and payable on February 6, 2007. On February 5, 2007, the WRH Bridge Notes, together with $0.1 million of interest thereon and an additional $5.9 million, were reinvested into three-year senior secured promissory notes issued by W.R. Hambrecht + Co., Inc. (which we refer to as the "WRH Senior Notes"). On March 29, 2007, IB Exchange Corp. purchased an additional $3.2 million of WRH Senior Notes. In addition to the WRH Senior Notes, we received three-year warrants which are immediately exercisable to acquire common stock of W.R. Hambrecht + Co, Inc., at a price equal to the fair market value of such common stock at the time of the issuance of the warrants. Our beneficial ownership of shares of W.R. Hambrecht + Co., Inc. may result in our being deemed to be an affiliate of W.R. Hambrecht + Co., Inc. The WRH Senior Notes bear interest at 8% per annum, which may be paid in cash or added to the principal amount of the WRH Senior Notes. The WRH Senior Notes are secured by the capital stock of certain subsidiaries and certain intellectual property of W.R. Hambrecht + Co.,

Inc. The WRH Senior Notes rank senior to all future funded indebtedness of W.R. Hambrecht + Co., Inc. As part of the financing, we were granted the right to designate two members (of not more than ten) of the board of directors of W.R. Hambrecht + Co., Inc. Such members are Thomas Peterffy and Kevin Fischer.

As a result of this financing, NASD Rule 2720 requires that the initial public offering price may be no higher than that recommended by a "qualified independent underwriter," as defined by the NASD. In accordance with this rule, Fox-Pitt, Kelton Incorporated has assumed the responsibilities of acting as a qualified independent underwriter. See "Plan of Distribution—Qualified Independent Underwriter."

### Review, Approval or Ratification of Transactions with Related Persons

As a private company, IBG LLC's policies and procedures for the review, approval or ratification of any related party transaction conferred upon Thomas Peterffy, IBG LLC's founder, chairman and chief executive officer, the sole discretion to approve such transactions. Such policies and procedures were not written. We anticipate that post-offering, our board of directors will adopt policies and procedures with regard to the approval of related party transactions.

142

# DESCRIPTION OF CAPITAL STOCK

The following description of our capital stock and provisions of our amended and restated certificate of incorporation, and our bylaws, each of which will be in effect prior to the date of this prospectus, are summaries and are qualified by reference to our amended and restated certificate of incorporation and our bylaws, copies of which have been filed with the SEC as exhibits to our registration statement, of which this prospectus forms a part.

Our current authorized capital stock consists of 100 shares of common stock, par value $0.01 per share, 100 shares of Class B common stock, par value $0.01 per share, and 10,000 shares of preferred stock. As of the consummation of this offering, our authorized capital stock will consist of 1,000,000,000 shares of Class A common stock, par value $0.01 per share, 100 shares of Class B common stock, par value $0.01 per share and 10,000 shares of preferred stock. In this section, when we refer to "common stock," we are referring to Class A common stock and Class B common stock, taken as a whole.

## Common Stock

As of the consummation of this offering, there will be 34,500,000 shares of Class A common stock issued and outstanding and 100 shares of Class B common stock issued and outstanding. All of the shares of Class B common stock will be owned by IBG Holdings LLC.

### Class A common stock

#### Voting rights

The holders of Class A common stock will be entitled to one vote per share. Holders of shares of Class A common stock will not be entitled to cumulate their votes in the election of directors. Generally, all matters to be voted on by stockholders must be approved by a majority (or, in the case of election of directors, by a plurality) of the votes entitled to be cast by all shares of Class A common stock and Class B common stock present in person or represented by proxy, voting together as a single class. Except as otherwise provided by law, amendments to our amended and restated certificate of incorporation must be approved by a majority of the combined voting power of all shares of Class A common stock and Class B common stock, voting together as a single class. However, amendments to the amended and restated certificate of incorporation that would alter or change the powers, preferences or special rights of the Class A common stock so as to affect them adversely also must be approved by a majority of the votes entitled to be cast by the holders of the shares affected by the amendment, voting as a separate class. Notwithstanding the foregoing, any amendment to our amended and restated certificate of incorporation to increase or decrease the authorized shares of any class of common stock shall be approved upon the affirmative vote of the holders of a majority of the shares of Class B common stock and Class A common stock, voting together as a single class.

#### Dividend rights

Holders of Class A common stock will share ratably (based on the number of shares of common stock held) in any dividend declared by our board of directors. Dividends consisting of shares of Class A common stock may be paid only as follows: (i) shares of Class A common stock may be paid only to holders of shares of Class A common stock; and (ii) shares shall be paid proportionally with respect to each outstanding share of Class A common stock. We may not subdivide or combine shares of either class of common stock without at the same time proportionally subdividing or combining shares of the other class. Dividends payable to holders of Class B common stock can only be paid if dividends in the same amount per share are simultaneously paid to holders of Class A common stock.

143

On our liquidation, dissolution or winding up, all holders of Class A common stock will be entitled to share ratably in any assets available for distribution to holders of shares of common stock.

*Other matters*

In accordance with our amended and restated certificate of incorporation and the amended and restated limited liability company agreement pursuant to which IBG LLC will be governed, the net cash proceeds received by us from any future issuance of shares of common stock will either be used to purchase IBG LLC membership interests from IBG Holdings LLC or be transferred to IBG LLC in exchange for newly issued membership interests equal in number to such number of shares of common stock issued by us. The number of outstanding IBG LLC membership interests owned by us will, therefore, equal the number of outstanding shares of our common stock at all times. As a result, existing common stockholders will experience no material dilution with regard to their equity interest in IBG LLC as a result of the issuance of additional shares of our common stock.

In the event of our merger or consolidation with or into another company in connection with which shares of either class of common stock are converted into or exchangeable for shares of stock, other securities or property (including cash), all holders of common stock, regardless of class, will be entitled to receive the same kind and amount of shares of stock and other securities and property (including cash), provided that if shares of either class of common stock are exchanged for shares of capital stock, such shares exchanged for or changed into may differ to the extent that the Class A common stock and the Class B common stock differ.

No shares of either class of common stock will be subject to redemption or have preemptive rights to purchase additional shares of either class of common stock. Upon consummation of this offering, all the outstanding shares of Class A common stock will be legally issued, fully paid and non-assessable.

### Class B common stock

*Voting rights*

The holders of Class B common stock, in the aggregate, will be entitled to the number of votes equal to the number of IBG LLC membership interests held by such holders. Initially, the holders of Class B common stock, in the aggregate, will be entitled to 365,500,000 votes.

Holders of shares of Class B common stock will not be entitled to cumulate their votes in the election of directors. Generally, all matters to be voted on by stockholders must be approved by a majority (or, in the case of election of directors, by a plurality) of the votes entitled to be cast by all shares of Class B common stock and Class A common stock present in person or represented by proxy, voting together as a single class. Except as otherwise provided by law, amendments to the amended and restated certificate of incorporation must be approved by a majority of the combined voting power of all shares of Class B common stock and Class A common stock, voting together as a single class. However, amendments to the certificate of incorporation that would alter or change the powers, preferences or special rights of the Class B common stock so as to affect them adversely also must be approved by a majority of the votes entitled to be cast by the holders of the shares affected by the amendment, voting as a separate class. Notwithstanding the foregoing, any amendment to our amended and restated certificate of incorporation to increase or decrease the authorized shares of any class of common stock shall be approved upon the affirmative vote of the holders of a majority of the shares of Class B common stock and Class A common stock, voting together as a single class.

144

*Dividend rights*

Holders of Class B common stock will share ratably (based on the number of shares of common stock held) in any dividend declared by the board of directors. Dividends consisting of shares of Class B common stock may be paid only as follows: (i) shares of Class B common stock may be paid only to holders of shares of Class B common stock; and (ii) shares shall be paid proportionally with respect to each outstanding share of Class B common stock. We may not subdivide or combine shares of either class of common stock without at the same time proportionally subdividing or combining shares of the other class. Dividends payable to holders of Class B common stock can only be paid if dividends in the same amount per share are simultaneously paid to holders of Class A common stock.

*Liquidation rights*

On our liquidation, dissolution or winding up, all holders of Class B common stock will be entitled to share ratably in any assets available for distribution to holders of shares of common stock.

*Other matters*

In the event of our merger or consolidation with or into another company in connection with which shares of either class of common stock are converted into or exchangeable for shares of stock, other securities or property (including cash), all holders of common stock, regardless of class, will be entitled to receive the same kind and amount of shares of stock and other securities and property (including cash), provided that, if shares of either class of common stock are exchanged for shares of capital stock, such shares exchanged for or changed into may differ to the extent that the Class A common stock and the Class B common stock differ.

No shares of either class of common stock will be subject to redemption or will have preemptive rights to purchase additional shares of either class of common stock. Upon consummation of this offering, all the outstanding shares of Class B common stock will be legally issued, fully paid and nonassessable.

## Preferred Stock

Our board of directors will have the authority, without further action by our stockholders, to issue our preferred stock in one or more series and to fix the rights, preferences, privileges, and restrictions thereof. These rights, preferences, and privileges include dividend rights, conversion rights, voting rights, terms of redemption, liquidation preferences, sinking fund terms, and the number of shares constituting any series or the designation of such series, any or all of which may be greater than the rights of our common stock. The issuance of our preferred stock could adversely affect the voting power of our holders of common stock and the likelihood that such holders will receive dividend payments and payments upon liquidation. In addition, the issuance of our preferred stock could have the effect of delaying, deferring, or preventing a change in our control.

## IBG LLC Membership Interests and Amended and Restated Limited Liability Company Agreement of IBG LLC

After completion of this offering, our primary assets will be our ownership of approximately 8.7% of the IBG LLC membership interests, and our controlling interest and related contractual rights as the sole managing member of IBG LLC. Immediately following this offering, there will be approximately 400,203,401 IBG LLC membership interests issued and outstanding, approximately 34,703,401, or 8.7%, of which will be owned by us, and 365,500,000, or 91.3%, of which will be owned by IBG Holdings LLC. All IBG LLC membership interests will be identical and have the same voting and other rights.

145

Our only business following this offering will be to act as the sole managing member of IBG LLC, and, as such, we will operate and control all of the business and affairs of IBG LLC, will have all of the rights and powers which may be possessed by managing members under the Connecticut Limited Liability Company Act and will be able to consolidate IBG LLC's financial results into our financial statements. Except with the prior written consent of both members of IBG LLC, we do not have the authority to:

- conduct any act in contravention of IBG LLC's amended and restated limited liability company agreement;

- knowingly perform any act that would subject any member to personal liability for debts or obligations of IBG LLC in any jurisdiction;

- engage in any activity which substantially changes the nature of IBG LLC's business;

- sell all or a substantial portion of the property of IBG LLC;

- merge or consolidate IBG LLC with or into another entity;

- convert IBG LLC, by whatever means, into a corporation or another form of business entity; or

- dissolve or liquidate IBG LLC.

The amended and restated limited liability company agreement of IBG LLC provides that immediately following this offering, the number of IBG LLC membership interests will equal the sum of the number of shares of common stock outstanding and the number of outstanding common shares of IBG Holdings LLC. It is the intent of the members that this relationship remain constant throughout the term of IBG LLC. It is anticipated that from time to time and without regard to the exchange agreement among us, IBG LLC, IBG Holdings LLC and the historical members of IBG LLC (and described in greater detail under "Transactions with Related Persons, Promoters and Certain Control Persons—Exchange Agreement"), we may issue additional shares of common stock under incentive plans for employees (including our 2007 Stock Incentive Plan), in exchange for capital or in other arrangements that benefit IBG LLC. In any such case, it is the intention of the members that a corresponding number of IBG LLC membership interests shall be issued to us in exchange for the consideration received by us for our issuance of additional shares of common stock. If any shares of common stock are issued subject to restrictions resulting in forfeiture to us or are otherwise redeemed by us, a corresponding number of IBG LLC membership interests shall be surrendered to IBG LLC by us for cancellation. Similarly, if any common shares of IBG Holdings LLC are forfeited to IBG Holdings LLC and as a result thereof are no longer outstanding, a corresponding number of IBG LLC membership interests shall be surrendered to IBG LLC by IBG Holdings LLC for cancellation. These and other adjustments to the number of IBG LLC membership interests outstanding may be made from time to time as necessary to properly reflect the relative interests of the members.

In accordance with the amended and restated limited liability company agreement pursuant to which IBG LLC will be governed, net profits, net losses and distributions of IBG LLC will be allocated and made to its members pro rata in accordance with the respective percentages of their membership interests in IBG LLC. Accordingly, net profits and net losses of IBG LLC will initially be allocated, and distributions by IBG LLC will initially be made, approximately 8.7% to us and approximately 91.3% to IBG Holdings LLC.

146

Pursuant to the terms of the amended and restated limited liability company agreement of IBG LLC, we, as the managing member of IBG LLC, expect to cause IBG LLC to make distributions to its members, including us, to the extent necessary to enable such members to pay taxes incurred with respect to their allocable shares of taxable income of IBG LLC, using a tax rate no less than the actual combined federal, state and local income tax rates applicable to our allocable share of taxable income. Any distributions by IBG LLC in excess of such tax distributions will be at the discretion of our board of directors and will depend on IBG LLC's strategic plans, financial results and condition, contractual, legal, financial and regulatory restrictions on distributions (including the ability of IBG LLC to make distributions under the covenants in its senior secured revolving credit facility and senior notes), capital requirements, business prospects and such other factors as our board of directors, in exercising our authority as managing member of IBG LLC, considers to be relevant to such determination.

## Anti-takeover Effects of the Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws

Certain provisions of our amended and restated certificate of incorporation and our bylaws could have anti-takeover effects. These provisions are intended to enhance the likelihood of continuity and stability in the composition of our corporate policies formulated by our board of directors. In addition, these provisions also are intended to ensure that our board of directors will have sufficient time to fulfill its fiduciary duties to us and our stockholders. These provisions also are designed to reduce our vulnerability to an unsolicited proposal for our takeover that does not contemplate the acquisition of all of our outstanding shares or an unsolicited proposal for the restructuring or sale of all or part of us. The provisions are also intended to discourage certain tactics that may be used in proxy fights. However, these provisions could delay or frustrate the removal of incumbent directors or the assumption of control of us by the holder of a large block of common stock, and could also discourage or make more difficult a merger, tender offer, or proxy contest, even if such event would be favorable to the interest of our stockholders.

*Special meetings of stockholders.*   Our bylaws preclude our stockholders from calling special meetings of stockholders or requiring the board of directors or any officer to call such a meeting or from proposing business at such a meeting. Our bylaws provide that only a majority of our board of directors, the chairman of the board or the chief executive officer can call a special meeting of stockholders. Because our stockholders do not have the right to call a special meeting, a stockholder cannot force stockholder consideration of a proposal over the opposition of the board of directors by calling a special meeting of stockholders prior to the time a majority of the board of directors, the chairman of the board or the chief executive officer believes the matter should be considered or until the next annual meeting provided that the requestor met the notice requirements. The restriction on the ability of stockholders to call a special meeting means that a proposal to replace board members also can be delayed until the next annual meeting.

*Other limitations on stockholder actions.*   Advance notice is required for stockholders to nominate directors or to submit proposals for consideration at meetings of stockholders. This provision may have the effect of precluding the conduct of certain business at a meeting if the proper notice is not provided and may also discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of our company. In addition, the ability of our stockholders to remove directors without cause is precluded.

## Section 203 of the General Corporation Law of the State of Delaware

We are subject to Section 203 of the General Corporation Law of the State of Delaware, which prohibits a Delaware corporation from engaging in any business combination with any interested

stockholder for a period of three years following the date that such stockholder became an interested stockholder, with the following exceptions:

- prior to such date, the board of directors of the corporation approved either the business combination or the transaction that resulted in the stockholder becoming an interested holder;

- upon consummation of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the number of shares outstanding those shares owned by persons who are directors and also officers and by employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer; and

- on or subsequent to such date, the business combination is approved by the board of directors and authorized at an annual or special meeting of the stockholders, and not by written consent, by the affirmative vote of at least $66^2/3\%$ of the outstanding voting stock that is not owned by the interested stockholder.

Section 203 defines business combination to include the following:

- any merger or consolidation involving the corporation and the interested stockholder;

- any sale, transfer, pledge or other disposition of 10% or more of the assets of the corporation involving the interested stockholder;

- subject to certain exceptions, any transaction that results in the issuance or transfer by the corporation of any stock of the corporation to the interested stockholder;

- any transaction involving the corporation that has the effect of increasing the proportionate share of the stock or any class or series of the corporation beneficially owned by the interested stockholder; or

- the receipt by the interested stockholder of the benefit of any loss, advances, guarantees, pledges, or other financial benefits by or through the corporation.

In general, Section 203 defines an interested stockholder as an entity or person beneficially owning 15% or more of the outstanding voting stock of the corporation or any entity or person affiliated with or controlling or controlled by such entity or person.

## Transfer Agent and Registrar

The transfer agent and registrar for shares of our common stock is Computershare Shareholder Services, Inc.

## Listing

We have applied to list shares of our common stock on The NASDAQ Global Select Market under the symbol "IBKR."

148

## DESCRIPTION OF INDEBTEDNESS

**Senior Secured Revolving Credit Facility**

The following description does not purport to be complete and is qualified in its entirety by reference to the credit agreement, which is available upon request from us.

IBG LLC entered into a senior secured revolving credit facility on May 19, 2006 with JPMorgan Chase Bank, N.A. as administrative agent, Harris N.A. as syndication agent, Citibank, N.A. and HSBC USA National Association as co-syndication agents, which consists of a credit facility in an aggregate principal amount not to exceed $300.0 million with a maturity date of May 19, 2010. Subject to compliance with certain conditions, the maximum aggregate amount IBG LLC can borrow under the credit facility may be increased up to $500.0 million.

Subject to compliance with customary conditions precedent and the availability of the lenders' committed amounts, revolving loans are available at any time prior to May 19, 2009. All outstanding loans under the senior secured revolving credit facility are due and payable on May 19, 2010, and amounts repaid under the senior secured revolving credit facility may be reborrowed prior to May 19, 2009.

All of IBG LLC's obligations under the senior secured revolving credit facility are required to be guaranteed by IBG LLC's domestic non-regulated subsidiaries (currently there are no such entities). The senior secured revolving credit facility and the related guarantees are secured by a perfected first priority security interest in all of the capital stock of each entity owned directly by IBG LLC (subject to customary limitations with respect to foreign subsidiaries).

Revolving loans under the senior secured revolving credit facility bear interest (i) in the case of fed funds loans, at a federal funds rate set forth in the credit agreement plus a margin ranging from 65 basis points to 140 basis points, depending on the third party credit rating issued to IBG LLC by Moody's Investor Service, Inc. or Standard & Poor's Rating Service or (ii) in the case of Eurodollar loans, at Eurodollar rate set forth in the credit agreement plus a margin ranging from 50 basis points to 125 basis points, depending on the third-party credit rating issued to IBG LLC by Moody's Investors Service, Inc. or Standard & Poor's Ratings Service. Interest on loans based on the federal funds rate is payable monthly in arrears, and interest on loans based on the Eurodollar rate is payable on the last day of each relevant interest period and, in the case of any interest period longer than three months, each day that is three months, or a whole multiple thereof, after the first day of such interest period and last day of such interest period. While a default is continuing, interest may accrue at 2.0% above the rate otherwise applicable. Notwithstanding the foregoing, interest on all loans under the senior secured revolving credit facility are payable at the time of repayment of any such loans, and at maturity. In addition to paying on any outstanding principal amount under the senior secured revolving credit facility, IBG LLC is required to pay a facility fee to the administrative agent for the account of the lenders based on the facility fee rate as set forth in the credit agreement commencing on the execution and delivery of the credit facility and payable quarterly in arrears until the maturity date or, if earlier, the date on which all loans under the credit facility have been paid in full. Further, on May 19, 2009, IBG LLC is required to pay a fee to the administrative agent for the account of the lenders in the amount of 0.25% of the principal amount of outstanding loans under the credit facility on such date.

The senior secured revolving credit facility contains representations and warranties, covenants (including limitations on the incurrence of additional debt, and prohibitions on certain corporate transactions such as liquidations, dissolutions and sales of assets outside the ordinary course of business), events of default and remedies and other provisions customary for credit facilities of this type.

The senior secured revolving credit facility also contains the financial covenants that require IBG LLC to maintain:

- a minimum net worth of $1.5 billion, with quarterly increases equal to 25% of positive consolidated income;

- a maximum total debt to capitalization ratio of 30%;

- a minimum liquidity ratio of 1.0 to 1.0; and

- a maximum total debt to net regulatory capital ratio of 35%.

The secured revolving credit facility restricts IBG LLC's ability to make dividend payments or similar distributions to the members of IBG LLC in any given fiscal year unless IBG LLC, prior to, as well as subsequent to making such dividend payments or distributions, is in compliance with the financial covenants described above.

IBG LLC has paid and will continue to pay the lenders certain syndication and administration fees, reimburse certain expenses and provide certain indemnities, in each case which are customary for credit facilities of this type.

## Senior Notes

IBG LLC periodically issues senior notes in private placements to certain qualified customers of Interactive Brokers LLC, our 99.9% broker-dealer subsidiary. IBG LLC uses the proceeds from sales of the senior notes to provide capital to IBG LLC's broker-dealer subsidiaries in the form of subordinated loans and for other general purposes. The outstanding senior notes have either a 15-month or an 18-month maturity. IBG LLC may, solely at its option, redeem the senior notes at any time on or after a specified date in the third month or the sixth month, respectively, after the date on which the senior notes are issued and sold, at a redemption price equal to 100% of the principal amount of the senior notes to be redeemed plus accrued interest.

IBG LLC had $150.6 million and $164.7 million of senior notes outstanding at December 31, 2006 and 2005, respectively. In 2006, IBG LLC redeemed $526.5 million of senior notes, which included $164.7 million of senior notes issued in 2005 and issued $512.5 million in new senior notes.

The senior notes are secured, along with the senior secured revolving credit facility, by a first priority interest in all of the capital stock of each entity owned directly by IBG LLC (subject to customary limitations with respect to foreign subsidiaries).

The senior notes contain covenants that may limit IBG LLC's ability to:

- incur, or permit its subsidiaries to incur, additional indebtedness;

- create, or permit its subsidiaries to create, liens on any capital stock or equity interests of its subsidiaries;

- declare and pay dividends or make other equity distributions as described below; and

- consolidate, merger or sell all or substantially all of its assets.

150

IBG LLC's senior notes contain covenants that prohibit IBG LLC from making dividend payments or similar distributions to its members in any given fiscal year that exceed the greatest of:

- 50% of IBG LLC's consolidated income before income taxes for such fiscal year, as determined in accordance with generally accepted accounting principles;

- 50% of IBG LLC's consolidated income before income taxes for the prior fiscal year, as determined in accordance with generally accepted accounting principles;

- $50 million; and

- the sum of (a) amounts distributable in accordance with the limited liability company agreement of IBC LLC to members of IBG to cover their tax liabilities, if any, with respect to the earnings of IBG LLC and (b) amounts, not exceeding $50 million in any calendar year, that are distributable pursuant to the limited liability company agreement of IBG LLC upon the death, withdrawal, or termination of employment of a member.

151

# SHARES ELIGIBLE FOR FUTURE SALE

Prior to the offering, there has been no public market for our common stock. Future sales of substantial amounts of our common stock in the public market, or the possibility of such sales occurring, could adversely affect the prevailing market price and our ability to raise equity capital in the future.

After giving effect to the Recapitalization and after this offering we will have approximately 34,500,000 outstanding shares of common stock. Of the outstanding shares, the shares sold in this offering will be freely tradable without restriction or further registration under the Securities Act of 1933, as amended (Securities Act), except that any shares held by our "affiliates" as that term is defined in Rule 144 promulgated under the Securities Act may only be sold in compliance with the limitations described below.

Restricted securities may be sold in the public market only if registered under the Securities Act or if they qualify for an exemption from registration described below under Rules 144, 144(k) or 701 promulgated under the Securities Act.

IBG Holdings LLC, certain of our security holders, each of our directors and certain of our officers have entered into lock-up agreements pursuant to which they have agreed, subject to limited exceptions, not to offer or sell any shares of common stock or securities convertible into or exchangeable or exercisable for common stock for a period of 180 days from the date of this prospectus without the prior written consent of WR Hambrecht + Co, LLC which may, at any time and without notice, waive any of the terms of the lock-up. Following the lock-up period, these shares will not be eligible for sale in the public market without registration under the Securities Act unless these sales meet the conditions and restrictions of Rules 144 or 701 as described below. As restrictions on resale end, the market price could drop significantly if the holders of these restricted shares sell them or are perceived by the market as intending to sell them. The 180-day period under the lock-up agreements may be extended under specified circumstances. See the section of this prospectus entitled "Plan of Distribution."

