UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

SEOW LIN, Individually and On Behalf of All   :
Others Similarly Situated,

               Plaintiff,            :     Civil Action No. 08 CV 00242 (CM)

   -against-                 :     **ELECTRONICALLY FILED**

INTERACTIVE BROKERS GROUP, INC. and   :
THOMAS PETERFFY,

               Defendants.

------------------------------------- X

## MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANTS'
## <u>MOTION TO DISMISS THE AMENDED COMLAINT</u>

DECHERT LLP
30 Rockefeller Plaza
New York, NY  10112-2200
(212) 698-3500
(212) 698-3599 (fax)

*Attorneys for Defendants Interactive Brokers*
*Group, Inc. and Thomas Peterffy*

**Table of Contents**

Preliminary Statement ................................................................................................ 1

Statement of Facts ...................................................................................................... 3

Argument ..................................................................................................................... 8

POINT I
      THE AMENDED COMPLAINT FAILS TO STATE A SECURITIES ACT CLAIM ..... 8

      A.    The Registration Statement Accurately Disclosed First Quarter
          Trading Losses ............................................................................................ 10

      B.    The Altana Fraud Had Not Yet Occurred And Could Not Have
          Been Disclosed In The Registration Statement ...................................... 12

      C.    The Registration Statement Adequately Warned Of The Risk
          Of Trading Losses ...................................................................................... 14

POINT II
      PERSONS WHO HELD IB STOCK AS OF THE FILING OF THE COMPLAINT
      WERE NOT DAMAGED ....................................................................................... 15

POINT III
      THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR CONTROL
      PERSON LIABILITY ........................................................................................... 17

Conclusion .................................................................................................................. 17

## Table of Authorities

Bell Atl. Corp. v. Twombly,
___ U.S. ___, 127 S. Ct. 1955 (2007)......................................................................9

Brody v. Transitional Hosps. Corp.,
280 F.3d 997 (9th Cir. 2002) ............................................................................11

Castlerock Mgmt., Ltd. v. Ultralife Batteries, Inc.,
114 F. Supp. 2d 316 (D.N.J. 2000) ....................................................................12

Cortec Indus., Inc. v. Sum Holding, L.P.,
949 F.2d 42 (2d Cir. 1991)...................................................................................3

DeMaria v. Andersen,
318 F.3d 170 (2d Cir. 2003)...............................................................................11

Denny v. Barber,
576 F.2d 465 (2d Cir. 1978)...............................................................................12

Goldkrantz v. Griffin,
97 cv 9075, 1999 WL 191540 (S.D.N.Y. Apr. 6, 1999)........................................16

Halperin v. eBanker USA.COM, Inc.,
295 F.3d 352 (2d Cir. 2002)...............................................................................14

In re AOL Time Warner, Inc. Sec. & ERISA Litig.,
381 F. Supp. 2d 192 (S.D.N.Y. 2004).................................................................16

In re Broderbund/Learning Co. Sec. Litig.,
294 F.3d 1201 (9th Cir. 2002) ...........................................................................16

In re CIT Group, Inc.,
349 F. Supp. 2d 685 (S.D.N.Y. 2004).......................................................3, 8, 9, 17

In re Initial Public Offering Sec. Litig.,
241 F. Supp. 2d 281 (S.D.N.Y. 2003)............................................................15, 16

Johnson v. NYFIX, Inc.,
399 F. Supp. 2d 105 (D. Conn. 2005)..................................................................12

Kramer v. Time Warner Inc.,
937 F.2d 767 (2d Cir. 1991)..................................................................................3

Oxford Asset Mgmt., Ltd. v. Jarharis,
 297 F.3d 1182 (11th Cir. 2002) ...........................................................................12

Panther Partners, Inc. v. Ikanos Commc'n, Inc.,
 06 Civ. 12967, 2008 U.S. Dist. LEXIS 18536 (S.D.N.Y. Mar. 11, 2008) ..........8, 9, 12, 13

Rombach v. Chang,
 355 F.3d 164 (2d Cir. 2004).................................................................................14

Steinberg v. PRT Group, Inc.,
 88 F. Supp. 2d 294 (S.D.N.Y. 2000)........................................................9, 14, 15

TSC Indus., Inc. v. Northway, Inc.,
 426 U.S. 438 (1976)..............................................................................................11

