Jack G. Fruchter (JF-8435)
Mitchell M.Z. Twersky (MT-6739)
Ximena R. Skovron (XS-3397)
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, New York 10119
Telephone: (212) 279-5050
Facsimile:  (212) 279-3655

**Attorneys for Lead Plaintiff**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| SEOW LIN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) | No. 08 CV 00242 (CM) |
| Plaintiff, | ) ) | **ECF Case** |
| vs. | ) ) ) | |
| INTERACTIVE BROKERS GROUP, INC., and THOMAS PETERFFY, | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Defendants Failed to Disclose Material Trading Losses Resulting from Options
    Market Making Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.    THE COMPLAINT STATES A CLAIM FOR VIOLATIONS OF THE SECURITIES
    ACT OF 1933 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.    Defendants Affirmatively Misrepresented and Omitted Material Financial Data
        Concerning the $25 Million Loss Suffered by the Company in Connection with
        Options Market Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    B.    Defendants Affirmatively Misrepresented and Omitted Material Information
        Concerning A Systematic Weakness in the Company's Proprietary Trading
        and Risk Management Systems With Respect to Options Market Making
        Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    C.    Defendants' General Risk Disclosures Were Misleading and Do Not Entitle
        Defendants to the Protection of the Bespeaks Caution Defense . . . . . . . . . . . 19

II.    THE AMENDED COMPLAINT STATES A CLAIM ON BEHALF OF
    ALL PERSONS WHO PURCHASED STOCK DURING THE IPO
    AND WHO SUFFERED DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

III.    THE AMENDED COMPLAINT PROPERLY ALLEGES A CLAIM FOR CONTROL
    PERSON LIABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Azrielli v. Cohen Law Offices,*
    21 F.3d 512 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Brody v. Transitional Hosps. Corp.,*
    280 F.3d 997 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*DeMaria v. Andersen,*
    318 F.3d 170 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Desiano v. Warner-Lambert Co.,*
    326 F.3d 339 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Finkel v. Putnam Convertible Opportunities,*
    162 F.3d 1147 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ganino v. Citizens Utils. Co.,*
    228 F.3d 154 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 23

*Gaskins v. Grosse,*
    No. CV 481-387, 1983 U.S. Dist. LEXIS 19618 (S.D. Ga. Jan. 31, 1983) . . . . . . . . . 19

*Goldman v. Belden,*
    754 F.2d 1059 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Grossman v. Novell, Inc.,*
    120 F.2d 1112 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Halperin v. ebanker USA.com, Inc.,*
    295 F.3d 352 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Herman & MacLean v. Huddleston,*
    459 U.S. 375 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Adams Golf, Inc. Secs. Litig.,*
    381 F.3d 267 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re AIG Advisor Group Sec. Litig.*,
   No. 06 CV 1625 (JG), 2007 U.S. Dist. LEXIS 30179 (E.D.N.Y. April 25, 2007) . . . . . 24

*In re AMF Bowling Sec. Litig.*,
   No. 99 Civ. 3023 (DC), 2001 U.S. Dist. LEXIS 3182 (S.D.N.Y. March 22, 2001). . . . 13

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   352 F. Supp. 2d 429 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Initial Pub. Offering Sec. Litig.*,
   358 F. Supp. 2d 189 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*In re Indep. Energy Holdings PLC Sec. Litig.*,
   154 F. Supp. 2d 741 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
   930 F. Supp. 68 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Unicapital Corp. Sec. Litig.*,
   149 F. Supp. 2d 1353 (S.D.Fla. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Ziff-Davis Inc. Secs. Litig.*,
   No. 98 Civ. 7158 (SWK), 2000 U.S. Dist. LEXIS 9076
   (S.D.N.Y. June 27, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17

*Merzin v. Provident Fin. Group Inc.*,
   311 F. Supp. 2d 674 (S.D.Oh. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Miller v. Lazard, Ltd.*,
   473 F. Supp. 2d 571 (S.D.N.Y 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Milman v. Box Hill Sys. Corp.*,
   72 F. Supp. 2d 220 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 21

*Panther Partners, Inc. v. Ikanos Communs., Inc.*,
    No. 06 Civ. 12967 (PAC), 2008 U.S. Dist. LEXIS 18536
    (S.D.N.Y. March 10, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22

*Randall v. Loftsgaarden*,
    478 U.S. 647 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Schaffer v. Evolving Sys., Inc.*,
    29 F. Supp. 2d 1213 (D. Col. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*SEC v. Manor Nursing Centers, Inc.*,
    458 F.2d 1082 (2d Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Siemers v. Wells Fargo & Co.*,
    No. C 05-04518 WHA, 2006 U.S. Dist. LEXIS 60858 (N.D. Cal. Aug. 14, 2006) . . . 24

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17

*United States v. Bazaldua*,
    506 F.3d 671 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## Statutes and Rules

15 U.S.C. § 77l(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 23

15 U.S.C. § 77k(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

15 U.S.C. § 77o . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

17 C.F.R. § 240.12b-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fed. R. Evid. 201(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Statutory Materials**

H. R. Rep. No. 85, 73d Cong., 1st Sess., 9 (1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Lead Plaintiff Seow Lin ("Plaintiff"), by his attorneys, respectfully submits this memorandum of law in opposition to the motion to dismiss the Amended Class Action Complaint (the "Amended Complaint") made by defendants Interactive Brokers Group, Inc. ("Interactive Brokers" or the "Company") and Thomas Peterffy ("Peterffy") (collectively referred to herein as "Defendants").

## PRELIMINARY STATEMENT

This is an action arising under Sections 11 and 12(a)(2) of the Securities Act of 1933 alleging materially false statements and omissions made by Defendants in a Registration Statement (the "Registration Statement") and Prospectus (the "Prospectus") filed with the Securities and Exchange Commission ("SEC") in connection with an initial public offering ("IPO" or "Offering") conducted by the Company on May 4, 2007.[1]

More specifically, the Company, an electronic brokerage firm and market maker, failed to disclose a $25 million loss suffered by the Company in the quarter ended March 31, 2007, as well as a 20.9% decline in the Company's income from its market making segment as a result of high volume options trading in advance of corporate announcements and furthermore, misled investors about the capabilities of its computer based, automatic trading and risk management systems in preventing such material trading losses from systematically recurring.

