UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
SEOW LIN, on behalf of herself
and all others similarly situated,

              Plaintiff,

     - against -                      08 Civ. 242 (CM)

INTERACTIVE BROKERS GROUP, INC.
and THOMAS PETERFFY,

              Defendants.

--------------------------------------------------------x

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

McMahon, J.:

## I.    Introduction

Plaintiff brings this federal securities class action alleging violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "1933 Act"), codified at 15 U.S.C. §§ 77k, 77*l*(a)(2), and 77o, against Defendants Interactive Brokers Group, Inc. and Thomas Peterffy. Defendants move to dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the reasons set forth below, Defendants' motion to dismiss is granted in part and denied in part.

## II.    Facts and Procedural Background

This recitation of the facts relies heavily upon those contained in the Amended Complaint, which are assumed to be true for the purposes of this motion. See Bell Atlantic Corp.

v. Twombly, 127 S. Ct. 1955, 1975 (2007). The Court may also consider documents relied upon in the drafting of the complaint. In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 406 (S.D.N.Y. 2001). Additionally, a court may take judicial notice of facts that are "not subject to reasonable dispute" because they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," FED. R. EVID. 201(b)(2), including public documents required by law to be filed with the Securities and Exchange Commission. Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991).

### A.    Facts

#### 1. Defendants

Defendant Interactive Brokers Group, Inc. ("IB" or the "Company") "operates as a global electronic market maker and broker, and it executes and processes securities, futures and foreign exchange trades on more than 60 electronic exchanges and trading platforms worldwide." (Dkt. #17, Am. Compl. ¶¶ 7, 15.) It is headquartered in Greenwich, Connecticut, and its stock is listed on the NASDAQ Global Select Market. (Id. ¶ 7.)

In the documents submitted as part of its initial public offering (hereinafter referred to as "Offering Documents"), the Company touts its strength in technology, especially its proprietary software. (Offering Documents at 2-3.)[1] By "assimilat[ing] market data and reevaluat[ing] [the Company's] outstanding quotes each second," IB's proprietary software lowers its costs and enables processing of a high daily volume of trades. (Id.) Because IB makes markets rather than invests in them, its profits are tied to "transaction volume on electronic exchanges rather than volatility or the direction of price movements." (Id. at 1, 3.)

---

[1]    The Offering Documents are attached as Exhibit B to the Affidavit of Neil A. Steiner, filed in support of Defendants' Motion to Dismiss. (Dkt. #20.)

Defendant Peterffy is the founder, Chief Executive Officer, Chairman of the Board and President of IB. (Am. Compl. ¶ 8.)

## 2. The Initial Public Offering

The Company's initial public offering (the "IPO") was conducted by Dutch auction. (Am. Compl. ¶ 17.) WR Hambrecht & Co., LLC, HSBC Securities (USA) Inc., Fox-Pitt, Kelton Incorporated, Sandler O'Neill + Partners, L.P. and E*Trade Securities, LLC acted as underwriters. (Id.) In contrast to traditional IPOs, "the offering price and allocation of shares was to be determined primarily by an auction process conducted by the lead banks and other securities dealers who participated in the [IPO]," and the underwriters "were not required to sell any specific number or dollar amount of shares of common stock but rather agreed to use their best efforts to obtain potential purchasers for the shares." (Id.)

As part of its IPO, IB filed a Form S-1/A Registration Statement with the Securities and Exchange Commission (the "SEC") on May 3, 2007. (Id. ¶ 15.) On May 4, IB filed with the SEC a Prospectus as part of the Registration Statement. It thereafter sold 40 million shares of its common stock to the public. (Id. ¶ 16.) At a price of $30.01 per share, the offering raised $1.2 billion. (Id.) The IPO "closed" on May 9, 2007. (Id.)

According to her certification, named plaintiff Seow Lin paid $30.01 per share for 8,500 shares of IB common stock in the IPO. (Am. Compl., Certification at Attachment A.) On August 24, 2007, plaintiff Lin sold 1,000 shares for $24.70 per share and 3,000 shares for $25.20 per share, giving her a loss of $19,740. (See id.)

Plaintiff claims that the Registration Statement and Prospectus (collectively, the "Offering Documents") are deficient in two ways. First, Plaintiff alleges that these documents omitted pertinent information regarding significant financial losses incurred in the first and

3

second quarters – the quarter immediately preceding the IPO and the one in which the IPO

occurred. Second, Plaintiff claims that language in the Offering Documents describing the

Company's proprietary pricing model, which is supposed to "continuously evaluate[] and

monitor[] the risks inherent in [its] portfolio" at every second, was false and misleading because

it inaccurately portrayed the capabilities of the software as demonstrated by its failure to prevent

the aforementioned losses.  (Am. Compl. ¶¶ 20-22 (quoting Offering Documents at 3-4).)

### 3.  The First Quarter "Loss"

In the Offering Documents, the Company indicated that its results for the first quarter of

2007 were not yet final, but estimated that earnings per share would be between $0.29 and $0.31.