In general, under Rule 144 as currently in effect, any person (or persons whose shares are aggregated), including an affiliate, who has beneficially owned shares for a period of at least one year is entitled to sell, within any three-month period, a number of shares that does not exceed the greater of:

- 1% of the then-outstanding common stock, or approximately 345,000 shares based on the number of shares to be outstanding immediately after this offering; or

- the average weekly trading volume in the common stock during the four calendar weeks immediately preceding the date on which the notice of such sale on Form 144 is filed with the SEC.

Sales under Rule 144 are also subject to certain provisions relating to notice and manner of sale and the availability of current public information about us.

In addition, a person (or persons whose shares are aggregated) who is not deemed to have been one of our affiliates at any time during the 90 days immediately preceding a sale, and who has beneficially owned the shares for at least two years, would be entitled to sell such shares under Rule 144(k) without regard to the volume limitation and other conditions described above. Therefore, unless otherwise restricted, Rule 144(k) shares may be sold immediately upon the completion of this offering. The foregoing summary of Rule 144 is not intended to be a complete description.

Subject to limitations on the aggregate offering price of a transaction and other conditions, Rule 701 may be relied upon with respect to the resale of securities originally purchased from us by our employees, directors, officers, consultants or advisors prior to the date we become subject to the reporting requirements of the Exchange Act. To be eligible for resale under Rule 701, shares must have

been issued pursuant to written compensatory benefit plans or written contracts relating to the compensation of such persons. In addition, the SEC has indicated that Rule 701 will apply to typical stock options granted by an issuer before it becomes subject to the reporting requirements of the Exchange Act, along with the shares acquired upon exercise of such options (including exercises after the date of the offering). Securities issued in reliance on Rule 701 are restricted securities and, subject to the lock-up agreements described above, beginning 90 days after the date of this prospectus, may be sold by persons other than affiliates, subject only to the manner of sale provisions of Rule 144, and by affiliates, under Rule 144 without compliance with its one-year minimum holding period requirements. The foregoing summary of Rule 701 is not intended to be a complete description.

We intend to file registration statements under the Securities Act to register the shares of common stock available for issuance pursuant to our equity plans. Shares issued pursuant to these plans after the effective date of such registration statement will be available for sale in the open market and, for our affiliates, subject to the conditions and restrictions of Rule 144.

In connection with the Recapitalization, the current members of IBG LLC will receive membership interests in IBG Holdings LLC.

For a description of the anticipated annual offerings of our common stock to finance the purchase of IBG LLC membership interests from IBG Holdings LLC as well as the potential mandatory redemptions of all or a portion of outstanding IBG Holdings LLC membership interests and the corresponding issuances of common stock to finance such redemptions, see the sections of this prospectus entitled "The Recapitalization Transactions and Our Organizational Structure—Exchange and Redemption of Membership Interests" and "Transactions with Related Persons, Promoters and Certain Control Persons—Exchange Agreement."

153

**MATERIAL UNITED STATES FEDERAL TAX CONSEQUENCES
TO NON-UNITED STATES HOLDERS**

**Preliminary Matters**

The following discussion is a summary of material U.S. federal income tax considerations generally applicable to non-U.S. holders of our common stock that acquire shares of our common stock pursuant to this offering and that hold such shares as capital assets (generally, for investment).

For purposes of this discussion, a non-U.S. holder is any beneficial owner that for U.S. federal income tax purposes is not a U.S. person; the term U.S. person means:

- an individual who is a citizen or resident of the United States;

- a corporation or other entity taxable as a corporation created in or organized under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust (x) if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more U.S. persons have the authority to control all substantial decisions of such trust or (y) that has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

If a partnership or other pass-through entity holds shares of our common stock, the U.S. federal income tax treatment of a partner in the partnership generally will depend upon the status of the partner or member and the activities of the partnership or other entity. Accordingly, we urge partnerships or other pass-through entities that hold shares of our common stock that hold shares of our common stock and partners or members in these partnerships or other entities to consult their tax advisors.

This summary does not consider specific facts and circumstances that may be relevant to a particular non-U.S. holder's tax position and does not consider the state, local or non-U.S. tax consequences of an investment in our common stock. It also does not apply to non-U.S. holders subject to special tax treatment under the U.S. federal income tax laws (including partnerships or other pass-through entities, banks, insurance companies, tax-exempt organizations, dealers in securities or currency, persons who hold common stock as part of a "straddle," "hedge," "conversion transaction" or other risk-reduction or integrated transaction, controlled foreign corporations, passive foreign investment companies, companies that accumulate earnings to avoid U.S. federal income tax, tax-exempt organizations, former U.S. citizens or residents and persons who hold or receive common stock as compensation). This summary is based upon the Internal Revenue Code of 1986, as amended (Code), existing and proposed Treasury regulations, IRS rulings and pronouncements and judicial decisions in effect, all of which are subject to change, possibly on a retroactive basis, or differing interpretations.

**This summary is included herein as general information only. Accordingly, each prospective Holder is urged to consult its tax advisor with respect to the U.S. federal, state, local and non-U.S. income and other tax consequences of holding and disposing of our common stock.**

*U.S. Trade or Business Income*

For purposes of this discussion, dividend income and gain on the sale, exchange or other taxable disposition of our common stock will be considered to be "U.S. trade or business income" if such income or gain is (i) effectively connected with the conduct by a non-U.S. holder of a trade or business within the United States and (ii) in the case of a non-U.S. holder that is eligible for the benefits of an income

154

tax treaty with the United States attributable to a permanent establishment (or, for an individual, a fixed base) maintained by the non-U.S. holder in the United States. Generally, U.S. trade or business income is not subject to U.S. federal withholding tax (provided the N.S. holder complies with applicable certification and disclosure requirements); instead, a non-U.S. holder is subject to U.S. federal income tax on a net income basis at regular U.S. federal income tax rates (in the same manner as a U.S. person) on its U.S. trade or business income. Any U.S. trade or business income received by a non-U.S. holder that is a corporation also may be subject to a "branch profits tax" at a 30% rate, or at a lower rate prescribed by an applicable income tax treaty, under specific circumstances.

### Distributions

Distributions of cash or property that we pay in respect of our common stock will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits (as determined under U.S. federal income tax principles). A non-U.S. holder generally will be subject to U.S. federal withholding tax at a 30% rate, or at a reduced rate prescribed by an applicable income tax treaty, on any dividends received in respect of our common stock. If the amount of a distribution exceeds our current and accumulated earnings and profits, such excess first will be treated as a tax-free return of capital to the extent of the non-U.S. holder's tax basis in our common stock, and thereafter will be treated as capital gain. In order to obtain a reduced rate of U.S. federal withholding tax under an applicable income tax treaty, a non-U.S. holder will be required to provide a properly executed IRS Form W-8BEN or other appropriate version of IRS Form W-8 certifying its entitlement to benefits under the treaty. A non-U.S. holder of our common stock that is eligible for a reduced rate of U.S. federal withholding tax under an income tax treaty may obtain a refund or credit of any excess amounts withheld by filing an appropriate claim for a refund with the IRS. A non-U.S. holder should consult its own tax advisor regarding its possible entitlement to benefits under an income tax treaty.

The U.S. federal withholding tax described in the preceding paragraph does not apply to dividends that represent U.S. trade or business income of a non-U.S. holder who provides a properly executed IRS Form W-8ECI, certifying that the dividends are effectively connected with the non-U.S. holder's conduct of a trade or business within the United States. In such circumstances, dividends will be subject to tax on a net income basis as described above under the caption entitled "U.S. Trade or Business Income."

### Dispositions

A non-U.S. holder generally will not be subject to U.S. federal income or withholding tax in respect of any gain on a sale, exchange or other taxable disposition of common stock unless:

- the gain is U.S. trade or business income (as described above);

- the non-U.S. holder is an individual who is present in the United States for 183 or more days in the taxable year of the disposition and meets other conditions; or

- our common stock constitutes a U.S. real property interest by reason of our status as a "U.S. real property holding corporation" (which we refer to as USRPHC) under Section 897 of the Code at any time during the shorter of the five-year period ending on the date of disposition and the non-U.S. Holder's holding period for our common stock.

In general, a corporation is a USRPHC if the fair market value of its "U.S. real property interests" equals or exceeds 50% of the sum of the fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business. If we are determined to be a USRPHC, the U.S.

155

federal income and withholding taxes relating to interests in USRPHCs nevertheless will not apply to gains derived from the sale or other disposition of our common stock by a non-U.S. holder whose shareholdings, actual and constructive, at all times during the applicable period, amount to 5% or less of our common stock, provided that our common stock is regularly traded on an established securities market. We do not believe that we currently are a USRPHC, and we do not anticipate becoming a USRPHC in the future. However, no assurance can be given that we will not be a USRPHC, or that our common stock will be considered regularly traded, when a non-U.S. holder sells its shares of our common stock.

### U.S. Federal Estate Taxes

Shares of our common stock owned or treated as owned by an individual who is a non-U.S. holder at the time of death will be included in the individual's gross estate for U.S. federal estate tax purposes, and may be subject to U.S. federal estate tax, unless an applicable estate tax treaty provides otherwise.

### Information Reporting and Backup Withholding Requirements

We must annually report to the IRS and to each non-U.S. holder any dividend income that is subject to U.S. federal withholding tax, or that is exempt from such withholding tax pursuant to an income tax treaty. Copies of these information returns also may be made available under the provisions of a specific treaty or agreement to the tax authorities of the country in which the non-U.S. holder resides. Under certain circumstances, the Code imposes a backup withholding obligation (currently at a rate of 28%) on certain reportable payments. Dividends paid to a non-U.S. holder of our common stock generally will be exempt from backup withholding if the non-U.S. holder provides a properly executed IRS Form W-8BEN or otherwise establishes an exemption.

The payment of the proceeds from the disposition of our common stock to or through the U.S. office of any broker, U.S. or foreign, will be subject to information reporting and possible backup withholding unless the owner certifies as to its non-U.S. status under penalties of perjury or otherwise establishes an exemption, provided that the broker does not have actual knowledge or reason to know that the holder is a U.S. person or that the conditions of any other exemption are not, in fact, satisfied. The payment of the proceeds from the disposition of our common stock to or through a non-U.S. office of a non-U.S. broker will not be subject to information reporting or backup withholding unless the non-U.S. broker has certain types of relationships with the United States (which we refer to as a United States related person). In the case of the payment of the proceeds from the disposition of our common stock to or through a non-U.S. office of a broker that is either a U.S. person or a United States related person, the Treasury regulations require information reporting (but not the backup withholding) on the payment unless the broker has documentary evidence in its files that the owner is a non-U.S. holder and the broker has no knowledge to the contrary. Non-U.S. holders should consult their own tax advisors on the application of information reporting and backup withholding to them in their particular circumstances (including upon their disposition of our common stock).

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules from a payment to a non-U.S. holder will be refunded or credited against the non-U.S. holder's U.S. federal income tax liability, if any, provided that the required information is furnished to the IRS.

156

# PLAN OF DISTRIBUTION

In accordance with the terms of the placement agency agreement among WR Hambrecht + Co., LLC, HSBC Securities (USA) Inc., Fox-Pitt, Kelton Incorporated, Sandler O'Neill + Partners, L.P. and E*TRADE Securities, LLC, as placement agents, and us, the placement agents have agreed to use their best efforts to procure potential purchasers for the shares of common stock offered hereby.

The placement agency agreement provides that the obligations of the placement agents are subject to various conditions, principally the declaration of effectiveness by the SEC of the registration statement of which this prospectus forms a part, the absence of any material adverse change in our business, and the receipt of certificates, opinions and letters from us and counsel. The placement agents are not purchasing or selling any of the shares being sold pursuant to this prospectus and they are not required to arrange the purchase or sale of any specific number or dollar amount of shares.

## Placement Fees and Concessions

The placement agents propose to procure potential purchasers to purchase shares of our common stock at the offering price set forth on the cover page of this prospectus, as this price is determined by the OpenIPO process described below, and to certain dealers at this price less a concession not in excess of $           per share. The placement agents may allow, and dealers may reallow, a concession not to exceed $           per share on sales to other dealers. The placement agents as well as any dealers that participate in the distribution of our common stock may be deemed to be underwriters within the meaning of the Securities Act, and any discount, commission or concession received by them and any provided by the sale of the shares by them may be deemed to be underwriting discounts and commissions under the Securities Act. Interactive Brokers LLC, our consolidated subsidiary and a registered broker/dealer, will be participating as a dealer in connection with this offering.

The following table shows the per share and total placement agent fee (rounded to the nearest cent for the purposes of this table) to be paid to the placement agents by us in connection with this offering. The placement agent fee has been determined through negotiations between us and the placement agents, and has been calculated as a percentage of the offering price.

|  | Per Share |
| --- | --- |
| Initial public offering price | $ 29.00 |
| Placement agency fee | $ 0.54 |
| Proceeds, before expenses, to us | $ 28.46 |

We estimate that the costs of this offering, exclusive of the placement agent fee, will be approximately $5.5 million, including fees and expenses of the placement agents as described below. These fees and expenses are payable entirely by IBG LLC. IBG LLC has agreed to reimburse the placement agents for their travel and other out-of-pocket expenses and legal fees in connection with this offering. We expect that such expenses will not exceed $1,000,000, which amount includes approximately $500,000 of legal fees and expenses. An electronic prospectus is available on the website maintained by WR Hambrecht + Co and may also be made available on websites maintained by other placement agents, selected dealers and selling group members participating in this offering.

## The OpenIPO Auction Process

The distribution method being used in this offering is known as the OpenIPO auction, which differs from methods traditionally used in public offerings. In particular, as described under the captions "—Determination of Public Offering Price" and "—Allocation of Shares" below, the public offering price and the allocation of shares are determined by an auction conducted by the placement agents and other factors as described below. All qualified individual and institutional investors may place bids in an

157

OpenIPO auction and investors submitting valid bids have an equal opportunity to receive an allocation of shares.

The following describes how the placement agents and some selected dealers conduct the auction process and, on our behalf, confirm bids from prospective investors:

*Prior to Effectiveness of the Registration Statement*

Before the registration statement relating to this offering becomes effective, but after a preliminary prospectus is available, the auction will open and the placement agents and participating dealers will solicit bids from prospective investors through the Internet and by telephone and facsimile. The bids specify the number of shares of our common stock the potential investor proposes to purchase and the price the potential investor is willing to pay for the shares. These bids may be above or below the range set forth on the cover page of the prospectus. The minimum size of any bid is 100 shares. Bidders may submit multiple bids in the auction.

The shares offered by this prospectus may not be sold, nor may offers to buy be accepted, prior to the time that the registration statement filed with the SEC becomes effective. A bid received by the placement agents or a dealer involves no obligation or commitment of any kind prior to the notice of acceptance being sent, which will occur after effectiveness of the registration statement and closing of the auction. Bids can be modified at any time prior to the closing of the auction.

Potential investors may contact the placement agents or dealers through which they submitted their bid to discuss general auction trends or to consult on bidding strategy. The current clearing price is at all times kept confidential and will not be disclosed during the OpenIPO auction to any bidder; however, the placement agents or participating dealers may discuss general auction trends with potential investors. General auction trends may include a general description of the bidding trends or the anticipated timing of the offering. In all cases, any oral information provided with respect to general auction trends by any placement agent or dealer is subject to change. Any general auction trend information that is provided orally by a placement agent or participating dealer is necessarily accurate only as of the time of inquiry and may change significantly prior to the auction closing. Therefore, bidders should not assume that any particular bid will receive an allocation of shares in the auction based on any auction trend information provided to them orally by any placement agent or participating dealer.

Approximately two business days prior to the registration statement being declared effective, prospective investors will receive, by email, telephone or facsimile, a notice indicating the proposed effective date. Potential investors may at any time expressly request that all, or any specific, communications between them and the placement agents and participating dealers be made by specific means of communication, including email, telephone and facsimile. The placement agents and participating dealers will contact the potential investors in the manner they request.

*Effectiveness of the Registration Statement*

After the registration statement relating to this offering has become effective, potential investors who have submitted bids to the placement agents or a dealer will be contacted by email, telephone or facsimile. Potential investors will be advised that the registration statement has been declared effective and that the auction may close in as little as one hour following effectiveness. Bids will continue to be accepted in the time period after the registration statement is declared effective but before the auction closes. Bidders may also withdraw their bids in the time period following effectiveness, including after the closing of the auction but before the notice of acceptance of their bid is sent.

158

*Reconfirmation of Bids*

The placement agents will require that bidders reconfirm the bids that they have submitted in the offering if any of the following events occur:

- more than 15 business days have elapsed since the bidder submitted its bid in the offering; or

- there is a material change in the prospectus that requires that the placement agents and we convey the material change to bidders in the offering and file an amended registration statement.

If a reconfirmation of bids is required, the placement agents and participating brokers will send an electronic notice (or communicate in an alternative manner as requested by a bidder) to everyone who has submitted a bid notifying them that they must reconfirm their bids by contacting the placement agents or participating dealers with which they have their brokerage accounts. Bidders will have a minimum of four hours to reconfirm their bids from the time they receive the notice requesting reconfirmation. Bidders will have the ability to modify or reconfirm their bids at any time until the auction closes. If bidders do not reconfirm their bids before the auction is closed (which will be no sooner than four hours after the request for reconfirmation is sent), we and the placement agents will disregard their bids in the auction, and they will be deemed to have been withdrawn. If appropriate, the placement agents may include the request for reconfirmation in a notice of effectiveness of the registration statement.

*Changes in the Price Range or Offering Size Before the Auction is Closed*

Based on the auction demand, we and the placement agents may elect to change the price range or the number of shares being sold in the offering either before or after the SEC declares the registration statement effective. If we and the placement agents elect to change the price range or the offering size after effectiveness of the registration statement, the placement agents will keep the auction open for at least one hour after notifying bidders of the new auction terms. If the change in price range or offering size is not otherwise material to this offering, we and the placement agents or participating dealers will:

- provide notice on the WR Hambrecht + Co website of the revised price range or number of shares to be sold in this offering, as the case may be;

- if appropriate, issue a press release announcing the revised price range or number of shares to be sold in this offering, as the case may be; and

- send an electronic notice (or communicate in an alternative manner as requested by a bidder) to everyone who has submitted a bid notifying them of the revised price range or number of shares to be sold in this offering, as the case may be.

In these situations, the placement agents could accept an investor's bid after the SEC declares the registration statement effective without requiring a bidder to reconfirm. However, the placement agents may decide at any time to require potential investors to reconfirm their bids, and if they fail to do so, their unconfirmed bids will be invalid.

In the event that the changes to the price range or the offering size constitute material changes, alone or in the aggregate, to the previously provided disclosure, we will reconfirm all bids that have been submitted in the auction after notifying bidders of the new auction terms. In the event that there is a material change to the price range or the offering size after effectiveness of the registration statement, we will file a post-effective amendment to the registration statement containing the new auction terms prior to accepting any offers. We will generally not consider any increase or decrease in the price range or

159

offering size to be material unless such increase or decrease represents more than a 20% change in the maximum aggregate offering price of the shares.

*Changes in the Price Range or Offering Size After the Auction is Closed and Pricing Outside the Price Range*

If we determine after the auction is closed that the initial public offering price will be above or below the stated price range in the auction but that it will not result in any material change to the previously provided disclosure, the placement agents and participating dealers may accept all successful bids without reconfirmation. Similarly, if after effectiveness of the registration statement and the auction is closed the number of shares sold in the offering is increased or decreased in a manner that is not otherwise material to this offering, the placement agents and participating dealers may accept all successful bids without reconfirmation. In this situation the placement agents and participating dealers will communicate the final price and size of the offering in the notice of acceptance that is sent to successful bidders.

If we determine, after the auction is closed, that the initial public offering price will be outside of the price range or we elect to change the size of the offering, and the public offering price and/or change in the offering size, alone or in the aggregate, constitute material changes to the previously provided disclosure, then we may convey the final price and offering size to all bidders in the auction, file a post-effective amendment to the registration statement with the final price and offering size, reconfirm all bids and accept offers after the post-effective amendment has been declared effective by the SEC. In the alternative, we may re-open the auction pursuant to the following procedures:

- WR Hambrecht + Co will provide notice on the WR Hambrecht + Co OpenIPO website that the auction has re-opened with a revised price range or offering size, as the case may be;

- we and the placement agents and participating dealers will issue a press release announcing the new auction terms;

- the placement agents and participating dealers will send an electronic notice (or communicate in an alternative manner as requested by a bidder) to everyone who has submitted a bid notifying them that the auction has re-opened with a revised price range or offering size, as the case may be;

- the placement agents and participating dealers will reconfirm all bids in the auction; and

- we will file a post-effective amendment to the registration statement containing the new auction terms and have the post-effective amendment declared effective prior to the acceptance of any offers by the placement agent or participating dealers.

We will generally not consider any increase or decrease in the initial public offering price or offering size to be material unless such increase or decrease represents more than a 20% change in the maximum aggregate offering price of the shares.

*Closing of the Auction and Pricing*

The auction will close and a public offering price will be determined after the registration statement becomes effective at a time agreed to by us and WR Hambrecht + Co, which we anticipate will be after the close of trading on The NASDAQ Global Select Market on the same day on which the registration statement is declared effective. The auction may close in as little as one hour following effectiveness of the registration statement. However, the date and time at which the auction will close and a public offering price will be determined cannot currently be predicted and will be determined by us and WR Hambrecht + Co based on general market conditions during the period after the registration statement is declared effective. If we are unable to close the auction, determine a public offering price

160

and file a final prospectus with the SEC within 15 days after the registration statement is initially declared effective, we will be required to file with the SEC and have declared effective a post effective amendment to the registration statement before the auction may be closed and before any bids may be accepted.

Once a potential investor submits a bid, the bid remains valid unless subsequently withdrawn by the potential investor. Potential investors are able to withdraw their bids at any time before the notice of acceptance is sent by notifying the placement agent or a participating dealer through which they submitted their bids. The auction website will not permit modification or cancellation of bids after the auction closes. Therefore, if a potential investor that bid through the Internet wishes to cancel a bid after the auction closes, the investor may have to contact the placement agent through which they submitted their bid (or the participating dealer through which the investor submitted the bid) by telephone, facsimile or email (or as specified by the placement agent or participating dealer through which the bidder submitted the bid).

Following the closing of the auction, the placement agents determine the highest price at which all of the shares offered may be sold to potential investors. This price, which is called the "clearing price," is determined based on the results of all valid bids at the time the auction is closed. The clearing price is not necessarily the public offering price, which is set as described in "Determination of Public Offering Price" below. The public offering price determines the allocation of shares to potential investors, with all valid bids submitted at or above the public offering price receiving a pro rata portion of the shares bid for.

You will have the ability to withdraw your bid at any time until the notice of acceptance is sent. The placement agents will notify successful bidders that we have accepted their bids by sending a notice of acceptance after the auction closes and a public offering price has been determined, and bidders who submitted successful bids will be obligated to purchase the shares allocated to them regardless of (1) whether such bidders are aware that the registration statement has been declared effective and that the auction has closed or (2) whether they are aware that the notice of acceptance of that bid has been sent. The placement agents will not cancel or reject a valid bid after the notices of acceptance have been sent.

Once the auction closes and a clearing price is set as described below, a placement agent or a participating dealer accepts on our behalf the bids that are at or above the public offering price, but may allocate to a prospective investor fewer shares than the number included in the investors bid, as described in "—Allocation of Shares" below.

## Determination of Initial Public Offering Price

The public offering price for this offering is ultimately determined by negotiation between the placement agents and us after the auction closes and does not necessarily bear any direct relationship to our assets, current earnings or book value or to any other established criteria of value, although these factors are considered in establishing the initial public offering price. Prior to this offering, there has been no public market for our common stock. The principal factor in establishing the public offering price is the clearing price resulting from the auction, although other factors are considered as described below. The clearing price is used by the placement agents and us as the principal benchmark, among other considerations described below, in determining the public offering price for the stock that will be sold in this offering.

The clearing price is the highest price at which all of the shares offered may be sold to potential investors, based on the valid bids at the time the auction is closed. Based on the auction results, we may elect to change the number of shares sold in the offering. Depending on the public offering price and the amount of the increase or decrease, an increase or decrease in the number of shares to be sold in the offering could affect the clearing price and result in either more or less dilution to potential investors in this offering.

161

Depending on the outcome of negotiations between the placement agents and us, the public offering price may be lower, but will not be higher, than the clearing price. The bids received in the auction and the resulting clearing price are the principal factors used to determine the public offering price of the stock that will be sold in this offering. The public offering price may be lower than the clearing price depending on a number of additional factors, including general market trends or conditions, the placement agents' assessment of our management, operating results, capital structure and business potential and the demand and price of similar securities of comparable companies. The placement agents and we may also agree to a public offering price that is lower than the clearing price in order to facilitate a wider distribution of the stock to be sold in this offering. For example, the placement agents and we may elect to lower the public offering price to include certain institutional or retail bidders in this offering. The placement agents and we may also lower the public offering price to create a more stable post-offering trading price for our shares.