## STATUTES/RULES

15 U.S.C. § 77k...................................................................................................8, 16

15 U.S.C. § 77l....................................................................................................8, 16

15 U.S.C. § 77o........................................................................................................17

Fed. R. Evid. 201 ......................................................................................................3

Defendants Interactive Brokers Group, Inc. ("IB" or the "Company") and Thomas Peterffy (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint with prejudice for failure to state a claim on which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## Preliminary Statement

Plaintiff Zeeshan Nayab filed the initial Complaint in this action on January 11, 2008, alleging that IB violated Sections 11 and 12 of the Securities Act of 1933 because the Registration Statement for its initial public offering did not disclose that IB was about to become a victim of fraudulent trading in the securities of Altana AG on the German stock exchange (the "Altana fraud") beginning the day *after* the Registration Statement was issued.  In addition to numerous other infirmities, that initial Complaint suffered from the fatal defect that Mr. Nayab had sold all of his IB stock more than a month before the Altana fraud was disclosed.

In response to IB's motion to require Mr. Nayab to post an undertaking as a condition to continuing the litigation -- and implicitly acknowledging that Mr. Nayab did not have a viable claim against IB -- plaintiffs filed an Amended Complaint on March 24, 2008.  The Amended Complaint substitutes Seow Lin as the Lead Plaintiff and proposed class representative in place of Mr. Nayab; adds IB's founder and chief executive officer, Thomas Peterffy, as a defendant; and in addition to asserting claims under Sections 11 and 12 of the Securities Act, includes a claim against Mr. Peterffy for control person liability under Section 15 of the Securities Act.

The Amended Complaint alleges that the Registration Statement was false and misleading because it purportedly did not disclose (i) that IB had incurred $25 million in trading losses as a result of options trading by counterparties in advance of a corporate announcement in its first quarter ended March 31, 2007, (ii) that IB was a victim of the Altana options fraud

(which did not even occur until after the Registration Statement was issued),[1] and (iii) that IB's internal controls were insufficient to prevent it from incurring losses as a result of insider trading or other fraud by trading counterparties. These allegations are belied by the Registration Statement itself and by the actual timing of issuance of the events at issue.

Specifically, the Registration Statement disclosed that IB had incurred losses during the first quarter of 2007 as a result of "[u]nexpectedly heavy options activity in advance of certain corporate announcements," and, although the exact magnitude of the losses was not known at that time, explained that IB's first quarter net income was expected to be in the range of $181 million to $192 million, or $0.29 to $0.31 per share, down from $215 million in the corresponding prior year period. IB's actual first quarter net profit, announced on May 29, 2007, was $0.31 per share, at the top of the range included in the Registration Statement. The Amended Complaint does not -- because it cannot -- allege any facts that give rise to a plausible inference that IB knew the actual results when the Registration Statement was issued.

The Amended Complaint is similarly devoid of any plausible factual allegation that the Registration Statement misrepresented or omitted IB's losses in connection with the Altana fraud, since plaintiffs cannot dispute that that fraud did not even occur until *after* the Registration Statement had been issued. And, the Registration Statement more than adequately disclosed the risk that IB would incur trading losses in the future, especially when those losses resulted from trading with counterparties who had informational advantages over IB or were engaged in fraud or other misconduct. Because the Amended Complaint does not adequately allege any materially

---

[1]    Plaintiffs attempt to plead around this defect by making up dates contrary to established facts. First, the Amended Complaint alleges that the Altana fraud began on May 3, 2007, even though the public filing on which the Amended Complaint relies says the fraud began on May 4. Second, Plaintiff alleges that the IPO "closed" on May 9, 2007, even though the Registration Statement became effective on May 3 and the IPO occurred on May 4; May 9 was just the settlement date for the May 4 transactions.

false statement or omission in the Registration Statement, it fails to state a Securities Act claim. See Point I infra.

Moreover, the claims of any person who continued to own IB shares at the time of filing of the Complaint are barred for the independent reason that such purchasers cannot, as a matter of law, establish damages. Both Section 11 and Section 12 limit damages to the difference between the offering price of the stock and the stock price on the date the complaint is filed. Here, IB's stock price when the Complaint was filed on January 11, 2008, was $32.77 per share -- $2.76 more than the offering price of $30.01. Accordingly, only persons who had sold IB stock at a loss prior to the filing the initial Complaint can even potentially maintain a claim for damages. See Point II infra.