## STATEMENT OF FACTS

**Plaintiff**

Plaintiff purchased 8,500 shares of Interactive Brokers' stock in the IPO at a price of $30.01 per share. *See* Certification, Attachment A (attached to Am. Compl.). On August 24,

_____

[1] The Registration Statement and Prospectus will collectively be referred to herein as the "Offering Documents."

2007, Plaintiff sold 1,000 shares at $24.70 per share and 3,000 shares at $25.20 per share. *Id.*

As a result, Plaintiff has suffered damages. Am. Compl. ¶¶46, 56, 57.

**Defendants**

Defendant Interactive Brokers together with its subsidiaries, operates as an automated

global electronic market maker and broker. Am. Compl. at ¶7. Traditionally, market makers

provide a critical function in securities markets by providing liquidity, in the form of continuous

bids and offers, in various types of financial instruments and by facilitating rapid purchases and

sales of such instruments. Registration St. at 95. Market makers compete for customer order

flow by displaying bid and offer quotations for a guaranteed number of shares, and adjust their

bid and offer prices in response to the forces of supply and demand for each security. *Id.*

Market makers derive most of their revenues from the difference, or spread, between the price

paid when a security is bought and the price received when that security is sold or the price paid

when bought back if a security is sold short. *Id.* The Company describes its market making

function as follows:

> As a market maker, we provide continuous bid and offer quotations on
> approximately 357,000 securities and futures products listed on electronic
> exchanges around the world. Our quotes are driven by proprietary mathematical
> models that assimilate market data and reevaluate our outstanding quotes each
> second. Unlike firms that trade over-the-counter (OTC) derivative products, it is
> our business to create liquidity and transparency on electronic exchanges. Our
> profits have been principally a function of transaction volume on electronic
> exchanges rather than volatility or the direction of price movements.

Registration St. at 1.

The Company's market making operations earned the majority of the Company's

revenues, generating over 80% of the Company's annual net revenues for the year ended

December 31, 2005. Registration St. at 17, 74.

2

Defendant Thomas Peterffy was, at all relevant times, the founder, Chief Executive Officer, Chairman of the Board and President of Interactive Brokers and in that capacity signed the Registration St.. Am. Compl. ¶8. Following the IPO, Peterffy owned and had voting power over 91.3% of the Company through IBG Holdings LLC, a holding company. Registration St. at 1, 6.

**Defendants Failed to Disclose Material Trading Losses Resulting from Options Market Making Activities**

In the first quarter of 2007 ended March 31, 2007, the Company experienced high volume trading in the options of different securities in advance of certain corporate announcements, which ultimately resulted in $25 million in losses by the Company. Am. Compl. ¶22. The Company's proprietary software, through which these trades were conducted, was unable to prevent these successive trading losses from repeatedly recurring despite the Company's claim that its proprietary software and pricing models automatically assimilated market data and reevaluated outstanding quotes each second and was thus dependent on volume and not price movement for profit. Am. Compl. ¶¶20, 21, 22.

On or about May 4, 2007 and continuing on through May 9, 2007, the Company conducted an IPO. Am. Compl. ¶16. The Company filed a Form S-1/A Registration Statement with the SEC on May 3, 2007, and an IPO Prospectus, which formed part of the Registration Statement, was filed on May 4, 2007. Am. Compl. ¶¶15, 16.

The IPO was conducted as a Dutch auction in which the public offering price and allocation of shares was determined primarily by an auction process conducted by the lead banks and other securities dealers who participated in the Offering. Am. Compl. ¶17. The placement agents were not required to sell any specific number or dollar amount of shares of common stock

3

but rather agreed to use their best efforts to obtain potential purchasers for the shares. *Id.*

Purchasers bid on shares at varying prices, and the Company ultimately set the offering price at

the lowest price at which all shares could still be sold, which in this instance was $30.01 per

share. Registration St. at 161; Am. Compl. ¶16.[2]  The IPO was highly successful, with the

Company selling 40 million shares to the public and obtaining $1.2 billion in net proceeds, with

Peterffy alone receiving $830.3 million. Registration St. at 9.

      Conspicuously absent from the Offering Documents was any mention of the $25 million

in losses that the Company had suffered as a result of the options market activities during the

quarter ended March 31, 2007, or that its market making segment income had declined by 20.9%

as a result of such activities. Despite the Company's claim that its proprietary technology

"marked-to-market daily [the Company's assets and liabilities] for financial reporting purposes

and re-valued [the assets and liabilities] continuously throughout the trading day for risk

management and asset/liability management purposes" the Company asserted that it was

"unable" to quantify the loss, although the IPO was conducted a full 35 days following the end

of the quarter. Am. Compl. at ¶22. The relevant section in the Offering Documents states:

> We expect total net revenues to be between $318 million and $338 million for the
> quarter ended March 31, 2007, compared to total net revenues of $1.25 billion
> and $329 million for the year ended December 31, 2006 and the quarter ended
> March 31, 2006, respectively. We expect income before income tax to be
> between $181 million and $192 million for the quarter ended March 31, 2007,
> compared to income before income tax of $762 million and $215 million for the
> year ended December 31, 2006 and the quarter ended March 31, 2006,
> respectively. We expect pro forma basic and diluted earnings per share both to be
> between $0.29 and $0.31 for the quarter ended March 31, 2007, compared to pro
> forma basic and diluted earnings per share of $1.21 for the year ended December
> 31, 2006 and $0.34 for the quarter ended March 31, 2006. Unexpectedly heavy

---

[2] Discovery will be necessary to determine the date on which IPO bids were accepted by
the Company and IPO participants were obligated to purchase shares in the IPO.

options trading activity in advance of certain corporate announcements adversely
impacted our market making operations during the quarter ended March 31, 2007.
While **we are unable to detail the exact frequency of these announcements in
a given period and their exact financial impact on our results of operations,
in the quarter ended March 31, 2007, there were a greater number of
surprise or unexpected announcements preceded by heavy options activity
than in prior quarters**. Heavy options activity typically occurs in advance of
certain surprise or unexpected corporate announcements, especially where there is
a leakage of information and when regularly scheduled annual or quarterly
corporate announcements materially deviate from expectations. This impacts us
as, when we trade with others who have different information than we do, we may
accumulate unfavorable positions preceding large price movements in companies.
To the extent the frequency or magnitude of these events increase, we would
expect our losses from such events to increase correspondingly. See "Risk
Factors - - Risks Related to Our Business - - We are exposed to losses due to
imperfect information."