(Offering Documents at 11.)  This range was lower than earnings per share in the same calendar

quarter of 2006, which were $0.34.  Management provided the following explanation for the

expected decrease in earnings in the first quarter of 2007:

> Unexpectedly heavy options activity in advance of certain corporate
> announcements adversely impacted our market making operations
> during the [first quarter].  While we are unable to detail the exact
> frequency of these announcements in a given period and their exact
> financial impact on our results of operations, in the quarter ended
> March 31, 2007, there were a greater number of surprise or
> unexpected announcements preceded by heavy options activity than
> in prior quarters. Heavy options activity typically occurs in advance
> of certain surprise or unexpected corporate announcements, especially
> where there is a leakage of information and when regularly scheduled
> annual or quarterly corporate announcements materially deviate from
> expectations. This impacts us as, when we trade with others who
> have different information than we do, we may accumulate
> unfavorable positions preceding large price movements in companies.
> To the extent the frequency or magnitude of these events increase, we
> would expect our losses from such events to increase
> correspondingly.

(Offering Documents at 11-12.)

4

On May 29, 2007, three weeks after the IPO had "closed," the Company reported its 2007 first quarter financial results in a press release. (Am. Compl. ¶ 23.) Its earnings per share were $0.31 – at the top end of the range predicted in the Offering Documents. There was no "loss;" earnings were, however, lower than management had anticipated.

The Company disclosed that its market making segment income had decreased by 20.6% due to "lower trading gains . . . driven in part by heavy options activity in advance of certain corporate announcements . . . ." This is exactly what the Offering Documents said in the segment quoted above. Since there was no "loss" in the First Quarter, I will refer to this decrease in income as the "First Quarter Decline."

After the May 29 announcement, IB's stock price fell by six percent. (Am. Compl. ¶ 23.)

#### 4. The Second Quarter Loss

In a Form 8-K filed after trading hours on July 5, 2007, the Company reported that it had incurred a $37 million loss relating to options trading in May 2007 (the "Second Quarter Loss"). (Id. ¶ 24.) This loss resulted from options trading on the German electronic stock market (the "Altana Options"). On July 6, 2007, immediately after the Company's 8-K and announcement, the closing price of IB's stock dropped to $24.97 from its July 5, 2007 value of $27.11. (Id. ¶ 24.) July 5, 2007, is the last day of the class period. (Am. Compl. ¶ 1.)

The Company fully described the losses resulting from trading in the Altana Options in a Form 10-Q for the period ended June 30, 2007, which was filed with the SEC on August 13, 2007. The Company stated:

> The second quarter was marked by an unusual event. On May 3, 2007, Altana AG, a stock in which we are a Registered Market Maker, declared a special cash dividend of EUR 33.00, which amounted to about 74% of the company's value. On Deutsche Boerse AG's XETRA trading system, closing stock prices are determined by

5

> a day's end auction. At the closing auction, approximately 31 million
> Altana shares, which amounted to 44% of the true float, traded at an
> artificial price that was approximately 25% below the regular trading
> session's final price ex-dividend. We believe that this artificial price
> was set by buyers and sellers who unlawfully colluded to manipulate
> Altana's options prices.
>
> The closing auction price of the Altana shares was used by the
> EUREX to calculate a new set of contract parameters for the
> outstanding options. Since Altana's closing stock price was artificial,
> its dependent option strike prices and contract multiplier were also
> artificial and not calculated to reflect values corresponding to the
> change in the value of the underlying stock. Accordingly, on May 4,
> 2007 and thereafter, our market making options positions were
> affected by the artificial closing price of May 3 and were mis-priced.
> As a result of this manipulation, we suffered a position loss over the
> ensuing trading days amounting to approximately $37 million. Other
> Altana market makers also suffered substantial losses as a result of
> this manipulation, and we have reported this manipulation to, and met
> with, the German Federal Financial Supervisory Authority, the BaFin,
> which has undertaken an official investigation of the matter.

(See Amended Complaint, ¶¶ 24, 29; see also Form 10-Q for the Second Quarter 2007, filed on

August 13, 2007, at 31.)

The Offering Documents were not amended during the IPO to include information about

the Altana situation. (Id. ¶ 30.)

An entity affiliated with Mr. Peterffy voluntarily paid the Company $37 million in

exchange for the right to any recovery up to that amount from the perpetrators of the alleged

fraud related to the Altana Options. (See id. ¶ 26; Dkt. #21, Defs.' Mem. at 6.)

### 5. IB's Technology

According to the Offering Documents, the Company regards itself "primarily as a

technology company." (Offering Documents at 3.) IB performs both as a broker and market

maker in financial instruments, using its unique technology to facilitate these services:

"integrating our system with electronic exchanges and market centers results in transparency,

liquidity and efficiencies of scale." (Id. at 2.) Listed first under the "Competitive Strengths" in

the Prospectus, IB SmartRouting^SM is the "key to [its] success." (Id. at 2-3.) This technology is

comprised of "proprietary mathematical models that assimilate market data and reevaluate our

outstanding quotes each second." (Id. at 1.) Automatic, constant reevaluation is meant to

"maximize profits while minimizing losses typically associated with manual risk management."