The public offering price always determines the allocation of shares to potential investors. Therefore, if the public offering price is below the clearing price, all valid bids that are at or above the public offering price receive a pro rata portion of the shares bid for. If sufficient bids are not received, or if we do not consider the clearing price to be adequate, or if the placement agents and we are not able to reach agreement on the public offering price, then the placement agents and we will either postpone or cancel this offering. Alternatively, we may file with the SEC a post-effective amendment to the registration statement in order to conduct a new auction.

The following simplified example illustrates how the public offering price is determined through the auction process:

Company X offers to sell 1,500 shares in its public offering through the auction process. The placement agents, on behalf of Company X, receive five bids to purchase, all of which are kept confidential until the auction closes.

The first bid is to pay $10.00 per share for 1,000 shares. The second bid is to pay $9.00 per share for 100 shares. The third bid is to pay $8.00 per share for 900 shares. The fourth bid is to pay $7.00 per share for 400 shares. The fifth bid is to pay $6.00 per share for 800 shares.

Assuming that none of these bids are withdrawn or modified before the auction closes, and assuming that no additional bids are received, the clearing price used to determine the public offering price would be $8.00 per share, which is the highest price at which all 1,500 shares offered may be sold to potential investors who have submitted valid bids. However, the shares may be sold at a price below $8.00 per share based on negotiations between Company X and the placement agents.

If the public offering price is the same as the $8.00 per share clearing price, the placement agents would accept bids on behalf of Company X at or above $8.00 per share. Because 2,000 shares were bid for at or above the clearing price, each of the three potential investors who bid $8.00 per share or more would receive approximately 75% (1,500 divided by 2,000) of the shares for which bids were made. The two potential investors whose bids were below $8.00 per share would not receive any shares in this example.

If the public offering price is $7.00 per share, the placement agents would accept bids on behalf of Company X that were made at or above $7.00 per share. No bids made at a price of less than $7.00 per share would be accepted. The four potential investors with the highest bids would receive a pro rata portion of the 1,500 shares offered, based on the 2,400 shares they requested, or 62.5% (1,500 divided by 2,400) of the shares for which bids were made. The potential investor with the lowest bid would not receive any shares in this example.

162

As described in "—Allocation of Shares" below, because bids that are reduced on a pro rata basis may be rounded down to round lots, a potential investor may be allocated less than the pro rata percentage of the shares bid for. Thus, if the pro rata percentage was 75%, the potential investor who bids for 200 shares may receive a pro rata allocation of 100 shares (50% of the shares bid for), rather than receiving a pro rata allocation of 150 shares (75% of the shares bid for).

The following table illustrates the example described above, after rounding down any bids to the nearest round lot in accordance with the allocation rules described below and assuming that the initial public offering price is set at $8.00 per share. The table also assumes that these bids are the final bids, and that they reflect any modifications that have been made to reflect any prior changes to the offering range, and to avoid the issuance of fractional shares.

| Bid Information Initial Public Offering of Company X | | | | Auction Results | | | |
|---|---|---|---|---|---|---|---|
| Shares Requested | Cumulative Shares Requested | Bid Price | Shares Allocated | Approximate Allocated Requested Shares | Clearing Price | | Amount Raised |
| | 1,000 | 1,000 $ | 10.00 | 700 | 75.0% $ | 8.00 $ | 5,600 |
| | 100 | 1,100 $ | 9.00 | 100 | 75.0% $ | 8.00 $ | 800 |
| Clearing price | 900 | 2,000 $ | 8.00 | 700 | 75.0% $ | 8.00 $ | 5,600 |
| | 400 | 2,400 $ | 7.00 | 0 | 0% | — | — |
| | 800 | 3,200 $ | 6.00 | 0 | 0% | — | — |
| Total | | | | 1,500 | | $ | 12,000 |

## Allocation of Shares

Bidders receiving a pro rata portion of the shares they bid for generally receive an allocation of shares on a round-lot basis, rounded to multiples of 100 or 1,000 shares, depending on the size of the bid. No bids are rounded to a round lot higher than the original bid size. Because bids may be rounded down to round lots in multiples of 100 or 1,000 shares, some bidders may receive allocations of shares that reflect a greater percentage decrease in their original bid than the average pro rata decrease. Thus, for example, if a bidder has submitted a bid for 200 shares, and there is an average pro rata decrease of all bids of 30%, the bidder may receive an allocation of 100 shares (a 50% decrease from 200 shares) rather than receiving an allocation of 140 shares (a 30% decrease from 200 shares). In addition, some bidders may receive allocations of shares that reflect a lesser percentage decrease in their original bid than the average pro rata decrease. For example, if a bidder has submitted a bid for 100 shares, and there is an average pro rata decrease of all bids of 30%, the bidder may receive an allocation of all 100 shares to avoid having the bid rounded down to zero.

Generally the allocation of shares in this offering will be determined in the following manner, continuing the first example above:

- Any bid with a price below the public offering price is allocated no shares.

- The pro rata percentage is determined by dividing the number of shares offered by the total number of shares bid at or above the public offering price. In our example, if there are 2,000 shares bid for at or above the public offering price, and 1,500 shares offered in the offering, then the pro rata percentage is 75%.

163

- All of the successful bids are then multiplied by the pro rata percentage to determine the allocations before rounding. For example, the three winning bids for 1,000 shares (Bid 1), 100 shares (Bid 2) and 900 shares (Bid 3) would initially be allocated 750 shares, 75 shares and 675 shares, respectively, based on the pro rata percentage.

- The bids are then rounded down to the nearest 100 share round lot, so the bids would be rounded to 700, 0 and 600 shares respectively. This creates a stub of 200 unallocated shares.

- The 200 stub shares are then allocated to the bids. Continuing the example above, because Bid 2 for 100 shares was rounded down to 0 shares, 100 of the stub shares would be allocated to Bid 2. If there were not sufficient stub shares to allocate at least 100 shares to Bid 2, Bid 2 would not receive any shares in the offering. After allocation of these shares, 100 unallocated stub shares would remain.

- Because Bid 3 for 900 shares was reduced, as a result of rounding, by more total shares than Bid 1 for 1,000 shares, Bid 3 would then be allocated the remaining 100 stub shares up to the nearest 100 round lot (from 600 shares to 700 shares).

If there are not sufficient remaining stub shares to enable a bid to be rounded up to a round lot of 100 shares the remaining unallocated stub shares would be allocated to smaller orders that are below their bid amounts. The table below illustrates the allocations in the example above.

| | Initial Bid | Pro-Rata Allocation (75% of Initial Bid) | Initial Rounding | Allocation of Stub Shares | Final Allocation |
|---|---|---|---|---|---|
| Bid 1 | 1,000 | 750 | 700 | 0 | 700 |
| Bid 2 | 100 | 75 | 0 | 100 | 100 |
| Bid 3 | 900 | 675 | 600 | 100 | 700 |
| Total | 2,000 | 1,500 | 1,300 | 200 | 1,500 |

## Requirements for Valid Bids

In order to participate in an OpenIPO offering, all bidders must have an account with WR Hambrecht + Co., LLC, HSBC Securities (USA) Inc., Fox-Pitt, Kelton Incorporated, Sandler O'Neill + Partners, L.P., E*TRADE Securities, LLC or one of the participating dealers. Valid bids are those that meet the requirements, including eligibility, account status and size, established by the placement agents or participating dealers. In order to open a brokerage account with WR Hambrecht + Co, a potential investor must deposit $2,000 in their accounts. This brokerage account will be a general account subject to WR Hambrecht + Co's customary rules, and will not be limited to this offering. Bidders will be required to have sufficient funds in their account to pay for the shares they are allocated in the auction at the closing of the offering, which is generally on the third business day following the pricing of the offering. The placement agents reserve the right, in their sole discretion and on our behalf, to reject or reduce any bids that they deem manipulative or disruptive or not creditworthy in order to facilitate the orderly completion of the offering. For example, in previous transactions for other issuers in which the auction process was used, WR Hambrecht + Co has rejected or reduced bids when, in its sole discretion, it deems the bids not creditworthy or had reason to question the bidder's intent or means to fund its bid. In the absence of other information, we and the placement agents or participating dealer may assess a bidder's creditworthiness based solely on the bidder's history with the placement agents or participating dealer. WR Hambrecht + Co has also rejected or reduced bids in past OpenIPO offerings that it deemed, in its sole discretion, to be potentially manipulative or disruptive or because the bidder

164

had a history of alleged securities law violations. Suitability and eligibility standards of participating dealers may vary. As a result of these varying requirements, a bidder may have its bid rejected by the placement agents or a participating dealer while another bidder's identical bid is accepted.

**The Closing of the Auction and Allocation of Shares**

The auction will close on a date and at a time estimated and publicly disclosed in advance by the placement agents on the website of WR Hambrecht + Co at www.wrhambrecht.com and www.openipo.com. The auction may close in as little as one hour following effectiveness of the registration statement. The 34,500,000 shares offered by this prospectus will be sold to investors who have submitted valid bids at or higher than the public offering price through the placement agents or participating dealers.

The placement agents or a participating dealer will notify successful bidders that we have accepted their bid by sending a notice of acceptance by email, telephone, facsimile or mail (according to any preference indicated by a bidder) informing bidders that the auction has closed and that their bids have been accepted. The notice will indicate the price and number of shares that have been allocated to the successful bidder. Other bidders will be notified that their bids have not been accepted.

Each participating dealer has agreed with the placement agents to conduct its solicitation efforts in accordance with the auction process described above, unless the placement agents otherwise consent. The placement agents do not intend to consent to the sale of any shares in this offering outside of the auction process. The placement agents reserve the right, in their sole discretion, to reject or reduce any bids that they deem manipulative or disruptive in order to facilitate the orderly completion of this offering, and they reserve the right, in exceptional circumstances, to alter this method of allocation as they deem necessary to ensure a fair and orderly distribution of the shares of our common stock. For example, large orders may be reduced to ensure a public distribution and bids may be rejected or reduced based on eligibility or creditworthiness criteria. Once the placement agents have closed the auction and we have accepted a bid, the allocation of shares sold in this offering will be made according to the process described in "—Allocation of Shares" above, and no shares sold in this offering will be allocated on a preferential basis or outside of the allocation rules to any institutional or retail bidders. In addition, the placement agents or the participating dealers may reject or reduce a bid by a prospective investor who has engaged in practices that could have a manipulative, disruptive or otherwise adverse effect on this offering.

Investors who receive notice of acceptance of their bids must make payment for the applicable number of shares by the close of business on the third business day (the "closing date") following notice of acceptance of their bids. We will have the option to cancel any bids that are not funded by the close of business on the closing date without any obligation to the bidder and may reallocate the unpaid for shares to other successful bidders on a case by case basis or determine not to issue all or any portion of the unpaid for shares.

Some placement agents and dealers participating in the selling group may submit firm bids that reflect indications of interest from their customers that they have received at prices within the initial public offering price range. Some participating dealers or placement agents may also manage bids on behalf of their bidding customers. In these cases, the dealer submitting the bid is treated as the bidder for the purposes of determining the clearing price and allocation of shares.

Price and volume volatility in the market for our common stock may result from the somewhat unique nature of the proposed plan of distribution. Price and volume volatility in the market for our common stock after the completion of this offering may adversely affect the market price of our common stock.

165

**Lock-Up Agreements**

We have agreed not to offer, pledge, announce the intention to sell, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of any shares of our common stock or any securities convertible into or exercisable or exchangeable for shares of our common stock for a period of 180 days after the date of this prospectus without the prior written consent of the placement agents other than the shares of common stock or options to acquire common stock issued under our stock plans. Notwithstanding the foregoing, if (a) during the last 17 days of the 180-day period after the date of this prospectus, we issue an earnings release or publicly announce material news or if a material event relating to us occurs or (b) prior to the expiration of the 180-day period after the date of this prospectus, we announce that we will release earnings during the 16-day period beginning on the last day of the 180-day period, the above restrictions will continue to apply until the expiration of the 18-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event.

Our directors and executive officers have agreed not to (1) offer, pledge, announce the intention to sell, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of our common stock or any securities convertible into or exercisable or exchangeable for shares of our common stock or (2) enter into any swap or other agreement that transfers to another, in whole or in part, any of the economic consequences of ownership of our common stock for a period of 180 days after the date of this prospectus without the prior written consent of WR Hambrecht + Co or HSBC Securities (USA) Inc. other than (a) transfers of shares of common stock or any security convertible into our common stock as a bona fide gift or gifts to any charitable organization; (b) transfers of shares of common stock or any security convertible into our common stock as a bona fide gift or gifts to any other entity or person; (c) transfers to any trust for the direct or indirect benefit of the persons bound by the foregoing terms or the immediate family of the persons bound by the foregoing terms if such transfers do not involve a disposition for value; (d) transfers occurring by operation of law, such as rules of descent and distribution, statutes governing the effect of a merger or a qualified domestic order; (e) transfers to any other member of IBG LLC or IBG Holdings LLC; (f) transfers made pursuant to an exception from registration under the Securities Act, provided that the transferee agrees to be bound by the foregoing terms and signs an agreement to that effect before such transfer is made; or (g) transfers or distributions of shares of our common stock that have been registered under the Securities Act (other than on Form S-8) and are acquired in this offering or in open market transactions after the completion of this offering, provided that in the case of any transfer or distribution described in (b) through (f) above, the transferees, donees or distributees agree to be bound by the foregoing terms. These restrictions will remain in effect beyond the 180-day period under the same circumstances described in the immediately preceding paragraph.

There are no specific criteria that WR Hambrecht + Co, HSBC Securities (USA) Inc. or the other placement agents require for an early release of shares subject to lock-up agreements. The release of any lock-up will be on a case-by-case basis. Factors in deciding whether to release shares may include the length of time before the lock-up expires, the number of shares involved, the reason for release, including financial hardship, market conditions and the trading price of the common stock. Neither WR Hambrecht + Co, HSBC Securities (USA) Inc. nor the other placement agents have any present intention or understanding, implicit or explicit, to release any of the shares subject to the lock-up agreements prior to the expiration of the 180-day period.

**Short Sales, Stabilizing Transactions and Penalty Bids**

In connection with this offering, the placement agents may purchase and sell shares of common stock in the open market. These transactions may include short sales, stabilizing transactions and

166

purchases to cover positions created by short sales. Any short sales made by the placement agents would be naked short sales. "Naked" short sales are any sales made by the placement agents that the placement agents cannot cover through exercise of any option. The placement agents must close out any naked short position by purchasing shares in the open market. A naked short position is more likely to be created if the placement agents are concerned that there may be downward pressure on the price of the common stock in the open market after pricing that could adversely affect investors who purchase in this offering. Stabilizing transactions consist of various bids for or purchases of common stock made by the placement agents in the open market for the purpose of pegging, fixing or maintaining the price of the common stock.

These activities by the placement agents may stabilize, maintain or otherwise affect the market price of the common stock. As a result, the price of the common stock may be higher than the price that otherwise might exist in the open market. If these activities are commenced, the placement agents may discontinue them at any time. These transactions may be effected on The NASDAQ Global Select Market, in the over-the-counter market or otherwise.

## Indemnity

The placement agency agreement provides that we and the placement agents have agreed to indemnify each other against specified liabilities, including liabilities under the Securities Act, and contribute to payments that each other may be required to make relating to these liabilities.

## Foreign Jurisdictions

*United Kingdom.*    Each of the placement agents has represented and agreed that:

- it has not made or will not make an offer of shares to the public in the United Kingdom within the meaning of Section 102B of the Financial Services and Markets Act 2000 (as amended), or the FSMA, except to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities or otherwise in circumstances which do not require the publication by us of a prospectus pursuant to Section 85(1) of the FSMA;

- it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the FSMA) received by it in connection with the issue or sale of any shares in circumstances in which Section 21 of the FSMA does not apply to us; and

- it has complied with, and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the shares in, from or otherwise involving the United Kingdom.

*European Economic Area.*    In relation to each Member State of the European economic area which has implemented the prospectus directive, each a Relevant Member State, an offer to the public of any shares which are the subject of the offering contemplated by this prospectus, may not be made in that Relevant Member State other than the offers contemplated in this prospectus in that relevant member state once this prospectus has been approved by the competent authority in that relevant member state and published and passported in accordance with the prospectus directive as implemented in that Relevant Member State except that an offer to the public in that Relevant Member State of any shares may be made at any time under the following exemptions under the prospectus directive, if they have been implemented in that Relevant Member State:

- to legal entities which are authorised or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

- to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts;

- By the placement agents to fewer than 100 natural or legal persons (other than qualified investors as defined in the prospectus directive) subject to obtaining the prior consent of the lead placement agent; or

- in any other circumstances falling within article 3(2) of the prospectus directive,

provided that no such offer of shares shall result in a requirement for the publication by us or any placement agent of a prospectus pursuant to article 3 of the prospectus directive.

For the purposes of this provision, the expression an "offer to the public" in relation to any shares in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and any shares to be offered so as to enable an investor to decide to purchase any shares, as the same may be varied in that member state by any measure implementing the prospectus directive in that member state and the expression "prospectus directive" means directive 2003/71/ec and includes any relevant implementing measure in each Relevant Member State.

*Switzerland.*  This prospectus does not constitute an issue prospectus pursuant to Art 652a of the Swiss code of obligations. The shares will not be listed on the SWX Swiss Exchange and, therefore, the prospectus may not comply with the disclosure standards of the listing rules of the SWX Swiss exchange.

Accordingly, the shares may not be offered to the public in or from Switzerland, but only to a selected and limited circle of investors, which do not subscribe the shares with a view to distribution. The investors will be individually approached by the placement agents from time to time.

This prospectus is personal to each offeree and does not constitute an offer to any person. The prospectus may only be used by those persons to whom it has been handed out in connection with the offer described therein and may neither directly nor indirectly be distributed or made available to other persons without express consent of the issuer. It may not be used in connection with any other offer and shall in particular not be copied and/or distributed to the public in Switzerland.

*United Arab Emirates.*    Each of the placement agents has represented and agreed that:

- the shares have not been approved or licensed by the central bank of the United Arab Emirates, or the UAE, or any other relevant licensing authorities or governmental agencies in the UAE;

- nothing in the prospectus constitutes a public offer of securities in the UAE in accordance with the commercial companies law (Federal Law No. 8 of 1984 (as amended)) or otherwise;

- it has not offered or sold the shares directly or indirectly to the public in the UAE; and

168

• it has complied and will comply in all material respects with applicable laws and regulations in any jurisdiction where it
solicits investors in connection with the offering and which are customarily complied with by underwriters or placement
agents in transactions or offerings of this type (or save where compliance is not material in the context of the offering).

*Hong Kong.* The shares to be sold may not be offered or sold in Hong Kong, by means of any document, other than to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571), or the SFO, and any rules made under the SFO or in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (Cap. 571) or which do not constitute an offer to the public within the meaning of that ordinance. No person may have in its possession for the purposes of issue, or issue (in each case whether in Hong Kong or elsewhere), any advertisement, invitation or document relating to the shares which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to shares which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the SFO and any rules made under that ordinance.

*Singapore.* The prospectus has not been registered as a prospectus with the monetary authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the shares may not be circulated or distributed, nor may the shares be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than to an institutional investor under Section 274 of the securities and futures act, Chapter 289 of Singapore, or the SFA, to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA, or otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the shares are subscribed and purchased under Section 275 by a relevant person, which is (A) a corporation that is not an accredited investor, the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor or (B) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor, shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for 6 months after that corporation or that trust has acquired the shares under Section 275 except (1) to an institutional investor under Section 274 of the SFA or to a relevant person, or a person pursuant to Section 275 (1A), and in accordance with the conditions, specified in Section 275 of the SFA; (2) where no consideration is given for the transfer; or (3) by operation of law.

## Qualified Independent Underwriter

Interactive Brokers LLC, our consolidated subsidiary, will be acting as a selling group member in connection with this offering. As a result of this role, as well as due to our investment in W.R. Hambrecht + Co., Inc. as described under "Transactions with Related Persons, Promoters and Certain Control Persons—Investment in W.R. Hambrecht + Co. Inc.," NASD Rule 2720 requires that the initial public offering price may be no higher than that recommended by a "qualified independent underwriter," as defined by the NASD. In accordance with this rule, Fox-Pitt, Kelton Incorporated has assumed the responsibilities of acting as a qualified independent underwriter. The initial public offering price will be no higher than that recommended by Fox-Pitt, Kelton Incorporated. In its role as a qualified independent underwriter, Fox-Pitt, Kelton Incorporated has performed a due diligence investigation and participated in the preparation of this prospectus and the registration statement of which this prospectus is a part. We have agreed to indemnify Fox-Pitt, Kelton Incorporated against liabilities incurred in connection with acting as a qualified independent underwriter, including liabilities under the Securities Act. As

compensation for its role as qualified independent underwriter, we have agreed to pay Fox-Pitt, Kelton Incorporated a fee of $150,000.

**Other**

WR Hambrecht + Co currently intends to act as a market maker for the common stock following this offering. However, it is not obligated to do so and may discontinue any market making at any time.

IBG, the issuer of shares of common stock in this offering, is the indirect parent of Interactive Brokers LLC and Timber Hill LLC, each of which is an NASD member. Accordingly, this offering is being made in compliance with the applicable provisions of NASD Rule 2720. See "—Qualified Independent Underwriter."

170

## LEGAL MATTERS

The validity of the shares of our common stock offered hereby will be passed on for us by Dechert LLP, New York, New York. Earl H. Nemser, our vice chairman and one of our directors, has been Special Counsel to the law firm of Dechert LLP since January 2005. Mr. Nemser beneficially owns 1.1893% of IBG LLC. which, assuming an initial offering price of $29.00 per share of common stock (the midpoint of the range set forth on the cover page of this prospectus), would be worth $138.0 million at the time of this offering. See "Use of Proceeds" and "Transactions with Related Persons, Promoters and Certain Control Persons—Legal Representation." The placement agents are being represented by Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York. Skadden, Arps, Slate, Meagher & Flom LLP has represented the Company from time to time in unrelated matters.

## EXPERTS

The consolidated financial statements of IBG LLC (formerly known as Interactive Brokers Group LLC) as of December 31, 2006 and 2005, and for each of the three years in the period ended December 31, 2006, included in this prospectus and the related financial statement schedule included elsewhere in the registration statement have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports appearing herein and elsewhere in the registration statement, and have been so included in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

## WHERE YOU CAN FIND MORE INFORMATION

This prospectus is part of a registration statement on Form S-1 that we have filed with the SEC under the Securities Act of 1933 covering the common stock we are offering. As permitted by the rules and regulations of the SEC, this prospectus omits certain information contained in the registration statement. For further information with respect to us and our common stock, you should refer to the registration statement and to its exhibits and schedules. We make reference in this prospectus to certain of our contracts, agreements and other documents that are filed as exhibits to the registration statement. For additional information regarding those contracts, agreements and other documents, please see the exhibits attached to this registration statement. We also will file annual, quarterly and special reports, and other information with the SEC under the Exchange Act.

You can read the registration statement and the exhibits and schedules filed with the registration statement or any reports, statements or other information we have filed or file, at the public reference facilities maintained by the SEC at Room 1580, 100 F Street, N.E., Washington, D.C. 20549. You may also obtain copies of the documents from such offices upon payment of the prescribed fees. You may call the SEC at (800) SEC-0330 for further information on the operation of the public reference room. You may also request copies of the documents upon payment of a duplicating fee, by writing to the SEC. In addition, the SEC maintains a website that contains reports and other information regarding registrants (including us) that file electronically with the SEC, which you can access at http://www.sec.gov.

In addition, you may request copies of this filing and such other reports as we may determine or as the law requires at no cost, by telephone at (203) 618-5800, or by mail to Interactive Brokers Group, Inc., One Pickwick Plaza, Greenwich, Connecticut 06830, Attention: Investor Relations.

171

# INDEX TO FINANCIAL STATEMENTS

Consolidated Financial Statements for the Years Ended December 31, 2006, 2005 and 2004:

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Statements of Financial Condition as of December 31, 2006 and 2005 | F-3 |
| Consolidated Statements of Income for the Years Ended December 31, 2006, 2005 and 2004 | F-4 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2006, 2005 and 2004 | F-5 |
| Consolidated Statements of Changes in Redeemable Members' Interests for the Years Ended December 31, 2006, 2005 and 2004 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

F-1

# REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Members of IBG LLC (formerly known as Interactive Brokers Group LLC)

We have audited the accompanying consolidated statements of financial condition of IBG LLC and subsidiaries (the "Group") as of December 31, 2006 and 2005, and the related consolidated statements of income, cash flows and changes in redeemable members' interests for each of the three years in the period ended December 31, 2006. These financial statements are the responsibility of the Group's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Group is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Group's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of IBG LLC and subsidiaries at December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2006, in conformity with accounting principles generally accepted in the United States of America.