Finally, the control person claim against Mr. Peterffy fails because the Amended Complaint does not state a primary violation of Section 11 or Section 12 against IB, which is a prerequisite for a control person claim. See Point III infra.

### Statement of Facts[2]

Defendant IB operates as a global electronic market maker and broker, and it executes and processes securities, futures and foreign exchange trades on more than 60 electronic exchanges and trading platforms worldwide. (Am. Compl. ¶ 7, 15.) Defendant Peterffy is the founder and chief executive officer of IB. (Am. Compl. ¶ 8.) On May 3, 2007, IB filed the Registration Statement for its IPO with the Securities and Exchange Commission. (Am. Compl.

---

[2]    This Statement of Facts is drawn from the allegations of the Amended Complaint, which are accepted as true solely for purposes of this motion, as well as from documents referenced in the Amended Complaint, and other facts of which the Court may take judicial notice, including facts that are "not subject to reasonable dispute [because they are] . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)(2). Such indisputable facts may be considered on a motion to dismiss. See, e.g., Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991); Cortec Indus., Inc. v. Sum Holding, L.P., 949 F.2d 42, 47-48 (2d Cir. 1991); In re CIT Group, Inc., 349 F. Supp. 2d 685, 688 (S.D.N.Y. 2004). Copies of the Amended Complaint, Registration Statement and a stock price history for IB are annexed as Exhibits A, B and C, respectively, to the Declaration of Neil A. Steiner, dated April 25, 2008.

¶ 15.) The following day, May 4, 2007, IB filed with the SEC its Prospectus for the IPO and sold 40 million shares of its common stock to the public for $30.01 per share, raising approximately $1.2 billion. (Am. Compl. ¶ 16.) IB's common stock trades on the NASDAQ under the ticker symbol IBKR. In the months following the IPO, the price of the Company's common stock decreased to a low of $21.00. The price subsequently rebounded, and at the time of the filing of the original Complaint on January 11, 2008, it closed at $32.77 per share. (Steiner Decl. Ex. C.)

Plaintiff Lin purchased 8,500 shares of IB common stock in the IPO on May 4, 2007, at a price of $30.01 per share. (Am. Compl., Certification.) Even though her purchase occurred on May 4, in her Certification attached to the Amended Complaint, Ms. Lin asserts that the transaction occurred three business days later, on May 9, 2007, when the purchase transaction settled in accordance with stock exchange rules. According to her Certification, Ms. Lin sold 4,000 of those shares on August 24, 2007 for $24.70 or $25.20 per share, and apparently continues to own the remaining 4,500 shares. (Am. Compl., Certification.)

According to the Amended Complaint, the Registration Statement was materially false and misleading because it failed to disclose that IB had incurred losses totaling $25 million as a result of manipulative options trading activities by third parties in advance of corporate announcements during its quarter ended March 31, 2007. (Am. Compl. ¶ 22.) In fact, the Registration Statement disclosed that:

> Unexpectedly heavy options activity in advance of certain corporate announcements adversely impacted our market making operations during the quarter ended March 31, 2007. **While we are unable to detail the exact frequency of these announcements in a given period and their exact financial impact on our results of operations, in the quarter ended March 31, 2007, there were a greater number of surprise or unexpected announcements preceded by heavy options activity**

**than in prior quarters.** Heavy options activity typically occurs in advance of certain surprise or unexpected corporate announcements, especially where there is a leakage of information and when regularly scheduled annual or quarterly corporate announcements materially deviate from expectations. This impacts us as, when we trade with others who have different information than we do, we may accumulate unfavorable positions preceding large price movements in companies. To the extent the frequency or magnitude of these events increase, we would expect our losses from such events to increase correspondingly. See "Risk Factors -- Risks Related to Our Business -- We are exposed to losses due to lack of perfect information."

Registration Statement at 11-12 (emphasis added). The Registration Statement further advised potential purchasers that, although first quarter financial results were not yet finalized:

[IB] expect[s] income before income tax to be between $181 million and $192 million for the quarter ended March 31, 2007, compared to income before income tax of . . . $215 million for . . . the quarter ended March 31, 2006[.] We expect pro forma basic and diluted earnings per share both to be between $0.29 and $0.31 for the quarter ended March 31, 2007, compared to pro forma basic and diluted earnings per share of . . . $0.34 for the quarter ended March 31, 2006.