Registration St. at 11 (emphasis added); Am. Compl. ¶34.

Although the Company claimed that it was unable to determine the exact financial impact

of the options market activities at the time of the IPO, on May 29, 2007, just three weeks after

the IPO, the Company reported that its market making segment income had decreased 20.9%

partly as a result of the options market activities that occurred prior to certain corporate

announcements during the first quarter:

Market making segment income before income tax decreased 20.9% in the
quarter ended March 31, 2007 compared with the same period in 2006, reflecting
lower trading gains driven ***in part*** by heavy options activity in advance of certain
corporate announcements, which had a negative impact on profits.

Am. Compl. ¶35; Form 8-K filed May 29, 2007 (Ex. 99.1 at p. 2) (emphasis added).

Although the Company did not reveal the extent of the losses suffered as a result of the

options market activities, or attribute its income decline wholly to those activities, the

Company's partial disclosure nevertheless caused an immediate 6% decline in the Company's

stock price. As *The Street.com* observed:

5

> Interactive Brokers Group (IBKR - Cramer's Take - Stockpickr) was among the many trailing financial stocks, sliding 6% to $25.91 after the Connecticut firm said first-quarter income was only $12.4 million, or 31 cents a share (pro forma), compared with year-ago income of 34 cents a share.

Am. Compl. ¶23.

A few weeks later, on July 5, 2007, the Company filed a Form 8-K in which it announced a decline in expected earnings per share, between $0.27 and $0.29 for the quarter ended June 30, 2007. Form 8-K dated July 5, 2007 at Ex. 99.1. The Form 8-K did not discuss or even mention the earlier options market activities that resulted in a $25 million loss. An article published in *Forbes.com* on July 6, 2007, however, did discuss those losses and attributed the entire amount to the heavy options market activities in the first quarter of 2007, noting that the Company had "a $25 million loss as a result of being on the wrong end of trades." Liz Moyer, *Interactive Brokers Cries Foul, available at* http://www.forbes.com (last accessed on March 24, 2008)(cited in Am. Compl. ¶28).

In the Form 8-K the Company disclosed, for the first time, another staggering loss – $37 million – resulting from high volume trading activity in the options of Altana AG (the "Altana Options"), which had occurred two months earlier, on May 3, 2007, the day before the IPO was conducted. *Id.* at Schedule I. *See also* Am. Compl. ¶24. These activities allegedly occurred when buyers and sellers colluded to set an artificially low trading price, thus causing the Company's proprietary pricing model to set lower market making options prices and ultimately selling the Altana Options at those prices. Although the Altana Options trading allegedly occurred on May 3, 2007, and the losses were incurred by the Company on May 4, 2007 through

6

the ensuing trading days, the Company failed to supplement the prospectus with this disclosure in accordance with the anti-fraud provisions of the federal securities laws.[3]

The Company's newly disclosed $37 million in losses from the Altana Options trading machinations was widely commented upon by analysts. The July 6, 2007 *Forbes.com* article discussed above observed that the Altana Options machinations were the second instance of large scale losses resulting from options trading:

> For the second time since its public stock debut in May, derivatives trading giant Interactive Brokers Group says options market manipulation is weighing on its business. The firm was hit with a $37 million loss in May because of manipulative trading activities on the German electronic stock market, it said in a regulatory filing late Thursday. News of the loss and its potential effect on second-quarter revenues sent shares of Interactive (nasdaq: IBKR - news - people) down nearly 8% in heavy trading Friday . . . . It's not the first time Interactive has claimed market manipulation is costing it money.

Am. Compl. ¶28.

These July 6, 2007 disclosures of widespread, costly and systematic failures in the Company's technology with regard to its options trading and risk management systems had an immediate and severe impact on the stock price, causing it to drop by approximately 10%, from a closing price of $27.11 per share on July 5, 2007 to a closing price of $24.97 per share on July 6, 2007, on extremely heavy trading volume. The stock price continued to decline and closed at $23.49 per share on July 10, 2007. Am. Compl. ¶25.

The stock price decreased sharply notwithstanding the Company's announcement that an entity affiliated with Defendant Peterffy had purchased the Company's right to recover losses resulting from the manipulation of the Altana Options for $37 million, hoping to recover the

---

[3] Pursuant to Section 10(b) of the Securities Exchange Act of 1934 and Section 17 of the Securities Act of 1933, Defendants had a duty to supplement the prospectus. *See SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1095-96 (2d Cir. 1972).

losses after the investigation being conducted in Germany.  Form 8-K at Ex. 99.1 at 2.

According to the *Forbes.com* article, Peterffy's "reassurance wasn't enough to convince

investors, who dumped Interactive Brokers in after-hours trading . . . ."  Am. Compl. ¶26.

The Company's failure to disclose the substantial losses it had suffered from heavy

options trading in advance of certain corporate announcements, as well as its failure to

supplement the prospectus with information concerning the losses it had suffered in connection

with the Altana Options, was compounded by its misleading statements concerning the

competitive benefits of its automatic trading and risk management systems which, in fact, was

inherently flawed as it was not effective when confronted with heavy options trading and options

machinations and could not prevent trading losses associated with the Company's market

making activities under those circumstances.  Am. Compl. ¶22.