(Id. at 4.)

      Nonetheless, the Company did not represent that its technology rendered options trading

free of risk:

> We may incur losses in our market making activities in the event of
> failures of our proprietary pricing model. The success of our market
> making business is substantially dependent on the accuracy of our
> Proprietary pricing mathematical model, which continuously
> evaluates and monitors the risks inherent in our portfolio, assimilates
> market data and reevaluates our outstanding quotes in seconds. Our
> model is designed to automatically rebalance our positions throughout
> the trading day to manage risk exposures on our positions in options,
> futures and the underlying securities. In the event of a flaw in our
> pricing model and/or a failure in the related software, our pricing
> model may lead to unexpected and/or unprofitable trades, which may
> result in material trading losses.

(Offering Documents at 24).

      And in the Introduction to the Prospectus, the Company announced:

> This offering involves substantial risk. You should purchase shares only
> if you can afford a complete loss of your investment.

(Form S-1/A, filed May 3, 2007.)

## B.    Procedural History

      Former lead plaintiff Zeeshan Nayab ("Nayab") filed the Complaint on January 11, 2008,

against IB, alleging that the putative class of plaintiffs who purchased securities from IB's IPO

7

suffered damages due to misstatements and omissions in the Registration Statement and Prospectus. (Compl. ¶ 17, Dkt. #1.)

On March 10, 2008, Defendant IB filed a Motion for an Undertaking pursuant to 15 U.S.C. § 77k(e). (Dkt. #7.) In support of its motion, IB claimed, inter alia, that lead plaintiff Nayab's claim was meritless because he sold his securities in IB before the alleged losses occurred. (Dkt. #9, Def.'s Mem. at 2.) The parties had already discussed this in correspondence. (Dkt. #8, Affidavit of Neil Steiner ("Steiner Aff."), Exs. 2 and 3 (1/17/08 Letter from Andrew J. Levander, Esq. to Jeffrey S. Abraham, Esq., and 1/29/08 Letter from Jack G. Fruchter, Esq., to Andrew J. Levander, Esq.).)

On March 11, 2008, before the Court ruled on Defendant's Motion for an Undertaking, the Motion to Appoint Seow Lin as Lead Plaintiff and to Appoint Abraham Fruchter & Twersky LLP as Lead Counsel was filed. (Dkt. #10.) The memorandum in support of this motion describes the putative class as "all persons who purchased or otherwise acquired shares of Interactive Brokers Group, Inc. ("IBG" or the "Company") Class A common stock . . . traceable to its initial public offering ("IPO") which occurred on May 4, 2007." (Dkt. #11, Pl.'s Mem. at 1.) There being no competition for the honor of being Lead Plaintiff or Lead Counsel, I granted both motions on March 14, 2008. (Dkt. #14 and Minute Entry entered March 14, 2008.)

On March 24, 2008, Plaintiff filed an Amended Complaint adding Peterffy as a defendant, alleging control person liability under Section 15 of the Securities Act. (Am. Compl. ¶¶ 8, 58-59.) The Amended Complaint describes the putative class as "all persons other than defendants and certain others, who purchased the common stock ("Common Stock") of Interactive Brokers pursuant to and/or traceable to the Company's initial public offering . . . on or about May 4, 2007 through July 5, 2007 . . . ." (Am. Compl. ¶ 1.)

The Court denied the Motion for an Undertaking on April 3, 2008. (Dkt. #18.)  On April 25, 2008, Defendants filed the Motion to Dismiss. (Dkt. #19.)

### C.    The Parties' Arguments

In the Amended Complaint, Plaintiff alleges that Defendants violated Sections 11 and 12(a)(2) of the Securities Act of 1933 by issuing "materially false and misleading" Offering Documents— specifically, by failing to disclose the First Quarter Decline (as I insist on calling it) and the Second Quarter Loss, and by making misrepresentations about the Company's internal mechanisms and strategies to prevent losses. (Am. Compl. ¶¶ 22, 30.)

## III.    Discussion

### A.    Standard

#### 1.    Motion to Dismiss for Failure to State a Claim

The appropriate standard to apply on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) was recently rearticulated by the Supreme Court. In Bell Atlantic v. Twombly, the Court abandoned the well-settled formulation that a "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," Conley v. Gibson, 355 U.S. 41, 45-46 (1957), in favor of the following: "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 127 S. Ct. 1955, 1964-65 (2007). The Court further stated: "We do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." Id. at 1974.

9

Interpreting this standard, the United States Court of Appeals for the Second Circuit has concluded that the Supreme Court "is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original).