/s/ Deloitte & Touche LLP
New York, New York
April 4, 2007

F-2

**IBG LLC AND SUBSIDIARIES**

## CONSOLIDATED STATEMENTS OF FINANCIAL CONDITION

|  | As of December 31, | |
|---|---|---|
|  | **2006** | **2005** |
|  | (in thousands) | |
| **Assets** | | |
| Cash and cash equivalents | $      669,271 | $      408,232 |
| Cash and securities—segregated for regulatory purposes | 3,111,795 | 1,804,148 |
| Securities borrowed | 10,479,231 | 8,902,672 |
| Securities purchased under agreements to resell | 97,740 | 4,000 |
| Trading assets, at fair value: | | |
| Financial instruments owned | 7,485,879 | 5,417,063 |
| Financial instruments owned and pledged as collateral | 8,331,923 | 6,621,916 |
|  | 15,817,802 | 12,038,979 |
| Other receivables: | | |
| Customers (net of allowance for doubtful accounts of $1,031 at December 31, 2006 and $0 at December 31, 2005) | 848,448 | 436,166 |
| Brokers, dealers and clearing organizations | 856,957 | 577,555 |
| Interest | 62,772 | 38,340 |
|  | 1,768,177 | 1,052,061 |
| Secured demand note receivable, collateralized by marketable securities | — | 5,200 |
| Other assets | 136,502 | 76,855 |
| Total assets | $  32,080,518 | $  24,292,147 |
| **Liabilities and redeemable members' interest** | | |
| Liabilities: | | |
| Trading liabilities—financial instruments sold but not yet purchased, at fair value | $  14,785,617 | $  12,426,375 |
| Securities loaned | 8,026,468 | 6,147,254 |
| Short-term borrowings | 1,296,909 | 707,296 |
| Other payables: | | |
| Customers | 3,914,037 | 2,412,511 |
| Brokers, dealers and clearing organizations | 743,339 | 88,634 |
| Accounts payable, accrued expenses and other liabilities | 161,812 | 141,114 |
| Interest | 49,821 | 24,851 |
|  | 4,869,009 | 2,667,110 |
| Senior notes payable | 150,598 | 164,666 |
| Senior secured credit facility | 150,000 | — |
| Liabilities subordinated to claims of general creditors | — | 5,200 |
| Redeemable members' interests | | |
| (including accumulated other comprehensive income of $98,568 at December 31, 2006 and $47,275 at December 31, 2005) | 2,801,917 | 2,174,246 |
| Total liabilities and redeemable members' interest | $  32,080,518 | $  24,292,147 |

See accompanying notes to the consolidated financial statements.

F-3

**IBG LLC AND SUBSIDIARIES**

## CONSOLIDATED STATEMENTS OF INCOME

| | Year ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| | (in thousands) | | |
| Revenues: | | | |
| Trading gains | $ 805,110 | $ 640,383 | $ 423,186 |
| Commissions and execution fees | 174,437 | 132,156 | 111,988 |
| Interest income | 672,057 | 273,222 | 79,518 |
| Other income | 85,238 | 53,392 | 6,972 |
| Total revenues | 1,736,842 | 1,099,153 | 621,664 |
| Interest expense | 484,433 | 170,045 | 57,688 |
| Total net revenues | 1,252,409 | 929,108 | 563,976 |
| Non-interest expenses: | | | |
| Execution and clearing | 313,271 | 214,972 | 152,471 |
| Employee compensation and benefits | 110,125 | 90,175 | 79,150 |
| Occupancy, depreciation and amortization | 22,697 | 20,417 | 16,360 |
| Communications | 12,645 | 10,458 | 8,983 |
| General and administrative | 32,110 | 23,788 | 17,014 |
| Total non-interest expenses | 490,848 | 359,810 | 273,978 |
| Income before income taxes | 761,561 | 569,298 | 289,998 |
| Income tax expense | 27,392 | 33,778 | 19,555 |
| Net income | $ 734,169 | $ 535,520 | $ 270,443 |

See accompanying notes to the consolidated financial statements.

F-4

**IBG LLC AND SUBSIDIARIES**

## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year ended December 31, | | |
|---|---|---|---|
| | **2006** | **2005** | **2004** |
| | **(in thousands)** | | |
| Cash flows from operating activities: | | | |
| Net income | $ 734,169 | $ 535,520 | $ 270,443 |
| Adjustments to reconcile net income to net cash used in operating activities: | | | |
| Translation (gains) losses | 47,130 | (43,904) | 18,226 |
| Deferred income taxes | (587) | 17,068 | 3,677 |
| Depreciation and amortization | 11,630 | 10,913 | 9,049 |
| Impairment charge for trading rights | — | — | 2,721 |
| Loss (income) from equity investments in exchanges | 337 | (1,312) | 1,450 |
| Other | 1,481 | 177 | 672 |
| Change in operating assets and liabilities: | | | |
| Increase in cash and securities—segregated for regulatory purposes | (1,307,649) | (704,837) | (362,146) |
| Increase in securities borrowed | (1,570,433) | (4,821,122) | (1,191,851) |
| (Increase) decrease in securities purchased under agreements to resell | (93,817) | 57,300 | 92,404 |
| Increase in trading assets | (3,716,794) | (3,488,197) | (2,431,309) |
| Increase in receivables from customers | (410,288) | (166,753) | (135,864) |
| Increase in other receivables | (288,910) | (110,534) | (79,075) |
| (Increase) decrease in other assets | (19,544) | (6,946) | 6,416 |
| Increase in trading liabilities | 2,300,181 | 4,841,812 | 1,608,268 |
| Increase in securities loaned | 1,899,853 | 2,857,974 | 1,513,200 |
| Increase in payable to customers | 1,495,049 | 887,593 | 465,462 |
| Increase in other payables | 698,891 | 24,729 | 28,379 |
| Net cash used in operating activities | (219,301) | (110,519) | (179,878) |
| Cash flows from investing activities: | | | |
| Purchase of investments | (39,268) | — | (1,687) |
| Distributions received from equity investees | 1,229 | — | — |
| Purchase of property and equipment | (12,349) | (12,836) | (11,420) |
| Proceeds from sale of investments | — | 2,596 | 1 |
| Sale (purchase) of trading rights | — | 537 | (2,625) |
| Purchase of exchange seats | — | — | (2,680) |
| Net cash used in investing activities | (50,388) | (9,703) | (18,411) |
| Cash flows from financing activities: | | | |
| Issuance of senior notes | 512,462 | 549,025 | 335,378 |
| Redemptions from senior notes | (526,530) | (493,170) | (270,310) |
| Borrowings under senior secured credit facility | 150,000 | — | — |
| Increase in short-term borrowings, net | 525,887 | 403,251 | 87,943 |
| Members' contributions | 10,609 | 10,220 | 10,342 |
| Members' interests redeemed | (3,900) | (6,738) | (2,622) |
| Dividends paid | (164,500) | (88,500) | (80,800) |
| Net cash provided by financing activities | 504,028 | 374,088 | 79,931 |
| Effect of exchange rate changes on cash and cash equivalents | 26,700 | (14,471) | 4,402 |
| Net increase (decrease) in cash and cash equivalents | 261,039 | 239,395 | (113,956) |
| Cash and cash equivalents at beginning of year | 408,232 | 168,837 | 282,793 |
| Cash and cash equivalents at end of year | $ 669,271 | $ 408,232 | $ 168,837 |
| Supplemental disclosures of cash flow information: | | | |
| Interest paid | $ 460,097 | $ 152,959 | $ 52,665 |
| Taxes paid | $ 16,963 | $ 24,960 | $ 20,280 |
| Non-cash investing activities— | | | |
| Cancellation of secured note receivable | $ 5,200 | $ — | $ — |
| Non-cash financing activities: | | | |
| Termination of subordinated loan | $ 5,200 | $ — | $ — |

| | | | 512 | | 2,622 |
|---|---|---|---|---|---|
| Member redemption payables | | | | | |
| Total non-cash financing activities | $ | 5,200 | $ | 512 | $ | 2,622 |

See accompanying notes to the consolidated financial statements.

F-5

**IBG LLC AND SUBSIDIARIES**

## CONSOLIDATED STATEMENTS OF CHANGES IN REDEEMABLE MEMBERS' INTERESTS

| | Redeemable Members' Interests and Accumulated Earnings | Accumulated Other Comprehensive Income | Total Redeemable Members' Interests and Accumulated Other Comprehensive Income |
|---|---|---|---|
| | | (in thousands) | |
| Balance, January 1, 2004 | $ 1,479,106 | $ 77,419 | $ 1,556,525 |
| Dividends | (80,800) | | (80,800) |
| Members' interests redeemed | (2,622) | | (2,622) |
| Members' contributions | 10,342 | | 10,342 |
| Comprehensive income: | | | |
| Net income | 270,443 | | 270,443 |
| Cumulative translation adjustment | | 44,564 | 44,564 |
| Total comprehensive income | 270,443 | 44,564 | 315,007 |
| Balance, December 31, 2004 | $ 1,676,469 | $ 121,983 | $ 1,798,452 |
| Dividends | (88,500) | | (88,500) |
| Members' interests redeemed | (6,738) | | (6,738) |
| Members' contributions | 10,220 | | 10,220 |
| Comprehensive income: | | | |
| Net income | 535,520 | | 535,520 |
| Cumulative translation adjustment | | (74,708) | (74,708) |
| Total comprehensive income | 535,520 | (74,708) | 460,812 |
| Balance, December 31, 2005 | $ 2,126,971 | $ 47,275 | $ 2,174,246 |
| Dividends | (164,500) | | (164,500) |
| Members' interests redeemed | (3,900) | | (3,900) |
| Members' contributions | 10,609 | | 10,609 |
| Comprehensive income: | | | |
| Net income | 734,169 | | 734,169 |
| Cumulative translation adjustment | | 51,293 | 51,293 |
| Total comprehensive income | 734,169 | 51,293 | 785,462 |
| Balance, December 31, 2006 | $ 2,703,349 | $ 98,568 | $ 2,801,917 |

See accompanying notes to the consolidated financial statements.

F-6

IBG LLC and Subsidiaries

**Notes to Consolidated Financial Statements**

**Three Years Ended December 31, 2006**

**(in thousands)**

## 1. Organization and Nature of Business

IBG LLC, formerly known as Interactive Brokers Group LLC, and subsidiaries ("IBG LLC" or the "Group") is an automated global market maker and electronic broker specializing in routing orders and processing trades in securities, futures and foreign exchange instruments. See Note 17, "Segment and Geographic Information" in the Notes to Consolidated Financial Statements.

IBG LLC is a Connecticut limited liability company that conducts its business through its operating subsidiaries (collectively called the "Operating Companies"): Timber Hill LLC ("TH LLC"), Timber Hill Europe AG ("THE"), Timber Hill Securities Hong Kong Limited ("THSHK"), Timber Hill Australia Pty Limited ("THA"), Timber Hill Canada Company ("THC"), Interactive Brokers Hungary KFT ("IBH"), IB Exchange Corp. ("IBEC"), Interactive Brokers LLC ("IB LLC"), Interactive Brokers Canada Inc. ("IBC") and Interactive Brokers (U.K.) Limited ("IBUK"). The operations of Timber Hill Hong Kong Limited ("THHK") were assumed by THSHK and THHK ceased operating in February 2004 and was liquidated in October 2005. Timber Hill (U.K.) Limited ("THUK"), a subsidiary of THE, transferred its operations to THE and THUK ceased operating on November 16, 2004.

The Operating Companies are members of various securities and commodities exchanges in the United States, Europe and the Asia/Pacific region. Other than IB LLC, IBUK and IBC, the Operating Companies do not carry securities accounts for customers or perform custodial functions relating to customer securities.

IB LLC, a U.S. broker-dealer and futures commission merchant conducts electronic brokerage services for customers. IB LLC carries customer securities and commodity accounts and is subject to the regulatory requirements of the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act") and the U.S. Commodities Exchange Act.

## 2. Significant Accounting Policies

### *Basis of Presentation*

These consolidated financial statements are prepared in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP"). The consolidated financial statements are presented in U.S. dollars. Gains and losses from foreign currency transactions are included in trading gains and losses where related to market making activities or in interest income where related to investment of customer funds as part of electronic brokerage activities in the consolidated statements of income. Non-U.S. subsidiaries have a functional currency (i.e., the currency in which activities are primarily conducted) that is other than the U.S. dollar. Such subsidiaries' assets and liabilities are translated to U.S. dollars at year-end exchange rates, while revenues and expenses are translated at average exchange rates during the year. Adjustments that result from translating amounts from a subsidiary's functional currency to the U.S. dollar are reported in redeemable members' interests as a component of accumulated other comprehensive income.

During 2006, the Group began to report the U.S. dollar reporting currency equivalent of foreign currency cash flows using a weighted average exchange rate for the period for changes in operating

F-7

assets and liabilities in the consolidated statement of cash flows, whereas in prior periods, these exchange rate impacts were reported as total foreign currency translation. All prior period amounts have been reclassified to conform to this presentation. Such reclassifications had no effect on cash flows generated by operating activities.

## Fair Value

At December 31, 2006 and 2005, substantially all of the Group's assets and liabilities were carried at fair value or at amounts that approximate fair value. The fair value amounts for financial instruments are disclosed in each respective note to the consolidated financial statements.

## Principles of Consolidation

The consolidated financial statements include the accounts of the Group and its majority and wholly owned subsidiaries. The Group's policy is to consolidate all entities of which it owns more than 50% unless it does not have control. All intercompany balances and transactions have been eliminated. At December 31, 2006 and 2005, there was a minority interest of $506 and $376, respectively, which was included in accounts payable, accrued expenses and other liabilities in the consolidated statements of financial condition. Pursuant to the revised Financial Accounting Standards Board ("FASB") Interpretation ("FIN") No. 46, "Consolidation of Variable Interest Entities," the Group would also consolidate any Variable Interest Entities ("VIEs") of which it is the primary beneficiary. The Group currently is not the primary beneficiary of any such entities and therefore no VIEs are included in the consolidated financial statements.

## Redeemable Members' Interests

Redeemable members' interests represent member interests in IBG LLC that are entitled to share in the consolidated profits and losses of the Group. IBG LLC is a private entity owned by the members holding such member interests. As a private company, such amounts were classified historically as members' capital. For presentation purposes, IBG LLC has applied guidance within Emerging Issues Task Force ("EITF") Topic D-98 "Classification and Measurement of Redeemable Securities," which requires securities or equity interests of a company whose redemption is outside the control of the company to be classified outside of permanent capital in the statement of financial condition. The member interests in IBG LLC can be redeemed by the members at book value at their option. Because this redemption right is deemed to be outside of its control, IBG LLC has classified all members' capital outside of permanent capital to redeemable members' interests in the consolidated statements of financial condition. Such reclassification was made to comply with EITF Topic D-98 and the requirements of Regulation S-X of the Exchange Act.

Selected employees are granted non-transferable fully vested member interests in IBG LLC. Such grants are accounted for pursuant to Accounting Principles Board ("APB") Opinion No. 25, "Accounting for Stock Issued to Employees" and EITF Issue No. 00-23, "Issues Related to the Accounting for Stock Compensation under APB Opinion No. 25 and FIN No. 44." IBG LLC records a fixed dollar amount of expense for member interest grants at the date of grant based on management's estimate of fair value,

F-8

which is book value (as defined in IBG LLC's "Agreement as to Member Interest Purchase Rights"). Member interests confer ownership rights in IBG LLC and entitle the holder to proportionate rights to future allocable profits and losses of IBG LLC. Member-employees may only sell their interests back to IBG LLC at any time at book value. Member interest grants are initially accounted for as liabilities until six months elapse from the date of grant, at which time such liabilities are reclassified to redeemable members' interests as members' contributions.

On December 16, 2004, the FASB issued SFAS No. 123 (revised 2004), "Share-Based Payment, a Revision of SFAS No. 123, Accounting for Stock-Based Compensation." In April 2005, the Securities and Exchange Commission ("SEC") delayed the effective date for SFAS No. 123R until the first fiscal year beginning after June 15, 2005. As a result of the SEC ruling, the Group was required to adopt the provisions of SFAS No. 123R in the first quarter of 2006. SFAS No. 123R clarifies and amends the guidance of SFAS No. 123 in several areas, including measuring fair value, classifying an award as equity or as a liability, attributing compensation cost to service periods and accounting for forfeitures of awards. With the adoption of SFAS No, 123R, the Group continues to account for all grants of member interests granted subsequent to December 31, 2005 as liability awards.

## Use of Estimates

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts and disclosures in the consolidated financial statements and accompanying notes. Estimates, by their nature, are based on judgment and available information. Therefore, actual results could differ materially from those estimates. Such estimates include the estimated fair value of financial instruments, the estimated useful lives of property and equipment, including capitalized internally developed software, compensation accruals, tax liabilities and estimated contingency reserves.

## Cash and Cash Equivalents

The Group defines cash equivalents as short-term, highly liquid securities and cash deposits with original maturities of three months or less, other than those used for trading purposes. At December 31, 2006 and 2005, foreign currency owned of $279,501 and $38,385 is included in cash and cash equivalents and foreign currency sold of $11,837 and $23,190 is included in short-term borrowings, respectively, and are carried at fair value.

## Cash and Securities—Segregated for Regulatory Purposes

As a result of customer activities, certain Operating Companies are obligated by rules mandated by their primary regulators including the Securities and Exchange Commission ("SEC") and the Commodities Futures Trading Commission ("CFTC") in the United States and the Financial Services Authority ("FSA") in the United Kingdom to segregate or set aside cash or qualified securities to satisfy such regulations, which regulations have been promulgated to protect customer assets. In addition, substantially all of the Operating Companies are members of various clearing organizations at which cash or securities are deposited as required to conduct day-to-day clearance activities.

F-9

*Securities Borrowed and Securities Loaned*

Securities borrowed and securities loaned are recorded at the amount of cash collateral advanced or received. Securities borrowed transactions require the Group to provide counterparties with collateral, which may be in the form of cash, letters of credit, or other securities. With respect to securities loaned, the Group receives collateral, which may be in the form of cash or other securities in an amount generally in excess of the fair value of the securities loaned.

The Group monitors the market value of securities borrowed and loaned on a daily basis, with additional collateral obtained or refunded as required contractually. Receivables and payables with the same counterparty are not offset in the consolidated statements of financial condition. For these transactions, the fees received or paid by the Group are recorded as interest income or interest expense in the consolidated statements of income.

*Securities Purchased Under Agreements to Resell and Securities Sold Under Agreements to Repurchase*

Securities purchased under agreements to resell and securities sold under agreements to repurchase are treated as collateralized financing transactions and are recorded at contract value, plus accrued interest, which approximates fair value. The Group's policy is to obtain possession of collateral with a fair value equal to or in excess of the principal amount loaned under resale agreements. To ensure that the fair value of the underlying collateral remains sufficient, this collateral is valued daily with additional collateral obtained or excess collateral returned, as required under contractual provisions.

*Financial Instruments Owned and Sold, Not Yet Purchased*

Stocks, government and corporate bonds, futures and options transactions are reported in the consolidated financial statements on a trade date basis. Substantially all financial instruments owned and financial instruments sold, not yet purchased are recorded at fair value based upon quoted market prices. All firm-owned financial instruments pledged to counterparties where the counterparty has the right, by contract or custom, to sell or repledge the financial instruments are classified as financial instruments owned and pledged as collateral in the consolidated statements of financial condition (see Note 5).

The Group also enters into cross-currency swap transactions. These transactions, which are also reported on a trade date basis, are agreements to exchange a fixed amount of one currency for a specified amount of a second currency at the outset and at completion of the swap term. Unrealized mark-to-market gains and losses on cross-currency swap transactions are reported as components of financial instruments owned or financial instruments sold, not yet purchased in the consolidated statements of financial condition. Net earnings or losses are reported as components of interest income in the consolidated statements of income.

*Customer Receivables and Payables*

Customer securities transactions are recorded on a settlement date basis and customer commodities transactions are recorded on a trade date basis. Receivables from and payables to customers include amounts due on cash and margin transactions, including futures contracts transacted

F-10

on behalf of the Group's customers. Securities owned by customers, including those that collateralize margin loans or other similar transactions, are not reported in the consolidated statements of financial condition. Amounts receivable that were written off to expense were $432, $150 and $662 for the years ended December 31, 2006, 2005 and 2004, respectively.

### Receivables from and Payables to Brokers, Dealers and Clearing Organizations

Receivables from brokers, dealers and clearing organizations include amounts receivable for securities not delivered by the Group to the purchaser by the settlement date ("fails to deliver") and margin deposits. Payables to brokers, dealers and clearing organizations include amounts payable for securities not received by the Group from a seller by the settlement date ("fails to receive"). Receivables and payables to brokers, dealers and clearing organizations also include amounts related to futures contracts executed on behalf of the Group's customers as well as net payables and receivables from unsettled trades.

### Investments

The Group makes certain strategic investments and accounts for these investments under the equity method of accounting. Investments are accounted for under the equity method of accounting when the Group has significant influence over the investee as required under Accounting Principles Board Opinion No. 18, "The Equity Method of Accounting for Investments in Common Stock" ("APBO No. 18"). Investments accounted for under the equity method are recorded at the amount of the Group's investment and adjusted each period for the Group's share of the investee's income or loss. The Group's share of the income or losses from equity investments is reported as a component of other income in the consolidated statements of income and the Group's equity investments, which are included in other assets in the consolidated statements of financial condition, increase or decrease accordingly. Distributions received from equity investees are recorded as reductions to the respective investment balance.

A judgmental aspect of accounting for investments is evaluating whether an other-than-temporary decline in the value of an investment has been sustained. The evaluation of an other-than-temporary impairment is dependent on specific quantitative and qualitative factors and circumstances surrounding an investment, including recurring operating losses, credit defaults and subsequent rounds of financing. As none of the Group's investments have readily determinable market values, the primary factor considered by Group management in assessing if an other-than-temporary impairment of value has occurred is the financial condition of the investee company. All investments are reviewed for changes in circumstances or occurrence of events that suggest the Group's investment may not be recoverable. If an unrealized loss on any investment is considered to be other than temporary, the loss is recognized in the period the determination is made.

The Group also holds exchange memberships and investments in equity securities of certain exchanges as required to qualify as a clearing member. Such investments are recorded at cost or, if an other-than-temporary impairment in value has occurred, at a value that reflects management's estimate

F-11

of the impairment, and are included in other assets in the consolidated statements of financial condition. Dividends are recognized as a component of other income as such dividends are received.

## Property and Equipment

Property and equipment consist of purchased technology hardware and software, internally developed software, leasehold improvements and office furniture and equipment. Property and equipment are recorded at historical cost, less accumulated depreciation and amortization. Additions and improvements that extend the lives of assets are capitalized, while expenditures for repairs and maintenance are expensed as incurred. Depreciation and amortization are computed using the straight-line method. Equipment is depreciated over the estimated useful lives of the assets, while leasehold improvements are amortized over the lesser of the estimated economic useful life of the asset or the term of the lease, generally three to seven years. Computer equipment is depreciated over three to five years and office furniture and equipment are depreciated over five to seven years. Qualifying costs for internally developed software are capitalized and amortized over the expected useful life of the developed software, not to exceed three years.

## Comprehensive Income

Comprehensive income consists of two components: net income and other comprehensive income. Other comprehensive income refers to revenues, expenses, gains and losses that are included in redeemable members' interests but are excluded from net income. The Group's other comprehensive income is comprised of foreign currency translation adjustments.

The local currency is designated as the functional currency for the Group's international operating companies. Accordingly, assets and liabilities are translated into U.S. dollars at year-end exchange rates, and revenues and expenses are translated at average exchange rates prevailing during the year. Translation gains and losses, included in trading gains in the accompanying consolidated statements of income, for the years ended December 31, 2006, 2005 and 2004 were ($47,130), $43,904 and ($18,226), respectively. Adjustments that result from translating amounts from a subsidiary's functional currency are reported as a component of redeemable members' interests.

## Revenue Recognition

### —Trading Gains

Trading gains and losses are recorded on trade date, and are reported on a net basis. Net trading gains are comprised of changes in the fair value of trading assets and liabilities (i.e., unrealized gains and losses) and realized gains and losses. Dividends are integral to the valuation of stocks bought and sold and, accordingly, are reported on a net basis as a component of trading gains in the accompanying consolidated statements of income. Net dividends were $(39,513), $42,939 and $36,219 for the years ended December 31, 2006, 2005 and 2004, respectively.

F-12

*—Commissions and Execution Fees*

Commissions charged for executing and clearing customer transactions are accrued on a trade date basis and are reported as commissions and execution fees in the consolidated statements of income, and the related expenses are reported as execution and clearing expenses, also on a trade date basis.

## Income Taxes

The Group accounts for income taxes in accordance with SFAS No. 109, "Accounting for Income Taxes," which requires the recognition of tax benefits or expenses on the temporary differences between the financial reporting and tax bases of assets and liabilities. The Group operates in the United States as a limited liability company that is treated as a partnership for U.S. federal income tax purposes. Accordingly, the Group's income is not subject to U.S. federal income taxes. Taxes related to income earned by partnerships represent obligations of the individual partners.