Registration Statement at 11. And, as Plaintiff acknowledges, when the first quarter financial results were released on May 29, 2007, IB's net earnings were $0.31 per share -- at the top of the range estimated in the Registration Statement. (Am. Compl. ¶ 23.)

The Amended Complaint also alleges that the Registration Statement was false and misleading because it failed to disclose that the Company had incurred a $37 million loss as a result of the Altana fraud. (Am. Compl. ¶ 30.) In an effort to suggest that IB knew or should have known of the loss before the Registration Statement was issued, the Amended Complaint alleges that the Altana fraud occurred "beginning on or about May 3, 2007 and continuing on the following few trading days through the close of the IPO on May 9, 2007." (Am. Compl. ¶ 24.) But plaintiffs' alteration of dates in an attempt to manufacture a claim is flatly contradicted by the public filings on which she relies.

As disclosed in IB's Form 8-K filed on July 5, 2007 (cited in paragraph 24 and quoted in paragraph 29 of the Amended Complaint), the losses from the Altana fraud occurred "on May 4, 2007 and thereafter." (Am. Compl. ¶ 29.) And as the Amended Complaint itself acknowledges, the Registration Statement became effective on May 3, 2007 and the IPO occurred on May 4, 2007 (Am. Compl. ¶¶ 15, 16); the May 9, 2007 "close" of the IPO was merely the settlement date for trades that had occurred three business days earlier, on May 4, 2007. It is thus for good reason that the Amended Complaint does not allege that IB or any officer or director of IB knew of the Altana fraud prior to the issuance of the Registration Statement. In any event, IB did not actually suffer losses as a result of the Altana fraud because a company owned by Mr. Peterffy voluntarily paid the Company $37 million in exchange for the right to any recovery up to that amount, plus costs, from the perpetrators of the fraud. (Am. Compl. ¶ 26.)

Moreover, IB's Registration Statement contained detailed cautionary language specifically warning potential investors against the precise risks that plaintiffs complain came to fruition:

> **We may incur material trading losses from our market making activities.** A substantial portion of our revenues and operating profits is derived from our trading as principal in our role as a market maker and specialist. We may incur trading losses relating to these activities since each primarily involves the purchase or sale of securities for our own account. In any period, we may incur trading losses in a significant number of securities for a variety of reasons including:
>
> - price changes in securities;
> - lack of liquidity in securities in which we have positions; and
> - the required performance of our market making and specialist obligations.
>
> These risks may limit or restrict our ability to either resell securities we purchased or to repurchase securities we sold. In addition, we may experience difficulty borrowing securities to make delivery to purchasers to whom we sold short, or lenders

from whom we have borrowed. From time to time, we have large position concentrations in securities of a single issuer or issuers engaged in a specific industry or traded in a particular market. Such a concentration could result in higher trading losses than would occur if our positions and activities were less concentrated.

In our role as a market maker, we attempt to derive a profit from the difference between the prices at which we buy and sell, or sell and buy, securities. However, competitive forces often require us to match the quotes other market makers display and to hold varying amounts of securities in inventory. By having to maintain inventory positions, we are subjected to a high degree of risk. We cannot assure you that we will be able to manage such risk successfully or that we will not experience significant losses from such activities, which could have a material adverse effect on our business, financial condition and operating results. …

**We are exposed to losses due to lack of perfect information.** As market makers, we provide liquidity by buying from sellers and selling to buyers. Quite often, we trade with others who have different information than we do, and as a result, we may accumulate unfavorable positions preceding large price movements in companies. Should the frequency or magnitude of these events increase, our losses will likely increase correspondingly.

"Risk Factors," Registration Statement at 23-24. In addition, the Registration Statement

disclosed that:

*Dividend Risk.* We face dividend risk in our market making business as we derive significant revenues in the form of dividend income from our substantial inventory of equity securities, and must make significant payments in lieu of dividends on short positions in securities in our portfolio. Projected future dividends are an important component of pricing equity options and other derivatives, and incorrect projections may lead to trading losses. The amount of these risks cannot be quantified. …

*Pricing Model Exposure.* Our strategy as a market maker is to calculate quotes a few seconds ahead of the market and execute small trades at tiny but favorable differentials as a result. This is made possible by our proprietary pricing model, which continuously evaluates and monitors the risks inherent in our portfolio, assimilates market data and reevaluates the outstanding quotes in our entire portfolio each second. Certain aspects of the model rely on historical prices of securities. **If the behavior of price movements of individual securities diverges substantially**

> **from what their historical behavior would predict, we might**
> **incur trading losses.**  We attempt to limit such risks by
> diversifying our portfolio across many different options, futures
> and underlying securities and avoiding concentrations of positions
> based on the same underlying security.  Historically, our losses
> from these events have been immaterial in comparison to our
> annual trading profits.