Instead, the Company claimed that it maintained "technological superiority" in its

industry, stating that, among other things, its technology was "the key to [the Company's]

success" (Registration St. at 2), its proprietary pricing model was capable of calculating quotes

ahead of the market based upon projected supply and demand, automatically rebalancing trading

positions throughout the trading day to manage the Company's risk exposures in options, and

marked to market[4] its assets and liabilities daily for financial reporting purposes:

> *Real-time risk management.*  We operate as a market maker, not an investor.
> **Therefore, our ability to generate profits is generally a function of
> transaction volume on electronic exchanges rather than volatility or the
> direction of price movements. We seek to calculate quotes at which supply**

---

[4] In accounting and finance, "mark to market" is the act of assigning a value to a position
held in a financial instrument based on the current market price for that instrument or similar
instruments.  Mark to market, *available at* http://en.wikipedia.org/wiki/Mark_to_market (Last
accessed on May 16, 2008).  *See also United States v. Bazaldua*, 506 F.3d 671, 673 n.2 (8th Cir.
2007) (taking judicial notice of article in Wikipedia, the online encyclopedia).

**and demand for a particular security are likely to be in balance a few
seconds ahead of the market and execute small trades at tiny but favorable
differentials. Our proprietary pricing model continuously evaluates and
monitors the risks inherent in our portfolio, assimilates market data and
reevaluates the outstanding quotes in our portfolio each second. Our model
automatically rebalances our positions throughout the trading day to
manage risk exposures on our positions in options, futures and the
underlying securities, and will price the increased risk that a position may
add to the overall portfolio into the bid and offer prices we post.**
Continuously, and in real-time, we believe our system maintains an overall
position that minimizes the risks from up or down market movements, and at a
reasonable cost. The effectiveness of our risk management is monitored closely
by our management team. **Our assets and liabilities are marked-to-market
daily for financial reporting purposes and re-valued continuously throughout
the trading day for risk management and asset/liability management
purposes** . . . . In summary, our anticipated portfolio risk management system for
market making and our real-time credit management system for customer
accounts enable us to maximize profits while minimizing losses typically
associated with manual risk management.

Registration St. at 98 (emphases added).

The Company's general risk statements concerning the Company's market making

activities further contributed to the rosy – but inaccurate – picture painted by the Company about

its leading edge technology, which affirmatively stated that such losses *might* occur, rather than

truthfully disclosing that they *had* occurred:

> **We may incur material trading losses from our market making
> activities.**
> A substantial portion of our revenues and operating profits is derived from
> our trading as principal in our role as a market maker and specialist. We may
> incur trading losses relating to these activities since each primarily involves the
> purchase or sale of securities for our own account. In any period, we may incur
> trading losses in a significant number of securities for a variety of reasons
> including:
>> ■    price changes in securities;
>>
>> ■    lack of liquidity in securities in which we have positions; and
>>
>> ■    the required performance of our market making and specialist obligations.

9

>These risks may limit or restrict our ability to either resell securities we purchased or to repurchase securities we sold. In addition, we may experience difficulty borrowing securities to make delivery to purchasers to whom we sold short, or lenders from whom we have borrowed. From time to time, we have large position concentrations in securities of a single issuer or issuers engaged in a specific industry or traded in a particular market. Such a concentration could result in higher trading losses than would occur if our positions and activities were less concentrated.

>In our role as a market maker, we attempt to derive a profit from the difference between the prices at which we buy and sell, or sell and buy, securities. However, competitive forces often require us to match the quotes other market makers display and to hold varying amounts of securities in inventory. By having to maintain inventory positions, we are subjected to a high degree of risk. We cannot assure you that we will be able to manage such risk successfully or that we will not experience significant losses from such activities, which could have a material adverse effect on our business, financial condition and operating results.

Registration St. at 23-24; Am. Compl. ¶31.

The Offering Documents further described ***possible*** losses in connection with the Company's pricing model, but did not warn investors that the system was flawed with respect to heavy options trading in advance of corporate announcements and market manipulations:

>**We may incur losses in our market making activities in the event of failures of our proprietary pricing model.**
>The success of our market making business is substantially dependent on the accuracy of our proprietary pricing mathematical model, which continuously evaluates and monitors the risks inherent in our portfolio, assimilates market data and reevaluates our outstanding quotes each second. Our model is designed to automatically rebalance our positions throughout the trading day to manage risk exposures on our positions in options, futures and the underlying securities. **In the event of a flaw in our pricing model and/or a failure in the related software, our pricing model may lead to unexpected and/or unprofitable trades, which may result in material trading losses.**

Registration St. at 24 (second emphasis added); Am. Compl. ¶32.

In addition, as Defendants highlight in their brief, Defendants further misled the public by stating that the Company ***might*** suffer losses as a result of price movements in different securities – such as the options market activities described earlier – but that the Company

10

historically has suffered only "immaterial" losses as a result of such activity, notwithstanding the

fact that the Company *had* suffered a $25 million loss in the first quarter of 2007:

> If the behavior of price movements of individual securities diverges substantially from what their historical behavior would predict, **we might incur trading losses**.  We attempt to limit such risks by diversifying our portfolio across many different options, futures, and underlying securities and avoiding concentrations of positions based on the same underlying security.  **Historically, our losses from these events have been immaterial in comparison to our annual trading profits**.

> Registration St. at 84 (emphases added).

As discussed in the following section, the Amended Complaint states a claim for

violations of Sections 11 and 12(a)(2) for material misstatements and omissions of fact in the

Offering Documents concerning the Company's failure to disclose (1) the amount of losses

sustained in the first quarter of 2007 from its market making activities in the face of heavy

options trading activity in advance of corporate announcements and options machinations; (2) a

20.9% drop in its market making income in the first quarter of 2007, and the fact that the drop

was attributable to the losses incurred in connection with these options trading activities; and (3)

the ineffectiveness of its technology and risk management systems with respect to heavy options

trading activitiy in anticipation of corporate announcements and options machinations.