This being a securities fraud claim, however, a heightened standard of pleading pertains. Because this claim arises under the 1933 Act, the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") are not applicable. However, the Second Circuit has held that plaintiffs pleading Sections 11 and 12 claims under the 1933 Act still must plead with the particularity required by Federal Rule of Civil Procedure 9(b) in order to withstand a motion to dismiss. Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004). Rule 9(b) requires that the "circumstances constituting fraud . . . be stated with particularity," as opposed to the "short and plain statement" required by Federal Rule of Civil Procedure 8(a). According to the Second Circuit Court of Appeals, the heightened pleading standard for fraud serves three functions: it gives a defendant better notice of plaintiff's claims, provides better protection for a defendant's reputation, and minimizes the number of strike suits. Rombach, 355 F.3d at 171 (citing O'Brien v. Nat'l Prop. Analysis Partners, 936 F.2d 674, 676 (2d Cir. 1991)).

To determine whether Plaintiff's claims in the instant matter sound in fraud and thus whether the heightened pleading standard of Rule 9(b) applies, the Court must consider whether the claims are rooted in allegations of fraudulent behavior. Id. at 171. Although "[f]raud is not an element or a requisite" of Section 11 and Section 12 claims, it often forms the basis of such claims. Id. at 170. If it forms the basis for the claims in this case, the heightened pleading

10

standard of Rule 9(b) applies. Id. When subject to the heightened pleading standard of Rule

9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2)

identify the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent." Id. (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175

(2d. Cir. 1993)).

The complaint in this case meets the Rule 9(b) standard. However, it does not meet

much of anything else. It pleads with particularity, but with the exception of one claim, what it

pleads is not securities fraud.

### 2.    Section 11 and Section 12(a)(2) of the 1933 Act

The 1933 Act is intended to enable investors to make informed and prudent investment

decisions by mandating disclosure of relevant and accurate information regarding new public

offerings. Section 11 of the 1933 Act provides civil liability for false and misleading statements

or omissions in registration documents. It reads, in relevant part:

> In case any part of the registration statement, when such part became
> effective, contained an untrue statement of a material fact or omitted to
> state a material fact required to be stated therein or necessary to make the
> statements therein not misleading, any person acquiring such security
> (unless it is proved that at the time of such acquisition he knew of such
> untruth or omission) may, either at law or in equity, in any court of
> competent jurisdiction, sue (1) every person who signed the registration
> statement . . . .

15 U.S.C. § 77k(a). There are two elements of a Section 11 claim. First, a plaintiff must show

that the defendant "has an affirmative duty to disclose the information but fail[ed] to do."

Panther Partners, Inc. v. Ikanos Commc'ns, Inc., 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008)

(citing Milman v. Box Hill Sys. Corp., 72 F. Supp. 2d 220, 227 (S.D.N.Y. 1999)). Second, the

misstatement or omission must be material, id., and it must have been material as of the date the

11

offering documents became effective. In re Ziff-Davis Inc. Sec. Litig., 2000 U.S. Dist. LEXIS

9076 at *4 (S.D.N.Y. June 30, 2000) (citing Nelson v. Paramount Commc'ns, Inc., 872 F. Supp.

1242, 1246 (S.D.N.Y. 2004)).  Unlike Section 10(b) of the 1934 Act, scienter and reliance need

not be shown.  Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc., 114 F. Supp. 2d 316, 322-23

(D.N.J. 2000).

    Section 12(a)(2) provides civil liability for misleading prospectuses or oral

communication and reads:

> Any person who offers or sells a security . . . , by the use of any means or
> instruments of transportation or communication in interstate commerce or
> of the mails, by means of a prospectus or oral communication, which
> includes an untrue statement of a material fact or omits to state a material
> fact necessary in order to make the statements, in the light of the
> circumstances under which they were made, not misleading (the
> purchaser not knowing of such untruth or omission), and who shall not
> sustain the burden of proof that he did not know, and in the exercise of
> reasonable care could not have known, of such untruth or omission, shall
> be liable.

15 U.S.C. § 77l(a)(2).  Pursuant to 12(a)(2), plaintiffs must show that:  (1) the defendants were

the sellers; (2) the mail or some other means of transportation or communication in interstate

commerce was used in connection with the offer or sale to the plaintiffs; (3) the defendants failed

to comply with the requirements of the registration document or the prospectus; (4) the action

was not barred by the statute of limitations; and (5) if the plaintiff is seeking rescission, adequate

tender was made.  Id.

    Claims under Sections 11 and 12 are usually evaluated in tandem, because if a plaintiff

fails to plead a cognizable Section 11 claim, he or she will be unable to plead one under Section

12(a)(2).  See, e.g., Panther Partners, 538 F. Supp. 2d 662; In re CIT Group, Inc. Sec. Litig., 349

F. Supp. 2d 685 (S.D.N.Y. 2004); Steinberg v. PRT Group, Inc., 88 F. Supp. 2d 294 (S.D.N.Y.

2000).  Plaintiffs pleading Sections 11 and 12 claims must state facts showing the "allegedly

omitted facts both existed and were known or knowable, at the time of the offering." Castlerock,

114 F. Supp. 2d at 323 (citing first dismissal of same case, Castlerock Mgmt. Ltd. v. Ultralife

Batteries, Inc., 68 F. Supp. 2d 480, 487-88 (D.N.J. 1999)). In evaluating claims under Sections

11 and 12(a)(2), the court must review the Offering Documents as a whole rather than

determining whether individual statements are true. See, e.g., Olkey v. Hyperion 1999 Term

Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996). Additionally, if the complaint directly contradicts the

Offering Documents, the court need not accept the allegations as true. Steinberg, 88 F. Supp. 2d

at 300.