Income taxes shown on the Group's consolidated statements of income are primarily attributable to taxes incurred in non-U.S. entities. State and local income taxes reported in the consolidated statement of income represent taxes assessed by jurisdictions that do not recognize the Group's limited liability company status. Outside the United States, the Group principally operates through subsidiary corporations and is subject to local income taxes. Foreign income taxes paid on dividends received are also reported as income taxes.

## Recently Issued Accounting Pronouncements

In May 2005 the FASB issued SFAS No. 154, "Accounting Changes and Error Corrections," which replaces APB Opinion No. 20, "Accounting Changes," and SFAS No. 3, "Reporting Accounting Changes in Interim Financial Statements," and changes the requirements for reporting of a change in accounting principle. SFAS No. 154 is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005, although early adoption is permitted for accounting changes and corrections of errors made in fiscal years beginning after the date that SFAS No. 154 was issued. Adoption of SFAS No. 154 in the first quarter of 2006 did not have a material effect on the Group's consolidated statements of financial condition, income or cash flows.

In June 2005, the EITF reached a consensus on Issue 04-5, "Determining Whether a General Partner, or the General Partners as a Group, Controls a Limited Partnership or Similar Entity When the Limited Partners Have Certain Rights." EITF Issue 04-5 presumes that a general partner (or managing member in the case of a limited liability company) controls a limited partnership, and should therefore consolidate a limited partnership, unless the limited partners have the substantive ability to remove the general partner without cause based on a simple majority vote or can otherwise dissolve the limited partnership, or unless the limited partners have substantive participating rights over decision making. The guidance in EITF Issue 04-5 was effective immediately for all new limited partnership agreements and any limited partnership agreements that are modified. The guidance is effective for existing partnership agreements for financial reporting periods beginning after December 15, 2005 may be reported as either a cumulative effect of a change in accounting principle or via retroactive restatement. Adoption of

F-13

EITF Issue 04-5 in the first quarter of 2006 did not have a material effect on the Group's consolidated statements of financial condition, income or cash flows.

On December 16, 2004, the FASB issued SFAS No. 123 (revised 2004), "Share-Based Payment, a revision of SFAS No. 123, Accounting for Stock-Based Compensation" ("SFAS No. 123R"). In April 2005, the SEC delayed the effective date for SFAS No. 123R until the first fiscal year beginning after June 15, 2005. As a result of the SEC ruling, the Group was required to adopt the provisions of SFAS No. 123R in the first quarter of 2006. SFAS No. 123R clarifies and amends the guidance of SFAS No. 123 in several areas, including measuring fair value, classifying an award as equity or as a liability, attributing compensation cost to service periods and accounting for forfeitures of awards. The Group adopted SFAS No. 123R using the prospective method and accordingly the adoption did not have a material impact on the Group's consolidated statements of financial condition, income or cash flows.

In February 2006, the FASB issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments an amendment of FASB Statements No. 133 and 140." SFAS No. 155 permits companies to elect, on a transaction-by-transaction basis, to apply a fair value measurement to hybrid financial instruments that contain an embedded derivative that would otherwise require bifurcation under SFAS No. 133. SFAS No. 155 is effective for financial statements issued for fiscal years beginning after September 15, 2006. Adoption of SFAS No. 155 is not expected to have a material effect on the Group's consolidated statements of financial condition, income or cash flows.

In June 2006 the FASB issued FIN No. 48, "Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109," which is effective for fiscal years beginning after December 15, 2006. FIN No. 48 requires enterprises to assess and account for the effect of uncertainty of tax positions taken or to be taken on tax returns in their financial statements. Adoption of FIN No. 48 is not expected to have a material effect on the Group's consolidated statements of financial condition, income or cash flows.

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements." SFAS No. 157 defines fair value, establishes a framework for measuring fair value and requires enhanced disclosures about fair value measurements. SFAS No. 157 requires companies to disclose the fair value of financial instruments according to a fair value hierarchy (i.e., levels 1, 2, and 3, as defined). Additionally, companies are required to provide enhanced disclosure regarding instruments in the level 3 category, including a reconciliation of the beginning and ending balances separately for each major category of assets and liabilities. SFAS No. 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007 and for interim periods within those fiscal years. Adoption of SFAS No. 157 is not expected to have a material effect on the Group's consolidated statements of financial condition, income or cash flows.

In February 2007, the FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities, Including an Amendment of FASB Statement No. 115." SFAS No. 159 permits entities to choose, at specified election dates, to measure many financial instruments and certain other

F-14

items at fair value that are not currently required to be measured at fair value. SFAS No. 159 is effective for financial statements issued for an entity's first fiscal year beginning after November 15, 2007. Management is currently evaluating the impact that adoption of SFAS No. 159 may have on the Group's consolidated statements of financial condition, income or cash flows.

In September 2006, the SEC issued Staff Accounting Bulletin ("SAB") No. 108, "Considering the Effects of Prior Year Misstatements When Quantifying Misstatements in Current Year Financial Statements." SAB No. 108 is effective for annual financial statements for fiscal years ending after November 15, 2006, and requires registrants to assess the effects of correcting prior years' misstatements on the current year's statement of income. The cumulative effect, if any, of initial application is to be reported as of the beginning of such fiscal year. Adoption of SAB No. 108 for 2006 did not have a material effect on the Group's consolidated statements of financial condition, income or cash flows.

## 3. Trading Activities and Related Risks

The Group's trading activities include providing securities market maker and brokerage services. Trading activities expose the Group to market and credit risks. These risks are managed in accordance with established risk management policies and procedures. To accomplish this, management has established a risk management process that includes:

- A regular review of the risk management process by executive management as part of its oversight role;

- Defined risk management policies and procedures supported by a rigorous analytic framework; and

- Articulated risk tolerance levels as defined by executive management that are regularly reviewed to ensure that the Group's risk-taking is consistent with its business strategy, capital structure, and current and anticipated market conditions.

*Market Risk*

IBG LLC is exposed to various market risks. Exposures to market risks arise from equity price risk, foreign currency exchange rate fluctuations and changes in interest rates which impact our variable rate debt obligations.

The Group seeks to mitigate market risk associated with trading inventories by employing hedging strategies that correlate rate, price and spread movements of trading inventories and related financing and hedging activities. The Group uses a combination of cash instruments and exchange traded derivatives to hedge its market exposures. The following discussion describes the types of market risk faced by the Group:

F-15

IBG LLC and Subsidiaries

**Notes to Consolidated Financial Statements (Continued)**

**Three Years Ended December 31, 2006**

**(in thousands)**

3. **Trading Activities and Related Risks (Continued)**

*Equity Price Risk*

Equity price risk arises from the possibility that equity security prices will fluctuate, affecting the value of equity securities and other instruments that derive their value from a particular stock, a defined basket of stocks, or a stock index. The Group is subject to equity price risk primarily in securities owned and securities sold, not yet purchased. The Group attempts to limit such risks by diversifying its portfolio across many different options, futures and underlying securities and avoiding concentrations of positions based on the same underlying security.

*Currency Risk*

Currency risk arises from the possibility that fluctuations in foreign exchange rates will impact the value of financial instruments. Exchange rate contracts include cross-currency swaps and currency futures contracts. Currency swaps are agreements to exchange future payments in one currency for payments in another currency. These agreements are used to effectively convert assets or liabilities denominated in different currencies. Currency futures are contracts for delayed delivery of currency at a specified future date. The Group uses currency swaps to manage the levels of its non-U.S. dollar currency balances and currency cash and futures to hedge its global exposure.

*Interest Rate Risk*

Interest rate risk arises from the possibility that changes in interest rates will affect the value of financial instruments. The Group is exposed to interest rate risk on variable-rate debt, cash and margin balances and positions carried in equity securities, options and futures. These risks are managed through investment policies and by entering into interest rate futures contracts.

*Credit Risk*

The Group is exposed to risk of loss if an individual, counterparty or issuer fails to perform its obligations under contractual terms ("default risk"). Both cash instruments and derivatives expose the Group to default risk. The Group has established policies and procedures for mitigating credit risk on principal transactions, including reviewing and establishing limits for credit exposure, maintaining collateral, and continually assessing the creditworthiness of counterparties.

In the normal course of business, the Group executes, settles and finances various customer securities transactions. Execution of these transactions includes the purchase and sale of securities by the Group that exposes the Group to default risk arising from the potential that customers or counterparties may fail to satisfy their obligations. In these situations, the Group may be required to purchase or sell financial instruments at unfavorable market prices to satisfy obligations to customers or counterparties. The Group seeks to control the risks associated with its customer margin activities by requiring customers to maintain collateral in compliance with regulatory and internal guidelines.

F-16

Liabilities to other brokers and dealers related to unsettled transactions (i.e., securities failed-to-receive) are recorded at the amount for which the securities were purchased, and are paid upon receipt of the securities from other brokers or dealers. In the case of aged securities failed-to-receive, the Group may purchase the underlying security in the market and seek reimbursement for any losses from the counterparty.

The Group enters into securities purchased under agreements to resell and securities sold under agreements to repurchase transactions ("repos") in addition to securities borrowing and lending arrangements, all of which may result in credit exposure in the event the counterparty to a transaction is unable to fulfill its contractual obligations. In accordance with industry practice, repos are collateralized by securities with a market value in excess of the obligation under the contract. Similarly, securities borrowed and loaned agreements are collateralized by deposits of cash. The Group attempts to minimize credit risk associated with these activities by monitoring collateral values on a daily basis and requiring additional collateral to be deposited with or returned to the Group when deemed necessary.

### Concentrations of Credit Risk

The Group's exposure to credit risk associated with its trading and other activities is measured on an individual counterparty basis, as well as by groups of counterparties that share similar attributes. Concentrations of credit risk can be affected by changes in political, industry, or economic factors. To reduce the potential for risk concentration, credit limits are established and exposure is monitored in light of changing counterparty and market conditions.

### Off-Balance Sheet Risks

The Group may be exposed to a risk of loss not reflected in the consolidated financial statements for certain derivative instruments, including equity options and futures products and for securities sold, but not yet purchased, which represent obligations of the Group to deliver specified securities at contracted prices, which may create a liability to repurchase them in the market at prevailing prices. Accordingly, these transactions result in off-balance sheet risk as the Group's cost to liquidate such securities and futures contracts may exceed the amount reported in the Group's consolidated statements of financial condition.

**4.  Financial Instruments Owned and Sold, But Not Yet Purchased, at Fair Value**

Financial instruments owned and sold, but not yet purchased consisted of securities, at quoted market prices, as follows at December 31:

| | 2006 | | 2005 | |
| | Owned | Sold, But Not Yet Purchased | Owned | Sold But Not Yet Purchased |
|---|---|---|---|---|
| Stocks | $  10,596,252 | $      9,761,798 | $  8,020,389 | $      9,111,073 |
| Options | 4,597,737 | 5,022,253 | 3,424,053 | 3,315,302 |
| U.S. and foreign government obligations | 494,362 | — | 525,504 | — |
| Warrants | 83,322 | — | 33,234 | — |
| Corporate bonds | 4,862 | 54 | 26,639 | — |
| Discount certificates | 41,040 | 1,408 | 9,160 | — |
| Currency forward contracts | 227 | 104 | — | — |
| | $  15,817,802 | $    14,785,617 | $  12,038,979 | $    12,426,375 |

**5.  Collateral**

The Group enters into securities borrowing and lending transactions and agreements to repurchase and resell securities to finance trading inventory, to obtain securities for settlement and to earn residual interest rate spreads. In addition, the Group's customers pledge their securities owned to collateralize margin loans. Under these transactions, the Group either receives or provides collateral, including equity, corporate debt and U.S. Government securities. Under many agreements, the Group is permitted to sell or repledge securities received as collateral and use these securities to secure repurchase agreements, enter into securities lending transactions or deliver these securities to counterparties to cover short positions. At December 31, 2006 and 2005, the fair value of securities received as collateral where the Group is permitted to sell or repledge the securities was approximately $11.5 and $9.3 billion, respectively, of which $10.4 and $8.7 billion, respectively, had been repledged or resold.

In the normal course of business, the Group pledges qualified securities with clearing organizations to satisfy daily margin and clearing fund requirements. At December 31, 2006, substantially all government obligations owned were pledged to clearing organizations.

Financial instruments owned and pledged, where the counterparty has the right to repledge, at December 31, 2006 and 2005 consisted of the following:

| | 2006 | 2005 |
|---|---|---|
| Stocks | $      7,837,561 | $      6,096,412 |
| U.S. and foreign government obligations | 494,362 | 525,504 |
| | $      8,331,923 | $      6,621,916 |

F-18

In 2002, the Group acquired an interest in Boston Options Exchange, LLC ("BOX"), which is accounted for under the equity method of accounting. BOX was approved as an exchange by the SEC on January 7, 2004, and commenced operations. In January 2005, the Group sold a portion of its interest in BOX for its recorded value of $2,596. In 2006, the Group received distributions from BOX totaling $1,229, which reduced the Group's investment. As of December 31, 2006 and 2005, the Group's carrying value of its investment in BOX was $5,054 and $5,433, respectively.

Income earned by the Group from transactions executed through BOX of $1,824, $2,469 and $160 for the years ended December 31, 2006, 2005 and 2004, respectively, is reported as market maker incentives, a component of other income (Note 11). BOX exchange fees for the years ended December 31, 2006, 2005 and 2004 were $7,766, $6,889 and $1,866, respectively, and are included in execution and clearing expenses in the consolidated statements of income. As of December 31, 2006 and 2005, receivables from BOX were $232 and $418, respectively, and exchange fees payable to BOX were $1,112 and $584, respectively. These amounts are included in other assets and in accounts payable, accrued expenses and other liabilities, respectively, in the consolidated statements of financial condition.

In 2006, the Group made strategic investments totaling $29,250 in electronic trading exchanges, OneChicago LLC, ISE Stock Exchange, LLC and CBOE Stock Exchange, LLC. CBOE Stock Exchange, LLC has not commenced operations as of December 31, 2006. These investments are accounted for under the equity method of accounting. As of December 31, 2006, the carrying value of the Group's investments in these three exchanges were $19,083, $3,980 and $5,000, respectively.

In December 2006, the Group lent $10 million to W. R. Hambrecht + Co., Inc. ("Hambrecht") under a senior secured promissory note at the rate of 15% maturing on January 23, 2007, which maturity was subsequently extended to February 5, 2007. This promissory note is reported at par in the consolidated statement of financial condition as of December 31, 2006. The Group also had a commitment to lend Hambrecht $16 million as part of a three-year senior secured promissory note ("2007 Note") at December 31, 2006. On February 5, 2007, as the promissory note matured, the Group exercised its option, included in the note, to reduce the interest rate to 6% in exchange for warrants to purchase Series C common stock of Hambrecht at $0.01 per share representing 4.01% of the fully diluted common shares of Hambrecht's capital stock.

On February 5, 2007, the Group lent Hambrecht $16 million, as committed, and received warrants to purchase Series C common stock of Hambrecht at $0.01 per share representing 16.00% of the fully diluted common shares of Hambrecht's capital stock and two seats on Hambrecht's board of directors. On March 29, 2007, the Group loaned an additional $3.2 million to Hambrecht under this note and received warrants to purchase Series C common stock of Hambrecht at $0.01 per share representing an additional 5.47% of the fully diluted common shares of Hambrecht's capital stock. The 2007 Note bears interest at a rate of 8% and the loans mature on February 5, 2010 and March 29, 2010, respectively, subject to redemption by Hambrecht at any time and by the Group in the event of a fundamental change in Hambrecht, as defined in the 2007 Note agreements.

F-19

**7.  Short-Term Borrowings**

Short-term borrowings consist primarily of collateralized borrowing facilities with clearing banks in multiple currencies that bear interest at fluctuating overnight rates based on interbank funds rates prevailing in the respective currencies. In addition, the Group has available secured and unsecured overnight bank loan facilities. All short-term borrowings outstanding at December 31, 2006 and 2005 were either repaid on the next business day or rolled forward. Also included in short-term borrowings at December 31, 2006 and 2005 is foreign currency sold (Note 2).

As of December 31, short-term borrowings consisted of:

|  | 2006 | | 2005 | |
|---|---|---|---|---|
|  | Principal | Weighted Average Rates | Principal | Weighted Average Rates |
| Overnight borrowing facilities | $    1,137,752 | 4.69% | $    633,006 | 3.18% |
| Unsecured bank loans | 147,320 | 4.44% | 12,100 | 4.63% |
| Secured bank loans | — | n/a | 39,000 | 4.40% |
| Foreign currency sold | 11,837 | n/a | 23,190 | n/a |
|  | $    1,296,909 | | $    707,296 | |
| Collateral for secured bank loans, at market | $    — | | $    44,154 | |

Interest expense on short term borrowings for each of the three years ended December 31, 2006, 2005 and 2004 was $29,768, $11,537 and $6,545, respectively.

**8.  Senior Notes Payable**

At December 31, 2006 and 2005, IBG LLC had $150,598 and $164,666 of 7% and 8%, respectively, senior notes outstanding which were privately placed to certain qualified customers of IB, LLC. All of the senior notes outstanding at December 31, 2006 have either a 15-month or an 18-month maturity. IBG LLC may, solely at its option, redeem the senior notes at any time on or after a specified date in the third month or the sixth month, respectively, after the date on which the senior notes are issued and sold (the "Optional Redemption Date"), at a redemption price equal to 100% of the principal amount of the senior notes to be redeemed plus accrued interest. Historically, IBG LLC has redeemed these senior notes at their Optional Redemption Dates. The carrying value of the senior notes approximates their fair value since they are short-term in nature. In 2006 and 2005, IBG LLC redeemed $526,530 and $493,170 of senior notes, which included $164,666 and $108,811 of senior notes issued in 2005 and 2004, respectively. During the period from January 1 through March 20, 2007, total senior notes issued were $112,816, and senior notes issued in 2006 which were redeemed totaled $108,810. Interest expense on senior notes was $13,159, $11,558 and $5,937 for the years ended December 31, 2006, 2005 and 2004, respectively.

F-20

In May 2006, the Group entered into a 3-year $300 million revolving credit facility with a syndicate of banks, of which $150 million was borrowed in May 2006. As of December 31, 2006, the interest rate on this credit facility, which is indexed to LIBOR, was 5.95%. The carrying value of the senior secured credit facility approximates its fair value since borrowings under the facility could be paid down at any time from available funds, making such borrowings short-term in nature. The facility is secured by a first priority interest in all of the capital stock of each entity owned directly by IBG LLC (subject to customary limitations with respect to foreign subsidiaries), and loans and advances to, and other intercompany obligations owed by, each entity owned directly or indirectly by IBG LLC. The financial covenants on the Group under the terms of the senior secured credit facility are:

- minimum net worth (redeemable members' interests) of $1.5 billion, with quarterly increases equal to 25% of positive consolidated net income;

- maximum total debt to capitalization (including redeemable members' interests) ratio of 30%;

- minimum liquidity (unencumbered marketable securities and other liquid financial assets divided by unsecured short-term (maturities of less than one year) liabilities) ratio of 1.0 to 1.0; and

- maximum total debt to net consolidated regulatory capital ratio of 35%.

Interest expense on the senior secured credit facility for the year ended December 31, 2006 was $5,712, which includes commitment fees on the facility. As of December 31, 2006, the Group was in compliance with all of the covenants under this credit facility.

## 10. Liabilities Subordinated to Claims of General Creditors

TH LLC had an unsecured revolving senior subordinated loan facility of $15,000, which was terminated in May 2006. This loan was subject to a 0.5% commitment fee. Interest expense related to this loan facility was $29, $76 and $76 for the three years ended December 31, 2006, 2005 and 2004, respectively.

TH LLC also had a 5% secured demand note collateral agreement, and a related subordinated loan agreement, for $5,200, which was terminated in December 2006. Interest expense related to this agreement was $262, $264 and $264 for the three years ended December 31, 2006, 2005 and 2004, respectively.

F-21

**11. Other Income**

The components of other income for years ended December 31, 2006, 2005 and 2004 are:

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Payments for order flow | $ 60,189 | $ 19,987 | $ 4,157 |
| Market data fees | 9,036 | 6,061 | 5,290 |
| Market maker incentives | 4,133 | 7,994 | 5,035 |
| Gains (losses) on restricted securities | 6,603 | 15,669 | (6,679) |
| Income (loss) from equity investments | (337) | 1,312 | (1,450) |
| Other, net | 5,614 | 2,369 | 619 |
|  | $ 85,238 | $ 53,392 | $ 6,972 |

Payments for order flow are earned from various options exchanges based upon options trading volume originated by the Operating Companies. Market data fees are charged to customers based upon market data services provided. Various exchanges pay the Group market maker incentives for its market making efforts on those exchanges. Gains (losses) on restricted securities are primarily generated when the Group has investments in securities on which there are restrictions from trading. Such securities are valued at cost until such time as the trading restrictions lapse and such securities become freely tradable, at which time the securities are marked to market.

**12. Defined Contribution and Employee Incentive Plans**

*Defined Contribution Plan*

The Group offers substantially all employees of U.S.-based Operating Companies who have met minimum service requirements the opportunity to participate in defined contribution retirement plans qualifying under the provisions of Section 401(k) of the Internal Revenue Code. The general purpose of these plans is to provide employees with an incentive to make regular savings in order to provide additional financial security during retirement. These plans provide for the Group to match 50% of the employees' pre-tax contribution, up to a maximum of 10% of eligible earnings. The employee is vested in the matching contribution incrementally over six years. Included in employee compensation and benefits expenses in the consolidated statements of income are $1,203, $1,172 and $1,058 of plan contributions for the years ended December 31, 2006, 2005 and 2004, respectively.

*Employee Incentive Plans*

Return on Investment Dollar Units ("ROI Dollar Units"): Since 1998, IBG LLC has granted all non-member employees ROI Dollar Units, which are redeemable under the amended provisions of the plan, and in accordance with regulations issued by the Internal Revenue Service (Section 409A of the Internal Revenue Code). Upon redemption, the grantee is entitled to accumulated earnings on the face value of the certificate, but not the actual face value. For grants made in 1998 and 1999, grantees may redeem the ROI Dollar Units after vesting on the fifth anniversary of the date of their grant and prior to the tenth anniversary of the date of their grant. For grants made between January 1, 2000 and January 1, 2005, grantees must elect to redeem the ROI Dollar Units upon the fifth, seventh or tenth

F-22

anniversary date. These ROI Dollar Units will vest upon the fifth anniversary of the date of their grant and will continue to accumulate earnings until the elected redemption date. For grants made on or after January 1, 2006, all ROI Dollar Units shall vest on the fifth anniversary date of their grant and will be automatically redeemed.

The Group recorded $15,623, $10,304 and $7,276, of ROI Dollar Unit expense for the years ended December 31, 2006, 2005 and 2004, respectively, which is included in employee compensation and benefits in the consolidated statements of income. As of December 31, 2006 and 2005, payables to employees for ROI Dollar Units were $39,644 and $34,091, respectively, of which $14,003 and $18,035, respectively, were vested. These amounts are included in accounts payable, accrued expenses and other liabilities in the consolidated statements of financial position.

Redeemable Members' Interests: Selected employees are granted non-transferable member interests in IBG LLC, which confer ownership rights in IBG LLC and entitle the holders to their proportionate share of the consolidated profits and losses of IBG LLC based on their holding percentages beginning on the date of the grant. The "Agreement as to Member Interest Purchase Rights" (the "Agreement") gives IBG LLC the right to repurchase any member's interests at its discretion at any time which, in particular, is triggered by the termination of employment of a member-employee, and also permits members to sell their interests back to IBG LLC at any time, in every case for an amount equal to management's estimate of fair value, which is book value as defined in the Agreement. Because IBG LLC places a high value on the retention of its key employees, payment for a portion of redeemed interests is contingent on a post-redemption consulting services requirement that, among other conditions, requires that a member-employee not compete with IBG LLC in any area of its businesses for five years following the date of redemption. In order to enforce these terms, payment for one-half of the redeemed interests is, under normal conditions, made within five months after the redemption date. Payment for the remaining one-half of the redeemed interests is made five years hence, subject to satisfaction of the consulting services and non-compete provisions of the Agreement. IBG LLC recognizes compensation expense equal to the granted interest at the time of grant. If and when the terms of the five-year consulting and non-compete period are satisfied, IBG LLC records a distribution of redeemable members' interests at such time as the remaining payment is made to the member-employee. Should any portion of a member-employee's interests be forfeited, such forfeited member interests would be redistributed among the remaining members in proportion to their holding percentages.

IBG LLC recorded member interest grant expenses of $14,957, $10,326 and $10,220 in 2006, 2005 and 2004, respectively, which are included in employee compensation and benefits in the consolidated statements of income. As of December 31, 2006 and 2005, $14,674 and $10,224, respectively, of member interest grants awarded are reported as liabilities (Note 2) in the consolidated statements of financial condition.