Id. at 84, 86 (emphasis added).

## Argument

### POINT I

### THE AMENDED COMPLAINT
### FAILS TO STATE A SECURITIES ACT CLAIM

To state a Section 11 claim, plaintiffs must allege that IB's Registration Statement

"contained an untrue statement of a material fact or omitted to state a material fact required to be

stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).

Similarly, Section 12(a)(2) requires plaintiffs to show that the prospectus or oral communication

contained a material misstatement.  15 U.S.C. § 77l(a)(2).  Against the backdrop of the accurate

guidance concerning IB's first quarter results, the fact that the Altana fraud had not yet occurred

and the detailed disclosures of the risks inherent in IB's business as a market maker, the

Amended Complaint does not allege that the Registration Statement contained any false

statement or suffered from a misleading omission, much less that any such misrepresentation or

omission was material to the investment decision made by purchasers in the IPO.

Statements are materially misleading only when a defendant's "representations, taken

together and in context, would have mislead a reasonable investor."  CIT Group, 349 F. Supp. 2d

at 688 (citing Rombach v. Chang, 355 F.3d 164, 172 n.7 (2d Cir. 2004)).  An omission is

actionable only if: "(1) the defendant has an affirmative duty to disclose the information but fails

to do so, and, (2) the untrue or omitted information was material."  Panther Partners, Inc. v.

8

_Ikanos Commc'n, Inc._, 06 Civ. 12967, 2008 U.S. Dist. LEXIS 18536, at *16 (S.D.N.Y. Mar. 11,

2008) (citation omitted). To survive a motion to dismiss a Securities Act claim, plaintiffs must

"allege plausible grounds to infer that [their] claims of misstatement or omission rise above the

speculative level." _Id._ at *14 (internal quotations and citations omitted); _see also_ _Bell Atl. Corp._

_v. Twombly_, ___ U.S. ___, 127 S. Ct. 1955, 1974 (2007) (holding that a complaint should be

dismissed unless plaintiffs plead "enough facts to state a claim to relief that is plausible on its

face.").

In assessing whether a misrepresentation or omission was material, "courts may not

employ 20/20 hindsight; instead they must consider whether the misrepresentation or omission

was material on the date the prospectus or registration statement was issued." _Panther Partners_,

2008 U.S. Dist. LEXIS 18536, at *16 (citation omitted). Offering documents must be read as a

whole to determine whether any alleged misstatements would have misled a reasonable investor

about the nature of the investment and "individual statements should not be parsed to determine

if each was 'literally true[.]'" _See_ _CIT Group_, 349 F. Supp. 2d at 688 (citing _Olkey v. Hyperion_

_1999 Term Trust, Inc._, 98 F.3d 2, 5 (2d Cir. 1996)). Further, there is no obligation to accept as

true the allegations of a complaint to the extent that plaintiffs' claims of misstatement or

omission are contradicted by the plain language of the offering documents. _See_ _Steinberg v._

_PRT Group, Inc._, 88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000) (dismissing Section 11, 12(a)(2) and

15 claims with prejudice for lack of material misstatements or omissions).

Here, plaintiffs allege that the Registration Statement was materially false and misleading

because (i) it failed to disclose that IB's proprietary technology had failed to prevent $25 million

in trading losses resulting from unexpectedly heavy options trading during the quarter ending

March 31, 2007, (ii) failed to disclose that IB's proprietary technology had failed to prevent $37

million in losses as a result of the Altana fraud, and (iii) failed to disclose that IB's proprietary technology had been proven inadequate due to these failures.  (Am. Compl. ¶¶ 22, 30, 33.)  None of these purported omissions rendered any statement in the Registration Statement false, nor could any such alleged omission have been material in light of the disclosures in the Registration Statement taken as a whole.