## ARGUMENT

When deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must construe the

complaint in the light most favorable to the plaintiff and accept the factual allegations in the

complaint as true.  *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 204 (S.D.N.Y.

2004)(citing *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 347 (2d Cir. 2003)).  "The issue is

not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer

evidence to support the claims." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d

388 (S.D.N.Y. 2005) (quoting cases).

Although courts may not consider matters outside the pleadings, courts may consider

documents attached to the pleadings, documents referenced in the pleadings, or documents that

are integral to the pleadings. *Id.* (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53

(2d Cir. 2002)). In addition, in securities fraud actions, courts may consider public disclosure

documents that have been filed with the SEC. *Id.* (citing *Rothman v. Gregor*, 220 F.3d 81, 88

(2d Cir. 2000)).

## I.    THE AMENDED COMPLAINT STATES A CLAIM FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Section 11 of the Securities Act of 1933 (the "Securities Act") imposes strict liability on

issuers and signatories, such as officers of the issuer and underwriters, of a registration statement

that "contained an untrue statement of a material fact or omitted to state a material fact . . .

necessary to make the statements therein not misleading." *Rombach v. Chang*, 355 F.3d 164,

169 n.2 (2d Cir. 2003).

Similarly, Section 12(a)(2) of the Securities Act provides that a person who sells

securities by means of a prospectus that misrepresents or omits material facts is liable to the

person purchasing such security from him. *Id.* at 169 n.3 (citing 15 U.S.C. § 77l(a)(2)). Neither

Section 11 nor Section 12(a)(2) requires that a plaintiff allege the scienter or reliance elements of

a fraud cause of action. *Id.* at 169 n.4 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375,

382 (1983)). Notice pleading standards apply to Section 11 and 12 claims. *See, e.g., In re*

*Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006).

Whether a fact or omission of fact is material for purposes of the federal securities laws "is a mixed question of law and fact which the trier of fact ordinarily decides." *TSC Indus., Inc. v. Northway*, 426 U.S. 438, 450 (1976)). "Materiality is . . . therefore not typically a matter for Rule 12(b)(6) dismissal." *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d at 211(quoting *In re Adams Golf, Inc. Secs. Litig.*, 381 F.3d 267 (3d Cir. 2004)); *see also, Halperin v. ebanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("Recognizing that the materiality of an omission is a mixed question of law and fact, courts often will not dismiss a securities fraud complaint at the pleading stage of the proceedings, unless reasonable minds could not differ on the importance of the omission").

The Second Circuit has held that "[w]hen presented with a Fed. R. Civ. P. 12(b)(6) motion, a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) and citing *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994)). *See also, In re AMF Bowling Sec. Litig.*, No. 99 Civ. 3023 (DC), 2001 U.S. Dist. LEXIS 3182, at *10 (S.D.N.Y. March 22, 2001) (noting that "[w]hile a court may dismiss a claim on the ground that a misstatement or omission was not material, 'the standard for doing so is high'") (quoting *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 228 (S.D.N.Y. 1999) (same); *Goldman*, 754 F.2d at 1067 ("Even if . . . the facts characterized by the Complaint as adverse were clearly not problems . . . [the district court] could not properly, on this Complaint, determine as a matter of law that reasonable minds could not differ as to whether the undisclosed facts would be important to a reasonable investor.")).

13

Here, as described below, the Offering Documents failed to disclose material information, including highly relevant financial data.

**A.     Defendants Affirmatively Misrepresented and Omitted Material Financial Data Concerning the $25 Million Loss Suffered by the Company in Connection with Options Market Activities**

The Offering Documents failed to disclose that options market activities occurring in the first quarter of 2007 had resulted in $25 million in losses, causing a 20.9% decrease in income generated from the Company's market making segment.  While the Offering Documents stated that "heavy options activity" had "adversely impacted our market making operations" during the first quarter of 2007, the Company claimed that it was "unable to detail the exact financial impact on our results of operations."  Registration St. at 11.

However, as the Company also stated in the Registration Statement, the Company's **"assets and liabilities are marked-to-market daily for financial reporting purposes and re-valued continuously throughout the trading day for risk management and asset/liability management purposes**."  Registration St. at 98 (emphasis added).  If the Company's assets and liabilities were marked to market daily – and precisely for the purpose of financial reporting – then it is fair to infer that at the time of the IPO, the Company was able to detail the financial impact of the heavy options trading in advance of corporate announcements and was able to determine that it had lost $25 million in a series of transactions in different securities occurring over the course of several weeks during the quarter ended March 31, 2007.  The IPO was conducted a full **35 days** following the end of the quarter, giving the Company an additional four weeks to determine the impact on its quarterly revenues.

Indeed, on May 29, 2007 – just three weeks after the close of the IPO – the Company was able to determine the impact of its trading losses on its income, reporting that its market making

14

segment income had decreased by 20.9% allegedly, in part, as a consequence of the options

market machinations that occurred prior to certain corporate announcements during the first

quarter:

> **Market making segment income before income tax decreased 20.9% in the
> quarter ended March 31, 2007 compared with the same period in 2006,**
> reflecting lower trading gains driven in part by heavy options activity in advance
> of certain corporate announcements, which had a negative impact on profits.

Form 8-K filed May 29, 2007 (Ex. 99.1 at p. 2) (emphasis added); Am. Compl. ¶35.

Even this disclosure of May 29, 2007 did not reveal to investors the full impact of the

losses suffered as a result of the options market activities, since the Company did not attribute

the 20.9% decrease in its quarterly market making income entirely to such losses, nor did it

quantify the amount of losses it had suffered.  This was a material omission of fact because the

Company's losses constituted approximately 7% of the Company's pro forma net revenue of

$318 to $338 million for the quarter.  *See* Registration St. at 11.