### 3.    SEC Regulations

The duty of disclosure in offering documents stems from regulations set forth by the SEC

pursuant to its authority under the 1933 Act. Some of these regulations are found in Title 17,

Part 229 of the Code of Federal Regulations, and are known as "Regulation S-K." Two items of

Regulation S-K apply generally to the instant matter, although more specific regulations also

apply.

Within Regulation S-K, Item 303 provides a list of mandatory disclosures for public

offerings. 17 C.F.R. § 229.303. Subsection (a)(3)(i) of Item 303 requires disclosure of "any

unusual or infrequent events or transactions or any significant economic changes that materially

affected the amount of reported income from continuing operations," as well as disclosure

regarding the "extent to which income was so affected." 17 C.F.R. § 229.303(a)(3)(i).

Additionally, subsection (b)(2) of Item 303 provides that, "If the registrant is required to or has

elected to provide an income statement for the most recent fiscal quarter, such discussion shall

also cover material changes with respect to that fiscal quarter and the corresponding fiscal quarter

in the preceding year." 17 C.F.R. § 229.303(b)(2).

13

Item 503(c) of Regulation S-K regards mandatory risk disclosures for public offerings. It requires, inter alia, that offering documents include a section on the "most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c).

In addition, Item 408 of Regulation C creates a duty for registrants to supply non-misleading registration statements. It states: "In addition to the information expressly required to be included in a registration statement, there shall be added such further information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 230.408.

### 4. The Bespeaks Caution Doctrine

It is no surprise that companies want to present their corporate prospects, especially during IPOs, in as positive a light as possible. As long as optimism is not excessive, and sufficient disclosure of associated risks is included, companies have a relevant defense available to them for claims under Sections 11 and 12.

The common law "bespeaks caution" doctrine allows a court to conclude that forward-looking statements by a company, if properly qualified with cautionary language, are not fraudulent as a matter of law. Steinberg, 88 F. Supp. 2d at 300-01. The court must consider the company's alleged omissions or misrepresentations in the context of the entire document "to determine whether a reasonable investor would have been misled." Halperin v. Ebanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002). Specifically, the court must decide "not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." Id. Thus, sufficient warnings can "render[] the alleged omissions or misrepresentations

14

immaterial as a matter of law." Castlerock Mgmt., 114 F. Supp. 2d at 326 (quoting In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 371 (3d Cir. 1993)). However, no amount of general cautionary language can protect a company from failure to disclose a specific, known risk or a risk that has already occurred. In re Prudential Sec. Inc. P'ship Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996).

## B. Analysis

Ordinarily, the Court would have to address three questions: (1) whether the Offering Documents were accurate and sufficiently candid; (2) whether any defenses apply; and (3) whether Defendant Peterffy is liable under a control person theory. Here, I need address only the first question.

### 1. Sections 11 and 12(a)(2) Claims

#### a. The First Quarter Decline

It is hard to know where to begin when discussing the alleged "losses" in the First Quarter. Indeed, it is hard to discuss this purported non-disclosure allegation with a straight face— and hard to believe that any lawyer could make such an allegation with a straight face.

IB suffered no "loss" in the First Quarter of 2007. Earnings per share were $0.31. Furthermore, there was no failure to disclose that earnings per share were going to be in the range of $0.31 per share. The Registration Statement estimated "pro forma and basic and diluted earnings per share both to be between $0.29 and $0.31 for the quarter ended March 31, 2007." (Offering Documents at 11.) The prediction was exactly on the money.

Earnings per share were lower than they had been in the corresponding calendar quarter of 2006, but that was not a secret. The Company disclosed its earnings for the corresponding

15

calendar quarter in 2006, and it also disclosed its summary historical consolidated statement of income data for the years 2006, 2005, 2004, 2003, and 2002. (Offering Documents at 16-17.)

Earnings per share were apparently below management's original expectations. However, the Offering Documents clearly set out the reason why— heavy options trading activity in advance of certain corporate announcements had a negative impact on profits. (Offering Documents at 11-12). None of the subsequent "corrective" disclosures reveals any other reason for the diminished earnings in the First Quarter, and Plaintiff suggests none in her Amended Complaint.

Plaintiff acknowledges that Defendants disclosed this lower-than-expected earnings in IB's Offering Documents, but argues that Defendants failed to disclose "material information concerning the extent of the impact . . . on the Company's earnings." (Am. Compl. ¶ 34.) That is utter nonsense; Defendants predicted the impact of this so-called "adverse event" on IB's earnings to the penny.

Because absolutely everything about the decline in First Quarter earnings as against management's original expectation was fully and accurately disclosed in the Offering Documents while the earnings projection was right on target, any and all claims relating to the so-called "losses" in the First Quarter must be dismissed.