F-23

**IBG LLC and Subsidiaries**

**Notes to Consolidated Financial Statements (Continued)**

**Three Years Ended December 31, 2006**

**(in thousands)**

## 13. Income Taxes

Income tax expense differs from the U.S. Federal statutory rate (35% for each of the three years ended December 31, 2006) due to IBG LLC's status as a limited liability company, which qualifies it as a partnership for Federal income tax purposes. Therefore, no Federal income taxes are recognized by the Group, as described in Note 2. Income tax expense reflects effective tax rates in foreign state and local jurisdictions where certain Operating Companies are subject to corporate taxation. Deferred income taxes arise due to differences between mark to market and lower of cost or market valuation of THE's financial assets and liabilities. For the three years ended December 31, 2006, 2005 and 2004, the provision for income taxes consisted of:

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Current-state and local | $   871 | $   710 | $   883 |
| Current-foreign | 27,108 | 16,000 | 14,995 |
| Deferred | (587) | 17,068 | 3,677 |
|  | $ 27,392 | $ 33,778 | $ 19,555 |

A reconciliation of the statutory U.S. Federal income tax rate of 35% to the Group's effective tax rate is set forth below:

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| U.S. statutory tax rate | 35.0% | 35.0% | 35.0% |
| Increase related to state, local and foreign taxes | 3.6% | 5.9% | 6.7% |
| Rate benefit as a limited liability company | -35.0% | -35.0% | -35.0% |
|  | 3.6% | 5.9% | 6.7% |

Current and deferred income taxes payable, which are included in accounts payable, accrued expenses and other liabilities in the consolidated statements of financial condition as of December 31 consisted of:

|  | 2006 | 2005 |
|---|---|---|
| Current | $ 13,598 | $   5,470 |
| Deferred | 33,392 | 31,463 |
|  | $ 46,990 | $ 36,933 |

F-24

## 14. Property and Equipment

Property and equipment which are included in other assets in the consolidated statements of financial condition and are comprised of leasehold improvements, computer hardware, software developed for the Group's internal use and office furniture and equipment at December 31 consisted of:

|  | 2006 | 2005 |
|---|---|---|
| Leasehold improvements | $    7,836 | $    13,431 |
| Computer equipment | 8,762 | 8,389 |
| Internally developed software | 27,657 | 19,770 |
| Office furniture and equipment | 4,507 | 4,204 |
|  | 48,762 | 45,794 |
| Less—accumulated depreciation and amortization | (27,284) | (25,100) |
| Property and equipment, net | $    21,478 | $    20,694 |

Depreciation and amortization of $11,522, $10,888 and $9,023 for the years ended December 31, 2006, 2005 and 2004, respectively, is included in occupancy, depreciation and amortization expenses in the consolidated statements of income.

## 15. Redeemable Members' Interests

The IBG LLC operating agreement (the "LLC Agreement"), as amended, sets forth the respective rights and obligations of members of the Group. The LLC Agreement also provides for terms of its management and conduct of its affairs. The Group executive committee is responsible for managing the affairs of the Group.

The Group's founder, chairman and chief executive officer, Thomas Peterffy and his affiliates own approximately 85% of member interests and the remaining interests are owned primarily by key employees (Note 12).

Mr. Peterffy, who is also the Managing Member and sole voting member of IBG LLC, may transfer all or any portion of his member interests to any person. In the event that the percentage interest of any member changes or a new member is admitted, all member interests are recalculated in proportion to the percentage interest held at that time. The Group may enter into an agreement of merger, consolidation, or sale or other transfer of substantially all of the assets of the Group upon the decision of the Managing Member. The Group will terminate upon a vote to dissolve the Group; upon the retirement, resignation or other withdrawal of the Managing Member; or under certain statutory events, unless the Managing Member and a majority of the members vote to continue the business of the Group.

Pursuant to the LLC Agreement, consolidated profits and losses of the Group are allocated to the members in proportion to their respective percentage interests. Distributions to members, which historically have been made to assist members in meeting their income tax obligations with respect to

F-25

their proportionate share of the Group's profits, are made at the discretion of the Managing Member in proportion to the respective members' percentage interests.

## 16.  Commitments, Contingencies and Guarantees

### *Litigation*

The Group is subject to certain pending and threatened legal actions which arise out of the normal course of business. Litigation is inherently unpredictable, particularly in proceedings where claimants seek substantial or indeterminate damages, or which are in their early stages. The Group cannot predict with certainty the actual loss or range of loss related to such legal proceedings, the manner in which they will be resolved, the timing of final resolution or the ultimate settlement. Consequently, the Group cannot estimate losses or ranges of losses related to such legal matters, even in instances where it is reasonably possible that a future loss will be incurred. In the opinion of management, after consultation with counsel, the resolution of all ongoing legal proceedings will not have a material adverse effect on the consolidated financial condition, results of operations or cash flows of the Group. The Group accounts for potential losses related to litigation in accordance with SFAS No. 5 "Accounting for Contingencies." As of December 31, 2006 reserves provided for potential losses related to litigation matters were not material. No such reserves were deemed necessary as of December 31, 2005.

### *Leases*

Operating Companies have non-cancelable operating leases covering office space. All but one of the office space leases are subject to escalation clauses based on specified costs incurred by the respective landlords and contain renewal elections. Rent expense calculated on a straight-line basis for the Group was $6,156, $5,457 and $4,626 for the years ended December 31, 2006, 2005 and 2004, respectively, and is reported in occupancy, depreciation and amortization expenses in the consolidated statements of income. In November 2005, the leases on the primary U.S. office space for the Group and its affiliates were renegotiated through January 2014, with renewal options through January 2026. As of December 31, 2006, the Group's minimum annual lease commitments are as follows:

| Year | |
| --- | --- |
| 2007 | $ 6,673 |
| 2008 | 6,394 |
| 2009 | 6,038 |
| 2010 | 5,649 |
| 2011 | 5,726 |
| Thereafter | 14,045 |
| | $ 44,525 |

F-26

Certain of the Operating Companies provide guarantees to securities clearing houses and exchanges which meet the accounting definition of a guarantee under FIN No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others." Under the standard membership agreement, members are required to guarantee collectively the performance of other members. Under the agreements, if another member becomes unable to satisfy its obligations to the clearinghouse, other members would be required to meet shortfalls. In the opinion of management, the Operating Companies' liability under these arrangements is not quantifiable and could exceed the cash and securities they have posted as collateral. However, the potential for these Operating Companies to be required to make payments under these arrangements is remote. Accordingly, no contingent liability is carried on the consolidated statements of financial condition for these arrangements.

In connection with its retail brokerage business, IB LLC performs securities and commodities execution, clearance and settlement on behalf of its customers for whom it commits to settle trades submitted by such customers with the respective clearing houses. If a customer fails to fulfill its obligation, IB LLC must fulfill the customer's obligation with the trade counterparty.

IB LLC is fully secured by assets in customers' accounts and any proceeds received from securities and commodities transactions entered into by IB LLC on behalf of customers. No contingent liability is carried on the consolidated statements of financial condition for these fully collateralized transactions.

## Other Commitments

Certain clearing houses and clearing banks and firms used by certain Operating Companies are given a security interest in certain assets of those Operating Companies held by those clearing organizations. These assets may be applied to satisfy the obligations of those Operating Companies to the respective clearing organizations.

## 17. Segment and Geographic Information

The Group operates in two business segments, Market Making and Electronic Brokerage. The Group conducts its market making business through its Timber Hill subsidiaries on the world's leading exchanges and market centers, primarily in exchange-traded equities, equity options and equity-index options and futures. The Group conducts its electronic brokerage business through its Interactive Brokers subsidiaries, which provide electronic execution and clearing services to customers worldwide.

There are significant transactions and balances between the Operating Companies, primarily as a result of certain Operating Companies holding exchange or clearing organization memberships, which are utilized to provide execution and clearing services to affiliates. Intra-segment and intra-region income and expenses and related balances have been eliminated in this segment and geographic information in order to accurately reflect the external business conducted in each segment or geographical region. Rates on

F-27

transactions between segments are designed to approximate full costs. Corporate items include non-allocated corporate income and expenses that are not attributed to segments for performance measurement, corporate assets and eliminations.

Management believes that the following information by business segment provides a reasonable representation of each segment's contribution to total net revenues, income before income taxes and to total assets as of and for the years ended December 31, 2006, 2005 and 2004:

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| **Net revenues:** | | | |
| Market making | $ 954,729 | $ 738,412 | $ 428,438 |
| Electronic brokerage | 298,390 | 185,354 | 133,211 |
| Corporate and eliminations | (710) | 5,342 | 2,327 |
| Total net revenues | $ 1,252,409 | $ 929,108 | $ 563,976 |
| **Income before income taxes:** | | | |
| Market making | $ 662,823 | $ 505,258 | $ 241,154 |
| Electronic brokerage | 98,612 | 59,317 | 45,659 |
| Corporate and eliminations | 126 | 4,723 | 3,185 |
| Total income before income taxes | $ 761,561 | $ 569,298 | $ 289,998 |

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| **Segment assets:** | | | |
| Market making | $ 28,007,880 | $ 21,778,775 | $ 13,453,637 |
| Electronic brokerage | 4,761,244 | 2,852,611 | 1,836,863 |
| Corporate and eliminations | (688,606) | (339,239) | (230,095) |
| Total assets | $ 32,080,518 | $ 24,292,147 | $ 15,060,405 |

The Group operates in both U.S. and international markets on more than 60 exchanges and market centers. A significant portion of the Group's net revenues are generated by consolidated subsidiaries operating outside the United States, primarily THE, which is operated and managed in Zug, Switzerland. International operations are comprised of market making and electronic brokerage activities in 20 countries in Europe, Asia and North America (outside the United States). The following table

presents total net revenues and income before income taxes by geographic area for the years ended December 31, 2006, 2005 and 2004:

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| **Net revenues:** | | | |
| United States | $ 986,720 | $ 615,223 | $ 404,913 |
| International | 264,991 | 308,714 | 156,750 |
| Corporate and eliminations | 698 | 5,171 | 2,313 |
| Total net revenues | $ 1,252,409 | $ 929,108 | $ 563,976 |
| **Income before income taxes:** | | | |
| United States | $ 642,644 | $ 363,880 | $ 220,617 |
| International | 117,460 | 200,852 | 66,167 |
| Corporate and eliminations | 1,457 | 4,566 | 3,214 |
| Total income before income taxes | $ 761,561 | $ 569,298 | $ 289,998 |

## 18.  Regulatory Requirements

TH LLC and IB LLC are subject to the Uniform Net Capital Rule (Rule 15c3-1) under the Exchange Act and the Commodities Futures Trading Commission's minimum financial requirements (Regulation 1.17). At December 31, 2006, TH LLC had net capital of $996,200, which was $982,679 in excess of required net capital of $13,521, and IB LLC had net capital of $268,897, which was $245,562 in excess of required net capital of $23,335.

THE is subject to the Swiss National Bank eligible equity requirement. At December 31, 2006, THE had eligible equity of $643,240 which was $437,557 in excess of the minimum requirement of $205,683.

THSHK is subject to the Hong Kong Securities Futures Commission liquid capital requirement, THA is subject to the Australian Stock Exchange liquid capital requirement, THC and IBC are subject to the Investment Dealers Association of Canada risk-adjusted capital requirement and IBUK is subject to the U.K. Financial Services Authority financial resources requirement.

At December 31, 2006, all of the Operating Companies were in compliance with their respective regulatory capital requirements.

Regulatory capital requirements could restrict the Operating Companies from expanding their business and declaring dividends if their net capital does not meet regulatory requirements. Also, certain entities within the Group are subject to other regulatory restrictions and requirements.

## 19.  Subsequent Event

On January 16, 2007, the Group's Managing Member approved and paid a cash dividend to the members of the Group totaling $24,500.

F-29

34,500,000 Shares of Class A Common Stock



# Interactive Brokers Group, Inc.

### Dealer Prospectus Delivery Obligation

Until          , 2007 (the 25th day after the date of this prospectus), all dealers that effect transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealer's obligation to deliver a prospectus when acting as a placement agent and with respect to unsold allotments or subscriptions.



[ALTERNATE PAGE FOR MARKET MAKING PROSPECTUS]

The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

SUBJECT TO COMPLETION, DATED MAY 3, 2007

Class A Common Stock



Interactive Brokers Group, Inc.

This prospectus has been prepared for and will be used by W.R. Hambrecht + Co., LLC in connection with offers and sales of shares of our class A common stock in market making transactions effected from time to time. These transactions may occur in the open market or may be privately negotiated at prevailing market prices at the time of sales, at prices related thereto or at negotiated prices. W.R. Hambrecht + Co., LLC may act as principal or agent in such transactions. We will not receive any proceeds of such sales. W.R. Hambrecht + Co., LLC has no obligation to make a market in our class A common stock, and may discontinue its market making activities at any time without notice, at its sole discretion.

Proposed NASDAQ Global Select Market Symbol: IBKR

**Investing in the common stock involves substantial risk. You should purchase shares only if you can afford a complete loss of your investment. See "Risk Factors" beginning on page 19.**

Neither the Securities Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

# WR HAMBRECHT+CO

The date of this prospectus is                , 2007

A-1

[ALTERNATE PAGE FOR MARKET MAKING PROSPECTUS]

## USE OF PROCEEDS

This prospectus is delivered in connection with the sale of the common stock by W.R. Hambrecht + Co., LLC in market making transactions. We will not receive any of the proceeds from these transactions.

A-2

[ALTERNATE PAGE FOR MARKET MAKING PROSPECTUS]

**PLAN OF DISTRIBUTION**

This prospectus has been prepared for use by WR Hambrecht + Co., LLC in connection with offers and sales of the common stock in market making transactions effected from time to time. W.R. Hambrecht + Co may act as a principal or agent in these transactions. These sales will be made at prevailing market prices at the time of sale, at prices related thereto or at negotiated prices. We will not receive any of the proceeds of these sales.

Through our ownership of currently exercisable warrants, we have the right to acquire common stock of W.R. Hambrecht + Co., Inc., the parent of W.R. Hambrecht Co., LLC, and we own $19.2 million in aggregate principal amount of W.R. Hambrecht + Co., Inc.'s outstanding 8% senior secured promissory notes due February 5, 2010. We agreed to file a "market making" prospectus in order to allow WR Hambrecht + Co to engage in market making activities for our common stock. WR Hambrecht + Co acted as a lead placement agent in our recently completed initial public offering of common stock. In addition, WR Hambrecht + Co and its affiliates have in the past performed, and may in the future perform, various financial and investment advisory and investment banking services for us, for which they received or will receive customary fees and expenses. See "Transactions with Related Persons, Promoters and Certain Control Persons" for a description of certain relationships and transactions between WR Hambrecht + Co and us.

We have been advised by WR Hambrecht + Co that, subject to applicable laws and regulations, WR Hambrecht + Co currently intends to make a market in the common stock following completion of the offering. However, WR Hambrecht + Co is not obligated to do so and WR Hambrecht + Co may discontinue its market making activities at any time without notice. In addition, such market making activity will be subject to the limits imposed by the Securities Act and the Exchange Act. There can be no assurance that an active trading market will develop or be sustained. See "Risk Factors—There is no existing market for our common stock and we do not know if one will develop to provide you with adequate liquidity."

We have agreed to indemnify WR Hambrecht + Co against certain liabilities, including liabilities under the Securities Act, and to contribute to payments which WR Hambrecht + Co might be required to make in respect thereof.

A-3

**[ALTERNATE PAGE FOR MARKET MAKING PROSPECTUS]**

## 34,500,000 Class A Common Stock



# Interactive Brokers Group, Inc.

### Dealer Prospectus Delivery Obligation

Until       , 2007 (the 25th day after the date of this prospectus), all dealers that effect transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealer's obligation to deliver a prospectus when acting as a placement agent and with respect to unsold allotments or subscriptions.

A-4

## PART II

## INFORMATION NOT REQUIRED IN PROSPECTUS

### ITEM 13. Other Expenses of Issuance and Distribution.

The following table sets forth all expenses other than the placement agency fee in connection with the sale of the common shares being registered. The following expenses will be borne by IBG LLC. All amounts shown are estimates except for the SEC registration fee.

| | | |
|---|---|---|
| SEC registration fee | $ | 53,500 |
| NASD fee | $ | 50,000 |
| Legal fees and expenses | $ | 2,475,000* |
| Printing and engraving expenses | $ | 450,000 |
| NASDAQ fees | $ | 105,000 |
| Transfer agent fees | $ | 100,000 |
| Accounting fees and expenses | $ | 1,800,000 |
| Miscellaneous | $ | 500,000 |
| Total | $ | 5,533,500 |

\*     Includes the legal fees of both counsel to the issuer and counsel to the placement agents.

### ITEM 14. Indemnification of Officers and Directors.

Section 145 of the Delaware General Corporation Law (DGCL) provides that a corporation may indemnify directors and officers as well as other employees and individuals against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with any threatened, pending or completed actions, suits or proceedings in which such person is made a party by reason of such person being or having been a director, officer, employee of or agent to the Registrant. The statute provides that it is not exclusive of other rights to which those seeking indemnification may be entitled under any by-law, agreement, vote of stockholders or disinterested directors or otherwise.

As permitted by the DGCL, our certificate of incorporation includes a provision that eliminates the personal liability of our directors for monetary damages for breach of fiduciary duty as a director, except for liability (1) for any breach of the director's duty of loyalty to us or our stockholders; (2) for acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of the law; (3) under Section 174 of the DGCL regarding unlawful dividends and stock purchases; or (4) arising as a result of any transaction from which the director derived an improper personal benefit.

As permitted by the DGCL, our bylaws provide that (1) we are required to indemnify our directors and officers to the fullest extent permitted by applicable law; (2) we are permitted to indemnify our other employees to the extent permitted by applicable statutory law; (3) we are required to advance expenses to our directors and officers in connection with any legal proceeding, subject to the provisions of applicable statutory law; and (4) the rights conferred in our bylaws are not exclusive.

At present, we are not aware of any pending or threatened litigation or proceeding involving any of our directors, officers, employees or agents in which indemnification would be required or permitted. We believe that our charter provisions and indemnification agreements are necessary to attract and retain qualified persons as directors and officers.

II-1

**Item 15. Recent Sales of Unregistered Securities.**

### IBG LLC Senior Notes

As described under "Description of Indebtedness—Senior Notes," IBG LLC periodically issues senior notes in private placements to certain qualified customers of Interactive Brokers LLC in private placements in reliance on Section 4(2) of the Securities Act. These senior notes were offered through Interactive Brokers LLC, the exclusive placement agent, on a best-efforts basis for a commission of $1.00 per $1,000 principal amount of the senior notes subscribed to by the purchasers. IBG LLC uses the proceeds from sales of the senior notes to provide capital to IBG LLC's broker-dealer subsidiaries in the form of subordinated loans and for other general purposes. All of the outstanding senior notes have either a 15-month or an 18-month maturity. IBG LLC may, solely at its option, redeem the senior notes at any time on or after a specified date in the third month or the sixth month, respectively, after the date on which the senior notes are issued and sold, at a redemption price equal to 100% of the principal amount of the senior notes to be redeemed plus accrued interest.

The following chart sets forth the principal amounts of senior notes issued since January 1, 2004:

| Date Issued | Principal Amount | Interest Rate | Date Redeemed |
|---|---|---|---|
| January 20, 2004 | $ 16,903,000 | 8.00% | April 19, 2004 |
| February 23, 2004 | $ 18,540,000 | 8.00% | May 24, 2004 |
| March 22, 2004 | $ 21,662,000 | 8.00% | June 21, 2004 |
| April 19, 2004 | $ 24,930,000 | 8.00% | July 19, 2004 |
| May 24, 2004 | $ 26,269,000 | 8.00% | August 23, 2004 |
| June 21, 2004 | $ 26,355,000 | 8.00% | September 20, 2004 |
| July 19, 2004 | $ 29,497,000 | 8.00% | October 18, 2004 |
| August 23, 2004 | $ 33,335,000 | 8.00% | November 22, 2004 |
| September 20, 2004 | $ 29,076,000 | 8.00% | December 20, 2004 |
| October 18, 2004 | $ 29,497,000 | 8.00% | January 24, 2005 |
| November 22, 2004 | $ 44,235,000 | 8.00% | February 22, 2005 |
| December 20, 2004 | $ 34,766,000 | 8.00% | March 21, 2005 |
| January 24, 2005 | $ 38,328,000 | 8.00% | April 18, 2005 |
| February 22, 2005 | $ 47,671,000 | 8.00% | May 23, 2005 |
| March 21, 2005 | $ 43,052,000 | 8.00% | June 20, 2005 |
| April 18, 2005 | $ 45,344,000 | 8.00% | July 18, 2005 |
| May 23, 2005 | $ 40,123,000 | 8.00% | November 21, 2005 |
| May 23, 2005 | $ 14,498,000 | 8.00% | August 22, 2005 |
| June 20, 2005 | $ 35,371,000 | 8.00% | September 19, 2005 |
| June 20, 2005 | $ 13,847,000 | 8.00% | December 24, 2005 |
| July 18, 2005 | $ 39,712,000 | 8.00% | October 24, 2005 |
| July 18, 2005 | $ 10,030,000 | 8.00% | January 23, 2006 |
| August 22, 2005 | $ 36,219,000 | 8.00% | November 21, 2005 |
| August 22, 2005 | $ 12,218,000 | 8.00% | February 21, 2006 |
| September 19, 2005 | $ 29,929,000 | 8.00% | December 19, 2005 |
| September 19, 2005 | $ 7,722,000 | 8.00% | March 20, 2006 |
| October 24, 2005 | $ 32,890,000 | 8.00% | January 23, 2006 |
| October 24, 2005 | $ 11,091,000 | 8.00% | April 24, 2006 |
| November 21, 2005 | $ 32,266,000 | 8.00% | February 21, 2006 |
| November 21, 2005 | $ 14,414,000 | 8.00% | May 22, 2006 |
| December 19, 2005 | $ 30,212,000 | 8.00% | March 20, 2006 |
| December 19, 2005 | $ 13,823,000 | 8.00% | June 19, 2006 |

II-2

| | | | |
|---|---|---|---|
| January 23, 2006 | $ | 38,926,000 | 8.00% April 24, 2006 |
| January 23, 2006 | $ | 18,495,000 | 8.00% July 24, 2006 |
| February 21, 2006 | $ | 35,821,000 | 8.00% May 22, 2006 |
| February 21, 2006 | $ | 16,475,000 | 8.00% August 21, 2006 |
| March 20, 2006 | $ | 32,847,000 | 8.00% June 19, 2006 |
| March 20, 2006 | $ | 14,073,000 | 8.00% September 18, 2006 |
| April 24, 2006 | $ | 37,369,000 | 8.00% July 24, 2006 |
| April 24, 2006 | $ | 18,191,000 | 8.00% October 23, 2006 |
| May 22, 2006 | $ | 38,822,000 | 8.00% August 21, 2006 |
| May 22, 2006 | $ | 14,467,000 | 8.00% November 20, 2006 |
| June 19, 2006 | $ | 18,795,000 | 7.00% September 18, 2006 |
| June 19, 2006 | $ | 7,309,000 | 7.00% December 18, 2006 |
| July 24, 2006 | $ | 23,727,000 | 7.00% October 23, 2006 |
| July 24, 2006 | $ | 12,102,000 | 7.00% January 22, 2007 |
| August 21, 2006 | $ | 26,492,000 | 7.00% November 20, 2006 |
| August 21, 2006 | $ | 11,031,000 | 7.00% February 20, 2007 |
| September 18, 2006 | $ | 20,055,000 | 7.00% December 18, 2006 |
| September 18, 2006 | $ | 10,318,000 | 7.00% March 19, 2007 |
| October 23, 2006 | $ | 28,910,000 | 7.00% January 22, 2007 |
| October 23, 2006 | $ | 14,096,000 | 7.00% April 23, 2007 |
| November 20, 2006 | $ | 26,450,000 | 7.00% February 20, 2007 |
| November 20, 2006 | $ | 14,328,000 | 7.00% Maturity Date: May 19, 2008 |
| December 18, 2006 | $ | 19,999,000 | 7.00% March 19, 2007 |
| December 18, 2006 | $ | 13,364,000 | 7.00% Maturity Date: June 23, 2008 |
| January 22, 2007 | $ | 26,953,000 | 7.00% April 23, 2007 |
| January 22, 2007 | $ | 20,074,000 | 7.00% Maturity Date: July 21, 2008 |
| February 20, 2007 | $ | 19,716,000 | 7.00% Maturity Date: May 19, 2008 |
| February 20, 2007 | $ | 12,857,000 | 7.00% Maturity Date: August 18, 2008 |
| March 19, 2007 | $ | 22,360,000 | 7.00% Maturity Date: June 23, 2008 |
| March 19, 2007 | $ | 10,911,000 | 7.00% Maturity Date: September 22, 2008 |
| April 23, 2007 | $ | 24,113,000 | 7.00% Maturity Date: July 21, 2008 |
| April 23, 2007 | $ | 12,545,000 | 7.00% Maturity Date: October 20, 2008 |

## Class B Common Stock

On November 21, 2006, the Registrant issued 100 shares of the Registrant's Class B common stock, par value $0.01 per share, to IBG LLC for $1. The issuance of such shares of common stock to IBG LLC was not registered under the Securities Act because the shares were offered and sold in a transaction exempt from registration under Section 4(2) of the Securities Act. IBG LLC will contribute these shares to IBG Holdings LLC in connection with the Recapitalization.