A.    The Registration Statement Accurately Disclosed First Quarter Trading Losses

First, with respect to IB's results for the first quarter of 2007, the Registration Statement advised potential purchasers that IB had incurred losses during the quarter as a result of options trading in advance of certain corporate announcements, and that such trading had occurred more frequently during the first quarter than in prior periods:

> Unexpectedly heavy options activity in advance of certain corporate announcements adversely impacted our market making operations during the quarter ended March 31, 2007.  While we are unable to detail the exact frequency of these announcements in a given period and their exact financial impact on our results of operations, in the quarter ended March 31, 2007, there were a greater number of surprise or unexpected announcements preceded by heavy options activity than in prior quarters.

Registration Statement at 11.  Indeed, even plaintiffs admit that "the Company disclosed an adverse event concerning options trading activities [during the quarter ended March 31, 2007] in the Registration Statement."  (Am. Compl. ¶ 34.)

The Registration Statement also gave accurate guidance as to the Company's expected first quarter results, with the actual results coming in at the top of the range provided in the Registration Statement.  And, the Registration Statement explicitly warned that trading losses could be incurred in the future for a variety of reasons, including information disadvantages, risks in the pricing model, and dividend risks.  See, e.g., Registration Statement at 23, 84, 86. Hence, there is simply no basis for plaintiffs' assertion that the Registration Statement materially

misrepresented IB's first quarter financial results. See, e.g., TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976) (omitted information is material only if it would be "viewed by the reasonable investor as having *significantly* altered the 'total mix' of information made available") (emphasis added); DeMaria v. Andersen, 318 F.3d 170, 181 (2d Cir. 2003) (affirming dismissal of Section 11 and 12(a) claims because defendant's failure to include specific financial results for the most recent quarter did not render the offering documents materially misleading); Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002) (holding that to be actionable an omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists").

As the Brody Court explained, "if a company reports that its sales have risen from one year to the next, that statement is not misleading even though it does not include a detailed breakdown of the company's region by region or month by month sales." 280 F.3d at 1006 n.8; Similarly, in DeMaria, the Second Circuit affirmed dismissal of the complaint because the offering document's cautionary statements and specific, prominent disclosures about losses in the quarter did not paint an unrealistically optimistic picture of the defendant's future performance, even though the statements did not specifically mention a $6 million first quarter loss. See DeMaria, at 318 F.3d at 181-82 ("It can hardly be said that, by having not been explicitly told of the company's actual first quarter losses, a reasonable investor would have been misled about the nature of [defendant's] securities. [Defendant's] prospectus is replete with warnings and explanations of risks associated with the company's past financial history and future expectations."). The same is true here: IB's alleged failure to quantify the amount of losses that resulted from options trading in advance of unexpected corporate announcements was

11

not materially misleading in light of IB's disclosure that such losses had been incurred and its correct guidance as to the quarter's results.

In any event, the Amended Complaint does not allege any plausible factual basis to suggest that IB knew the exact amount of its trading losses from the first quarter of 2007 at the time of the IPO.  See Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978) (holding that corporations and their officers need not be clairvoyant and are only responsible for revealing those material facts reasonably available to them); Oxford Asset Mgmt., Ltd. v. Jarharis, 297 F.3d 1182, 1188 (11th Cir. 2002) ("conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal").  Plaintiffs cannot use IB's subsequent earnings announcements as evidence that it knew such information at the time of the IPO.  See Johnson v. NYFIX, Inc., 399 F. Supp. 2d 105, 106 (D. Conn. 2005) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud"); see also Denny, 576 F.2d at 470 (dismissing securities fraud claim where plaintiff simply pointed to later disclosures as evidence of misstatements in the original disclosures).

B.    The Altana Fraud Had Not Yet Occurred And
      Could Not Have Been Disclosed In The Registration Statement

To state a Securities Act claim, plaintiffs must plead facts plausibly suggesting that IB or its officers knew or should have known the scope or magnitude of the problem at the time of the offering.  Panther Partners, 2008 U.S. Dist. LEXIS 18536, at *32.  It is well settled, however, that "statements and facts can be neither fraudulently nor negligently omitted if they are unknown or unknowable at the time the Offering Documents came into effect and were disseminated." Castlerock Mgmt., Ltd. v. Ultralife Batteries, Inc., 114 F. Supp. 2d 316, 323 n.5 (D.N.J. 2000) (dismissing claims under Section 11, 12(2) and 15 of the Securities Act).  "This is

especially true where, as here, the nature of the allegation is an exercise in 'backwards' pleading -- an attempt to allege liability for disclosures not made because the material fact was unknowable or had not even occurred as of the critical date." Panther Partners, at *32.