Accordingly, Plaintiff's allegations concerning Defendants' failure to describe, quantify

and/or attribute this material financial loss in the Offering Documents states a claim for a

violation of Section 11.  *See, e.g., In re Ziff-Davis Inc. Secs. Litig.*, No. 98 Civ. 7158 (SWK),

2000 U.S. Dist. LEXIS 9076, at *6-8 (S.D.N.Y. June 27, 2000).  In *Ziff-Davis*, Judge Kram

denied a motion to dismiss a Section 11 claim where the complaint alleged that the defendant

had failed to disclose the actual cause of a decline in the company's revenue.  *Id.*  The defendant

in *Ziff-Davis* had stated that it would be reporting a decline in its net revenues and in the same

section pointed to general market conditions as the cause of the decline, but did not disclose the

effect of increased competition and loss of market share, which was alleged to be the actual

cause of the decline:

> For the first quarter of 1998, the Company [Ziff-Davis] will report revenue of $ 228.1 million compared to $ 224.9 million for the first quarter of 1997. Revenue from publishing operations will decline approximately 4.1% primarily due to the absence of $ 14.8 million of revenue from Macuser and MacWeek magazines, which were transferred in October 1997 to a 50/50 joint venture with another publishing company and are no longer consolidated in the Company's results. **The publishing segment will also report lower advertising revenues from its business publications principally as a result of factors affecting the computer technology industry generally, including slowing demand for computer products, fewer new product launches, pricing pressures, vendor market share shifts and excess PC inventories in distribution channels.**

*In re Ziff-Davis Inc. Secs. Litig.*, 2000 U.S. Dist. LEXIS 9076 at *6-7 (emphasis added).

Here, the Company's disclosures were similarly vague and even more misleading, because in contrast to *Ziff-Davis*, the Company did not state that it would be reporting a $25 million loss in the first quarter and a 20.9% decrease in income from its market making activities that resulted from heavy options trading in advance of corporate announcements.  Instead, the Company provided a broad range for expected revenues for comparison to the prior year's revenues, stating that revenues were expected to be between $318 and $338 million for the quarter ended March 31, 2007, compared to revenues of $329 million for the quarter ended March 31, 2006.  Registration St. at 11.  In the same section, the Company noted the existence of "[u]nexpectedly heavy options activity" that had "adverse impacted [the Company's] market making operations" but as stated earlier, claimed it was "unable" to determine "the exact financial impact" of such activities, when in fact such financial information was ascertainable. *Id.*  Moreover, the Company affirmatively misrepresented the impact of such activities, stating in the Offering Documents that "*[h]istorically, our losses from [price movements in securities] have been immaterial* in comparison to our annual trading profits."  Registration St. at 84 (emphasis added).

16

Contrary to Defendants' assertion, *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002), cited by Defendants, is inapposite to the case at Bar. *See* Defs. Br. at 11. There, the court hypothesized in a footnote that the omission of financial data concerning a "detailed breakdown of the company's region by region or month by month sales" would not be misleading. *Brody*, 280 F.3d at 1006 n.8.

Here, in contrast, the $25 million loss was not an insignificant detail concerning regional or monthly sales figures, but was a substantial financial loss constituting approximately 7% of the Company's pro forma net revenue for the quarter and a 20.9% drop in its market making segment income. The Company's market making operations comprised a significant portion of its net revenues, generating over 80% of the Company's net revenues for the year ended December 31, 2005. Registration St. at 17, 74. Certainly, this information would have altered the "total mix" of information available to investors and as such, states a claim for a violation of Sections 11 and 12. *See TSC Industries, Inc.*, 426 U.S. at 449. *See also In re Ziff-Davis Inc. Secs. Litig.*, 2000 U.S. Dist. LEXIS 9076 at *6-7. Because Defendants withheld negative information concerning the amount of the losses suffered as a result of options market activities, they may be held liable under Section 11 for omitting such information and misleading investors as to the Company's ability to determine such information. *See, e.g., Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213, 1221 (D. Col. 1998) (citing *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994) ("a duty to speak the full truth arises when a defendant undertakes a duty to say anything")). In *Schaffer*, for example, the court denied a motion to dismiss a Section 11 claim where the defendant made positive statements concerning its quarterly revenue results, while failing to disclose that there had been a decline in new business. *Id.* In addition, *Schaffer* found that the company's failure to disclose the amount of prepayment penalties owed in connection

17

with certain subordinated notes was a material omission, notwithstanding the fact that the

company had disclosed the existence of such penalties. *Id.* at 1222.

*DeMaria v. Andersen*, 318 F.3d 170 (2d Cir. 2002), relied upon by Defendants, is

similarly distinguishable. There, the court held that the omission of revenue information for a

given quarter was not misleading because the company subsequently filed a corrected

prospectus, and, moreover, the court observed that the omission of such information would have

caused an investor to believe that the company's revenue was *less* than it actually was, and

would not have led the investor to overestimate the company's future performance. *Id.* at 181.

Here, in contrast, Defendants included only partial information concerning the Company's

revenues, which did not reveal material financial losses, falsely claimed that it was unable to

determine such information and did not file a corrected prospectus to remedy these misleading

statements and omissions.

> **B.     Defendants Affirmatively Misrepresented and Omitted Material Information
> Concerning A Systematic Weakness in the Company's Proprietary Trading
> and Risk Management Systems With Respect to Options Market Making
> Activities**

According to the Offering Documents, the Company is a "technology company," whose

profitability and competitive edge are directly attributable to its most valuable asset, proprietary

technology and pricing models that "calculate[s] quotes at which supply and demand for a

particular security are likely to be in balance a few seconds ahead of the market . . . continuously

evaluates and monitors the risks inherent in [the Company's] portfolio, assimilates market data .

. . reevaluates the outstanding quotes in [the] portfolio each second . . . . .automatically

rebalances . . . positions throughout the trading day to manage risk exposures on [the

Company's] positions in options, futures and the underlying securities, and will price the

increased risk that a position may add to the overall portfolio into the bid and offer prices [the Company] post[s]." Registration St. at 98.