### b.   Technology

Plaintiff contends that the Offering Documents are materially false and misleading because they failed to disclose a "systematic weakness" in the Company's proprietary technology— one that would have been apparent had the First Quarter Decline and the as-yet-unknowable Second Quarter Loss been disclosed.

16

IB claimed to be a risk averse investor and touted its proprietary software as enabling it to prevent or minimize losses:

> *Proprietary technology.* We view ourselves primarily as a technology company. Since our inception in 1977, we have focused on developing proprietary software to automate broker-dealer functions. We believe that our early and continuous investment in technology, as well as our overall technological capabilities, provide us with a significant advantage over our competition by enabling us to make markets profitably in financial instruments (e.g., equity options, futures, index options and equities) worldwide with low spreads between bid and offer prices, while at the same time providing our customers with the ability to effect trades at execution and commission costs that are among the lowest in the industry.

(Id. ¶ 19 (quoting Offering Documents at 3).) The Company explained that it played the role of "market maker" as a result of its technology:

> *Real-time Risk Management.* We operate as a market maker, not an investor. Therefore, our ability to generate profits is generally a function of transaction volume on electronic exchanges rather than volatility or the direction of price movements. We seek to calculate quotes a few seconds ahead of the market and execute small trades at a tiny but favorable differential as a result. Our proprietary pricing model continuously evaluates and monitors the risk inherent in our portfolio, assimilates market data and reevaluates the outstanding quotes in our entire portfolio each second. In our electronic brokerage business, our entire credit management process is automated, including real-time margin calls and automatic liquidation. This automated system enables us to maximize profits while minimizing losses typically associated with manual risk management.

(Am. Compl. ¶ 20 (quoting Offering Documents at 3-4).)

The Company further described its market making activity:

> *Market Making.* We conduct our market making business through our Timber Hill subsidiaries. As one of the largest market makers on many of the world's leading exchanges, we provide liquidity by offering competitively tight bid/offer spreads over a broad base of approximately 357,000 tradable, exchange-listed products. . . . As principal, we commit our own capital and derive revenues or incur losses from the difference between the price paid when securities are

> bought (or sold) and the price received when those securities are sold
> (or bought). Because we provide continuous bid and offer quotations
> and we are continuously both buying and selling quoted securities, we
> may have either a long or a short position in a particular product at a
> given point in time. . . . Our entire portfolio is evaluated each second
> and continuously rebalanced throughout the trading day, thus
> minimizing the risk of our portfolio at all times. This real-time
> rebalancing of our portfolio, together with our real-time proprietary
> risk management system, enables us to curtail risk and to be
> profitable in both up-market and down-market scenarios.

(Id. ¶ 21 (quoting Offering Documents at 58).)

The technology is supposed to "continuously evaluate[] and monitor[] risks in [IB's]

portfolio" to "maximize profits while minimizing losses typically associated with manual risk

management." (Am. Compl. ¶¶ 19-21 (quoting Offering Documents).)

As evidence of the failure of Defendants' proprietary software to do what it was supposed

to do, Plaintiff points to the First Quarter "Loss" and the Second Quarter Loss. (Am. Compl. ¶¶

21-22.)

Public offering registrants have a duty to ensure that their offering documents are not

misleading, and must adequately disclose the most significant risks of investing in the registrant.

17 U.S.C. § 230.408(a) ("In addition to the information expressly required to be included in a

registration statement, there shall be added such further material information, if any, as may be

necessary to make the required statements, in the light of the circumstances under which they are

made, not misleading."); 17 C.F.R. § 229.503(c) (requiring disclosure of "the most significant

factors that make the offering speculative or risky").

The materiality inquiry is "not whether the particular statements, taken separately, were

literally true, but whether defendants' representations, taken together and in context, would have

misled a reasonable investor about the nature of the [securities]." McMahan & Co. v.

Wherehouse Entm't, Inc., 900 F.2d 576, 579 (2d Cir. 1990). Generally, information is material if

it would affect an investor's decision to buy, sell, or hold the security. <u>In re Initial Pub. Offerings</u> <u>Sec. Litig.</u>, 358 F. Supp. 2d 189, 210 (S.D.N.Y. 2004). If the alleged omission or misstatement is explicitly addressed in the risk disclosures of the offering documents, it is immaterial. <u>Halperin</u> <u>v. eBanker USA.com, Inc.</u>, 295 F.3d 352, 360 (2d Cir. 2002) ("[C]autionary language addresses the relevant risk directly, and therefore neither offering memorandum was misleading.").

In <u>Halperin</u>, plaintiffs, who invested in defendant companies, alleged under Section 10(b) of the 1934 Act that the defendants misrepresented the likelihood that their then-unregistered securities would become registered at a later date. The Second Circuit held that, because the offering memoranda warned that registration was not guaranteed, and included only hortatory language regarding plans to register, a "reasonable investor was therefore put on notice that, at the very least, registration is not guaranteed." <u>Halperin</u>, 295 F.3d at 360.