## IBG LLC Membership Interests

Prior to consummation of the Recapitalization, IBG LLC has historically adjusted from time to time the relative percentage ownership of IBG LLC among the members thereof as part of its overall compensation arrangement and to reflect the admission or departure of members. In the last three fiscal years, such adjustments have included the issuance of IBG LLC membership interests to, and the admission as members of, 12 new non-executive officer employees in consideration for services rendered to IBG LLC or its subsidiaries. Such issuances were pursuant to transactions exempt from registration under Section 4(2) of the Securities Act.

II-3

**Item 16. Exhibits and Financial Statement Schedules.**

    (a)    Exhibits:

| Exhibit Number | Description |
|---|---|
| 1.1 | Form of Placement Agency Agreement.** |
| 3.1 | Amended and Restated Certificate of Incorporation of Interactive Brokers Group, Inc.** |
| 3.2 | Bylaws of Interactive Brokers Group, Inc.** |
| 5.1 | Opinion of Dechert LLP.** |
| 10.1 | Credit Agreement, dated as of May 19, 2006, by and among Interactive Brokers Group LLC, JPMorgan Chase Bank, N.A., Harris N.A., Citibank, N.A. HSBC USA National Association and the Lenders party thereto.** |
| 10.2 | Pledge and Collateral Agency Agreement, dated as of May 19, 2006, made by Interactive Brokers Group LLC and each of the other signatories thereto in favor of JPMorgan Chase Bank, N.A., as Collateral Agent for the secured parties and as Bank Agent.** |
| 10.3 | Guarantee and Collateral Agreement, dated as of May 19, 2006, made by Interactive Brokers Group LLC and each of the other signatories thereto in favor of JPMorgan Chase Bank, N.A., as Administrative Agent for the secured parties.** |
| 10.4 | Form of Amended and Restated Operating Agreement of IBG LLC.** |
| 10.5 | Form of Limited Liability Company Operating Agreement of IBG Holdings LLC** |
| 10.6 | Form of Exchange Agreement by and among Interactive Brokers Group, Inc., IBG Holdings LLC, IBG LLC and the Members of IBG LLC.** |
| 10.7 | Form of Tax Receivable Agreement by and between Interactive Brokers Group, Inc. and IBG Holdings LLC.** |
| 10.8 | Interactive Brokers Group, Inc. 2007 Stock Incentive Plan.**+ |
| 10.9 | Interactive Brokers Group, Inc. 2007 ROI Unit Stock Plan.**+ |
| 21.1 | Subsidiaries of the registrant.** |
| 23.1 | Consent of Deloitte & Touche LLP.* |
| 23.2 | Consent of Dechert LLP (included in Exhibit 5.1).** |
| 23.3 | Consent of Philip D. DeFeo, Incoming Director.** |
| 24.1 | Power of Attorney.** |

\*    Filed herewith.

\*\*    Previously filed.

+    These exhibits relate to management contracts or compensatory plans or arrangements.

    (b)    Financial Statement Schedules:

Schedule I—Condensed Financial Statements Of Interactive Brokers Group LLC For The Years Ended December 31, 2006, 2005 and 2004

Schedules other than that noted above are omitted because of an absence of other conditions under which they are required or because the information required to be disclosed is presented in the financial statements or notes thereto.

II-4

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to our directors, officers and controlling persons pursuant to the foregoing provisions, or otherwise, we have been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by us of expenses incurred or paid by a director, officer or controlling person of us in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, we will, unless in the opinion of counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by us is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

The undersigned registrant hereby undertakes to provide to the placement agents at the closing specified in the placement agency agreement, certificates in such denominations and registered in such names as required by the placement agents to permit prompt delivery to each purchaser.

We hereby undertake that:

(i)    for purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the Registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(ii)   for purposes of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

II-5

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-1 and has duly caused this Amendment No. 5 to the Registration Statement on Form S-1 to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Greenwich, State of Connecticut on May 2, 2007.

INTERACTIVE BROKERS GROUP, INC.

By:    /s/  PAUL J. BRODY

Paul J. Brody, Chief Financial Officer,
Treasurer and Secretary

Pursuant to the requirements of the Securities Act of 1933, this Amendment No. 5 to the Registration Statement on Form S-1 has been signed below by the following persons on behalf of Interactive Brokers Group, Inc. and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/  THOMAS PETERFFY<br>Thomas Peterffy | Chairman of the Board of Directors, Chief Executive Officer and President (Principal Executive Officer) | May 2, 2007 |
| *<br>Earl H. Nemser | Vice Chairman and Director | May 2, 2007 |
| /s/  PAUL J. BRODY<br>Paul J. Brody | Chief Financial Officer, Treasurer, Secretary and Director (Principal Financial and Accounting Officer) | May 2, 2007 |
| *<br>Milan Galik | Senior Vice President, Software Development and Director | May 2, 2007 |

*By: /s/  PAUL J. BRODY

Paul J. Brody
Attorney-in-fact

II-6

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Members of IBG LLC (formerly known as Interactive Brokers Group LLC)

We have audited the consolidated financial statements of IBG LLC and subsidiaries (the "Group") as of December 31, 2006 and 2005, and for each of the three years in the period ended December 31, 2006, and have issued our report thereon dated April 4, 2007 (included elsewhere in this Registration Statement). Our audits also included the financial statement schedule listed in Item 16 of this Registration Statement. The financial statement schedule is the responsibility of the Group's management. Our responsibility is to express an opinion based on our audits. In our opinion, such financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly, in all material respects the financial information set forth therein.

/s/ Deloitte & Touche LLP

New York, New York
April 4, 2007

S-1

**IBG LLC**

**(Parent Company Only)**

## CONDENSED STATEMENTS OF FINANCIAL CONDITION

|  | As of December 31, | |
|---|---|---|
|  | 2006 | 2005 |
|  | (in thousands) | |
| **Assets** | | |
| Cash and cash equivalents | $ 615 | $ 1,640 |
| Investments in subsidiaries, equity basis | 2,800,712 | 2,170,275 |
| Receivable from subsidiaries | 396,360 | 248,319 |
| Other assets | 11,777 | 14,358 |
| Total assets | 3,209,464 | 2,434,592 |
| | | |
| **Liabilities and redeemable members' interests** | | |
| Liabilities: | | |
| Short-term borrowings | $ — | $ 5,000 |
| Payable to subsidiaries | 87,389 | 69,515 |
| Senior notes payable | 150,598 | 164,666 |
| Senior secured credit facility | 150,000 | — |
| Accounts payable, accrued expenses and other liabilities | 19,560 | 21,165 |
| Redeemable members' interests | | |
| (including accumulated other comprehensive income of $98,568 and $47,275) | 2,801,917 | 2,174,246 |
| Total liabilities and redeemable members' interests | $ 3,209,464 | $ 2,434,592 |

See accompanying notes to the condensed financial statements.

S-2

**IBG LLC**

**(Parent Company Only)**

### CONDENSED STATEMENTS OF INCOME

### AND COMPREHENSIVE INCOME

| | Year ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| | (in thousands) | | |
| Revenues—dividends, interest and other | $ 373 | $ 187 | $ 135 |
| Expenses: | | | |
| Interest expense | 19,244 | 12,053 | 6,504 |
| Other | 37,475 | 27,136 | 21,103 |
| Total expenses | 56,719 | 39,189 | 27,607 |
| Loss before equity in income of subsidiaries and investments | (56,346) | (39,002) | (27,472) |
| Equity in income of subsidiaries and investments, net of tax | 790,515 | 574,522 | 297,915 |
| Net Income | 734,169 | 535,520 | 270,443 |
| Cumulative translation adjustment | 51,293 | (74,708) | 44,564 |
| Comprehensive income | $ 785,462 | $ 460,812 | $ 315,007 |

See accompanying notes to the condensed financial statements.

S-3

**IBG LLC**

**(Parent Company Only)**

## CONDENSED STATEMENTS OF CASH FLOWS

|  | Year ended December 31, | | |
|---|---|---|---|
|  | 2006 | 2005 | 2004 |
|  | | (in thousands) | |
| Cash flows from operating activities: | | | |
| Net income | $ 734,169 | $ 535,520 | $ 270,443 |
| Adjustments to reconcile net income to net cash (used in) provided by operating activities: | | | |
| Equity in income of subsidiaries and investment, net of dividends received | (603,640) | (508,015) | (213,407) |
| Amortization | 5,976 | 4,887 | 4,026 |
| Changes in operating assets and liabilities | (123,774) | (36,567) | (76,689) |
| Net cash provided by (used in) operating activities | 12,731 | (4,175) | (15,627) |
| Cash flows from investing activities | 13,103 | 34,846 | 23,611 |
| Cash flows from financing activities | (26,859) | (29,163) | (8,012) |
| Net (decrease) increase in cash and cash equivalents | (1,025) | 1,508 | (28) |
| Cash and cash equivalents at beginning of year | 1,640 | 132 | 160 |
| Cash and cash equivalents at end of year | $ 615 | $ 1,640 | $ 132 |
| Supplemental Disclosures of Cash Flow Information: | | | |
| Interest paid | $ 18,247 | $ 13,192 | $ 4,789 |
| Taxes paid | $ — | $ — | $ — |
| Non-cash investing activities—contribution of equity investments to affiliate | $ 34,556 | $ — | $ — |

See accompanying notes to the condensed financial statements.

S-4

The accompanying condensed financial statements (the "Parent Company Financial Statements") of IBG LLC, formerly known as Interactive Brokers Group LLC, including the notes thereto, should be read in conjunction with the consolidated financial statements of IBG LLC and subsidiaries ("the Group") and the notes thereto.

The preparation of the Parent Company Financial Statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts and disclosures in the condensed financial statements and accompanying notes. Actual results could differ materially from those estimates.

### Redeemable Members' Interests

Redeemable members' interests represent member interests in IBG LLC that are entitled to share in the consolidated profits and losses of the Group. IBG LLC is a private entity owned by the members holding such member interests. As a private company, such amounts were classified historically as members' capital. For presentation purposes, IBG LLC has applied guidance within Emerging Issues Task Force ("EITF") Topic D-98 "Classification and Measurement of Redeemable Securities," which requires securities or equity interests of a company whose redemption is outside the control of the company to be classified outside of permanent capital in the statement of financial condition. The member interests of IBG LLC can be redeemed by the members at book value at the option of the member. Because this redemption right is deemed to be outside of its control, IBG LLC has classified all redeemable members' interests outside of permanent capital to redeemable members' interests in the condensed statements of financial condition. Such reclassification was made to comply with EITF Topic D-98 and the requirements of Regulation S-X of the Securities Exchange Act of 1934, as amended.

On December 16, 2004, the FASB issued SFAS No. 123 (revised 2004), "Share-Based Payment, a Revision of SFAS No. 123, Accounting for Stock-Based Compensation." In April 2005, the Securities and Exchange Commission ("SEC") delayed the effective date for SFAS No. 123R until the first fiscal year beginning after June 15, 2005. As a result of the SEC ruling, the Group was required to adopt the provisions of SFAS No. 123R in the first quarter of 2006. SFAS No. 123R clarifies and amends the guidance of SFAS No. 123 in several areas, including measuring fair value, classifying an award as equity or as a liability, attributing compensation cost to service periods and accounting for forfeitures of awards. With the adoption of SFAS No. 123R, IBG LLC continues to account for all grants of member interests granted subsequent to December 31, 2005 as liability awards.

### Income Taxes

IBG LLC operates in the United States as a limited liability company that is treated as a partnership for U.S. federal income tax purposes. Accordingly, IBG LLC's income is not subject to U.S. federal or foreign income taxes.

## 2. Transactions with Subsidiaries

As of December 31, 2006 and 2005, receivables from subsidiaries of $396,360 and $248,319, respectively, and payables to subsidiaries of $87,389 and $69,515, respectively, related primarily to the allocation of funds, including funds received from issuance of senior notes payable (see Note 4) or borrowings under the senior secured credit facility (see Note 5) to subsidiaries to fund

S-5

regulatory capital. Dividends received from subsidiaries for the three years ended December 31, 2006, 2005 and 2004 were $188,769, $66,507 and $84,508, respectively.

## 3.  Short-term borrowings

IBG LLC had $5,000 in short-term borrowings outstanding at December 31, 2005 at an interest rate of 9.25%. For the years ended December 31, 2006, 2005 and 2004, interest expense under short-term borrowings was $193, $416 and $322, respectively.

## 4.  Senior Notes Payable

At December 31, 2006 and 2005 IBG LLC had $150,598 and $164,666 of 7% and 8% senior notes outstanding, respectively, which were privately placed to certain qualified customers of IB LLC. All of the senior notes outstanding at December 31, 2006 have either a 15-month or an 18-month maturity. IBG LLC may, solely at its option, redeem the senior notes at any time on or after a specified date in the third month or the sixth month, respectively, after the date on which the senior notes are issued and sold (the "Optional Redemption Date"), at a redemption price equal to 100% of the principal amount of the senior notes to be redeemed plus accrued interest. Historically, IBG LLC has redeemed these senior notes at their Optional Redemption Dates. The carrying value of the senior notes approximates their fair value since they are short-term in nature. In 2006 and 2005, IBG LLC redeemed $526,530 and $493,170 of senior notes, respectively, which included $164,666 and $108,811 of senior notes issued in 2005 and 2004, respectively. During the period from January 1 through March 20, 2007, total senior notes issued were $112,816, and senior notes issued in 2006 which were redeemed totaled $108,810. Interest expense on senior notes was $13,159, $11,558 and $5,937 for the years ended December 31, 2006, 2005 and 2004, respectively.

## 5.  Senior Secured Credit Facility

In May 2006, IBG LLC entered into a 3-year $300 million revolving credit facility with a syndicate of banks, of which $150 million was borrowed in May 2006. As of December 31, 2006, the interest rate on this facility, which is indexed to LIBOR, was 5.95%. The carrying value of the senior secured credit facility approximates its fair value since borrowings under the facility could be paid down at any time from available funds, making such borrowings short-term in nature. This credit facility is secured by a first priority interest in all of the capital stock of each entity owned directly by IBG LLC (subject to customary limitations with respect to foreign subsidiaries), and loans and advances to, and other intercompany obligations owed by, each entity owned directly or indirectly by IBG LLC. The financial covenants on the Group under the terms of the senior secured credit facility are:

- minimum net worth (redeemable members' interests) of $1.5 billion, with quarterly increases equal to 25% of positive consolidated net income;

- maximum total debt to capitalization (including redeemable members' interests) ratio of 30%;

- minimum liquidity (unencumbered marketable securities and other liquid financial assets divided by unsecured short-term (maturities of less than one year) liabilities) ratio of 1.0 to 1.0; and

S-6

maximum total debt to net consolidated regulatory capital ratio of 15%

Interest expense on the senior secured credit facility for the year ended December 31, 2006 was $5,712, which includes commitment fees on the facility. As of December 31, 2006, the Group was in compliance with all of the covenants under this credit facility.

## 6. Investments

In 2002, IBG LLC acquired an interest in Boston Options Exchange, LLC ("BOX"), and during 2006, IBG LLC made strategic investments totaling $29,250 in electronic trading exchanges, OneChicago LLC, ISE Stock Exchange, LLC and CBOE Stock Exchange, LLC. All of these investments were accounted for under the equity method of accounting. Subsequent to these investments being made, IB Exchange Corp. ("IBEC"), a wholly owned subsidiary of IBG LLC, was formed to hold such investments, and IBG LLC contributed these investments to IBEC as capital contributions.

## 7. Redeemable Members' Interests

The IBG LLC operating agreement, as amended (the "LLC Agreement"), sets forth the respective rights and obligations of members of the Group. The LLC Agreement also provides for terms of its management and conduct of its affairs. The Group executive committee is responsible for managing the affairs of the Group.

The Group's founder, chairman and chief executive officer, Thomas Peterffy, and his affiliates own approximately 85% of member interests and the remaining interests are owned primarily by key employees.

Mr. Peterffy, who is also the Managing Member and sole voting member of IBG LLC, may transfer all or any portion of his member interests to any person. In the event that the percentage interest of any member changes or a new member is admitted, all member interests are recalculated in proportion to the percentage interest held at that time. The Group may enter into an agreement of merger, consolidation, or sale or other transfer of substantially all of the assets of the Group upon the decision of the Managing Member. The Group will terminate upon a vote to dissolve the Group; upon the retirement, resignation or other withdrawal of the Managing Member; or under certain statutory events, unless the Managing Member and a majority of the members vote to continue the business of the Group.

Pursuant to the LLC Agreement, consolidated profits and losses of the Group are allocated to the members in proportion to their respective percentage interests. Distributions to members, which historically have been made to assist members in meeting their income tax obligations with respect to their proportionate share of the Group's profits, are made at the discretion of the Managing Member in proportion to the respective members' percentage interests.

## 8. Subsequent Events

On January 16, 2007, IBG LLC's Managing Member approved and paid cash dividends to members totaling $24,500.

S-7

## INDEX TO EXHIBITS

| Exhibit Number | Description |
|---|---|
| 1.1 | Form of Placement Agency Agreement.** |
| 3.1 | Amended and Restated Certificate of Incorporation of Interactive Brokers Group, Inc.** |
| 3.2 | Bylaws of Interactive Brokers Group, Inc.** |
| 5.1 | Opinion of Dechert LLP.** |
| 10.1 | Credit Agreement, dated as of May 19, 2006, by and among Interactive Brokers Group LLC, JPMorgan Chase Bank, N.A., Harris N.A., Citibank, N.A. HSBC USA National Association and the Lenders party thereto.** |
| 10.2 | Pledge and Collateral Agency Agreement, dated as of May 19, 2006, made by Interactive Brokers Group LLC and each of the other signatories thereto in favor of JPMorgan Chase Bank, N.A., as Collateral Agent for the secured parties and as Bank Agent.** |
| 10.3 | Guarantee and Collateral Agreement, dated as of May 19, 2006, made by Interactive Brokers Group LLC and each of the other signatories thereto in favor of JPMorgan Chase Bank, N.A., as Administrative Agent for the secured parties.** |
| 10.4 | Form of Amended and Restated Operating Agreement of IBG LLC.** |
| 10.5 | Form of Limited Liability Company Operating Agreement of IBG Holdings LLC.** |
| 10.6 | Form of Exchange Agreement by and among Interactive Brokers Group, Inc., IBG Holdings LLC, IBG LLC and the Members of IBG LLC.** |
| 10.7 | Form of Tax Receivable Agreement by and between Interactive Brokers Group, Inc. and IBG Holdings LLC.** |
| 10.8 | Interactive Brokers Group, Inc. 2007 Stock Incentive Plan.**+ |
| 10.9 | Interactive Brokers Group, Inc. 2007 ROI Unit Stock Plan.**+ |
| 21.1 | Subsidiaries of the registrant.** |
| 23.1 | Consent of Deloitte & Touche LLP.* |
| 23.2 | Consent of Dechert LLP (included in Exhibit 5.1).** |
| 23.3 | Consent of Philip D. DeFeo, Incoming Director.** |
| 24.1 | Power of Attorney (included in signature page).** |

\*      Filed herewith.
\*\*    Previously filed

\+      These exhibits relate to management contracts or compensatory plans or arrangements.

QuickLinks

EXPLANATORY NOTE
TABLE OF CONTENTS
INFORMATION ABOUT THIS PROSPECTUS
PROSPECTUS SUMMARY
The Offering
SUMMARY HISTORICAL AND PRO FORMA CONSOLIDATED FINANCIAL DATA
RISK FACTORS
Risks Related to Our Company Structure
Risks Related to Our Business
Risks Related to the Auction Process for This Offering
Other Risks Related To The Offering
FORWARD-LOOKING STATEMENTS
THE RECAPITALIZATION TRANSACTIONS AND OUR ORGANIZATIONAL STRUCTURE
USE OF PROCEEDS
DIVIDEND POLICY
CAPITALIZATION
DILUTION
UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL DATA
Unaudited Pro Forma Consolidated Statement of Income
Notes to the Unaudited Pro Forma Consolidated Statement of Income
Unaudited Pro Forma Consolidated Statement of Financial Condition As of December 31, 2006
Notes to the Unaudited Pro Forma Consolidated Statement of Financial Condition
SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA
MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS
BUSINESS
MANAGEMENT
PRINCIPAL STOCKHOLDERS
TRANSACTIONS WITH RELATED PERSONS, PROMOTERS AND CERTAIN CONTROL PERSONS
DESCRIPTION OF CAPITAL STOCK
DESCRIPTION OF INDEBTEDNESS
SHARES ELIGIBLE FOR FUTURE SALE
MATERIAL UNITED STATES FEDERAL TAX CONSEQUENCES TO NON-UNITED STATES HOLDERS
PLAN OF DISTRIBUTION
LEGAL MATTERS
EXPERTS
WHERE YOU CAN FIND MORE INFORMATION
INDEX TO FINANCIAL STATEMENTS
REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM
IBG LLC AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF FINANCIAL CONDITION
IBG LLC AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF INCOME
IBG LLC AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF CASH FLOWS
IBG LLC AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF CHANGES IN REDEEMABLE MEMBERS' INTERESTS
IBG LLC and Subsidiaries Notes to Consolidated Financial Statements Three Years Ended December 31, 2006 (in thousands)
USE OF PROCEEDS
PLAN OF DISTRIBUTION
PART II INFORMATION NOT REQUIRED IN PROSPECTUS
SIGNATURES
IBG LLC (Parent Company Only) CONDENSED STATEMENTS OF FINANCIAL CONDITION
IBG LLC (Parent Company Only) CONDENSED STATEMENTS OF INCOME AND COMPREHENSIVE INCOME
IBG LLC (Parent Company Only) CONDENSED STATEMENTS OF CASH FLOWS
INDEX TO EXHIBITS