Here, as in Panther Partners, plaintiffs are seeking to hold defendants liable for failing to disclose the Altana fraud in the Registration Statement, even though the fraud had not even occurred at the time the Registration Statement was issued. The Amended Complaint acknowledges that IB's Registration Statement was filed with the SEC on May 3, 2007 and its Prospectus was filed on May 4, 2007. (Am. Compl. ¶¶ 15, 16.) The Amended Complaint claims that the Altana fraud had occurred prior to the Registration Statement being filed by alleging that it began "on or around May 3, 2007," but the documents cited in the Amended Complaint for this proposition in fact show that the losses from the Altana fraud began on May 4, 2007:

> Accordingly, on May 4, 2007 and thereafter, our market making options positions were affected by the artificial closing price of May 3 and were mis-priced. As a result of this manipulation, we suffered a position loss over the ensuing trading days amounting to approximately $37 million.

(Am. Compl. ¶ 29 (quoting IB's Form 10-Q for the quarter ended June 30, 2007).) Moreover, the Amended Complaint acknowledges that IB's losses from the Altana fraud occurred over several trading days, further confirming that, even if the losses from the Altana fraud began on May 3 as the Amended Complaint misleading asserts, such losses could not have been known prior to the issuance of the Registration Statement and Prospectus. Nor is there merit to plaintiffs' suggestion that the Registration Statement should have been updated prior to the "closing" of the IPO on May 9, 2007, since the IPO transactions occurred on May 4, not on the May 9 settlement date.

C.    The Registration Statement Adequately Warned Of The Risk Of Trading Losses

Plaintiffs also assert that the Registration Statement misleadingly touted the ability of

IB's proprietary technology to manage risk and prevent trading losses because it allegedly

omitted information concerning the first quarter trading losses and the Altana fraud.  As

explained above, the Registration Statement accurately and adequately disclosed IB's first

quarter results, and it did not omit information concerning the Altana fraud since those losses had

not occurred prior to the IPO.  Furthermore, plaintiffs' claim cannot survive because the

Registration Statement specifically cautioned investors against the risks to IB's trading system.

See Steinberg, 88 F. Supp. 2d at 304 ("This alleged omission is not misleading as a matter of

law, because the prospectus disclosed these very risks").

Allegations of a failure to disclose material information "are undercut by the fact that the

offering documents either did not omit such information or contained sufficient cautionary

language to bespeak caution and trigger the safe harbor provision of the PSLRA."  Rombach v.

Chang, 355 F.3d 164, 175 (2d Cir. 2004) (affirming the dismissal a Section 11 claim because

cautionary statements in the offering documents provided a sobering picture of offer's financial

condition); Halperin v. eBanker USA.COM, Inc., 295 F.3d 352, 361-62 (2d Cir. 2002) ("The

cautionary language addresses the relevant risk directly, and therefore neither offering

memorandum was misleading").  Similarly, expressions of corporate optimism and puffery do

not give rise to securities violations.  See Rombach, 355 F.3d at 174.

There can be little dispute that the Registration Statement adequately disclosed the risks

to IB both from the trading losses incurred in the first quarter of 2007 specifically and the

ongoing risks with respect to option market manipulations generally.  As discussed above, the

Registration Statement disclosed that the Company already had suffered an adverse impact in the

quarter ending March 31, 2007 due to options market manipulation.  Investors, such as plaintiffs,

were informed that the Company's safeguards could not completely protect against options market manipulations.  In fact, the Registration Statement explicitly advised that "[t]o the extent the frequency or magnitude of [options market manipulations] increase, we would expect our losses from such events to increase correspondingly."  Registration Statement at 24 ("Risk Factors -- Risks Related to Our Business -- We are exposed to losses due to lack of perfect information").  Similarly, the Registration Statement warned that IB could be exposed to losses if the price of a security deviated substantially from that predicted by the historical price of the security and as a result of dividend risk -- both of which were factors in the losses from the Altana fraud.  No reasonable investor reading this disclosure and the associated cautionary language could have been misled into thinking that IB had not experienced, and could not potentially experience again in the future, adverse impacts due to options market manipulations.[3]