In short, the Company touted its primary asset – its proprietary technology, pricing models and risk management systems – rather than accurately reporting a significant and systematic impairment to those assets: the software flaw that could not prevent losses caused by strategic, high volume trading in options. *See, e.g., In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1364 (S.D. Fla. 2001) (denying motion to dismiss Section 11 claim concerning an overstatement of the company's assets); *Gaskins v. Grosse*, No. CV481-487, 1983 U.S. Dist. LEXIS 19618, at *22 (S.D. Ga. Jan. 31, 1983) ("I can think of nothing more critical to the average potential investor's ultimate decision to purchase securities than representations with regard to the worth of the company . . . ."). Thus, the Company failed to alert investors to this impairment, a failure that is highlighted by the fact that on the very day the Company conducted its IPO, the Company began suffering an additional $37 million in losses as a result of the Altana Options machinations.[5]

### C.    Defendants' General Risk Disclosures Were Misleading and Do Not Entitle Defendants to the Protection of the Bespeaks Caution Defense

The general risk disclosures contained in the Offering Documents do not make Defendants' nondisclosure concerning the $25 million loss and resulting decline in income generated from market making activities any less misleading. To the contrary, the general risk disclosures with respect to the Company's market making activities only discussed ***potential***

---

[5] To the extent the IPO participants were contractually obligated to purchase shares on or after May 4, 2007 pursuant to the Dutch auction process, Plaintiff and other putative class members would have a Section 12(a)(2) claim against Defendants for failing to supplement the prospectus with a disclosure of the $37 million in losses suffered from the Altana Options trading and reserves his right to assert such claims following discovery on the issue.

risks, and not **known** risks and events that had already occurred with respect to those risks,

particularly options market making activities. For instance, in the same section discussing the

heavy options market making activities, the Company stated that as a result of such activities, the

Company "**may** accumulate unfavorable positions preceding large price movements in

companies. **To the extent** the frequency or magnitude of these events increase, we **would expect**

our losses from such events to increase correspondingly." Defs. Br. 4-5 (quoting Registration St.

at 11-12) (emphases added).

As highlighted by Defendants in their brief, similar statements couched in the language

of possibilities were included in other sections of the Offering Documents. For example, the

Company stated: "We **may** incur material trading losses from our market making activities."

Registration St. at 23 (quoted in Defs. Br. at 6). Also, the Company stated: "We are exposed to

losses due to lack of perfect information . . . . and as a result, we **may** accumulate unfavorable

positions preceding large price movements in companies." Registration St. at 24 (quoted in Defs.

Br. at 7). Moreover, the Company stated that "[h]istorically, our losses from these events have

been immaterial in comparison to our annual trading profits." Registration St. at 84.

However, Defendants failed to disclose that the Company, in fact, **had** accumulated

unfavorable positions in options resulting in material financial losses. As such, the Amended

Complaint states a claim for a violation of Section 11 based upon these affirmative

misrepresentations. *See Panther Partners, Inc. v. Ikanos Communs., Inc.*, No. 06 Civ. 12967

(PAC), 2008 U.S. Dist. LEXIS 18536, at *18-19 (S.D.N.Y. March 10, 2008) ("[C]autionary

language does not protect material misrepresentations or omissions when defendants knew they

were false when made.") (quoting *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68,

72 (S.D.N.Y. 1996)); *Brody*, 280 F.3d at 1006 (misrepresentations are actionable under securities

20

laws where they "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.").

Nor do the above statements entitle Defendants to the protection of the "bespeaks caution" doctrine, which provides that a misrepresentation or omission will be considered immaterial if cautionary language is sufficiently specific to render reliance on the false or omitted statement unreasonable. *See Milman*, 72 F. Supp.2d at 230 (citing *Finkel v. Putnam Convertible Opportunities*, 162 F.3d 1147 (2d Cir. 1998)). *Accord Grossman v. Novell, Inc.*, 120 F.2d 1112, 1120 (10th Cir. 1997) ("At bottom, the bespeaks caution doctrine stands for the unremarkable proposition that statements must be analyzed in context when determining whether or not they are materially misleading."). The doctrine is not without limits, however, and "[g]eneral risk disclosures in the face of specific known risks which border on certainties do not bespeak caution." *Panther Partners*, 2008 U.S. Dist. LEXIS 18536 at *20 (citing *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. at 72).

In *Milman*, the court declined to apply the bespeaks caution doctrine where the issuer represented that a rejection by the marketplace of its new product line "***could have*** a material effect on its business" and that "[t]here can be "no assurance that the Company will be successful in identifying, managing, developing, manufacturing, or marketing product enhancements or new products that respond to technological change or evolving industry standards" although the issuer was alleged to have had actual – not  hypothetical – knowledge that the products were not being well received by customers. *Milman*, 72 F. Supp. 2d at 230-31 (emphasis added).

Similarly, here, Defendants stated that the Company might suffer losses as a result of any defects in the Company's proprietary pricing models and trading system technology, but

21

nowhere in the Offering Documents did the Company disclose that a flaw in the Company's trading and risk management systems was presently having a materially adverse impact on the Company. Furthermore, the failure to disclose the systemwide flaw with regard to high volume options trading and the resulting losses and decline in income generated from market making activities is particularly significant in light of the subsequent $37 million loss suffered by the Company beginning on May 4, 2007 as a result of manipulative trading in the Altana Options occurring on or about May 3, 2007. Full and accurate disclosure concerning the Company's options market activities would have allowed investors to take into account the risks inherent in the Company's proprietary pricing models, trading system technology and risk management system and factor that into their purchasing decision. Accordingly, the bespeaks caution doctrine does not apply here. *Id. See also Panther Partners*, 2008 U.S. Dist. LEXIS 18536, at *18-19; *Schaffer*, 29 F. Supp. 2d at 1221.