The cautionary language and overall reading of the Offering Documents in the instant matter resemble those of <u>Halperin</u>. A reasonable investor would not have been misled regarding the risk of failure of IB's proprietary technology. Under "Risk Factors" of the Offering Documents, the Company acknowledged that its success was "substantially dependent on the accuracy of our proprietary pricing model" and that IB could incur losses "in the event of failure of our proprietary pricing model:"

> Our model is designed to automatically rebalance our positions throughout the trading day to manage risk exposures on our positions in options, futures, and the underlying securities. **In the event of a flaw in our pricing model and/or a failure in the related software, our pricing model may lead to unexpected and/or unprofitable trades, which may result in material trading losses.**

(Offering Documents at 24 (emphasis added).)

Additionally, Defendants acknowledged that their business strategy was a risky one:

> Our strategy as a market maker is to calculate quotes a few seconds
> ahead of the market and execute small trades at tiny but favorable
> differentials as a result. This is made possible by our proprietary
> pricing model, which continuously evaluates and monitors the risks
> inherent in our portfolio, assimilates market data and reevaluates the
> outstanding quotes in our entire portfolio each second. Certain
> aspects of the model rely on historical prices of securities. **If the
> behavior of price movements of individual securities diverges
> substantially from what their historical behavior would predict,
> we might incur trading losses.** We attempt to limit such risks by
> diversifying our portfolio across many different options, futures and
> underlying securities and avoiding concentration

(Offering Documents at 84 (emphasis added).) These statements candidly acknowledge

that the proprietary technology could fail if marketplace behavior diverged from prediction, and

that losses would result if it did. No reasonable investor could disregard these warnings, despite

the frequent and laudatory descriptions of the proprietary technology also included in the

Offering Documents. Indeed, the admitted disclosure in the Offering Documents of the

unanticipated market behavior, and the prediction of lower-than-anticipated earnings as a result,

should have alerted a reasonable investor that the model was not perfect. No reasonable investor

could have assumed – in view of all of the disclosures made, including the characterization of the

investment as "risky" – that Defendants were offering investors an insurance policy against

future market losses. Only an unreasonable investor would have assumed that purchasing IB's

stock was risk-free.

### c.  The Second Quarter Loss

The Amended Complaint states that on or about May 3, 2007, IB filed with the SEC its

Registration Statement for the IPO, and that it filed its Prospectus on or about May 4. (Am.

Compl. ¶¶ 15, 16.) Plaintiff alleges that the loss related to the Altana Options "beg[an] on or

about May 3, 2007," which would seem to suggest that a loss occurred prior to the filing of the

Prospectus, even though the Offering Documents on which the Amended Complaint relies make clear that:

> *on May 4, 2007 and thereafter*, our market making options positions were affected by the artificial closing price of May 3 and were mis-priced. As a result of this manipulation, we suffered a position loss over the ensuing trading days amounting to approximately $37 million.

(Id. ¶ 24; ¶ 29 (quoting IB's Form 10-Q for the quarter ended June 30, 2007, filed August 13, 2007, at 31 (emphasis added)).)

To eliminate a red herring: the issue is not whether the Defendants were required to disclose that they would end up losing money during the Second Quarter, because there was no way that Defendants could have known, in early May, that they would end up losing money for the quarter that would not end until seven weeks later, on June 30. To be actionable under Section 11, the registration statement must contain an untruth or material omission "when such part became effective." 15 U.S.C. § 77k(a). Section 12(a)(2) is similar: it requires that the untruth or omission be known or reasonably knowable. 15 U.S.C. § 77*l*(a)(2). A cognizable claim under Section 11 or 12 of the 1933 Act requires plaintiffs to, "at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering." Castlerock, 114 F. Supp. 2d at 323; see also Panther Partners, 538 F. Supp. 2d at 673 (holding that "'backwards' pleading— an attempt to allege liability for disclosures not made because the material fact was unknowable or had not even occurred as of the critical date" fails as a 1933 Act claim); In re CIT Group, Inc. Sec. Litig., 349 F. Supp. 2d at 691.

To the extent that the Amended Complaint purports to allege that IB should have disclosed, in documents filed with the SEC on May 3 and 4, 2007, that the Company was going to report a loss for the Second Quarter as a result of Altana Options trading losses that occurred

over several days beginning on May 3 and 4, it is a classic example of "pleading with 20/20 hindsight." Panther Partners, 538 F. Supp. 2d at 669. Trading companies have good days and bad days; they make money on some trades and lose money on other trades. Not only is it not "plausible" to suggest that Defendants could have known that they would lose money during the Second Quarter before that quarter was half over; it is absurd. "The securities laws do not require clairvoyance in the preparation of offering documents." Id. at 664 (citing cases).

Since the Altana trading losses began just as the IPO was commencing, the real question on this motion is whether Defendants had a duty, under applicable SEC regulations, to amend their Offering Documents to disclose the specific trading losses that occurred during the period when the IPO was effective. In other words, the issue is whether there was a duty to disclose the Altana losses as extraordinary events in and of themselves.