| Date | Open | High | Low | Close | Volume | Adj Close |
|---|---|---|---|---|---|---|
| 4/24/2008 | 27.55 | 28.1 | 27.31 | 27.87 | 1146600 | 27.87 |
| 4/23/2008 | 27.5 | 27.99 | 27.29 | 27.48 | 582200 | 27.48 |
| 4/22/2008 | 28.08 | 28.08 | 27.11 | 27.59 | 741700 | 27.59 |
| 4/21/2008 | 27.59 | 28.41 | 27.12 | 28.27 | 467900 | 28.27 |
| 4/18/2008 | 28.87 | 29.4 | 27.25 | 27.87 | 788100 | 27.87 |
| 4/17/2008 | 28.47 | 28.6 | 27.41 | 28.1 | 698400 | 28.1 |
| 4/16/2008 | 27.13 | 28.4 | 27.13 | 28.13 | 811200 | 28.13 |
| 4/15/2008 | 26.17 | 27.24 | 26.17 | 26.69 | 706100 | 26.69 |
| 4/14/2008 | 27.51 | 27.51 | 25.65 | 25.9 | 948800 | 25.9 |
| 4/11/2008 | 27.76 | 28.04 | 27.04 | 27.29 | 332300 | 27.29 |
| 4/10/2008 | 27.86 | 28.45 | 27.68 | 27.95 | 589000 | 27.95 |
| 4/9/2008 | 28.97 | 29.19 | 27.64 | 27.8 | 313600 | 27.8 |
| 4/8/2008 | 28.38 | 29.44 | 28.34 | 28.87 | 529200 | 28.87 |
| 4/7/2008 | 28.78 | 29.26 | 28.2 | 28.73 | 357700 | 28.73 |
| 4/4/2008 | 28.99 | 29.53 | 28.2 | 28.7 | 579300 | 28.7 |
| 4/3/2008 | 27.89 | 28.95 | 27.65 | 28.94 | 744800 | 28.94 |
| 4/2/2008 | 28.5 | 28.85 | 27.66 | 28.25 | 563300 | 28.25 |
| 4/1/2008 | 26.1 | 28.49 | 25.9 | 28.44 | 1377300 | 28.44 |
| 3/31/2008 | 26.04 | 26.42 | 25.33 | 25.67 | 741400 | 25.67 |
| 3/28/2008 | 26.83 | 27 | 25.98 | 26.07 | 671400 | 26.07 |
| 3/27/2008 | 27.01 | 27.87 | 26.02 | 26.82 | 1051700 | 26.82 |
| 3/26/2008 | 26.84 | 27.47 | 26.63 | 26.87 | 820300 | 26.87 |
| 3/25/2008 | 27.23 | 27.49 | 26.52 | 27.11 | 1022200 | 27.11 |
| 3/24/2008 | 26.95 | 27.8 | 26.68 | 27.16 | 1047800 | 27.16 |
| 3/20/2008 | 26.91 | 27.18 | 26 | 26.9 | 2460900 | 26.9 |
| 3/19/2008 | 25.85 | 27.45 | 25.85 | 26.74 | 2310400 | 26.74 |
| 3/18/2008 | 27.28 | 27.95 | 24.34 | 25.59 | 4639800 | 25.59 |
| 3/17/2008 | 28.58 | 29.55 | 20.25 | 25.37 | 7513500 | 25.37 |
| 3/14/2008 | 31.93 | 31.93 | 28.74 | 29.72 | 1553900 | 29.72 |
| 3/13/2008 | 31.5 | 32.22 | 30.5 | 31.91 | 919100 | 31.91 |
| 3/12/2008 | 31.68 | 32.99 | 31.67 | 31.93 | 1149100 | 31.93 |
| 3/11/2008 | 30.72 | 31.66 | 29.37 | 31.66 | 1049000 | 31.66 |
| 3/10/2008 | 30.61 | 30.86 | 29.57 | 29.84 | 724300 | 29.84 |
| 3/7/2008 | 29.37 | 31.1 | 29.23 | 30.35 | 1408300 | 30.35 |
| 3/6/2008 | 30.83 | 31.2 | 29.69 | 29.71 | 902000 | 29.71 |
| 3/5/2008 | 30.4 | 31.75 | 30.28 | 30.97 | 856200 | 30.97 |
| 3/4/2008 | 30.39 | 30.82 | 29.83 | 30.28 | 1195700 | 30.28 |
| 3/3/2008 | 31.18 | 31.63 | 29.8 | 30.49 | 1445500 | 30.49 |
| 2/29/2008 | 33.37 | 33.51 | 30.85 | 31.07 | 1431600 | 31.07 |
| 2/28/2008 | 34.3 | 34.3 | 33.27 | 33.28 | 530300 | 33.28 |
| 2/27/2008 | 34.57 | 34.62 | 34 | 34.06 | 706800 | 34.06 |
| 2/26/2008 | 34.4 | 35.69 | 33.86 | 34.87 | 670200 | 34.87 |
| 2/25/2008 | 34.51 | 35.03 | 33.75 | 34.7 | 992400 | 34.7 |
| 2/22/2008 | 34.61 | 34.62 | 32.79 | 34.49 | 728100 | 34.49 |
| 2/21/2008 | 34.92 | 35.66 | 34.52 | 34.6 | 885600 | 34.6 |
| 2/20/2008 | 33.88 | 35.14 | 33.67 | 34.65 | 583900 | 34.65 |
| 2/19/2008 | 34.75 | 34.97 | 33.77 | 34.05 | 1059300 | 34.05 |
| 2/15/2008 | 34.44 | 34.66 | 33.25 | 34.45 | 1224500 | 34.45 |
| 2/14/2008 | 34 | 34.8 | 33.71 | 33.96 | 1083500 | 33.96 |
| 2/13/2008 | 33.56 | 34.89 | 32.55 | 34.07 | 1127100 | 34.07 |
| 2/12/2008 | 33.27 | 33.85 | 32.76 | 33.23 | 1010600 | 33.23 |

| 2/11/2008 | 31.68 | 33.42 | 31.06 | 32.74 | 852100 | 32.74 |
|---|---|---|---|---|---|---|
| 2/8/2008 | 32.23 | 32.86 | 31.56 | 31.67 | 915600 | 31.67 |
| 2/7/2008 | 32.55 | 33.32 | 32.01 | 32.23 | 843200 | 32.23 |
| 2/6/2008 | 34.26 | 34.68 | 32.5 | 32.6 | 690300 | 32.6 |
| 2/5/2008 | 34.36 | 35.18 | 33.89 | 34.02 | 1220100 | 34.02 |
| 2/4/2008 | 35.42 | 35.66 | 34.53 | 35 | 942500 | 35 |
| 2/1/2008 | 34.8 | 35.93 | 34.41 | 35.47 | 1211300 | 35.47 |
| 1/31/2008 | 33.39 | 35 | 33.13 | 34.81 | 1681100 | 34.81 |
| 1/30/2008 | 33.05 | 34.53 | 32.77 | 33.74 | 840600 | 33.74 |
| 1/29/2008 | 33.48 | 34.57 | 33.13 | 33.35 | 1745200 | 33.35 |
| 1/28/2008 | 31.42 | 33.6 | 30.7 | 33.34 | 1460900 | 33.34 |
| 1/25/2008 | 31.22 | 32.25 | 30.75 | 31.45 | 2967300 | 31.45 |
| 1/24/2008 | 32.15 | 33.61 | 32.05 | 32.86 | 1987000 | 32.86 |
| 1/23/2008 | 30 | 32.44 | 30 | 31.87 | 2097000 | 31.87 |
| 1/22/2008 | 29.8 | 31.75 | 29.75 | 30.52 | 1380500 | 30.52 |
| 1/18/2008 | 32.07 | 32.19 | 30.25 | 31.33 | 1476100 | 31.33 |
| 1/17/2008 | 32.6 | 32.85 | 31.31 | 31.45 | 1549000 | 31.45 |
| 1/16/2008 | 32.37 | 33.63 | 32.3 | 32.54 | 1114500 | 32.54 |
| 1/15/2008 | 33.46 | 33.46 | 32.75 | 32.89 | 547900 | 32.89 |
| 1/14/2008 | 33 | 34.15 | 32.44 | 33.87 | 1044900 | 33.87 |
| 1/11/2008 | 32.32 | 33.19 | 32.28 | 32.77 | 707200 | 32.77 |
| 1/10/2008 | 31.68 | 32.99 | 31.41 | 32.61 | 1141000 | 32.61 |
| 1/9/2008 | 31.31 | 31.97 | 30.72 | 31.78 | 927400 | 31.78 |
| 1/8/2008 | 31.51 | 31.92 | 31.1 | 31.32 | 770000 | 31.32 |
| 1/7/2008 | 31.09 | 31.7 | 30.65 | 31.35 | 474500 | 31.35 |
| 1/4/2008 | 31.25 | 31.5 | 30.47 | 31 | 661900 | 31 |
| 1/3/2008 | 31.92 | 32.16 | 31.38 | 31.61 | 323800 | 31.61 |
| 1/2/2008 | 32.4 | 32.75 | 31.61 | 31.91 | 496400 | 31.91 |
| 12/31/2007 | 32.35 | 32.66 | 31.24 | 32.32 | 536600 | 32.32 |
| 12/28/2007 | 32.68 | 33 | 32.07 | 32.4 | 238800 | 32.4 |
| 12/27/2007 | 32.98 | 33.3 | 32.25 | 32.44 | 453800 | 32.44 |
| 12/26/2007 | 32.55 | 33.11 | 32.08 | 33.01 | 274100 | 33.01 |
| 12/24/2007 | 32.73 | 33.1 | 32.44 | 32.56 | 190400 | 32.56 |
| 12/21/2007 | 32.68 | 33.36 | 31.95 | 32.66 | 1243300 | 32.66 |
| 12/20/2007 | 31.23 | 32.39 | 31.03 | 32.27 | 1029500 | 32.27 |
| 12/19/2007 | 30.01 | 30.96 | 29.94 | 30.93 | 830400 | 30.93 |
| 12/18/2007 | 30.35 | 30.55 | 29.84 | 29.88 | 503300 | 29.88 |
| 12/17/2007 | 30.36 | 31.25 | 29.75 | 30.02 | 696800 | 30.02 |
| 12/14/2007 | 30.12 | 31.25 | 29.81 | 30.64 | 454400 | 30.64 |
| 12/13/2007 | 30.99 | 31.19 | 29.65 | 30.18 | 1022400 | 30.18 |
| 12/12/2007 | 31.5 | 32.19 | 30.32 | 30.89 | 720700 | 30.89 |
| 12/11/2007 | 31.94 | 31.95 | 30.62 | 30.96 | 583800 | 30.96 |
| 12/10/2007 | 31.12 | 32.27 | 31.12 | 31.8 | 1531100 | 31.8 |
| 12/7/2007 | 30.86 | 31.38 | 30.57 | 31.05 | 565600 | 31.05 |
| 12/6/2007 | 29.99 | 30.99 | 29.69 | 30.79 | 1197300 | 30.79 |
| 12/5/2007 | 29.86 | 30.43 | 29.84 | 29.99 | 650400 | 29.99 |
| 12/4/2007 | 29.6 | 29.86 | 29.28 | 29.5 | 334000 | 29.5 |
| 12/3/2007 | 29.4 | 30.37 | 29.21 | 29.75 | 810200 | 29.75 |
| 11/30/2007 | 29.72 | 30.06 | 29.11 | 29.4 | 1453100 | 29.4 |
| 11/29/2007 | 28.57 | 29.29 | 28.31 | 29.17 | 539300 | 29.17 |
| 11/28/2007 | 28.32 | 29.01 | 28.15 | 28.69 | 1061000 | 28.69 |
| 11/27/2007 | 27.61 | 28.12 | 27.51 | 27.95 | 1123600 | 27.95 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 11/26/2007 | 27.6 | 28.1 | 27.26 | 27.58 | 430000 | 27.58 |
| 11/23/2007 | 28.22 | 28.22 | 27.26 | 27.66 | 270800 | 27.66 |
| 11/21/2007 | 27.89 | 28.85 | 27.47 | 28 | 566800 | 28 |
| 11/20/2007 | 27.37 | 28.1 | 27.13 | 28 | 645000 | 28 |
| 11/19/2007 | 27.46 | 27.56 | 26.83 | 27.31 | 1176500 | 27.31 |
| 11/16/2007 | 27.72 | 27.99 | 26.94 | 27.68 | 1588500 | 27.68 |
| 11/15/2007 | 27.79 | 28.01 | 26.95 | 27.6 | 405400 | 27.6 |
| 11/14/2007 | 28.07 | 28.49 | 27.6 | 27.92 | 518100 | 27.92 |
| 11/13/2007 | 28.07 | 28.64 | 27.33 | 28 | 679200 | 28 |
| 11/12/2007 | 27.23 | 28.12 | 27.23 | 27.76 | 664000 | 27.76 |
| 11/9/2007 | 27.68 | 28 | 27.01 | 27.56 | 568500 | 27.56 |
| 11/8/2007 | 28.98 | 28.98 | 27.31 | 27.97 | 1128500 | 27.97 |
| 11/7/2007 | 28.64 | 29 | 28.42 | 28.5 | 601700 | 28.5 |
| 11/6/2007 | 28.94 | 29.5 | 28.62 | 28.99 | 523900 | 28.99 |
| 11/5/2007 | 28.67 | 29.62 | 28.48 | 28.91 | 968700 | 28.91 |
| 11/2/2007 | 28.02 | 29.1 | 27.55 | 29 | 680600 | 29 |
| 11/1/2007 | 28.52 | 28.66 | 27.74 | 27.83 | 758900 | 27.83 |
| 10/31/2007 | 28.81 | 29.05 | 27.87 | 28.87 | 991500 | 28.87 |
| 10/30/2007 | 29.1 | 29.45 | 28.35 | 28.67 | 820900 | 28.67 |
| 10/29/2007 | 30.39 | 30.39 | 28.73 | 29.15 | 1223200 | 29.15 |
| 10/26/2007 | 32.5 | 32.56 | 29.3 | 30.11 | 2611600 | 30.11 |
| 10/25/2007 | 30.33 | 31.16 | 29.77 | 30.94 | 1705500 | 30.94 |
| 10/24/2007 | 29.96 | 30.48 | 29.03 | 30.11 | 847600 | 30.11 |
| 10/23/2007 | 29.3 | 29.99 | 28.77 | 29.91 | 680900 | 29.91 |
| 10/22/2007 | 28.49 | 28.97 | 27.5 | 28.95 | 595800 | 28.95 |
| 10/19/2007 | 29.58 | 29.62 | 28 | 28.61 | 653900 | 28.61 |
| 10/18/2007 | 29.04 | 29.78 | 28.63 | 29.5 | 381000 | 29.5 |
| 10/17/2007 | 29.1 | 29.75 | 28.11 | 29.18 | 1025900 | 29.18 |
| 10/16/2007 | 28.56 | 29.14 | 28.4 | 28.75 | 585800 | 28.75 |
| 10/15/2007 | 27.91 | 29.1 | 27.65 | 28.9 | 686600 | 28.9 |
| 10/12/2007 | 27.66 | 28.4 | 27.66 | 27.93 | 182000 | 27.93 |
| 10/11/2007 | 28.46 | 28.52 | 27.55 | 27.79 | 409000 | 27.79 |
| 10/10/2007 | 27.3 | 28.32 | 27.09 | 28.32 | 372000 | 28.32 |
| 10/9/2007 | 27.28 | 27.58 | 27.13 | 27.45 | 142500 | 27.45 |
| 10/8/2007 | 27.5 | 27.64 | 27.12 | 27.31 | 99300 | 27.31 |
| 10/5/2007 | 27.71 | 27.97 | 27.54 | 27.6 | 470100 | 27.6 |
| 10/4/2007 | 27.42 | 27.55 | 27.1 | 27.3 | 176800 | 27.3 |
| 10/3/2007 | 27.32 | 27.52 | 27.25 | 27.37 | 148600 | 27.37 |
| 10/2/2007 | 27.3 | 28.23 | 27.25 | 27.5 | 556700 | 27.5 |
| 10/1/2007 | 26.11 | 27.67 | 26.11 | 27.58 | 1136500 | 27.58 |
| 9/28/2007 | 26.72 | 27.24 | 26.26 | 26.26 | 627700 | 26.26 |
| 9/27/2007 | 27.16 | 27.25 | 26.56 | 26.79 | 920800 | 26.79 |
| 9/26/2007 | 27.1 | 27.35 | 26.83 | 27.02 | 217700 | 27.02 |
| 9/25/2007 | 27.25 | 27.33 | 26.7 | 26.95 | 128700 | 26.95 |
| 9/24/2007 | 27.75 | 27.75 | 27.26 | 27.33 | 255300 | 27.33 |
| 9/21/2007 | 27.88 | 27.96 | 27.56 | 27.75 | 421800 | 27.75 |
| 9/20/2007 | 27.32 | 27.75 | 27.3 | 27.48 | 281500 | 27.48 |
| 9/19/2007 | 27.24 | 27.99 | 27.09 | 27.43 | 472200 | 27.43 |
| 9/18/2007 | 26.33 | 27.07 | 25.93 | 27.02 | 389800 | 27.02 |
| 9/17/2007 | 26.09 | 26.25 | 25.69 | 26.17 | 125600 | 26.17 |
| 9/14/2007 | 25.86 | 26.39 | 25.85 | 26.12 | 148400 | 26.12 |
| 9/13/2007 | 26.07 | 26.4 | 25.9 | 26.12 | 180000 | 26.12 |

| | | | | | |
|---|---|---|---|---|---|
| 9/12/2007 | 25.27 | 26.15 | 25.27 | 26.01 | 278800 | 26.01 |
| 9/11/2007 | 25.75 | 26.15 | 25.3 | 25.37 | 219100 | 25.37 |
| 9/10/2007 | 26.14 | 26.25 | 25.26 | 25.65 | 251600 | 25.65 |
| 9/7/2007 | 26.01 | 26.12 | 25.42 | 26.04 | 506900 | 26.04 |
| 9/6/2007 | 26.58 | 26.65 | 26.05 | 26.29 | 247600 | 26.29 |
| 9/5/2007 | 26.9 | 26.91 | 26.23 | 26.49 | 218800 | 26.49 |
| 9/4/2007 | 26.7 | 27.5 | 26.7 | 27.01 | 378300 | 27.01 |
| 8/31/2007 | 26.9 | 27.18 | 26.49 | 26.76 | 239400 | 26.76 |
| 8/30/2007 | 26.6 | 26.88 | 26.16 | 26.61 | 244000 | 26.61 |
| 8/29/2007 | 26.36 | 26.89 | 26.12 | 26.81 | 260900 | 26.81 |
| 8/28/2007 | 26.24 | 26.61 | 25.9 | 26.26 | 356700 | 26.26 |
| 8/27/2007 | 26.75 | 26.86 | 26.27 | 26.52 | 198900 | 26.52 |
| 8/24/2007 | 26.7 | 26.85 | 26.45 | 26.75 | 192900 | 26.75 |
| 8/23/2007 | 26.6 | 26.8 | 26.25 | 26.53 | 229900 | 26.53 |
| 8/22/2007 | 25.64 | 26.74 | 25.5 | 26.59 | 941000 | 26.59 |
| 8/21/2007 | 24.87 | 25.46 | 24.48 | 25.33 | 395900 | 25.33 |
| 8/20/2007 | 24.75 | 24.94 | 23.49 | 24.75 | 408800 | 24.75 |
| 8/17/2007 | 24.75 | 25.08 | 24.03 | 24.69 | 749000 | 24.69 |
| 8/16/2007 | 23.99 | 23.99 | 22.61 | 23.91 | 1396900 | 23.91 |
| 8/15/2007 | 24.97 | 25.74 | 23.74 | 24.06 | 485800 | 24.06 |
| 8/14/2007 | 25.4 | 25.43 | 24.85 | 24.86 | 331000 | 24.86 |
| 8/13/2007 | 25.45 | 25.92 | 25.09 | 25.25 | 476800 | 25.25 |
| 8/10/2007 | 24.91 | 25.69 | 24.8 | 25.13 | 647400 | 25.13 |
| 8/9/2007 | 24.15 | 25.5 | 23.9 | 25.07 | 1031300 | 25.07 |
| 8/8/2007 | 24.29 | 25.55 | 23.86 | 24.57 | 723300 | 24.57 |
| 8/7/2007 | 23 | 24.27 | 22.69 | 24.02 | 1133200 | 24.02 |
| 8/6/2007 | 23.6 | 23.6 | 22.39 | 23.18 | 1024300 | 23.18 |
| 8/3/2007 | 24.45 | 24.69 | 23.45 | 23.5 | 1043900 | 23.5 |
| 8/2/2007 | 24 | 24.86 | 23.89 | 24.54 | 1071900 | 24.54 |
| 8/1/2007 | 24.61 | 24.61 | 23.18 | 24.11 | 802600 | 24.11 |
| 7/31/2007 | 24.69 | 25.12 | 24.22 | 24.28 | 559300 | 24.28 |
| 7/30/2007 | 23.75 | 24.82 | 23.73 | 24.69 | 1102600 | 24.69 |
| 7/27/2007 | 21.55 | 23.5 | 21.5 | 22.93 | 670300 | 22.93 |
| 7/26/2007 | 21.61 | 22.2 | 21 | 21.98 | 943800 | 21.98 |
| 7/25/2007 | 22.2 | 22.33 | 21.56 | 21.8 | 822800 | 21.8 |
| 7/24/2007 | 22.95 | 22.99 | 21.91 | 21.99 | 804100 | 21.99 |
| 7/23/2007 | 23.25 | 23.46 | 22.89 | 23.07 | 308900 | 23.07 |
| 7/20/2007 | 22.76 | 23.6 | 22.36 | 23.12 | 955200 | 23.12 |
| 7/19/2007 | 23.02 | 23.44 | 22.35 | 22.81 | 692700 | 22.81 |
| 7/18/2007 | 23.39 | 23.47 | 22.5 | 23.01 | 677400 | 23.01 |
| 7/17/2007 | 23.5 | 23.74 | 23.3 | 23.41 | 223700 | 23.41 |
| 7/16/2007 | 23.98 | 23.98 | 23.51 | 23.54 | 280600 | 23.54 |
| 7/13/2007 | 24.14 | 24.33 | 23.75 | 23.98 | 242900 | 23.98 |
| 7/12/2007 | 23.88 | 24.48 | 23.7 | 24.24 | 802700 | 24.24 |
| 7/11/2007 | 23.5 | 24.07 | 23.35 | 23.71 | 472000 | 23.71 |
| 7/10/2007 | 24.28 | 24.32 | 23.49 | 23.49 | 808000 | 23.49 |
| 7/9/2007 | 25 | 25.12 | 24.29 | 24.35 | 1196700 | 24.35 |
| 7/6/2007 | 24.64 | 25.75 | 24.25 | 24.97 | 3168700 | 24.97 |
| 7/5/2007 | 27.06 | 27.18 | 26.27 | 27.11 | 582000 | 27.11 |
| 7/3/2007 | 27.19 | 27.4 | 26.95 | 27.23 | 130100 | 27.23 |
| 7/2/2007 | 27.21 | 27.3 | 26.96 | 27.26 | 434700 | 27.26 |
| 6/29/2007 | 27.34 | 27.35 | 26.88 | 27.13 | 347600 | 27.13 |

| | | | | | |
|---|---|---|---|---|---|
| 6/28/2007 | 27.16 | 27.32 | 26.82 | 27.22 | 269100 | 27.22 |
| 6/27/2007 | 26.6 | 27.48 | 26.4 | 27.23 | 385600 | 27.23 |
| 6/26/2007 | 26.13 | 26.96 | 25.92 | 26.88 | 809200 | 26.88 |
| 6/25/2007 | 26.25 | 26.33 | 25.61 | 26.13 | 726000 | 26.13 |
| 6/22/2007 | 26.79 | 26.79 | 26 | 26.41 | 4619300 | 26.41 |
| 6/21/2007 | 26.86 | 26.93 | 26.38 | 26.85 | 453500 | 26.85 |
| 6/20/2007 | 27.45 | 27.72 | 27 | 27.06 | 344200 | 27.06 |
| 6/19/2007 | 27.55 | 27.69 | 27.02 | 27.32 | 534700 | 27.32 |
| 6/18/2007 | 28 | 28.03 | 27.5 | 27.6 | 269800 | 27.6 |
| 6/15/2007 | 27.35 | 27.95 | 27.25 | 27.95 | 690400 | 27.95 |
| 6/14/2007 | 27.9 | 28.15 | 27.36 | 27.46 | 485500 | 27.46 |
| 6/13/2007 | 29 | 29.05 | 27.65 | 27.91 | 1499800 | 27.91 |
| 6/12/2007 | 28 | 28.7 | 28 | 28.7 | 686900 | 28.7 |
| 6/11/2007 | 27.52 | 28.48 | 27.25 | 28.24 | 629800 | 28.24 |
| 6/8/2007 | 26.6 | 27.78 | 26.6 | 27.74 | 944400 | 27.74 |
| 6/7/2007 | 26.85 | 27.1 | 26.52 | 26.8 | 416600 | 26.8 |
| 6/6/2007 | 26.29 | 27 | 26 | 26.96 | 498100 | 26.96 |
| 6/5/2007 | 26.09 | 26.36 | 25.85 | 26.27 | 631000 | 26.27 |
| 6/4/2007 | 26.58 | 26.6 | 25.96 | 26.1 | 596100 | 26.1 |
| 6/1/2007 | 25.75 | 26.6 | 25.52 | 26.54 | 562600 | 26.54 |
| 5/31/2007 | 25.8 | 26.25 | 25.25 | 25.5 | 842700 | 25.5 |
| 5/30/2007 | 25.79 | 26.05 | 24.54 | 25.91 | 3813300 | 25.91 |
| 5/29/2007 | 27.4 | 27.8 | 27.1 | 27.55 | 442400 | 27.55 |
| 5/25/2007 | 27.44 | 27.44 | 27.12 | 27.29 | 271800 | 27.29 |
| 5/24/2007 | 27.12 | 27.33 | 26.92 | 27 | 461800 | 27 |
| 5/23/2007 | 27.93 | 27.99 | 26.95 | 27.12 | 531100 | 27.12 |
| 5/22/2007 | 27.32 | 27.96 | 27.16 | 27.55 | 780100 | 27.55 |
| 5/21/2007 | 26.52 | 27.41 | 26 | 27.09 | 1071500 | 27.09 |
| 5/18/2007 | 27.55 | 27.55 | 26.15 | 26.62 | 1645400 | 26.62 |
| 5/17/2007 | 28.51 | 28.55 | 27.2 | 27.32 | 714200 | 27.32 |
| 5/16/2007 | 28 | 28.44 | 27.7 | 28.27 | 1040000 | 28.27 |
| 5/15/2007 | 27.99 | 28.38 | 27.42 | 27.98 | 1571600 | 27.98 |
| 5/14/2007 | 27.2 | 28.6 | 27.18 | 27.65 | 2094400 | 27.65 |
| 5/11/2007 | 28.14 | 28.4 | 27.21 | 27.23 | 1309600 | 27.23 |
| 5/10/2007 | 28.46 | 28.55 | 27.45 | 27.69 | 1391000 | 27.69 |
| 5/9/2007 | 28.51 | 29.28 | 27.76 | 28.32 | 2220600 | 28.32 |
| 5/8/2007 | 29.82 | 30 | 28.29 | 28.5 | 2873400 | 28.5 |
| 5/7/2007 | 31.5 | 31.56 | 29.3 | 29.75 | 4712200 | 29.75 |
| 5/4/2007 | 33 | 34.25 | 31.03 | 31.3 | 23514900 | 31.3 |