## POINT II

### PERSONS WHO HELD IB STOCK AS OF THE FILING OF THE COMPLAINT WERE NOT DAMAGED

The Court should dismiss the claims of any shareholder who purchased IB common stock in or traceable to the IPO and continued to own those shares as of the filing of the initial Complaint on January 11, 2008 for the independent reason that no such person has a cognizable damage claim.  See In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281, 296 (S.D.N.Y. 2003) (holding that Section 11 plaintiffs who sold their shares above the offering price had no damages as a matter of law and should be dismissed).

---

[3]   Nor is there merit to plaintiffs' suggestion that the use of the future tense in the risk factor disclosure was itself misleading because it concealed the fact that the Company had previously incurred losses as a result of those same risks. (Am. Compl. § 33.)  See Steinberg, 88 F. Supp. 2d at 310-11 (rejecting plaintiffs' attempt to use the future tense of the risk factors to argue that the offering materials misleadingly implied that these negative events were not currently occurring, and dismissing Section 11, 12 and 15 claims).

The measure of damages for a Section 11 violation is the difference between the price paid for the stock (which cannot exceed the offering price, or $30.01 per share for IB) and (i) if the stock was sold prior to the litigation, the price at which the stock was sold or (ii) if the stock was not sold prior to the litigation, (a) the price on the date the action was commenced or (b) the price at which the stock was subsequently sold, if that would result in a lower amount of damages. See 15 U.S.C. § 77k(e). Similarly, a Section 12 plaintiff is required to tender the security upon the commencement of litigation, and damages are limited to the difference between the price paid for the security, plus interest thereon, less amounts received for the securities, or for damages if the security was sold prior to the commencement of litigation. See 15 U.S.C. § 77l(a).

Under these statutory limitations, no plaintiff who continued to own IB stock as of the filing of the Complaint has a claim for damages. The offering price of IB in the May 4, 2007 IPO was $30.01 per share, yet by the time the Complaint was filed eight months later, on January 11, 2008, the stock price had risen to $32.77 per share. Thus, any person who continued to own IB stock cannot have a Section 11 claim because the stock price on the date of the Complaint exceeded the offering price. See Initial Public Offering, 241 F. Supp. 2d at 347 ("If a plaintiff has no conceivable damages under Section 11, she cannot state a claim upon which relief can be granted and her Section 11 claims must be dismissed."); see also, e.g., In re Broderbund/Learning Co. Sec. Litig., 294 F.3d 1201, 1203-05 (9th Cir. 2002); In re AOL Time Warner, Inc. Sec. & ERISA Litig., 381 F. Supp. 2d 192, 246 (S.D.N.Y. 2004); Goldkrantz v. Griffin, 97 cv 9075, 1999 WL 191540, at *4 (S.D.N.Y. Apr. 6, 1999). Similarly, persons continuing to own IB stock and desiring to pursue a Section 12 claim were required to tender

16

their stock upon the filing of the Complaint, which was trading on the open market for $32.77 per share, in exchange for $30.01. Clearly, those shareholders do not have a damage claim.

### POINT III

### THE AMENDED COMPLAINT
### FAILS TO STATE A CLAIM FOR CONTROL PERSON LIABILITY

A claim for control person liability under Section 15 of the Securities Act requires a showing of a primary violation of Section 11 or 12 by the controlled person. See 15 U.S.C. § 77o. Because plaintiffs have failed to allege a viable Section 11 or Section 12 claim against IB, it "therefore follows that no cause of action has been stated under Section 15." CIT Group, 349 F. Supp. 2d at 691-92 (citation omitted).

### Conclusion

For the foregoing reasons, Defendants Interactive Brokers Group, Inc. and Thomas Peterffy respectfully requests that the Court dismiss the Amended Complaint in its entirety, with prejudice.

Dated: New York, New York.
     April 25, 2008

DECHERT LLP

By: _____
    Andrew J. Levander
    Neil A. Steiner
    30 Rockefeller Plaza
    New York, NY 10112-2200
    (212) 698-3500
    (212) 698-3599 (fax)
    andrew.levander@dechert.com
    *Attorneys for Defendants Interactive*
    *Brokers Group, Inc. and Thomas Peterffy*