## II.    THE AMENDED COMPLAINT STATES A CLAIM ON BEHALF OF ALL PERSONS WHO PURCHASED STOCK DURING THE IPO AND WHO SUFFERED DAMAGES

Section 11 provides three methods to calculate damages: (1) the difference between the amount paid for the stock and the stock's price the day the lawsuit was brought; (2) the difference between the amount paid for the stock and the amount received for it when it was sold, if it was sold before the lawsuit was brought; and (3) the difference between the amount paid for the stock and the amount received for it when it was sold, if it was sold after the lawsuit was brought but before judgment, only if such damages are less than the damages as calculated under (1). *In re Cendant Corp. Litig.*, 264 F.3d 201, 228 n.8 (3d Cir. 2001) (citing 15 U.S.C. § 77k(e)).

Contrary to Defendants' assertion, the date that Lin filed his Amended Complaint (March 24, 2008) is the operative date for purposes of measuring Section 11 damages suffered by the putative class members, not the date that the original plaintiff filed his action (January 11, 2008). *See* 15 U.S.C. § 77k(e) (providing that "any person acquiring such security" may sue to recover damages "as shall represent the difference between the amount paid for the security . . . and the value thereof as of the time ***such*** suit was brought) (emphasis added). *See also Merzin v. Provident Fin. Group Inc.*, 311 F. Supp. 2d 674, 686 (S.D.Oh. 2004) (holding that date of filing of amended complaint by a new plaintiff is the operative filing date for purposes of determining stock price in measuring Section 11 damages).

Therefore, those putative class members who held their stock as of March 24, 2008, are entitled to recover damages because on that date the price of the stock was $27.16 per share, which was ten percent lower than the IPO price of $30.01 per share, a fact of which this Court may take judicial notice. *See* Fed. R. Evid. 201(b); *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 578 (S.D.N.Y. 2007) (noting that a "court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment") (quoting *Ganino*, 228 F.3d at 167 n.8). Additionally, any putative class member such as Plaintiff who sold stock at a price lower than the IPO purchase price prior to the time Plaintiff brought his suit on March 24, 2008, will be entitled to the difference in the purchase and sale price as a measure of damages. *See* 15 U.S.C. § 77k(e). *See also* Defs. Br. at 16.

Section 12(a)(2), in turn, states that any person may sue for "the consideration paid for the security with interest thereon, less the amount of any income received thereon, upon the tender of such security, **or for damages if he no longer owns the security**." 15 U.S.C. § 77l(a)(2) (emphasis added).

23

Thus, Section 12 provides that "if a plaintiff no longer holds a security, he or she can seek damages. If the person still holds the security, he or she must tender the security and then seek rescission of the sale, recovering the amount paid, plus interest and less any income received." *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2006 U.S. Dist. LEXIS 60858 (N.D. Cal. Aug. 14, 2006).  Therefore, those putative class members who continue to hold Interactive Brokers stock maintain a claim for rescission (*i.e.* tender of the stock in exchange for the consideration paid) or rescissionary damages (*i.e.* the price paid reduced by the amount realized upon sale, as long as such damages do not exceed the amount paid).  *Id.*; *In re AIG Advisor Group Sec. Litig.*, No. 06 CV 1625 (JG), 2007 U.S. Dist. LEXIS 30179, at *47 (E.D.N.Y. April 25, 2007) (where plaintiff pleads tender of securities on behalf of putative class members pursuant to Section 12(a)(2), plaintiff and class members who hold the subject securities may opt for rescission); *Randall v. Loftsgaarden*, 478 U.S. 647, 655-56 (1986) (Under Section 12(a)(2), "the plaintiff is entitled to a return of the consideration paid, reduced by the amount realized when he sold the security and by any "income received" on the security.") (citing H. R. Rep. No. 85, 73d Cong., 1st Sess., 9 (1933) (under § 12, the buyer can "sue for recovery of his purchase price, or for damages not exceeding such price")).  *See also* Am. Compl. ¶¶55, 56.

## III.    THE AMENDED COMPLAINT PROPERLY ALLEGES A CLAIM FOR CONTROL PERSON LIABILITY

Section 15 of the Act allows a plaintiff to proceed against "every person who, by or through stock ownership, agency or otherwise . . . controls any persons liable under section 11 or 12" of the Securities Act.  15 U.S.C. § 77o.  "To state a claim under this provision a plaintiff must plead: (1) a primary violation; and (2) control over the primary violator."  *In re Flag*

*Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 457 (S.D.N.Y. 2005) (citing *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 770 (S.D.N.Y. 2001) (a plaintiff is not required to plead "culpable participation" to state a claim under § 15)). "Control" in this context is defined as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d at 457 (quoting 17 C.F.R. § 240.12b-2 and citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996)). Courts in this district have consistently held that "control of a primary violator at the time of an offering is sufficiently pled where a plaintiff alleges that the defendant signed a registration statement containing materially false or misleading statements." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d at 457. *See also, e.g., In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 504 (S.D.N.Y. 2004).

The Amended Complaint alleges that Defendant Peterffy was the founder, Chief Executive Officer, Chairman of the Board and President of the Company. Am. Compl. ¶8. Peterffy, who, following the IPO, had voting power over 91.3% of the Company through IBG Holdings LLC, received $830.3 million in net proceeds from the IPO. Registration St. at 9.

As the Amended Complaint further alleges, Peterffy signed the Registration Statement. Am. Compl. ¶8. *See also* Registration St. at II-6. Therefore, to the extent the Court determines that the Amended Complaint states a claim pursuant to Sections 11 or 12 of the Act, the Amended Complaint also states a claim for control person liability against Peterffy pursuant to Section 15 of the Act.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that Defendants' motion to dismiss be denied in its entirety.  In the event the Court determines that any aspect of the Amended Complaint is inadequately pled, Plaintiff respectfully seeks leave to amend.

Dated: May 16, 2008
      New York, New York

                        **ABRAHAM FRUCHTER & TWERSKY LLP**

                By:       /S/
                        Jack G. Fruchter (JF-8435)
                        Mitchell M.Z. Twersky (MT-6739)
                        Ximena R. Skovron (XS-3397)
                        One Pennsylvania Plaza, Suite 2805
                        New York, New York 10119
                        Tel.: (212) 279-5050
                        Fax: (212) 279-3655
                        *Attorneys for Lead Plaintiff Seow Lin*