Courts have held that the disclosure of interim financial information is required where, at the time the Prospectus became effective, the interim results represented "'an extreme departure from the range of results which could be anticipated based on currently available information....'" See In re N2K, Inc. Sec. Litig., 82 F. Supp. 2d 204, 208 (S.D.N.Y. 2000) (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1210 (1st Cir. 1996), *superseded by statute on other grounds*); see also In re Turkcell Iletisim Hizmetler A.S. Sec. Litig., 202 F. Supp. 2d 8, 12 (S.D.N.Y. 2001) (quoting the same statement from Shaw).

The Shaw Court held that an issuer in possession of nonpublic information was required, in connection with a public offering, to disclose known adverse facts about a quarter that had not yet ended, if those facts represented an "extreme departure" from the range of results that could be anticipated. 82 F.3d at 1210. However, in N2K, the court found that the plaintiffs' allegations did not meet Shaw's "extreme departure" standard because, based on available

22

information at the time of the offering, N2K's actual losses for the interim period were not beyond the range of plausible results. N2K, 82 F. Supp. 2d at 208-09.

This Court has previously stated that if the adverse information is not known or knowable until after purchasers have made an irrevocable commitment to take shares, then there can be no duty to disclose the adverse information, so there is no need to determine whether the event in question qualifies as an "extreme departure" such that disclosure is warranted. See In re Alliance Pharm. Corp. Sec. Litig., 279 F. Supp. 2d 171, 185 (S.D.N.Y. 2003). In Alliance, plaintiffs purchased Alliance stock in a stock-swap, pursuant to a merger agreement. The shareholders voted to approve the merger on December 29, 2000, but the completed merger was not announced until January 3, 2001. The effective date of the merger was critical because developments in Alliance's clinical trials were happening at the same time as the merger process, and there was an issue as to materiality. Id. at 187-88.

This Court concluded that, for purposes of liability under Section 12(a)(2), the crucial date was the date "plaintiffs became committed to the sale—and thus 'purchased' the Alliance stock." Id. at 185. However, it was not clear from the record in Alliance when that happened. So I denied defendant's motion for summary judgment. Id. at 188.

Defendants, citing Alliance, argue that they had no duty to update the Prospectus during the pendency of the IPO because the purchasers' irrevocable commitments were made in the Dutch auction on May 4, 2007— the same day the Prospectus was filed. Defendants further argue that it was not possible for them to know that anything untoward had occurred on May 3 – the day the Registration Statement was filed – although, according to the July disclosures, that was the day someone manipulated the market for Altana Options. Plaintiff acknowledges that the Company conducted its IPO on May 4. (Dkt. #25, Pl.'s Opp. Mem. at 19.) But Plaintiff

pleads that the losses "began" (whatever that means) on May 3 and continued until May 9 (which, according to Defendants, was the day the May 4 sales were settled).

Defendants' argument is appealing. However, this is NOT a motion for summary judgment; it is a motion to dismiss. The extraneous information about when irrevocable commitments were made is not within the four corners of the Amended Complaint or any of the documents referred to therein. I thus cannot grant the motion in its current posture.

What I can do is direct that extremely limited discovery be taken on two discrete issues: (1) What did Defendants know about the Altana situation on May 4, 2007, when the Prospectus was filed; and (2) On what day or days were irrevocable commitments made to purchase the IPO shares? Answering those questions will require, at most, two depositions and five interrogatories. If it turns out that details about the Altana situation were unknown on the date the irrevocable commitments were made, then the case will be over, and it will not be necessary to explore whether whatever was known to Defendants about the Altana losses constituted an "extreme departure from the range of results which could be anticipated based on currently available information . . . ." Shaw, *supra*, 82 F.3d at 1210.

The parties are directed to appear at a conference at the Moynihan Courthouse, Courtroom 21-B, on Friday, September 5, at 10:00 A.M. At that time, we will identify the witnesses who will be deposed and Plaintiff will present the Court and Defendants with no more than five interrogatories (no subparts). Discovery is limited to the issues relating to Altana; the other aspects of Plaintiff's complaint have already been dismissed, with prejudice. This discovery will be concluded by October 17, and if the record so warrants, Defendants will have two weeks (until October 31) to supplement the record so that the Court can convert what

24

remains of the motion to dismiss to a motion for summary judgment.  Plaintiff will have until November 14 to respond.  No reply will be necessary.

### 2.  Control Person Liability

Control person liability under the 1933 Act turns on whether there is an underlying violation of Section 11 or Section 12 by the issuer (the Company).  See, e.g., CIT Group, 349 F. Supp. 2d at 691-92.  Because Plaintiff still has the opportunity to prevail on her underlying Section 12(a)(2) claim as to the Altana Options losses, I deny Peterffy's motion to dismiss based on this underlying claim, without prejudice to its renewal if summary judgment is granted as to the Altana aspects of the complaint.

This constitutes the decision and order of the Court.

Dated:   August 22, 2008

_____
                                                U.S.D.J.

BY ECF TO ALL COUNSEL